UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA          4:23-CR-00042-1

VS.                               HOUSTON, TEXAS

CEDRIC TYRONE WALKER             FEBRUARY 24, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF SENTENCING PROCEEDINGS
HEARD BEFORE THE HONORABLE GEORGE C. HANKS
UNITED STATES DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

FOR THE GOVERNMENT:            MS. CARRIE WIRSING
                               U.S. Attorney's Office
                               1000 Louisiana Street
                               Suite 2300
                               Houston, Texas 77002

FOR THE DEFENDANT:             MR. DARRYL EMMANUEL AUSTIN
                               MS. NATALIE JIHAD AWAD
                               Office of the
                               Federal Public Defender
                               440 Louisiana
                               Suite 1350
                               Houston, Texas 77002

Official Court Reporter:       Lanie M. Smith, CSR, RMR, CRR
                               Official Court Reporter
                               United States District Court
                               Southern District of Texas
                               515 Rusk
                               Room 8004
                               Houston, Texas 77002

        Proceedings recorded by mechanical stenography,
transcript produced via computer.

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Please be seated, everyone.

Good morning, everyone.  The first case on the Court's docket this morning is Cause Number 4:23-cr-42-1, the United States of America versus Cedric Tyrone Walker.

Can counsel just introduce themselves to the Court and state the parties they represent starting with the government.

MS. WIRSING:  Good morning, Your Honor.  Carrie Wirsing representing the United States.

And I hope it's okay if I remain standing at counsel table for the sentencing --

THE COURT:  Not a problem.

MS. WIRSING:  -- for the safety of myself and the others at counsel table.

THE COURT:  Not a problem.

And counsel for defendant?

MR. AUSTIN:  Good morning, Your Honor.  Darryl Austin on behalf of Mr. Walker.

THE COURT:  Okay.  Mr. Walker, welcome, sir.

THE DEFENDANT:  How you are doing today, Your Honor?

THE COURT:  Great.

Mr. Walker, we're here this morning for purposes of your sentencing.

1      And I need to go over with all counsel all the

2  materials I've reviewed in preparation for the sentencing.

3      I didn't get objections until Friday late -- late

4  Friday, so I wasn't able to get to those until this morning so

10:47AM 5  that's why we're starting a little bit late.

6      In the future, we need to get objections timely

7  because I don't have any input from probation with respect to

8  the objections.

9      So we're going to go through the objections one

10:47AM 10  at a time.  I've reviewed them; I've thought about them, but

11  we're going to have to go through those this morning.

12      So in preparation for the sentencing today, I've

13  reviewed a number of documents; and I want to go through those

14  with counsel.

10:48AM 15      I reviewed the presentence investigation report,

16  the addendum to the presentence investigation report; the

17  second addendum to the presentence investigation report; the

18  third addendum to the presentence investigation report; the

19  defendant's objection to the presentence report, as I said

10:48AM 20  which were filed on Friday -- I received Friday late; the

21  defendant's submission to the Court, which I also received

22  Friday late.

23      Mr. Walker, your letter to the Court, Objection

24  to the Recommended Sentence and PSR, which was dated

10:48AM 25  December 19th that you filed with the Court.

1          I received the government's sentencing

2     submission, the defendant's objections to the PSR that were

3     filed on January the 6th, 2025.

4          Mr. Walker, your letter that you filed on

10:49AM  5     November 25th; a motion for exculpatory evidence that I

6     received; the verdict form in this case; the indictment and

7     that's it.

8          Are there any other documents that were more

9     recently filed that the parties believe the Court should have

10:49AM 10     reviewed that I just didn't mention this morning?

11          Ms. Wirsing?

12          MS. WIRSING:  None that the government is aware of,

13     Your Honor.

14          THE COURT:  Mr. Austin?

10:50AM 15          MR. AUSTIN:  No, Your Honor.

16          THE COURT:  Ms. Wirsing, do you have any witnesses or

17     victims present in the courtroom today?

18          MS. WIRSING:  Yes, Your Honor.

19          THE COURT:  And are you expecting an evidentiary

10:50AM 20     hearing or to hear evidence from those witnesses?

21          MS. WIRSING:  That depends on Your Honor's ruling on

22     the objections.  Your Honor was present for the testimony

23     elicited at trial and we stand by our position that the deputy

24     who was assaulted in this case did sustain his injury as a

10:50AM 25     result of the punch by Mr. Walker.

1    THE COURT:  Okay.

2    MS. WIRSING:  And he did testify to that effect at

3    trial; however, he is here today and prepared to clarify

4    anything that -- any questions that the Court might have

10:50AM 5    outstanding.

6    THE COURT:  Okay.

7    MS. WIRSING:  And he's also prepared to make a

8    statement, a victim impact statement here today.

9    THE COURT:  Okay.  Mr. Austin, have you and Mr. Walker

10:51AM 10   read and discussed the presentence investigation report in this

11   case?

12   MR. AUSTIN:  Yes.

13   THE COURT:  Okay.  And have you discussed the

14   objections you made on his behalf?

10:51AM 15   MR. AUSTIN:  Yes.

16   THE COURT:  Okay.  And are you expecting an evidentiary

17   hearing in this case?

18   MR. AUSTIN:  Potentially, Your Honor, considering the

19   government's position that the injury is a result of the punch.

10:51AM 20   THE COURT:  Okay.

21   MR. AUSTIN:  I don't know if I need to add, but I

22   certainly expect there to be some argument with regards to what

23   is the proper guideline that applies to this case.

24   THE COURT:  Okay.

10:51AM 25   MR. AUSTIN:  And I did provide some affidavits to

1    support the position that the wrong guideline has been applied.

2            THE COURT:  All right.  I did see the affidavits.

3    That's the other thing.  Did I mention those?  Because those

4    were also filed on Friday.  I did see the affidavits that were

10:51AM 5    attached.

6            MR. AUSTIN:  Yes.  They were included, I believe, with

7    the objection.

8            THE COURT:  And I've reviewed those as well.

9            MS. WIRSING:  And, Your Honor, I would ask the Court to

10:52AM 10   disregard anything in those affidavits as they are basically

11   invading the providence of the jurors and that is wholly

12   inappropriate.  It's offensive.

13           THE COURT:  Okay.  Mr. Austin?

14           MR. AUSTIN:  For sentencing, however, this is a

10:52AM 15   different scenario.

16               The government, for one, was there and was a

17   witness to some of the statements by some of the jurors.  And

18   because the PSR does not reflect that information, the

19   defense -- in particular, Mr. Walker -- is entitled to present

10:52AM 20   other facts for the Court to consider in opposition to what has

21   been presented in the PSR.

22               So her assertion is unfortunately incorrect.

23   Procedurally it is proper and it is for the Court to review.

24               And frankly, I do have one of the witnesses here

10:53AM 25   who could also testify.  I was a witness myself.  I can tell

1    you what I was told as well.

2    THE COURT:  Okay.

3    MS. WIRSING:  Your Honor, I also --

4    MR. AUSTIN:  I'm still speaking.

10:53AM 5    THE COURT:  Okay.

6    MR. AUSTIN:  The affidavits are streamlined and some of

7    the information maybe Ms. Wirsing was not present for.  That

8    doesn't negate the fact that it happened.

9    THE COURT:  Ms. Wirsing.

10:53AM 10    MS. WIRSING:  Your Honor, several of the members of the

11    government's prosecution team are also present today who

12    were -- who were present for the conversations with the jurors

13    posttrial as well.  Our recollection of those discussions is

14    vastly different than that which is represented by the defense

10:53AM 15    in this case.

16         In any event, it's totally inappropriate to

17    submits for the Court's consideration anything that the jurors

18    said posttrial without having them present to be questioned,

19    which is not a territory we even want to get into or a road

10:54AM 20    that we ever want to go down.

21         The jurors' deliberations are supposed to be a

22    black box that the attorneys and the Court are not to inject

23    themselves into.  This is incredibly inappropriate.  I don't

24    know on what foundation Attorney Austin is suggesting that any

10:54AM 25    such representations at this point are appropriate.  There's no

1    case law that he's cited to.  There's no rules that he's cited

2    to as making this appropriate here today.

3              I would ask the Court to disregard any

4    representations made about what jurors said posttrial.  The

10:54AM  5    bottom line is they found the defendant guilty of the offense

6    for which he was charged.

7              THE COURT:  Okay.

8              MR. AUSTIN:  The point was first brought up in our

9    motion for an acquittal or in the alternative for a new trial

10:55AM  10    under Federal Rules of Criminal Procedure 29(c) and 33(a).

11              We first brought to the Court's attention what

12    was indicated to not only myself but also the government.  And

13    so that point about asking the jurors what happened or any kind

14    of question for them, the government did not want that to

10:55AM  15    happen and ultimately Your Honor denied the motion for a new

16    trial -- or excuse me -- denied the motion for a judgment of

17    acquittal or in the alternative a new trial.

18              That doesn't mean what was told to us and the

19    government didn't happen.  And because we have that

10:55AM  20    information, that information contradicts directly the idea

21    that Mr. Walker forcibly caused the injury to Deputy Chavez and

22    that is appropriate for sentencing.

23              THE COURT:  Right.  I get that, but didn't the juror

24    find that he did, in fact, do that?

10:56AM  25              MR. AUSTIN:  No, they didn't.  We don't know.  That's

1    the problem.

2         THE COURT:  But -- well, the jury charge -- show

3    me -- okay.  Let's start again.

4         Do you have the jury charge in front of you?

10:56AM  5    MR. AUSTIN:  Yes.

6         THE COURT:  Okay.  One second.

7         MS. WIRSING:  I do not, Your Honor.  I did not

8    anticipate relitigating the jury charge here today.

9         THE COURT:  I guess that's the point.  I mean, I

10:56AM 10   understood that the jury found the defendant guilty and

11   implicit in that finding is that he physically caused harm to

12   the deputy.  What harm that was or how they came about that, it

13   doesn't matter, they found it.  And their deliberations as to

14   how they got to that, why should that make a difference in my

10:56AM 15   sentencing?

16        MR. AUSTIN:  Oh, perfect question, Your Honor, because

17   the statute bifurcates the penalty enhancements.  So 111(a),

18   the cap, so to speak, is 12 months.

19        THE COURT:  Okay.

10:57AM 20        MR. AUSTIN:  111(b)(1), if the punch caused the injury,

21   meaning the laceration was from the punch, the enhancement goes

22   up to 20 years.

23        If he made any contact, the penalty range is zero

24   to eight years.  So there are three different levels that for

10:57AM 25   sentencing purposes only make a very big difference.

1          And so because the guidelines that are objected

2    to go at minimum above the zero to eight years, when the jury

3    tells you or tells me or tells the government, "We didn't

4    believe the punch caused the laceration" --

10:57AM 5          THE COURT:  Wait a second.  Okay.  You said -- I read

6    the affidavit.  Some of the jurors said that.  Well, there was

7    a question.  I guess my one concern is from the very beginning,

8    which is Ms. Wirsing's concern, why are we talking about this

9    in the first place with the jury?  Why was anyone asking them

10:58AM 10   these kinds of questions?

11         MR. AUSTIN:  Nobody asked them those questions.

12         THE COURT:  Well --

13         MR. AUSTIN:  That's an assumption being made.  That

14   information was --

10:58AM 15         THE COURT:  But there was -- okay.  The jurors

16   apparently on their own came out and talked to you guys.  All

17   of you know that you have a responsibility, an obligation as

18   officers of the Court, not to inquire about the deliberation

19   from the jury.  I mean, it's a black box.  We're not supposed

10:58AM 20   to talk about that.

21         Once they mentioned anything about their

22   deliberations, did anyone try to stop them and tell them, "Wait

23   a second.  We can't talk about this because the Court's

24   instructions said that we're not to ever talk to anyone about

10:58AM 25   the deliberations"?

MR. AUSTIN:  You invited the jurors to speak to us.

THE COURT:  No.  I said if they wanted to speak to you, they could talk to you; but as officers of the Court, once they started talking about things regarding their deliberations, didn't anyone say, "Wait a second.  We're not supposed to talk to you about this.  The judge has already instructed you that your deliberations are in a black box and no one is ever to inquire about that"?

MR. AUSTIN:  No.  No one did.

THE COURT:  Why?  I mean, you're officers of the Court.

MR. AUSTIN:  The answer, I can't speak for them; but I can tell you what was offered to us so that we could understand where the case went well or went bad.  That's what was happening.  And so nobody asked them directly --

THE COURT:  Or no one tried to stop them.  That's the problem.  I mean, why are -- I guess the issue is -- well, nobody should have been talking to the jury about the deliberations.  Once that conversation went off in that tangent or whenever you started talking about what they deliberated about, that should have been the end of the discussion.  As officers of the Court, nobody should have been talking to the jury after that point.  They should have stopped.

MR. AUSTIN:  I understand Your Honor's position.  That was not the impression that was left, at least on my behalf.  Again, I don't speak for the government; but it seemed as if we

were invited to hear from the jury; and if the Court's intent was not for us to know any further insight, that point was lost on us.

THE COURT: Ms. Wirsing.

MS. WIRSING: Your Honor, as a matter of practice, I would not normally talk to jurors posttrial. I, however, was not about to allow defense counsel to be present for a conversation with jurors without at least being present.

I did not make any personal inquiries of the jurors. I know that defense asked several questions about their strategy and frankly --

MR. AUSTIN: I mean, at some point we've got to be honest, right? Don't we? So --

MS. WIRSING: I'm taking offense, Your Honor.

MR. AUSTIN: -- this is the problem, Your Honor.

She can take all the offense in the world. She's making accusations that might actually be probably caught on audio. Of course she asked questions. I am just being candid with the Court. I was not left with the impression that we could not engage the jurors. They came out to tell us what they felt, right, and questions were being asked. Nobody was imposing on them. Nobody was trying to make them feel like they did something right or wrong. It was just a dialogue.

And so from my perspective -- this is why I'm not speaking on their behalf -- I was left with the impression that

the Court wanted us to hear from the jurors.

I also found out later on that, I believe even the next day or two, the Court and maybe even the government had some conversation or some dialogue about what the jurors felt about the case as well.

So there was no indication to me that the Court would take an issue with attorneys waiting around and jurors that want to speak to them coming in. There was just no guidelines set.

Maybe in the future I don't talk to the jurors out of an abundance of caution, but this idea that the government didn't ask questions and they were only there just to make sure I was doing the right thing but they didn't object, I think, is more indicative of what actually happened. It was just a collegial conversation.

But in that conversation, I learned a few things; and that's what it was. I ran into other jurors in the street, on the bus -- excuse me -- on the train. I didn't bother them. I just knew what was told to me without having to ask and so that's what I reported to the Court and I wasn't by myself when that happened.

And so that information directly is indicative or relative to what is the proper guideline calculation. That's why I brought it to the Court's attention.

THE COURT: Okay.

1    MS. WIRSING:  And, again, Your Honor, I believe it's

2  most appropriate for the Court to disregard any representations

3  made about what the jurors may or may not have said.  My

4  recollection and that of the other members of the government's

11:03AM  5  trial team is very different than what has been represented on

6  behalf of the defense.

7          Bottom line, it just should not be a

8  consideration for the Court.

9          What the Court should focus on is the testimony

11:03AM 10  and evidence that was gleaned at trial.  Your Honor was present

11  for that.  There's a record of that and that is what should be

12  relied on.

13    THE COURT:  Well, bottom line is whatever the jurors

14  said or didn't say, they're not witnesses.  They didn't provide

11:03AM 15  evidence in this case.  The evidence came from the witnesses on

16  the stand and the documents introduced at trial.  That's the

17  evidence in this case.  That's what the Court is going to

18  consider.

19          What the jurors thought or didn't think, what

11:04AM 20  they considered or didn't consider is not evidence as to what

21  happened in this case and it's not evidence to what the Court

22  is going to consider.

23          I understand your argument though and you can

24  make it on appeal, but I am not going to consider

11:04AM 25  anything -- the evidence for purposes of sentencing in terms of

what happened.

Now, you can provide evidence about treatment and things that happened afterwards; but evidence with respect to what happened that day came from the witnesses on the stand and the documents that were presented to the Court. I'm not going to consider anything else.

MR. AUSTIN: I'm questioning which documents the Court is relying on being sent to the Court --

THE COURT: Whatever documents were introduced during the trial --

MR. AUSTIN: Oh.

THE COURT: -- as to what happened.

MR. AUSTIN: Okay.

THE COURT: Now, with respect to information regarding the appropriate sentence; with respect to, you know, I think there was information about Mr. Walker's personal life and that sort of thing, that evidence can be considered because that's relevant to sentencing; but with respect to what happened that day, the only evidence as to what happened that day the Court is going to consider is the evidence from the witnesses on the stand and the documents at trial. That's it.

With respect to the overall sentencing, whatever is attached to the memorandum, of course, I will consider that; but as to what happened, that's it. I'm going to let you guys deal with that on appeal as to what you heard, didn't hear, who

1   heard what, who had a responsibility to shut the conversation

2   off, that's on appeal. You guys can deal with it. I'm just

3   going to handle the sentencing based on the evidence at trial

4   and the documents presented as to what happened.

11:06AM  5         So I guess you do have witnesses present in the

6   courtroom and they may be testifying. That's the answer.

7         MR. AUSTIN: And I do have other information that is

8   indicative without regard to the jurors' perspective on the

9   force and all of that just in terms of the objections.

11:06AM 10        THE COURT: Okay. Then we'll hear those things.

11         MR. AUSTIN: I can call a witness --

12         THE COURT: Okay.

13         MR. AUSTIN: -- if Your Honor would like. It really

14   depends. I'm kind of getting an understanding of how it's

11:06AM 15   going to go, so I do not want to miss the opportunity to point

16   out that we do have other information that suggests Mr. Walker

17   was not the cause of the injury.

18         THE COURT: Okay. Well...

19         MR. AUSTIN: The punch was not the cause of the

11:06AM 20   laceration -- excuse me. The jury has already spoken as to the

21   cause of the injury; but the laceration being from the punch,

22   we have other information that suggests different.

23         THE COURT: Well, you can put on whatever evidence you

24   believe you need to; but with respect to what happened that

11:07AM 25   day, the evidence that I'm going to consider is the evidence

with respect to what was said at trial.  That's what the jury heard.  That's what they based their decision on.  But you're free to present any information you wish though.

Okay.  So let me make sure I get this.  Okay.  One second.

So the first objection is the one that was filed on January 6th; and it just generally objects to the final presentence report, which is Docket Number 84.  It improperly applied belated information from the government, misapplied the belated information, incorrectly increased the guidelines from the first final PSR with the range of 21 to 27 months to now 97 to 121 months and then more time is therefore needed to adequately file a response to the second final PSR.

So that objection, I'm going to overrule as moot -- deny as moot because there's now a new PSR, so these objections that were filed on January 6th are not going to be considered by the Court.

So then we're going to look at the objections that were filed on February 21st, 2025; and we're going to go through these one at a time.  And I've read the objections.  I understand them, but I want to hear argument on each one so we can make a record.

So the first objection is to PSR Paragraph 15, and it says that Mr. Walker objects to this paragraph as the wrong guideline provision was used in calculating the base

offense level.

I'll give you an opportunity to argue, Mr. Austin, and then I'll hear from Ms. Wirsing, and I would like to hear from probation as well.

I know that you just received this, but I would like to hear your input as well.

So Mr. Austin, Paragraph 15.

MR. AUSTIN: Yes. Thank you, Your Honor.

So because there is a dispute on the injuries and how the injuries occurred, 2A2.2 is being used and that is the improper guideline. The original guideline used 2A2.4, and that was the appropriate guideline. It has since changed due to information that happened -- that was given posttrial from the government, I believe; and that caused the probation office to write a new PSR.

The 2.2 is aggravated assault. The issue we have still remains to whether this was an aggravated assault or not; whether there was serious bodily injury or not; whether there was strangling, suffocating or attempt to strangle or suffocate or not; or an intent to do those things.

And so that's how the 2.2 guideline is supposed to apply. Otherwise 2A2.4, obstructing or impeding officers, which is what happened, is the appropriate guideline that applies.

And so there are no facts in the trial that

support that guideline, as the Court has just indicated you're

going off of the trial facts, I understand.  But procedurally

other information is always, I guess, entitled to be presented

to the Court.

11:11AM    But there's no serious bodily injury by this

Guideline 2.2 -- 2A2.2 and there are none of those other means

of affecting the injury to Mr. Chavez under the aggravated

assault guideline; so just the wrong guideline is being

applied.

11:11AM    THE COURT:  Ms. Wirsing.

MS. WIRSING:  Your Honor, the government's argument is

set forth very clearly in our sentencing submission.

Aggravated assault is defined as a felonious assault that

involves serious bodily injury and that's pursuant to

11:11AM    Section 2A2.2, Comment Number 1.

The commentary defines serious bodily injury as

injury involving extreme physical pain or the protracted

impairment of a function of a bodily member, organ or mental

faculty or requiring medical intervention such as surgery,

11:12AM    hospitalization or physical rehabilitation.

Here, Deputy United States Marshal Ruiz de Chavez

testified at trial that he did, in fact, experience extreme

pain as a result of the injuries he sustained on account of

Mr. Walker's actions.

11:12AM    Moreover, his injuries involved the laceration

1    that went entirely through his lip and required treatment by a

2    plastic surgeon immediately who sutured the wound with 12

3    stitches, two of which were internal to repair the muscle and

4    the other 10 were split amongst the front and back of the lip.

5              And moreover, Deputy Ruiz also suffered two

6    chipped front teeth and a loose front tooth, which required

7    examination by a dentist.

8              And moreover, following trial, the government did

9    submit a disfigurement award letter, which had been provided to

10   defense counsel in advance of trial, but that the government

11   did not -- that the government believed was more of a

12   sentencing issue than a finding of guilt issue.

13             And so in that disfigurement or in that award

14   letter, it was found that the deputy sustained a permanent

15   visible and protruding scar constituting serious disfigurement

16   of his face and that he was therefore entitled to compensation.

17             It was clear based on the initial presentence

18   investigation report that probation had not received a copy of

19   that letter in the discovery that they were provided in

20   preparing -- in preparation of the presentence investigation

21   report.  That is why the government felt it important to submit

22   that by way of its sentencing submission; and, again, this is

23   something that defense counsel already had available to them.

24             For this reason, Your Honor, the aggravated

25   assault is appropriate here.  I honestly don't -- the defense

attorney in this case is arguing that there is a dispute or a

disagreement about how the injury was sustained.

I beg to differ, Your Honor. The indictment and

the finding of guilt was that the defendant intentionally and

11:14AM forcibly assaulted, resisted, opposed, impeded, intimidated and

interfered with Supervisory Deputy United States Marshal

Joe Ruiz de Chavez and for engaging in acts involving physical

contact resulting in bodily injury to Deputy U.S. Marshal Ruiz

while he was engaged in the performance of official duties.

11:15AM That is what the defendant was found guilty of.

I don't understand why we are relitigating that matter here

today.

What is for the Court's consideration is the

extent of the injuries and the government has presented

11:15AM testimony at trial as well as additional documentation for

Your Honor's consideration.

MR. AUSTIN: Part of the issue, Your Honor, is the

government has several alternative theories to get a

conviction; and they presented several alternative theories to

11:15AM get that conviction.

One of those theories was a chain-of-events

theory. A chain of events contradicts the idea that the

government presented the punch caused the laceration. A chain

of events can cause or lead to Mr. Chavez, Officer Chavez being

11:16AM injured. I understand that.

1          The issue, I think, for the government is they

2     don't understand that that is different.  Saying he punched him

3     and the punch caused the laceration to his lip is very

4     different than saying, well, he resisted; and as a result,

11:16AM 5     Mr. Chavez got injured during the fracas.  That's the

6     difference.

7          And I would just point out to the Court, Officers

8     Oppedisano -- Special Agent Oppedisano and Steven Dvornick

9     Austin interviewed witnesses and wrote reports that

11:16AM 10    said -- that contradict the punch being the laceration.

11         In one such report, they wrote that it is

12    indicated to them that the officer hit his face on a metal

13    object which could have caused the injury.  It may not have

14    caused the injury.  We don't know, right.  There was no video

11:16AM 15    depicting what happened.

16         But those officers, when doing their due

17    diligence and interviewing, were told they saw Officer Chavez

18    hit his face on a metal pole.  No one said they saw him get

19    punched in the face, right.

11:17AM 20         The jury is going to believe the facts that were

21    presented.  The Court believes the facts that were presented,

22    but the problem still becomes did the injury, the laceration

23    come from the punch or not, not a chain of events.

24         And if it's a chain of events, that then is not a

11:17AM 25    forcible -- a punch that caused the injury.  Then we should be

acquitted.

That was the problem with the government advancing a different theory and now asking for an enhancement or an aggravated assault guideline. They got the conviction. That will be handled on its own and the jury questioning what the evidence deduced at trial, the Court has already ruled there was enough information for the jury to sustain a conviction, so I'm not arguing that.

I am arguing that there is not information in this PSR. There is not enough information in the facts to support the Guideline 2A2.2 being applied over 2.4 when the government has information in their possession that says he injured his face on a pole, not the punch.

And so the other issue is -- well, it goes to the very next Paragraph 16, they're asking for a Plus-7 for permanent or life-threatening bodily injury.

No one was shot. No one was maimed. I understand he was injured and he had to have sutures, I think was the word I heard used; but that's not the type of life-threatening permanent bodily injury that the guideline is contemplating.

I think the issue for us is let's just start with the correct guidelines. Let's get it right, and then we'll move forward. And to start with the correct guidelines, we need to start with 2A2.4, which starts with an Offense

1    Level 10, not 14.

2              Additionally, the government in their response to

3    my motion for a new trial defended the idea that multiple

4    theories could have gained the conviction.  They didn't stand

11:19AM  5    firm by saying it was the punch that caused the injury like

6    they are today.  In their own writing, they didn't do that.

7              MS. WIRSING:  Your Honor, respectfully I'm objecting.

8    We are not here to litigate the motion for acquittal.

9              MR. AUSTIN:  It's about 2A2.2 or 2A2.4.

11:19AM  10             THE COURT:  Basically the evidence is what the evidence

11    was at trial.

12             MR. AUSTIN:  But the problem is the evidence does not

13    support 2A2.2.  That's the problem.  The evidence supports --

14             THE COURT:  But there was -- okay.  So your argument is

11:19AM  15    it doesn't support the fact that he punched and physically

16    caused the injury with his fist?

17             MR. AUSTIN:  Yes.

18             THE COURT:  I beg to differ.  I think there is

19    sufficient evidence that that is the case.

11:19AM  20             MR. AUSTIN:  And I presented other information that

21    contradicts that.  That is my point to Your Honor.

22             And the government as well in their response left

23    it open because they don't know.  They understand -- at their

24    closing they argued -- so they argued in the beginning it was

11:20AM  25    the punch; and then at the end they argued, well, if you don't

1   believe it was the punch, you can believe he resisted -- his

2   resisting caused the injury.  That's perfectly fine argument.

3           But now to apply, oh, a but-for causation under

4   the -- for the guideline purposes is improper is my point.

11:20AM  5       THE COURT:  Okay.  Why can't I make --

6           Well, Ms. Wirsing, I'll give you the last word.

7       MS. WIRSING:  Again, I renew my objection, Your Honor.

8   As soon as Your Honor said, "I'm only going to consider what

9   was presented at trial," then counsel again is bringing up the

11:20AM 10  motion for acquittal.  That is not why we're here at trial.

11      MR. AUSTIN:  The information was not deduced about

12  trial.  The information that talks about all these injuries,

13  none of that came out at trial.  That came after.

14          And so the Court is in a tough position to

11:21AM 15  determine what guideline is appropriate.  If you're only going

16  to use what happened at trial, then 2.4 is the only guideline

17  to be used.

18      THE COURT:  Well, no --

19      MR. AUSTIN:  You have to take into consideration in

11:21AM 20  totality, I believe.  And so it is not improper for the

21  government to present additional information.  It would be

22  improper for them to do it, but not allow me to do it is what

23  I'm saying.

24          So in totality, we have an investigation report

11:21AM 25  by that officer sitting there in the middle who says somebody

1  told him there was pushing and the officer hit his face on a

2  pole.  No one said the punch caused the injury.  No one said

3  that.

4        MS. WIRSING:  I beg to differ, Your Honor.  The victim

11:21AM  5  himself took the stand under oath and testified to this Court

6  that that is what happened.

7        MR. AUSTIN:  And two eyewitnesses contradict what that

8  victim said.  And the victim doesn't know how he got the

9  injury.  He knows he was punched.  That's what his testimony

11:21AM  10  was.  He doesn't know how the laceration happened to his lip.

11  That was ultimately what happened at trial.

12        And so I'm just trying to get the Court to just

13  apply the appropriate guideline.  That's what I'm doing --

14        MS. WIRSING:  As am I.

11:22AM  15  MR. AUSTIN:  I'm not asking for the Court to grant a

16  new motion.  I'm not relitigating anything that has already

17  happened, but I am showing the contradictions from the evidence

18  that we have, the lack of evidence in the PSR, and so forth.

19        THE COURT:  Okay.  Respectfully the objection to PSR 15

11:22AM  20  and 16 is overruled.

21        I believe there's sufficient information in the

22  record that was developed during trial to support the PSR

23  finding that Mr. Walker physically injured with his fist the

24  deputy.

11:22AM  25        I hear your argument.  Respectfully the

                    objections to PSR 15 --

                            THE DEFENDANT:  Your Honor --

                            THE COURT:  -- and 16 are overruled.

                            MR. AUSTIN:  May I have a moment, Your Honor?

    11:22AM         THE COURT:  Sure.

                            (Off-the-record discussion between Mr. Austin and the

                    defendant.)

                            THE DEFENDANT:  Excuse me.  I apologize.

                            THE COURT:  No problem, Mr. Walker.

    11:23AM                 And based on my reading, the objection to the PSR

                    17 and 18 and 19 -- I'm sorry -- 17, 18 and 29 are basically

                    the same.

                            That is, basically you're arguing that there is

                    no evidence that would support the PSR finding that Mr. Walker

    11:23AM     injured the deputy with his fist as opposed to the injury being

                    caused by him falling against a metal object.

                            MR. AUSTIN:  They're slightly different.

                            THE COURT:  Okay.

                            MR. AUSTIN:  17, it says he was convicted under 18 USC

    11:24AM         Section 111(b).

                            Frankly we just don't know because he was charged

                    with 111(a) and (b).  And that part was not indicated on the

                    jury instruction.  So we really don't know the answer to that

                    one.

    11:24AM         THE COURT:  Okay.  Ms. Wirsing.

1          MS. WIRSING:  Your Honor, we do know because the

2     Section (b) is what includes the engaging in acts involving

3     physical contact resulting in bodily injury and that is what

4     the defendant was found guilty of.

11:24AM   5          There was a request for a jury instruction that

6     was for a misdemeanor assault.  That was denied based on the

7     information that was elicited at trial.

8          And, again, we are not relitigating this issue

9     here today.

11:24AM  10          MR. AUSTIN:  I don't know what the government thought

11     was going to happen today when the objections were filed, but

12     111(b) talks about enhancements.  I've already explained there

13     were three areas of punishment.  There's a misdemeanor, zero to

14     12 months; there's a felony, zero to eight years; and then

11:25AM  15     there's the enhancement if the injury was caused by the

16     punch -- the injury to Officer Chavez was caused by a punch.

17     That's zero to 20.

18          The problem is the specific offense

19     characteristics, they didn't rule on their jury charge the

11:25AM  20     enhancement for the zero to 20.  They didn't rule that the

21     punch was what caused the laceration and, of course, the Court

22     has already heard and was presented with some information that

23     suggests that is not the basis that they found him guilty.

24          The government also suggested in their closing

11:25AM  25     there is an alternative basis for a conviction, which would get

1    the zero to 8.  That's where we are, Your Honor.

2         THE COURT:  Still, my ruling is the same.  The

3    objection is overruled.

4              I believe that there's sufficient evidence

11:26AM  5    respectfully at trial and to support the jury's findings and

6    the Court's conclusion and most importantly, the PSR's

7    conclusion that Mr. Walker caused the injury by physically

8    striking the deputy.

9              So respectfully 17, 18 and 29 are overruled, the

11:26AM  10   objections.

11             One second.  Just one second, counsel.

12             So the Court has now ruled on the objections and

13   the Court finds based on the ruling on the objections, the

14   following guideline provisions are in effect in this case.

11:28AM  15            The total offense level is 29; the criminal

16   history category is 2, which provides for the following

17   guideline provisions:  Time in custody, 97 to 121 months;

18   probation, ineligible; supervised release of one to three

19   years; a fine of 30,000 to $300,000; restitution, mandatory;

11:28AM  20   and a special assessment of $100.

21             Based on the Court's rulings on these objections,

22   are these the correct guideline provisions that apply in this

23   case?

24             I understand that the objections were overruled;

11:28AM  25   but based upon the rulings on the objections, are these the

1 correct guideline provisions?

2 Ms. Wirsing?

3 MS. WIRSING: Yes, Your Honor.

4 THE COURT: And Mr. Austin?

11:28AM 5 MR. AUSTIN: Yes. Sorry.

6 THE COURT: Okay. After calculating the guidelines and

7 departures and hearing argument, I must now consider the

8 relevant factors set out by Congress at 18 USC Section 3553(a)

9 and ensure that I impose a sentence that is sufficient but not

11:29AM 10 greater than necessary to comply with the purposes of

11 sentencing.

12 These purposes include the need for the sentence

13 to reflect the seriousness of the crime, to promote respect for

14 the law, and to provide just punishment for the offense. The

11:29AM 15 sentence should also deter criminal conduct, protect the public

16 from future crime by the defendant and promote rehabilitation.

17 In addition to the guidelines and policy

18 statements, I must consider the nature and circumstances of the

19 offense, the history and characteristics of the defendant, the

11:29AM 20 need to avoid unwarranted sentencing disparities among

21 similarly situated defendants and the types of sentences that

22 are available.

23 Ms. Wirsing, I have reviewed the submission; but

24 at this time do you wish to argue about the application of the

11:29AM 25 factors set forth in Section 3553(a), request a variance, or

1    otherwise make a sentencing recommendation?

2        MS. WIRSING:  Your Honor, as indicated in our

3    sentencing submission, we are requesting a sentence at the high

4    end of the guideline range.  That would be 121 months.

11:30AM  5        Given the nature of the defendant's behavior in

6    this case, I would implore the Court to send a message to the

7    defendant that he cannot fight his way out of circumstances

8    that he does not want to face.

9        And in this case, this was a deputy who was doing

11:30AM 10    his job, Your Honor.  It wasn't confrontational.  He was sent

11    to return Mr. Walker to the Bureau of Prisons because he failed

12    to comply with the rules and regulations of the halfway house.

13        This was right around Christmastime, so

14    Deputy Chavez -- Ruiz de Chavez went there himself rather than

11:31AM 15    calling in any one of the other members of his team to handle

16    this matter and he walked out of there -- well, he ended up in

17    the hospital, Your Honor.

18        These deputies are the same ones that are present

19    here today in a showing of support for this case; and,

11:31AM 20    Your Honor, these are the same deputies who protect us every

21    day; and they should not have to face these kind of injuries

22    just on account of doing their job.

23        We do want to present the victim impact statement

24    in this case.  I don't know if you would like that to occur at

11:31AM 25    this time or after defense speaks.

1           THE COURT:  I would like to receive it at this time.

2           MS. WIRSING:  Okay.  Yes, Your Honor.

3                Then the government would ask Joseph Ruiz

4 de Chavez to come forward to read his statement.

11:32AM 5           THE COURT:  Deputy.

6           DEPUTY CHAVEZ:  I never expected I would be in this

7 position where I would be providing a victim impact statement,

8 but it should not be a surprise because every year

9 Deputy U.S. Marshals are assaulted more frequently than all

11:32AM 10 Department of Justice criminal investigators combined.  In

11 part, this is because the U.S. Marshals Service is the

12 enforcement arm of the federal courts and we are the

13 government's primary agency for fugitive investigations.  We

14 also assist state and local law enforcement agencies locate and

11:33AM 15 arrest the most dangerous and violent fugitives.

16                Mr. Walker, when I encountered you at the

17 Residential Reentry Center, I was taking you back to FDC to

18 finish your time.  I was in no way involved with your

19 underlying case or the violations that were alleged by the

11:33AM 20 halfway house.

21           THE DEFENDANT:  I disagree.

22           DEPUTY CHAVEZ:  I was there simply to carry out my

23 duties as a Deputy U.S. Marshal.

24           THE DEFENDANT:  Uh-huh.

11:33AM 25           DEPUTY CHAVEZ:  Although it was my blood that was

spilled, although it was my teeth that were cracked, you

striking me was an assault on the rule of law.  It was an

assault on the federal courts.  The injuries I sustained are

permanent.  The scar tissue has changed the contour of my upper

lip.  Oral X rays indicate that I will need future root canals

in at least four teeth.

When you are released one day, you will be on

supervised release or be supervised by U.S. Probation.  I truly

hope that you are successful and law abiding; but if you fail

and a warrant is issued for your arrest, a Deputy U.S. Marshal

wearing this badge will hunt you down and bring you back before

this Court.

I want to take a moment to thank all my

colleagues that have come out here to support me.  I'm very

proud of your commitment to public safety and the work that you

guys do every single day.

I also wanted to thank the U.S. attorney's office

and the FBI for your compassion and exceptional

professionalism.

And finally, I want to thank my family for their

support in allowing me to pursue my dream career even though it

can be dangerous and unpredictable.  Your love and support is

what drives me to serve our community and protect the public.

Thank you, Judge.

THE COURT:  Thank you, Deputy.

MS. WIRSING:  I have nothing further, Your Honor.

THE COURT:  Thank you, Ms. Wirsing.

Mr. Austin, I have read your pleadings; but do you wish to argue -- this is your opportunity to argue about the application of the factors set out in 3553(a), request a variance, or otherwise make a sentencing recommendation.

MR. AUSTIN:  Yes.  Thank you, Your Honor.

And so I would like to start with saying I understand Deputy Chavez's position.  I respect his work.  We respect the U.S. Marshal's office.  Mr. Walker will echo that sentiment.

But it is unfortunate that he was injured.  We are disputing on how.  It doesn't take away that the jury and the facts as presented place Mr. Walker at blame for his injuries.

With that knowledge and with that understanding, he's been in jail for two years.  That incident happened in 2022.  He finished the rest of his sentence for the robbery.  He was at the halfway house because he was doing all things correctly.  There's an actual dispute on whether or not he actually violated all the terms of the halfway house.  That wasn't presented at trial necessarily.  It was indicated, but he was given permission.

And he came back when they said you didn't have permission, and a few days later an arrest came.  That becomes

a charged scenario.  That was an unintentional act.

Mr. Chavez was doing his job.  He was not expecting a fight.  Mr. Walker was not expecting to be arrested or anything.

He's been in custody since 2010.  We are now in 2025.  He's completed his time for the robbery.  He hasn't even begun supervised release yet on that.

Now we are asking the Court to sentence him appropriately under the 3553(a) factors and the Court has ruled that his guideline range is now 97 to 121 months, so that's the starting point that we're dealing with.

All things in consideration, all things that have been brought to my attention, which I have also brought to the Court's attention, two years is more than enough.  The original guideline range was around 21 to 27 months for the assault, for the obstruction.

The Court has ruled it's an aggravated assault. I'm not fighting that anymore at this point.  What I am fighting is that Mr. Walker would like to put this all behind him.  Mr. Walker was trying to get home to his mother.  He was trying to be compliant.

What we've had today is a showing that -- as if he was trying to maim an officer.  That didn't happen.  There was a conversation.  That's what happened during that time. That's what the testimony was.  And I have presented that there

1    was an alternative to how he was injured, and I would like the

2    Court to consider that as well in fashioning the sentence.

3            It's not that the world or other people can't

4    learn from this incident.  The question is how much more time

11:38AM  5    is necessary for somebody to learn from this incident.

6            He's standing in front of a room full of Marshals

7    all around him to his left, to his right and behind him.  He's

8    always been surrounded by Marshals through the entirety of this

9    case.

11:39AM 10            He's had me to help him and he had the support of

11    his mother.  His mom sent letters of support with his mother

12    and his father.  He has something to look forward to.  He was

13    going home for Christmas to visit his mother.  They called him

14    and said, "You have to come back."

11:39AM 15            He came back.  When he was arrested, he was where

16    he was supposed to be.  That's the law-abiding status that the

17    Court can consider under 3553(a).

18            And frankly, none of this would have happened if

19    he had just taken the arrest and been brought to FDC and maybe

11:39AM 20    got sorted out.  That's very easy for me to say.  I've never

21    been in his shoes.  It's very easy for me to say because I

22    don't think he might feel that the justice system has always

23    been the best place for him to be and he's gotten a fair shake

24    at all times.  I don't know that, but my guess is he probably

11:40AM 25    doesn't feel that way.

1       And even now he's hearing all these aggravating

2   factors.  He's being told the pressure of the system is coming

3   down on him, and he's trying his best to maneuver in a foreign

4   land.  This is a federal court.

11:40AM  5       We're arguing over what words have meaning.

6   "Forcible" has a real definition.  "Resisting" has another.

7   He's fighting over I was told I could leave, but now I'm being

8   arrested.

9       He hasn't had an opportunity to get the help from

11:40AM  10  probation to help him maybe with management, health management,

11  mental health management or anger management classes.  None of

12  that has been afforded to him.

13      What he's being told is you've been in.  We're

14  going to arrest you.  No explanation as to why.  And now we're

11:41AM  15  charging you with a federal offense because of what happened.

16  And now when we get in here and we had a trial, he sat through

17  an information.  He sat through the testimony.  They convicted

18  him.  There's been no outbursts.  There's been no attacks on

19  anyone.

11:41AM  20      We came in here.  We're hearing sentiment like,

21  "I'm going to stand all the way back here for my safety."

22  Nobody has threatened the prosecutor.  He didn't threaten

23  anybody in this case.  What happened was a split second

24  instance and he's paying for it and he's paid for it.

11:41AM  25      I'm asking the Court to vary within the range of

1    the original guideline sentence, which was 21 to 27 months.

2    24 months is more than appropriate.  I think he knows at this

3    point certainly if he does anything aggressive or assaulting

4    towards an officer, he's got the whole courtroom that will

11:42AM   5    probably jump on him if need be.  Everyone here is perfectly

6    safe.

7            And he has remorse for Officer Chavez getting

8    injured.  I have sympathy for that as well.  A guideline

9    sentence of 97 to 121 months is just greater than necessary,

11:42AM  10    Your Honor, considering all things, starting with the fact that

11    he has served his entire sentence for the robbery and he has

12    now done two more years.

13            Thank you.

14        THE COURT:  Thank you, Mr. Austin.

11:42AM  15            You may call any witnesses you wish at this time;

16    however, I'm not going to consider any information about what

17    happened other than what was -- the evidence that was presented

18    at trial.

19            If you have any information you wish to present

11:43AM  20    regarding the government's sentencing memorandum as to the

21    deputy's injuries or disfigurement, you're free to do that; but

22    with respect to what happened that day when Officer Chavez was

23    injured, I'm not going to consider any evidence other than what

24    was considered at trial.

11:43AM  25        MR. AUSTIN:  Well, then I think I'm left with no

1    opportunity then to present anything further, Your Honor.

2         THE COURT:  Okay.  Mr. Walker, you have a right to make

3    a statement or present any information you wish the Court to

4    consider in mitigating its sentence in this case.

11:43AM    5         Do you wish to make a statement at this time?

6         THE DEFENDANT:  Yes, sir.

7         THE COURT:  You may proceed.

8         THE DEFENDANT:  First, the Court knows, Your Honor, I

9    never meant for anything -- for this to happen.  I never meant

11:43AM   10    or I never wanted to see Officer Chavez get injured.  That's --

11    I don't know where they're coming up with this idea at.  That

12    wasn't my conclusion.

13         I was supposed to be taken back to Houston FDC

14    based off of just failing -- they was trying to determine

11:44AM   15    whether there was going to be an escape charge or a facility

16    escape and Chavez was checking to see was he going to take me

17    to Joe Corley or Houston FDC.

18         What transpired at Houston FDC -- I mean, what

19    transpired at Leidel Sanctions Center, that from 12:00 A.M. all

11:44AM   20    the way up until I left, which is about 3:45 P.M., they leaving

21    all of that out.  The government, Chavez, Fernandez, the

22    government, all of that.

23         Ms. Wirsing, she's just -- she's not really

24    saying what really happened; and Chavez is not speaking about

11:44AM   25    what really happened.  I guess they got their rights to remain

silent as well about the case.

But like I said, 90 days compared to what you're giving me, 97 to 121 months, come on.  She's ridiculous.  What she's saying and what they're saying is ridiculous.  I never had no weapon to strike Officer Chavez to cause those injuries that he's griping about.  They never came from me.

Officer Chavez that day, he needs to know and he needs to understand that you choked multiple people pertaining to staff that worked there.  You physically put your hand on the staff members -- males and females -- at that place that morning.  I'm telling you.

Whether he's not listening or taking in to what he actually did or admitting to what he actually did, that's his problem, those are his consequences.  He'll have to deal with them.

But I'm not going to let you drift off on me to give me more time or to delay me from getting to my home.  I was trying to go home.

I didn't have no beef with Officer Chavez, who I seen numerous times inside Leidel Sanctions Center.  I talked to him on different occasions, whether he can recall or not, probably before he got the injuries.  We never had no man-to-man, no chest bumping, no griping, no attitude towards each other.  You see what I'm saying?

So for him to say that my intentions were to

assault him, I don't -- I wasn't high off no drugs.  I still ain't smoked no drugs.

And my alcohol level, I don't drink; so my blood level, it's all been tested since I got to Houston FDC.  I'm not withdrawing from nothing.  I've been sober for the last -- past 15 years waiting to get to the free world, waiting to enjoy my freedom, waiting to get a second chance in life.  I don't have no gripe between any other police officers from Harris County to Houston Police Department.

I was going on to get me a job and, you know, do what I was supposed to do for three years.  I don't see why the violation came in.  When you actually look up 18 USC 111(a)(1) and (b) it's basically telling you whoever possesses a deadly or dangerous weapon, uses that deadly or dangerous weapon, they receive 21, 20 years or better or they receive a fine or both.

I don't see how that he could have sustained a laceration from one punch that he claim that I threw at him; and then on top of that, I don't see that besides the one punch, I don't see where is the weapon.  You cuffed me.

After the action, was I cuffed?  "Did you cuff the prisoner?"

He said, "Yes."

He said, "Let me check the cuffs."

He checked the cuffs.  I was cuffed.

So how did I cause all this when Ms. Haynes, who

1    put the warrant in, she tried to bribe me and tell me that if I

2    want to go out on a pass, pay her a hundred dollars, $1500,

3    which they supposed to have been -- if they're not fired by

4    now, they're supposed to be transferred for different other

11:48AM  5    reasons relating to, you know, operating illegitimate business

6    at the halfway house.

7            So why do I have to stand here and lie before the

8    courtroom for my freedom?

9            I was doing everything that I was supposed to.

11:48AM 10    You don't have incident -- you don't have that many incident

11    reports on me in the halfway house.  Besides the facility, the

12    escape and besides from the assault that occurred, there was no

13    other incident reports.  There's no other curfew violations of

14    me in the halfway house, which they named inside the government

11:48AM 15    response.

16            And in the government response, it said that they

17    don't believe that I hit him with a punch.  It said that they

18    believed that I ran him into the side of the wall or hit him

19    with a wall or he hit the wall or something.  I got the

11:49AM 20    government response here today.

21            So at the end of the day, I don't understand

22    where does Ms. Wirsing -- drifting back to when did she come

23    back to the punch at.  This was in the government's response.

24    This is from the prosecutor.

11:49AM 25            And all these other people who had wrote these

statements was there.  She was even there, so what is she saying?  Why is she playing that she wasn't there?

I know you was there because you spoke to me personally.  You got in my face and you waved a handgun in my face, so I know you was there.

I know she was there.  That's why she don't want to admit being there because of what she did that day at the halfway house, but --

THE COURT:  Ms. Wirsing was at the halfway house?

THE DEFENDANT:  Yes, she was there.  That's what I'm saying.  Yes, sir.

Which one?  Wilmore.  Yes.  Kirrison Wilmore, yeah, she was there.

THE COURT:  Not this Ms. Wirsing?

THE DEFENDANT:  No.  Wilmore and Wirsing, this lady.

(Off-the-record discussion between Mr. Austin and the defendant.)

THE DEFENDANT:  She came later on.  That's what I'm saying.  She was there.

Oh, yeah, yeah, yeah.  Wilmore was there the whole time.  Wilmore complained to me about Chavez sexually assaulting her.

So they dispute is the reason why I didn't make it to Houston FDC to be -- to even add, their dispute between Wilmore.  Ms. Wilmore, the group transportation officer and

1   Officer Chavez dispute between he sexually assaulted her,

2   whether it took place or not is the reason why I didn't make it

3   to the Houston FDC because they didn't want -- Leidel didn't

4   want Chavez transporting me if that's what occurred, said that

11:51AM 5   he got some history of doing this to people at the halfway

6   house is the complaint.  It's based in the claim.

7          But all I'm saying is to make a long story short,

8   I don't have that -- I didn't have that type of energy that

9   they claim that I had to resist, to impede.  I didn't need all

11:51AM 10   that.  It was only going to be for 60 days, 90 days tops; and

11   then I was either going to go back to the halfway house to

12   complete the other 90 days or they was going to put me on home

13   confinement, which was going to be with my family.

14          I didn't have no complaint with that.  They are

11:51AM 15   trying to make it look like I didn't want to go home.  I was

16   scared to go home.  I don't understand that.  I don't agree

17   with that.  That's what I'm trying to explain to you.  I don't

18   totally agree with that.

19       THE COURT:  Okay.  Well, that is sort of my question

11:52AM 20   that I had.

21          This was only going to be a short amount of time.

22   Why take a swing at the officer over this kind of -- over

23   basically an additional 30 or 60 days?  Why did you do it?

24       THE DEFENDANT:  I don't have an answer for that,

11:52AM 25   Judge -- Your Honor -- Hanks.  I don't have no answer.  That

never was my intentions.

THE COURT:  Okay.  Thank you, Mr. Walker.

We're just going to take a brief recess, and I'll be right back with the sentence in this case.

11:52AM  THE MARSHAL:  All rise.

(Court is in recess.)

THE MARSHAL:  All rise.

THE COURT:  Please be seated, everyone.

The Court is ready to issue a sentence at this

12:08PM  time.

Mr. Walker, I guess before we begin, respectfully I don't see a basis for a downward variance in this case.  I understand that you've requested one.  Under the circumstances of this case, I do not see a basis for a downward variance and

12:08PM  I'm not going to grant it in this case.

Mr. Walker, I can understand that you are upset about what happened to you.  I can see the frustration.  I can understand how, you know, you could feel that you were being treated unjustly; but that is not an excuse for taking out or

12:09PM  trying to assault or assaulting or trying to take out an armed Deputy Marshal.

THE DEFENDANT:  Never had those intentions, Your Honor.

THE COURT:  But that's what happened.

THE DEFENDANT:  I didn't cause it.

12:09PM  THE COURT:  Okay.  Unfortunately there are consequences

1    for that -- that conduct, and this is the consequences that

2    result from your actions.  I understand you didn't intend to.

3    I understand you didn't want it, but that's what happened and

4    these are the consequences.

12:09PM  5         The Court finds that a sentence within the

6    guideline provisions is appropriate in this case, and the Court

7    will issue a sentence according to those guidelines.

8         The Court adopts the factual findings and the

9    guideline applications in the presentence investigation report,

12:10PM  10   Mr. Walker.

11        It is the judgment of the Court that the

12   defendant, Cedric Tyrone Walker, is hereby sentenced to 97

13   months in the custody of the Bureau of Prisons.

14        Upon release from imprisonment, the defendant

12:10PM  15   shall be placed on supervised release for a term of three

16   years.  The defendant shall report in person to the probation

17   office in the district to which the defendant is released

18   within 72 hours of being released from the Bureau of Prisons.

19        While on supervised release, you shall not commit

12:10PM  20   another federal, state or local crime.  You shall comply with

21   the standards conditions that have been adopted by this Court

22   under general order Number 2017-1; abide by any mandatory

23   conditions required by law; and shall comply with the

24   additional conditions as noted in the appendix of the

12:10PM  25   presentence report, which does include mental health treatment

while -- which includes mental health treatment.

Restitution is mandatory but undetermined in this case.

The Court finds that the defendant does not have the ability to pay a fine and the Court will waive the fine in this matter.

It is further ordered that you should pay the United States a special assessment of $100.

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

The defendant shall begin payment immediately. Any unpaid balance due in payments of greater than $25 per quarter or 50 percent of any wages earned while in prison. The defendant will receive credit for any payments made to the Bureau of Prisons Inmate Financial Responsibility Program, and any remaining balance after release from imprisonment shall be paid in monthly installments of $25 to commence 60 days after the release to a term of supervision.

Payments are to be made through the United States District Clerk's Office, Southern District of Texas.

You have a right to appeal my sentence. I'm giving Mr. Austin written notice of those rights.

Mr. Austin, if you can go over those with Mr. Walker whenever you can at your convenience.

1      Is there anything further from the government in

2 this case?

3      MS. WIRSING:  No, Your Honor.

4      THE COURT:  Okay.  Mr. Austin?

12:12PM 5      MR. AUSTIN:  No, Your Honor.

6      THE COURT:  Probation?

7      PROBATION OFFICER:  Jennifer Franklin with U.S.

8 Probation.

9      Just for clarification purposes, for the judgment

12:12PM 10 is restitution to be deferred in this case the 90 days?

11      MS. WIRSING:  Your Honor, we're not seeking any

12 restitution.

13      THE COURT:  Then restitution is not being ordered in

14 this case then.

12:12PM 15      PROBATION OFFICER:  Thank you, Your Honor.

16      THE COURT:  Is the mental health treatment part of the

17 SRT?

18      PROBATION OFFICER:  In the appendix of the PSR, the

19 mental health treatment and medication, that is part of the

12:12PM 20 supervised release once he completes his imprisonment term.

21      THE COURT:  Okay.  Great.

22      I also want to order when you're imprisoned for

23 you to be evaluated for any mental illness, sir, as part of the

24 sentence in this case.  I want you evaluated, respectfully.

12:13PM 25      Mr. Walker, you can't do the things that you did.

1   You just can't.  And I understand that you don't believe that

2   you did them.  That's your right and that's your belief, but

3   respectfully you did.

4           You can't do those things.  You can't do those

12:13PM  5   things.  And you injured a man that was just trying to do his

6   job, and that's not right.  I hope that you make better

7   decisions in the future.

8           If there's nothing further, this matter is

9   adjourned.  Good luck to you, sir.

10          (The proceedings were adjourned.)

11                      * * * *

12              REPORTER'S CERTIFICATE

13          I, Lanie M. Smith, CSR, RMR, CRR, Official
    Court Reporter, United States District Court, Southern District
14  of Texas, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
15  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

16

17                      ___/s/ Lanie M. Smith_____
                        Official Court Reporter

18

19

20

21

22

23

24

25