1        UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF TEXAS

3             HOUSTON DIVISION

4   UNITED STATES OF AMERICA
                                 .
                                 .  Criminal Action
5   VERSUS                       .  No. H-23-CR-42
                                 .
6   CEDRIC TYRONE WALKER,        .  Houston, Texas
                                 .  August 20, 2024
7                                .  9:01 a.m.
                    Defendant.   .
8   . . . . . . . . . . . . . . . . . . .

9

10            TRANSCRIPT OF PROCEEDINGS

11    BEFORE THE HONORABLE GEORGE C. HANKS, JR. AND A JURY

12                    **DAY 2**

13

14  APPEARANCES:

15  FOR THE UNITED STATES OF AMERICA:

16          Ms. Carrie Wirsing
            Ms. Anna Swanson
17          Assistant United States Attorneys
            UNITED STATES ATTORNEY'S OFFICE
18          1000 Louisiana
            Suite 2300
19          Houston, Texas  77002
            713.567.9000
20          FAX: 713.718.3300
            carrie.wirsing@usdoj.gov
21          anna.swanson@usdoj.gov

22  ALSO PRESENT:

23          Ms. Lasaunda Blake
            UNITED STATES ATTORNEY'S OFFICE
24
            PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

```
 1                          APPEARANCES

 2                           (continued)

 3   FOR THE DEFENDANT:

 4          Mr.  Darryl Emmanuel Austin
            Ms. Natalie Awad
 5          Assistant Federal Public Defenders
            OFFICE OF THE FEDERAL PUBLIC DEFENDER
 6          440 Louisiana
            Suite 1350
 7          Houston, Texas  77002-1056
            (713) 718-4600
 8          FAX:  (713) 718-4610
            darryl_austin@fd.org
 9          natalie_awad@fd.org

10   ALSO PRESENT:

11          Ms. Jessica Mireles
            OFFICE OF THE FEDERAL PUBLIC DEFENDER
12

13   THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
     CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY COURT
14   ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN ASSESSMENT
     AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE COPY AT THE
15   OFFICIAL RATE.

16   GENERAL ORDER 94-15, UNITED STATES DISTRICT COURT, SOUTHERN
     DISTRICT OF TEXAS.
17

18

19   COURT REPORTER:

20          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8004
21          Houston, Texas  77002
            713.250.5582
22

23

24

25


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582
```

1                          INDEX

2                                                          Page

3   GOVERNMENT'S OPENING STATEMENT BY MS. SWANSON           8
    DEFENDANT'S OPENING STATEMENT BY MR. AUSTIN            13
4

5

6

7

8                     INDEX OF WITNESSES

9
    FOR THE UNITED STATES OF AMERICA:
10
    **ARTHUR FERNANDEZ**
11
            DIRECT EXAMINATION BY MS. SWANSON             17
12          CROSS-EXAMINATION BY MR. AUSTIN               44
            REDIRECT EXAMINATION BY MS. SWANSON           72
13          RECROSS-EXAMINATION BY MR. AUSTIN             76

14  **JOSEPH RUIZ DE CHAVEZ**

15          DIRECT EXAMINATION BY MS. WIRSING             83
            CROSS-EXAMINATION BY MR. AUSTIN              102
16

17

18                         INDEX

19  GOVERNMENT RESTS                                     143
    DEFENSE RESTS                                        144
20  RULE 29 MOTION OF ACQUITTAL                          144
    JURY CHARGE CONFERENCE                               146
21  CHARGE OF THE COURT                                  162
    GOVERNMENT'S CLOSING ARGUMENT BY MS. WIRSING         171
22  DEFENDANT'S CLOSING ARGUMENT BY MR. AUSTIN           180
    GOVERNMENT'S REBUTTAL ARGUMENT BY MS. WIRSING        190
23  JURY NOTE NUMBER 1                                   195
    VERDICT                                              198
24

25



              Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                         PROCEEDINGS

2                       August 20, 2024

3        (Jury not present.)

4             THE MARSHAL:  All rise.

09:01:33   5             THE COURT:  Good morning, everyone.  We're waiting for

6    just one juror; and then, we can get started.  Before we get

7    started, I looked at, Mr. Austin, your comments and I looked at

8    the jury charge; and I want to make sure I understand what the

9    issue is before we get started.

09:01:50   10             You said that Element 4 you had a problem with.

11             MR. AUSTIN:  Yes.

12             THE COURT:  And I wanted to make sure I was looking at

13   the right Element 4.  So, on the government's requested jury

14   instructions under forcibly assaulting a federal officer, it

09:02:11   15   says, you know, first, second, third, and fourth.  And it says

16   that in doing such acts, the defendant inflicted bodily injury.

17             But you said that that language said something

18   different.  Is that the right fourth element that I'm supposed

19   to be looking at?  Because in your email, you object to the

09:02:34   20   fourth element of the jury charge.

21             MR. AUSTIN:  Yeah.  No.  When I was looking at it, I

22   realized I was looking at the actual pattern.

23             THE COURT:  Okay.

24             MR. AUSTIN:  So, I didn't want the weapon portion of

09:02:47   25   the pattern in it.  So, the alleged physical force, I want to

1   make sure it just says cause -- I'm sorry.  Physical --

2             THE COURT:  Inflicted bodily jury.

3             MR. AUSTIN:  That's the language I wanted included.

4             THE COURT:  Okay.  That's the language that you

5   included.

6             MS. WIRSING:  Correct.

7             THE COURT:  So, I was just trying to figure out what

8   the issue was.

9             MR. AUSTIN:  The other part of it is I want the Court

10  to consider a lesser included.

11            THE COURT:  Okay.

12            MR. AUSTIN:  And that part is not reflected in the

13  instruction or on the verdict form.

14            THE COURT:  Okay.

15            MR. AUSTIN:  It may be too premature for now.  I don't

16  know.

17            THE COURT:  I guess I need to hear the evidence.

18            MR. AUSTIN:  Yeah.  That's why I put it in that

19  way --

20            THE COURT:  Okay.

21            MR. AUSTIN:  -- so the verdict form might be changed.

22            THE COURT:  Okay.

23            MR. AUSTIN:  That was the only real issue.

24            THE COURT:  Well, I put it together based --

25                 Oh, did you supply an electronic form of your

1  jury charge?

2          MS. WIRSING:  Yes, your Honor.  These were filed on

3  August 15th.

4          THE COURT:  That's what I thought.  That's what my law

09:03:55  5  clerk was working from.  I just wanted to make sure that this

6  was -- the same version that I got is the version that we worked

7  on last night.

8          MS. WIRSING:  Yes, your Honor.

9          THE COURT:  We should be in great shape.

09:04:05  10          And then, the only other issue is the

11  lesser-included charge; and then, I'll wait to hear the evidence

12  before making that decision.

13          Is there anything else that I need to be looking

14  at?

09:04:15  15          MR. AUSTIN:  Not -- not --

16          MS. WIRSING:  No, your Honor.

17          THE COURT:  Okay.  Then, we'll just wait for the last

18  juror.

19          MS. WIRSING:  Thank you, your Honor.

09:06:41  20          THE COURT:  We're just going to take a brief recess,

21  and I'll check to see if the juror is in.

22          THE MARSHAL:  All rise.

23      (Court recessed at 9:06 a.m.)

24      (Court resumed at 9:10 a.m.; jury not present.)

09:11:00  25          THE MARSHAL:  All rise.

1    THE COURT:  He says he's 15 minutes out, that he's not
2  even into downtown yet.  So, all we can do is wait,
3  unfortunately.  Everybody else is here and ready to go.  We're
4  just missing one.
09:11:16  5    MS. WIRSING:  It was a busy morning, your Honor.  So,
6  understood.
7    THE COURT:  Okay.  So, I just wanted to let you guys
8  know to stand down; and I'll give you a call as soon as we get
9  the juror.
09:11:28  10    THE MARSHAL:  All rise.
11    (Court recessed at 9:11 a.m.)
12    (Court resumed at 9:36 a.m.; jury not present.)
13    THE COURT:  Okay.  One of the jurors is here, and
14  we're ready to get started.
09:36:36  15      For opening statements, how long does each side
16  need?
17    MS. SWANSON:  Your Honor, ours, about five to ten
18  minutes.
19    THE COURT:  Okay.
09:36:45  20      Mr. Austin?
21    MR. AUSTIN:  Probably five.  Roughly five.
22    THE COURT:  Then, I'll just set it at ten and let you
23  guys know if you go over ten.
24    MS. WIRSING:  Thank you, Judge.
09:37:05  25    (The jury was brought into the courtroom at 9:37 a.m.)

1          THE MARSHAL:  All rise.

2          THE COURT:  Please be seated, everyone.

3               Good morning, everyone, and welcome back.  I know

4    that it was difficult to get in this morning.  Lots of

09:38:42  5    accidents, lots of traffic.  Thank you-all for your patience.

6               We're ready to get started with the evidence.  As

7    I mentioned yesterday, the first thing this morning, you will

8    hear opening statements from both the prosecution and the

9    defense and then you'll start hearing testimony from witnesses

09:38:54 10   in this case.

11              I expect that we're going to go from now to about

12   maybe 11:00 o'clock and then take just a quick five-minute break

13   to stretch our legs and then continue on through the morning.

14              Ms. Wirsing, you may proceed.

09:39:09 15        MS. SWANSON:  Your Honor, may --

16         THE COURT:  Or Ms. Swanson.

17         MS. SWANSON:  May it please the Court.  And may I

18   approach the podium?

19         THE COURT:  You may approach.

09:39:18 20        MS. SWANSON:  Thank you, your Honor.

21              Good morning, ladies and gentlemen of the jury.

22              As you may remember yesterday from jury

23   selection, my name is Assistant United States Attorney Anna

24   Swanson; and along with my colleague, Assistant United States

09:39:39 25   Attorney Carrie Wirsing, we represent the United States in this

1  case.

2            And we're going to present evidence today that

3  will show that the defendant, Mr. Cedric Tyrone Walker,

4  assaulted a federal officer when this officer was performing his

09:39:54  5  official duties and this assault resulted in his bodily injury.

6            It was in December of 2022 that the defendant was

7  serving the remainder of a federal prison sentence at a facility

8  called the Leidel Reentry Center; and it was on December 24th

9  and then again on December 25th that the defendant had violated

09:40:15  10  the terms of the Leidel facility and he was to be transferred to

11  the Federal Detention Center.

12            And the evidence will show that when the United

13  States Marshals arrived at the Leidel facility to transfer the

14  defendant to the Federal Detention Center, the defendant was

09:40:37  15  agitated, he was resistant.  He was not going to leave Leidel

16  without a fight.

17            Ladies and gentlemen of the jury, we're going to

18  call two United States Marshals today who you will hear from.

19  And what you will learn is that the United States Marshals are

09:40:49  20  federal officers and part of their official duties is to

21  transfer and to secure federal prisoners.

22            And it was on December 27th of 2022 that Deputy

23  Arthur Fernandez and Deputy Chavez were called to transfer the

24  defendant from Leidel to the Federal Detention Center.  And what

09:41:15  25  you will learn from the deputies is that normally when they arrive at

1  this particular facility, they will have -- the staff at the

2  facility will have already brought the inmate who is going to be

3  transferred to a waiting area.

4           And this is an area where the Leidel staff is,

09:41:29  5  and they will have brought them there.  And then, the marshals

6  will come in and they will depart to transfer that particular

7  person.

8           Then, there's another portion of the facility

9  that they'll tell you about where the inmate pods are.  And pods

09:41:41  10  are, basically, where the resident inmates stay, their room, so

11  to speak.  And they'll be brought out of those rooms to the

12  waiting area to then be transferred.

13           What you're going to learn is that on December

14  27th of 2022, the Leidel staff couldn't get the defendant to

09:42:00  15  come to the waiting area for the US Marshals to arrive.  You

16  will learn that he wouldn't leave his pod, that he was

17  resistant.  He wouldn't comply with the staff.  He was not going

18  to leave without fighting.

19           And what the evidence is going to show is that

09:42:17  20  when the Leidel staff brought the US Marshals back into the pod

21  where Mr. Cedric Walker was staying, he was seated on the bed.

22  The US Marshals will testify as to his demeanor, that he was

23  visibly agitated.  He wouldn't get up off of the bed.

24           They walked in.  They had their US Marshal

09:42:40  25  badges.  He was informed who they were, that he was going to be

1  transferred to the Federal Detention Center.  And he was

2  resistant, agitated.  He wouldn't move.  There was some back and

3  forth that you'll hear about between the marshals and the

4  defendant, and they'll tell you about that.

09:42:56  5  They'll also tell you that finally slowly the

6  defendant stood up off the bed.  And when the US Marshals asked

7  him to put his hands behind his back so that they could handcuff

8  him and then take him out to be transferred to the Federal

9  Detention Center, he turned around and he only put one hand

09:43:16  10  behind his back.

11  And it was at that time when the marshals went in

12  to try to handcuff him, the evidence will show, that the

13  defendant spun around and he punched Deputy Chavez in the mouth.

14  And what you will hear from the testimony is that Deputy

09:43:34  15  Chavez's lip was split, his teeth were damaged.  There was blood

16  coming out of his mouth onto the floor, lots of blood flowing

17  from this injury.

18  You will learn that when the defendant swung

19  around and punched Deputy Chavez, Arthur Fernandez will testify

09:43:51  20  what he heard, what he saw, seen Deputy Chavez's neck snap back

21  when he was struck, and the two men falling to the ground

22  together.

23  The deputies will talk about how the defendant

24  continued to fight them when they were on the ground, so much so

09:44:08  25  that Deputy Fernandez had to use a TASER, not once but twice, to

1  finally get the defendant to stop fighting so that they were

2  able to handcuff him.

3           What you're also going to hear, and the evidence

4  will show, is that the defendant didn't stop being agitated, he

09:44:26  5  didn't stop fighting.  They were walking him out of this

6  facility.  He was visibly agitated, he was continually

7  resistant.  When they finally got him into the transfer vehicle,

8  you will hear from the deputies that he was banging against the

9  door, he was kicking.  He was not going to leave without

09:44:46  10  fighting.

11           And what you're going to hear is that Deputy

12  Chavez at that time -- when the defendant was put in the

13  transfer van to then go to the Federal Detention Center, Deputy

14  Chavez went to the hospital to seek medical treatment for the

09:45:03  15  injuries that happened that day; and you'll also hear that

16  Deputy Fernandez then escorted the transfer van to the Federal

17  Detention Center.

18           Ladies and gentlemen, this will be a shorter

19  trial, likely; but this is an important trial.  And you're going

09:45:16  20  to hear the evidence from two Deputy United States Marshals, and

21  we will show beyond a reasonable doubt that the defendant

22  assaulted -- he forcibly assaulted Deputy Chavez while Deputy

23  Chavez was performing his official duties of transferring the

24  defendant from one federal detention facility to another federal

09:45:40  25  detention facility.  We will show beyond a reasonable doubt that

1 the injuries were visible, that he was bodily injured by this

2 impact.

3          And ladies and gentlemen of the jury, the

4 evidence will be simple, it will be straightforward, and it will

09:45:56    5 be clear.  And we will ask -- when we come before you again

6 after you've heard the evidence in this case, we will ask that

7 you find the defendant guilty of assaulting -- forcibly

8 assaulting a federal officer.

9          Thank you.

09:46:15    10          THE COURT:  Thank you, Ms. Swanson.

11          Mr. Austin.

12          You may proceed when ready.

13          MR. AUSTIN:  Ladies and gentlemen, good morning.  I'm

14 Darryl Austin.  I actually -- I'm not sure if I actually

09:46:54    15 introduced myself to you-all yesterday; but I represent

16 Mr. Walker, the man that is on trial for allegedly assaulting

17 Deputy Chavez, who is alleged to have maybe punched Deputy

18 Chavez and caused all that blood and injuries that the

19 government just spoke about.

09:47:28    20          And if it goes that way, you might wonder, well,

21 what is my job?  I represent Mr. Walker.  I also have the

22 opportunity to usher or help usher in the truth of what

23 happened.  In the olden days, medieval times -- you know, in

24 movies they kind of talk about, like, these battles to the

09:47:57    25 death.

1          I'm not sure that that would be accurate; but in

2     this sense, I represent him.  I represent his interests against

3     the government choosing to prosecute him.  And what we just

4     heard can't be the way the trial will go.  What we just heard

09:48:16  5     can't be the evidence you will hear.  If it is, they're going to

6     come very, very short of their obligations.

7          They mentioned two officers, two United States

8     Marshals, Officer Chavez who is the man that was injured and

9     Officer Fernandez.  Officer Fernandez testify -- excuse me, not

09:48:42  10    testify -- stated in interviews he didn't see what happened.  He

11    had to ask Officer Chavez what happened.  How can he come here

12    and say he saw anybody punch anybody?  This is new information

13    you're going to find out.

14          There's also two more witnesses that were there.

09:49:02  15    Maybe they call them; maybe they don't.  I expect they do now.

16    One was a GEO officer.  Her name is Kirrison Wilmore.  And

17    there's another one, David Rozales.  David Rozales didn't see

18    what happened.  Officer Kirrison Wilmore said she saw somebody

19    -- or it's anticipated that she's alleged to have seen Chavez be

09:49:32  20    punched repeatedly.

21          She's the only one that gives that kind of an

22    account.  Deputy Chavez doesn't even give that kind of account.

23    So, there's some embellishment on that.  But what's interesting

24    and what tracks throughout all four of their interviews is that

09:49:52  25    she said Officer Chavez, after one of the officers tackled all

1  of them, he hit his face on a --

2          MS. WIRSING:  Objection, your Honor.

3          MR. AUSTIN:  Excuse me.  This is the anticipated

4  testimony, your Honor.

09:50:06  5          THE COURT:  Okay.  What's the objection?

6          MS. WIRSING:  The government did not indicate that

7  they anticipate calling either of these witnesses.  So, if the

8  defense intends to call them, that would be one thing.

9          MR. AUSTIN:  Objection.  Your Honor, this is --

09:50:16  10          THE COURT:  Okay.

11          MR. AUSTIN:  -- this is wholly inappropriate, your

12  Honor.

13          THE COURT:  Okay.

14          MS. WIRSING:  And it's bordering on argumentative.

09:50:20  15          MR. AUSTIN:  It's anticipated testimony.

16          THE COURT:  Okay.

17          MR. AUSTIN:  I'm entitled to do such.

18          THE COURT:  Respectfully, the objection is overruled.

19          The jury will remember what the evidence is and

09:50:30  20  remember what the party said.

21          So, the objection is overruled.  You may

22  continue.

23          MS. WIRSING:  I would like it noted for the record

24  that the government did not indicate that it anticipated calling

09:50:38  25  these witnesses.

1       MR. AUSTIN:  I object, your Honor.  I object.

2       THE COURT:  The jury -- you're instructed you will

3  remember what the lawyer said and didn't say in this case; and

4  you'll also remember my instructions, ladies and gentlemen, that

09:50:50    5  statements by the attorneys and argument by the attorneys is not

6  evidence in this case.  The only evidence in this case is what

7  you hear from the witnesses on the stand and the documents you

8  receive into evidence.

9       And, Mr. Austin, you may continue.

09:51:07   10       MR. AUSTIN:  Thank you, Judge.

11       So, if they know this person smacked his face on

12  a pole, how are we here saying it was a punch by Mr. Walker?

13  Those are conflicting bits of evidence, conflicting bits of

14  understanding of the events.

09:51:34   15       What won't you see in this case?  You're not

16  going to see any video surveillance.  It's a center that holds

17  -- the government classified it as inmates.  But it's a

18  residential reentry program.  There are cameras everywhere.  No

19  video surveillance.  You'll see none.  No audio.  You'll see

09:51:54   20  none.  And there were other witnesses who were not interviewed.

21       You're not going to hear from them.  Some of them

22  were recorded.  We don't -- we're not going to see any of that

23  either.  So, you're going to be left lacking to do the job that

24  you-all have already sworn to do.  And at the end of this case,

09:52:17   25  I'll be back; and I will implore you why, again, the government

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  will have failed to prove this case against Mr. Walker beyond a

2  reasonable doubt.

3              Thank you very much.

4              THE COURT:  Thank you, Mr. Austin.

09:52:39  5              Ms. Wirsing or Ms. Swanson, you may call your

6  first witness.

7              MS. SWANSON:  Your Honor, the United States calls

8  Arthur Fernandez.

9              THE COURT:  Okay.

09:53:10  10              Mr. Fernandez, if you'd just take the stand, sir.

11              And if you could, just raise your right hand.

12      (The witness, **ARTHUR FERNANDEZ**, called on behalf of the

13  government, was sworn.)

14              THE COURT:  You may proceed.

09:53:26  15              MS. SWANSON:  May it please the Court, may I approach

16  the podium?

17              THE COURT:  Oh, you may approach.  Sorry.

18                      DIRECT EXAMINATION

19  BY MS. SWANSON

09:53:41  20  **Q**    Good morning.  Would you please introduce yourself to the

21  jury.

22  **A**    My name is Arthur Fernandez.

23  **Q**    And, Mr. Fernandez, what do you currently do for a living?

24  **A**    Currently, I'm retired.  I was a US Marshal Deputy

09:53:56  25  Supervisor for about 27 years.

1  **Q**    You said you're currently retired.  What are you doing in

2  retirement?

3  **A**    I retired in the end of February.  So, March and April, you

4  know, the weather was really good.  I was working on the house.

09:54:03  5         THE COURT REPORTER:  I'm sorry.  I can't hear you.

6  Can you move closer to the mike, please.

7         THE WITNESS:  You know, just settling into retirement

8  for the first few months.  I took a vacation with my family to

9  Europe and then got back.  And I had to get into sending my son

09:54:26  10 off to college.  And my other son started high school.  So, it's

11 been a little bit hectic the last few months.

12         It doesn't feel like retirement yet except for I

13 don't have a laptop and I'm not getting a million emails a day.

14 BY MS. SWANSON:

09:54:41  15 **Q**    And you mentioned that you used to be a United States

16 Marshal; is that right?

17 **A**    Right.

18 **Q**    How long did you do that, would you tell the jury?

19 **A**    I started in 1997 in Washington DC where I was from, and I

09:54:52  20 worked there about four and a half years.  Transferred to

21 Houston in 2001.  So, I think it was just shy of 27 years.

22 **Q**    And of those 27, how long were you in Houston.  Trust me,

23 I'm not the greatest with math.  You said you were in Houston --

24 **A**    22, 23 years.

09:55:11  25 **Q**    Okay.  And in your 22, 23 years in Houston, did you do --

1  how many transfers of federal prisoners do you think you did in

2  20 some years?

3  **A**     The early part of deputies' careers --

4            THE COURT REPORTER:  I'm sorry.

09:55:28  5            THE WITNESS:  The early part of deputies' careers in

6  the Marshal Service is custodial or can be custodial, depending

7  on what district you go to, which means in court with prisoners,

8  moving prisoners in vans and different jails or moving one

9  special prisoner two hours away in a vehicle or going to pick

09:55:47  10  some up.

11            In terms of halfway house pickups, those are like

12  one a week in this office on average.  And my -- personally --

13  and when I first came to Houston, I probably did hundred before

14  I became a supervisor.

09:56:06  15  BY MS. SWANSON:

16  **Q**     Okay.  And you mentioned the supervisor.  What was your

17  role with the United States Marshals in December of 2022?

18  **A**     I was at the fugitive task force where marshals work with

19  sheriffs and police and other investigators from this area to --

09:56:28  20  **Q**     And what was your title during that?

21  **A**     Supervisor Deputy, Supervisor -- Supervisory Deputy

22  Commander or Deputy US Marshal Commander.

23  **Q**     And where were you working?

24  **A**     At the downtown office on San Jacinto Street, the old

09:56:50  25  Customs' building.

1  Q    When you say "downtown San Jacinto," is that in Houston?

2  A    Yes.  Downtown Houston.

3  Q    And you had mentioned that you had transferred prisoners

4  from Leidel to other places.  Would you tell the jury what is

09:57:05  5  the Leidel facility?

6  A    The Leidel facility is a residential reentry management

7  facility.  It's a halfway house for federal prisoners.  About

8  five percent of federal prisoners end up there to finish out

9  their sentence, and it helps them readjust to the community.

09:57:23  10          There's like job placement support, counseling.

11  They can go to medical appointments.  It sort of integrates them

12  back -- the goal is back into the community.  So, they finish

13  their sentence there for maybe up to a year but usually less

14  time.

09:57:45  15  Q    And where is the Leidel facility?

16  A    It's at Commerce Street, like not far from the baseball

17  field.

18  Q    And where is Commerce Street?

19  A    Downtown, sort of the east -- northeast of downtown near

09:58:02  20  Minute Maid Park.

21  Q    So, we're -- well, I don't know if everyone knows where

22  Minute Maid Park is.  But what city is that in?

23  A    In Houston.  Downtown Houston.  And I think the address is

24  1819 Commerce Street.

09:58:17  25  Q    All right.  Is Houston within the Southern District of

1  Texas?

2  **A**    Yes.

3  **Q**    And were you working on December 27th of 2022?

4  **A**    Yes.

09:58:28  5  **Q**    Were you involved in the transfer of the defendant in this

6  case, Mr. Cedric Tyrone Walker?

7  **A**    Yes.

8  **Q**    And would you -- do you recognize the defendant?  Would you

9  be able to point him out and identify him?

09:58:42  10 **A**    Yes.  He's seated over there at the defense table in a dark

11 navy blue suit or so with a tie and glasses.

12 **Q**    And what color -- can you see his tie?

13 **A**    Blue.

14 **Q**    Okay.

09:58:55  15        MS. SWANSON:  Your Honor, let the record reflect that

16 the witness has identified the defendant.

17        THE COURT:  The record will so reflect.

18 BY MS. SWANSON:

19 **Q**    Now, in your job in transferring an inmate that's serving

09:59:08  20 their time out at Leidel, if you're called to transfer them to

21 another facility, when you arrive, what usually happens when you

22 are doing this sort of transfer?

23 **A**    The warden usually gets a notice to transfer an inmate for

24 various reasons, for some usually violation of the rules of the

09:59:31  25 halfway house.  Or sometimes there's -- they escape, technical

1 escape where they leave and don't come back or they go to work

2 and don't come back so they miss curfew and they're gone for,

3 you know, a substantial time.

4             So, an escape notice comes out.  So, that -- and

09:59:50  5 then, they often return within a day or two.  Sometimes we use

6 that as the transfer paperwork to -- as a supervisor, I was

7 usually -- we would assign deputies to make that move.

8             When I was a deputy, I would be assigned, if it

9 was a halfway house transfer, stop whatever you're doing, go

10:00:12 10 take care of it.  So, you and another deputy would go to the

11 halfway house and pick up the prisoner and take him to the

12 Federal Detention Center which is also downtown.

13 Q    And when you received a notice regarding the defendant,

14 what was the notice for from Leidel?

10:00:32 15 A    It was an escape notice from the 24th, I believe.  From

16 just before Christmas.

17 Q    And were there more than one notices given regarding this

18 defendant?

19 A    I believe he came back and then left again and missed

10:00:48 20 another curfew or just left without permission.  So, I believe

21 there was two escape notices.

22 Q    Okay.

23             MS. SWANSON:  And we're going to -- I want to publish

24 to the jury what's been pre-admitted as Government's Exhibit 1.

10:01:12 25             THE COURT:  We're just going to turn down the light a

1    little bit so the jury can see.

2    BY MS. SWANSON

3    **Q**    Deputy -- well, Retired Deputy Fernandez, where is this?

4    **A**    That resembles the front entrance of the halfway house.

10:01:39    5    It's not a very good picture, though.

6         MS. SWANSON:  And I'd like to publish Exhibit 2,

7    what's been pre-admitted as Government's Exhibit 2 to the jury.

8    BY MS. SWANSON:

9    **Q**    Do you recognize this area?

10:01:55    10    **A**    Yeah.  That's the main entrance of the halfway house.

11    **Q**    And when you arrive, where do you go?  So, you walk in --

12    walk in that door -- the main door, I'm assuming.  Where do you

13    go from here?

14    **A**    We would walk -- I don't remember the night we're talking

10:02:08    15    about, but we would walk around.  It used to be to the left of

16    the booth.

17    **Q**    Uh-huh.

18    **A**    We would walk straight into the booth, the glass area; and

19    we would communicate with the person behind there, show our

10:02:22    20    badge.  And then, we would be let into the door on the right.

21    **Q**    All right.

22         MS. SWANSON:  I'd like to publish what's been

23    previously admitted as Government's Exhibit 3.

24    BY MS. SWANSON:

10:02:34    25    **Q**    When you -- you mentioned you went through the door on the

1  right.  Where is this area?

2  **A**    This is past that door on the right.  I believe it's around

3  that corner where it's the woman's bathroom.  That's where you

4  would enter right there.

10:02:53  5  **Q**    Okay.  And when you enter -- when you normally arrive at

6  this facility, where would the inmate that you're going to

7  transfer be brought to?

8  **A**    The goal over the years developed into us waiting here,

9  strategically asking staff to go get the inmate and bring them

10:03:08  10  to the front for what, we would hope, they would have an unknown

11  reason why they were being called to the front.  And then, we

12  would confront them there to detain them --

13  **Q**    Okay.

14  **A**    -- rather than going into the pod area.

10:03:21  15  **Q**    Okay.  And was the defendant in this area when you guys

16  arrived?

17  **A**    He was not.

18  **Q**    Where was he?

19  **A**    He was in the living quarters pod.

10:03:33  20        MS. SWANSON:  I'd like to publish to the jury what's

21  been previously admitted as Government's Exhibit 4.

22  BY MS. SWANSON:

23  **Q**    You had mentioned the pod area.  Where is this?  Do you

24  recognize this?

10:03:47  25  **A**    If you leave the other area and walk deep into the photo,

1  you end up in an open area.  Then, another door, you end up in
2  the pod area.
3  **Q**    Okay.
4  **A**    This is where you might have 20 inmates at a time but some
10:04:06  5  may be out wherever.  This is where they live.  It's their
6  bunks.
7  **Q**    Okay.  And where did you find the defendant on the day that
8  you arrived to do the transfer?
9  **A**    Well, when we arrived to do the transfer, we asked staff to
10:04:23  10  bring him up.  We had him transfer -- well, "You know why we're
11  here?  Will you go get the defendant like we usually do?"
12                 And they came back and said, "He's not coming
13  out."  And so, we ended up going back there; and we found him
14  back there in his pod.
10:04:41  15  **Q**    Okay.
16            MS. SWANSON:  I'd like to publish to the jury what's
17  been previously admitted as Government's Exhibit 5.
18  BY MS. SWANSON:
19  **Q**    Do you recognize this area?
10:04:59  20  **A**    Yes.  This is -- this is the -- like second pod, I think.
21  And this is where the inmate and another gentleman were when we
22  first walked into that area.
23  **Q**    Okay.  So, this photograph --
24            MS. SWANSON:  And then, I'd like to publish what's
10:05:18  25  been previously marked as Government's Exhibit 6 to the jury.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  BY MS. SWANSON:

2  **Q**    These two photographs, are these with the pods that you're

3  describing to the jury, this is what they look like?

4  **A**    Yes.  The previous photo was the hallway, and each of those

10:05:36  5  openings would look similar to this.

6  **Q**    Okay.

7         MS. SWANSON:  And would you publish back Government's

8  Exhibit 5 to the jury.

9  BY MS. SWANSON:

10:05:48  10  **Q**    So, when you were walked back to the pod area, where was

11  the defendant inside of the pod?

12  **A**    He was not on the first two bunks.  He was seated on the

13  second bed area.  I recall it being another bunk above him.

14  Maybe they moved it.  But he was seated in the second bunk that

10:06:12  15  doesn't have a second level.

16  **Q**    And when you -- when you originally entered the pod area,

17  where were you standing, approximately, in this -- in this

18  area?

19  **A**    I walked in.  I walked past him towards the lockers in the

10:06:30  20  back, between him and the lockers in the back near the fan.

21  It's hard to see there.  I can't see it.  But here, I see a fan

22  on the right on the floor.  And so, pretty much where he was.  I

23  walked in and walked right by him.

24  **Q**    And would you tell the jury, where was Deputy Chavez in

10:06:50  25  this area of the pod?

Fernandez - Direct/Swanson

1  **A**    He was next to me.  And then, he stopped -- sort of stopped
2  short so we would strategically place ourselves around him.  So,
3  I had the front, and he had the rear.  Or at that point, we were
4  just both right there.

10:07:09    5  **Q**    Okay.  Would you tell the jury -- when you went into this
6  pod area, would you describe what the defendant was doing.

7  **A**    The defendant was seated on the bottom bunk leaning over
8  his thighs, I guess, with his forearms and kind of just looking
9  down at the ground.

10:07:38   10  **Q**    Okay.  And you had mentioned he was seated on one of the
11  beds.  Was he -- what did you observe about his demeanor, if
12  anything?

13  **A**    Well, we already knew he refused to come out to the office
14  when the staff normally goes back and says, "Mr. Walker, you
10:08:01   15  need to come to the front office."  They said -- they came back
16  and said, "He won't come out.  He's uncooperative," something to
17  that effect.

18  **Q**    When you --

19  **A**    "Being difficult."

10:08:15   20  **Q**    Okay.  I'm sorry.  But when you walked into the pod, what
21  were you wearing?

22  **A**    We were in plain clothes that day because when you're
23  assigned to a task force, you wear plain clothes.  And when
24  there's an operation, you put your vest on, both your vest and
10:08:37   25  your heavier weapon, and maybe conduct the operation.  In this

1  case, we were in plain clothes.  So, I was -- I would have my

2  belt badge and my weapon.  And I had my TASER.  But I looked

3  like a plain clothes officer or detective.

4  **Q**    Okay.  And just for my understanding and the jury, we've

10:09:00  5  maybe seen like a police officer wearing full-on uniforms.  Did

6  the United States Marshals even wear that sort of police

7  uniform?

8  **A**    Certain positions, we do, depending on what you're assigned

9  to.  Cell blocks wear a position -- uniforms.  Other positions,

10:09:19  10  not.  Wear sort of a uniform.  But in general, US Marshals don't

11  have a daily uniform.  And when you're assigned to a warrants

12  team, you wear like what normal people wear every day.

13          You may need to wear a suit some days if you're

14  going to go do an interview of some company.  But you generally

10:09:39  15  want to blend in to whatever community you may end up working

16  in.

17  **Q**    And you mentioned that you were wearing your US Marshal

18  badge when you entered the pod that day?

19  **A**    Yeah.  Standard dress would be, you know, gun, badge, extra

10:09:55  20  magazines, handcuffs, and a badge -- you usually would have a

21  badge.  You'd have to have a badge.  It could be on a neck badge

22  or right next to your gun or on the outside.

23  **Q**    Okay.  And when you entered the pod that day, what, if

24  anything, did you do, you and Deputy Chavez, to identify

10:10:15  25  yourself to the defendant?

1 **A**     Identified ourselves by "US Marshals.  We're here to

2 transfer you."

3 **Q**     Okay.  And when you identified yourselves, what did the

4 defendant do?  What was his demeanor?

10:10:32    5 **A**     He was resistant and non-compliant, just kind of ignoring

6 us.

7 **Q**     Okay.  And what did you-all do?

8 **A**     I turned -- when I first went into the pod, there was

9 another person in back; and I wasn't hundred percent sure which

10:10:55   10 was Cedric Walker.  So -- but he quickly looked.  So, I turned

11 towards him.  So, I was right in front of him.  And my partner,

12 Supervisor Ruiz de Chavez, I think he first identified himself,

13 "US Marshals.  Time to go" or "We're here to transfer you,"

14 something to that effect.

10:11:21   15              He ignored that -- or he just didn't respond at

16 all.  And so, then, I tried to communicate with him.  And I

17 said, "We need to take you back to -- we need to take you to

18 FDC, Federal Detention Center.  Can you stand up?" or "Are you

19 able to stand up?" or "Could you stand up?"  And he ignored

10:11:45   20 that.

21              And then, he said -- he may have said, "What

22 for?"  And I said, "Well, you violated.  You left and came back

23 late so we got to go."

24              He continued to just ignore me.  He may have

10:12:03   25 mumbled something, but he didn't stand up.

2-30

1    And I said, "Are you going to stand up?"

2    And he said, "You tell me."

3    And then, we just -- we just stood there until --

4 I think at that point maybe my partner more forcefully said,

5 "Stand up."  And so, he did reluctantly, begrudgingly stood up

6 in a way slowly.  So, he was compliant slowly.

7 **Q**   Okay.  And would you describe for the jury -- you said

8 "reluctantly, begrudgingly."  Would you describe what that

9 looked like.

10 **A**   So, he was ignoring us.  We gave him numerous commands.  We

11 talked to him, explained what we were doing.  And then, he stood

12 up.  And I could just describe it as sort of like -- like a

13 pissed-off, kind of like an attitude thing.  Like not friendly,

14 not -- just like he had tension -- he had tension in his -- just

15 created tension for all of us, I guess.

16    But yeah, he had a mean look.  He was kind of

17 looking at me.  I ended up straight.  When he stood up, it was

18 me and him and Joe.  He turned towards me, and we were looking

19 at each other.  And he just -- he was having a bad morning.  He

20 was just mad, you know.  That's how I can describe it.

21 **Q**   Okay.  And you said when he finally got up, what happened

22 next?

23 **A**   He -- he and I were looking at each other.  I was looking

24 at his hands.  I was looking at his shoulders.  And I think I

25 bladed myself a little bit because I just felt uneasy.

1 **Q**    Now, when you say "bladed," would you describe to me and
2 the jury what does that mean.

3 **A**    I turned my body a little bit to the side so I'd be in a
4 more athletic position so I'm not flatfooted.  I'm more angled.
10:14:29   5 And also to protect my weapon.  In case anything goes down, it
6 will be harder for him to get to my weapon side.

7                But also that's -- like, it's from training.
8 It's just like an athletic FI stance, we call it, to be more
9 prepared to be able to react better if there was an incident.

10:14:55   10 **Q**    Sorry.  You said "FI stance."  I don't know what that
11 means.  Would you explain what that means --

12                MR. AUSTIN:  I didn't hear the question.

13 BY MS. SWANSON:

14 **Q**    -- in plain --

10:15:01   15                MR. AUSTIN:  I didn't hear the question.

16                MS. SWANSON:  He said -- the witness said an "FI
17 stance."  I was asking him to explain what that is.

18                THE WITNESS:  It's just a -- well, an example like in
19 boxing, a boxer wouldn't stand flat-footed toe to toe
10:15:19   20 horizontally with the person -- or parallel with the person in
21 front of them.  They blade their body so they're less of a
22 target.  And your feet are staggered.

23                So, my right foot was back so that if there was
24 -- if he came at me, I would be able to react better and my gun
10:15:40   25 would be protected.

1  BY MS. SWANSON

2  **Q**   And was this part of your training to --

3  **A**   Yes.

4  **Q**   And why did you do that on this day?

10:15:47   5  **A**   It's pretty standard.  Like when you're approaching people

6  to make an arrest -- in a sense, detention at a halfway house is

7  like a street arrest because they could see weapons in there.

8  It's not a full custodial setting like a jail or prison where --

9  you still have to search the inmates and everything on

10:16:12  10  transfers.  But in a halfway house, it's possible they could

11  have a weapon.

12  **Q**   So, you're standing.  The defendant has gotten up.  And

13  what happened next?

14  **A**   Ruiz de Chavez was behind him.  So, he initiated the

10:16:33  15  process of handcuffing.  Well, he was trying to.  He said, "Put

16  your hands behind your back."  And he ignored the command.

17  **Q**   Okay.

18  **A**   He said it again.  And then, I think he might have grabbed

19  his wrist.  Supervisor Ruiz de Chavez may have grabbed his wrist

10:17:02  20  to start putting a handcuff on, and that's when the inmate sort

21  of squatted down and -- and then twisted very fast from a low

22  position and struck Supervisor Ruiz de Chavez.

23  **Q**   Okay.  You said he squatted down and he swung -- spun

24  around.

10:17:30  25  **A**   Yes.

Fernandez - Direct/Swanson

1  Q    What did you see or hear when that happened?

2  A    So, in the process of getting him handcuffed, he turned his

3  body to the left and swung his right arm around.  And I heard

4  like a grunting sound, like "Ah."  And I heard Supervisor Ruiz

10:18:07  5  de Chavez say, "Hey," or something to that effect.

6              It was very close-quarter combat.  It was a

7  close-quarter situation.  Like, he would -- I couldn't see

8  clearly because it was a flash and the defendant's body blocked

9  my view of it.

10:18:28  10  Q    Okay.  What did you see?

11  A    I saw him twist, throw -- the beginning of throwing a punch

12  with his right arm.  Then, I saw Joe fall back, and they both

13  kind of fell back.

14  Q    Okay.

10:18:41  15  A    And they both fell away from me.  And then, I sort of went

16  with them.  It was just a sudden movement, everything that way.

17  Q    Okay.  And when you fell, where did you-all --

18  A    They fell like two feet away on an angle sort of together

19  on their sides or so.  I don't recall exactly.  Then, I quickly

10:19:11  20  jumped on and was able to help get him face down.

21  Q    Okay.  What was happening when -- when they fell, would you

22  say?

23  A    They were still fighting.  They were fighting or he was

24  struggling.  He was trying to break free.  I think the other

10:19:29  25  supervisor had his arm or had part of him.  It was like a

1 grappling, kind of fighting on the ground.  And I jumped on his

2 hip area, and I was pressing my weight against him so he would

3 have trouble moving, sort of control.  He couldn't turn.

4 At the same time, I was trying to grab his right

10:19:49 5 arm.  And he was just fighting, like, the best he could with

6 three people on the ground.  I couldn't see the other

7 supervisor's face so -- nor really the defendant's face.  So, I

8 didn't know what -- what was going on hundred percent.

9 For a second, I thought he could be biting my

10:20:12 10 co-supervisor.  So, I had concern of that.  But it was just kind

11 of a blur, but I knew -- I knew I had to get his arm under

12 control and control him as best I could.

13 **Q**    And if you had to approximately say about -- all that

14 you've described, about how -- how much time did that take from

10:20:33 15 when you saw spinning until you're on the ground fighting?

16 About how much time?

17 **A**    Three seconds, four seconds.

18 **Q**    So, it was pretty quick.  I mean, it was pretty quick,

19 three, four seconds?

10:20:49 20 **A**    Yes.

21 **Q**    Okay.  And you said that you had gotten on his legs and

22 they were -- you-all were trying to get him detained and he was

23 still fighting.  What did you do next?

24 **A**    I was grabbing his arm a little.  And then, I saw the other

10:21:09 25 guard that was standing nearby, and he came closer.  I either

1  directed him to grab his wrist or to help, and that gave me an

2  opportunity to retrieve my TASER from my left side.

3         So, while I was kind of kneeling on the back of

4  his legs maybe, I was still -- I pulled my TASER out; and my

10:21:31  5  initial thought was do not get the cables involved. So, I

6  pulled them off the TASER cartridge and put the TASER on his

7  back and pulled the trigger.

8         And the TASER went off for like five seconds, and

9  it kind of worked, but it didn't really work because he kept

10:21:49  10  fighting. So -- and his fighting increased sort of as the TASER

11  had. So, then the trigger resets after five seconds. I pulled

12  his shirt up; and then, I did it where the skin would be in

13  contact, and that worked.

14  Q    Okay. You said that worked. What happened next?

10:22:10  15  A    He said, "Ow" for a little bit or something to that

16  effect. I could tell it was having an impact; and then, he

17  ceased resisting.

18  Q    Okay.

19  A    His arms sort of went limp. And at that point, I saw Joe

10:22:25  20  -- Supervisor Ruiz de Chavez had his arm, his left arm; and

21  then, he used his cuffs and brought his arms together to cuff

22  him. So, he was cuffed.

23  Q    Okay. And once he was cuffed, what did you observe?

24  A    When he was cuffed, I immediately saw blood droplets on the

10:22:50  25  ground near him which I thought could be his. But as I scanned

1  upwards, I saw Supervisor Ruiz de Chavez on one knee and blood

2  was dripping out pretty significantly from his lip and he had

3  blood all over his face, like smeared.  And then, there was

4  blood on his clothes.  And he stood up, and we got some napkins.

10:23:26  5  And then, the inmate was still on the ground.

6  **Q**    Okay.

7       MS. SWANSON:  I'd like to publish for the jury what's

8  been previously admitted as Government's Exhibit 7A.

9  BY MS. SWANSON:

10:23:47  10  **Q**    In this photograph, who is this on the ground?

11  **A**    That's Mr. Walker.

12  **Q**    Okay.  And where was this blood coming from as you could

13  tell from what you observed?

14  **A**    That's where I wasn't sure.  But then, I realized Joe had

10:24:01  15  kneeled up right near his head area and he was dripping blood.

16  Then, I realized it was Joe's blood.

17  **Q**    Okay.

18       MS. SWANSON:  I'd like to publish for the jury what's

19  been previously marked as Government's Exhibit 7B.

10:24:10  20  BY MS. SWANSON:

21  **Q**    In this photograph, whose hand is that on the side of the

22  defendant?

23  **A**    That's my hand and my jacket; and I had blood on the

24  jacket, as well.

10:24:33  25  **Q**    Okay.  And were you able to observe the defendant's face

1 and body when he was off the ground?

2 **A**    Yes.

3 **Q**    And were there any injuries that you observed on the

4 defendant?

10:24:53    5 **A**    No.

6 **Q**    What, if anything -- did the defendant complain about any

7 injuries?

8 **A**    No.

9 **Q**    Was there any blood on the defendant, on his face?

10:24:59   10 **A**    No.

11 **Q**    Okay.  And what did you observe about Deputy Chavez?  You

12 mentioned that there was blood on his face.

13 **A**    Let me go back.

14 **Q**    Go ahead.

10:25:12   15 **A**    I don't remember if there was blood on his face; but if

16 there was, it would have been Joe's.  He didn't have any

17 injuries.

18 **Q**    Okay.  Okay.  You said it would have been Joe's.  What did

19 you see about Deputy Chavez's face?

10:25:27   20        MS. SWANSON:  And actually, I'd like to publish what's

21 been previously marked as Government's Exhibit 8.

22 BY MS. SWANSON:

23 **Q**    Whose face is this?

24 **A**    That's Joe, the other supervisor.

10:25:42   25 **Q**    And is this what you observed -- well, where is this?

1  **A**    This is in the -- this is right there in the pod.  The

2  window -- same window you can see behind, that was right after

3  the incident.

4  **Q**    And where was the blood coming from that you saw, you said

10:26:01  5  flowing out going on the ground?

6  **A**    Most of that appeared to be from that gash on the upper

7  lip, which was a pretty deep, significant gash.  Sort of

8  lightning bolt shape.  But there could have been blood in his

9  mouth, too, from some other small cuts.

10:26:17  10  **Q**    Okay.  And you had mentioned that after you got up, the --

11  he got a napkin or you were able to control the blood at some

12  point?

13  **A**    There were other people there, the two GEO guards.

14  **Q**    Okay.

10:26:41  15  **A**    They helped to transport.  They had a secure van.  They and

16  a staff member.  Somebody brought down quickly, like, napkins

17  from somewhere around the pod area.  And we tried to blot it and

18  stop -- just direct pressure, stop the bleeding, slow it down.

19  **Q**    Okay.  And where did you go after the defendant was

10:27:05  20  detained and you were able to control some of the blood?

21        MR. AUSTIN:  Judge, I can't hear the question.

22  They're like trailing off.

23  BY MS. SWANSON

24  **Q**    Where did you go after the defendant was detained and his

10:27:21  25  -- this injury was addressed?

1   **A**   We didn't go -- I didn't go anywhere.  Joe ended up going

2   straight to the hospital.  Other people -- other supervisor --

3   one other supervisor came and another deputy came to help us out

4   because we were going to -- we didn't want Supervisor Ruiz de

10:27:41  5   Chavez to drive in case there was some concussion concern or

6   something.  So, we would have to deal with his car.  So, he got

7   a ride to the hospital.

8   **Q**   Okay.  So, when Deputy Chavez went to the hospital, where

9   did you go?  The defendant's detained.  Where did you go?

10:28:00  10   **A**   I stayed there, and Deputy Simon arrived.

11   **Q**   Okay.

12   **A**   And we -- there was no reason to be there anymore.  Oh, I

13   think I talked with staff; and I asked if they had video.  They

14   said they didn't.  And I said, "Well, let's finish this

10:28:23  15   transfer.  It's fine."

16           So, we tried to stand up Mr. Walker to take him

17   to the van.

18   **Q**   Okay.

19   **A**   He didn't comply fully.  He ended up standing up, and he

10:28:34  20   was agitated.

21   **Q**   Okay.

22   **A**   He was saying things I can't recall.  Then, we walked out

23   to the van.

24   **Q**   Okay.  And what did you observe, if anything, about the

10:28:51  25   defendant when he got into the van?

1  **A**    We got outside of the facility into the front of Commerce

2  Street, walked over to the van.  And that's the point where we

3  may have exchanged handcuffs on the inmate because the handcuffs

4  were ours and we were not going to be with him when he got into

10:29:16  5  the jail.  The handcuffs are personal to the officers.

6           But we decided just to leave him just the way he

7  was already handcuffed and get the cuffs later.  We didn't want

8  to have an issue outside.  He was still agitated.  We opened the

9  van door, and we were able to get him in, and he ended up sort

10:29:32  10  of laying down on the bench seat in the back of the van from the

11  side door of the van.  They closed the door; and then, he kicked

12  -- started kicking the door --

13  **Q**    And what did you --

14  **A**    -- a couple of times.

10:29:48  15  **Q**    And what did you do at that time?

16  **A**    I looked at the guard, and we just maybe shook our heads.

17  And then, the guard went to the driver seat; and the other guard

18  went to the passenger seat.  And then, I said I'll follow you;

19  and I followed them to the detention center.

10:30:07  20  **Q**    Okay.

21  **A**    And then, they pulled up to the detention center; and the

22  guard comes out and asks the command center to open the back

23  doors.  And when they went to open -- the back doors opened.

24  They went in, and then I left.

10:30:23  25  **Q**    And when you left, where did you go?

2-41

Fernandez - Direct/Swanson

1  **A**   I went to the hospital to check on Joe.

2  **Q**   And when you got to the hospital, what did you see?

3  **A**   Joe was in a bed like cropped up a little bit in the

4  hallway, like they had already treated him.  They moved him out,

10:30:51  5  and he was standing there -- or he was sitting -- laying there

6  and standing next to him was Supervisor Aloyo --

7  **Q**   Okay.

8  **A**   -- who was supportive in the paperwork.

9           And then, Joe was sort of bandaged, stitched.  I

10:31:09  10  could see he was stitched.  There was a little cleanup.

11  **Q**   Okay.

12  **A**   And a couple doctors came by and had some comments,

13  conversation.

14           MS. SWANSON:  I'd like to publish for the jury what's

10:31:22  15  been previously admitted as Government's Exhibit 9.

16           THE WITNESS:  One of the doctors was looking into his

17  mouth as well because he was saying, "I'm just going to examine

18  him further."

19  BY MS. SWANSON:

10:31:38  20  **Q**   Where is this?

21  **A**   I think that's before I got there.

22  **Q**   Okay.  What you saw at the hospital that you described, was

23  he laying down like in the photograph?

24  **A**   In a bed, but it was slightly cropped up.

10:31:55  25  **Q**   Okay.  Now, you had mentioned just a moment ago that you

```
 1  had spoke to the staff and you had asked for videos of this
 2  incident.
 3                   Were there any videos?
 4  A    No.
 5  Q    Now, let me ask you:  Where did this incident occur?
 6  A    In the pod area, in the living space.
 7  Q    Okay.  And are there cameras in a living space of inmates
 8  in this residential facility?
 9  A    There are not.
10  Q    Okay.  And why would there not be cameras in a living
11  space?
12                   MR. AUSTIN:  Objection.  Calls for speculation, your
13  Honor.
14                   THE COURT:  Objection, sustained.
15                   Can you ask the witness how he would know, lay a
16  foundation?
17                   MS. SWANSON:  Yes, your Honor.
18  BY MS. SWANSON:
19  Q    In your time doing federal transfers from Leidel facility
20  as a part of your duties, are you familiar with the facilities,
21  Leidel, specifically?
22  A    Somewhat.
23  Q    Okay.  Are you familiar with where there are cameras within
24  the facility?
25  A    Not hundred percent, but I know there's one in the front.
```

10:32:12 (line 5)
10:32:31 (line 10)
10:32:38 (line 15)
10:32:48 (line 20)
10:33:01 (line 25)

1  I believe we have video of an inmate once trying to sneak a gun

2  in and the gun fell.  And there was video of the gun falling on

3  the ground near the entrance.  But I asked the staff.  That was

4  -- before I left, I would love to see the video.

10:33:23  5  **Q**    Okay.

6  **A**    Because it could be evidence.

7  **Q**    And in your experience with detention centers and housing

8  areas for inmates --

9            MR. AUSTIN:  Objection, Judge.

10:33:37  10           THE COURT:  Objection overruled.

11           MR. AUSTIN:  She's asking about other facilities.

12  That is not specific to Leidel.  That's the objection.

13           THE COURT:  Objection overruled.

14              You're laying a foundation.

10:33:48  15  BY MS. SWANSON

16  **Q**    In your experience in federal detention facilities with

17  inmate living spaces, is it common or not common for there to be

18  video cameras within the places where inmates are actually

19  living, I mean, their bedroom areas, so to speak?

10:34:04  20  **A**    All I can say is there wasn't a camera at the Leidel living

21  space area, probably for privacy concerns.  It's where inmates

22  sleep.  I'm not sure about every jail or every federal jail.  We

23  have lots of different levels of federal jails.  But there would

24  be a reason not to put a camera, to give them some privacy.

10:34:29  25           MS. SWANSON:  Your Honor, one moment to confer with my

1  co-counsel.

2              We pass the witness.

3              THE COURT:  Cross-examination.

4              MR. AUSTIN:  Yes.

10:34:52  5              THE COURT:  Mr. Austin, are you going to need any

6  pictures published?

7              MR. AUSTIN:  Yes.  For now, we can turn off the

8  lights, I guess.

9              THE COURT:  We can turn them off?

10:35:03  10              MR. AUSTIN:  Yes.

11              THE COURT:  And you may proceed when ready.

12              MR. AUSTIN:  Thank you, Judge.

13                          CROSS-EXAMINATION

14  BY MR. AUSTIN:

10:35:33  15  **Q**    So, it's Deputy Fernandez, correct?

16  **A**    Yes.

17  **Q**    And you're retired now.  Congratulations.

18  **A**    Thanks.

19  **Q**    Thank you for your service.

10:35:43  20              You said you were roughly working as a US Marshal

21  from 1997 up until, I guess, this year, 2024?

22  **A**    Correct.

23  **Q**    Were you a police officer in the military prior to 1997?

24  **A**    No.

10:35:59  25  **Q**    So, your first job as a -- in law enforcement was with the

1  US Marshals?

2  **A**   Correct.

3  **Q**   And as a US Marshal, did they put you through like -- I

4  would call like an academy?

10:36:13   5  **A**   Yes.  I went to the academy for four months.

6  **Q**   Four months of training?

7  **A**   Training, legal studies, shooting.

8  **Q**   Any training on report writing?

9  **A**   Sure, yes.

10:36:27  10  **Q**   And so, you're familiar what the purpose of writing a

11  report is, right?

12  **A**   Yes.

13  **Q**   To capture, as best as you can recall it, the events at

14  that time, right?

10:36:36  15  **A**   Yes.

16  **Q**   And did you write a report of the incident in this case?

17  **A**   I wrote a use-of-force report.

18  **Q**   That's for the TASER?

19  **A**   Right.

10:36:48  20  **Q**   But you didn't describe any of what you testified today up

21  until the TASER part, right?

22  **A**   I don't remember.

23  **Q**   You don't remember writing one, correct?

24  **A**   Yes.  I remember writing about the use of force.

10:37:03  25  **Q**   And the use of force was about the TASER, correct?

1   **A**    Yes.

2   **Q**    Did you write a report on everything leading up to the

3   TASERing or the TASing or not?

4   **A**    I don't think so.

10:37:15   5   **Q**    Okay.  So, in preparation for your testimony today, you

6   didn't read any report, right?

7   **A**    I did read a report from the FBI.

8   **Q**    Okay.  So, what did you familiarize yourself with to

9   testify today?

10:37:34   10   **A**    Just scanning what we had told the FBI in the interview

11   with them.

12   **Q**    Okay.  And how many reports did you read?

13   **A**    One.

14   **Q**    Yours?

10:37:46   15   **A**    No.

16   **Q**    Whose did you read?  Oh, your interview or somebody else's

17   interview?

18   **A**    It was -- it was a summary of everything.

19   **Q**    Understood.

10:38:01   20            Would it help you refresh your recollection on

21   which report you read if I showed you a bunch of reports?

22   **A**    Sure.

23            MR. AUSTIN:  May I approach, your Honor?

24            THE COURT:  You may approach.

10:38:12   25   //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  BY MR. AUSTIN:

2  Q    I think I have one, two -- no.  One, two, three, four

3  reports, okay?  See, if you'd look at that, if those are any of

4  the reports that you reviewed in preparation for your testimony

10:38:31  5  today -- if it helps refresh your recollection, sorry, on which

6  report you reviewed.

7          MS. SWANSON:  Objection, your Honor.  This witness has

8  not testified that he forgot what happened.  I think this is

9  improper refreshment of his recollection.

10:38:52  10         THE COURT:  I'm not sure if it's impeachment or

11  refresh your recollection.  The witness did not say that he

12  didn't remember what he looked at.  I guess are you asking

13  him --

14         MR. AUSTIN:  Which report he looked at, if he

10:39:06  15  recalled.  And I said would it refresh his recollection if I

16  showed him a bunch of reports.

17         THE COURT:  I'm going to allow it because the witness

18  hasn't said which report it was -- or he couldn't remember which

19  report it was.

10:39:19  20         MS. SWANSON:  Your Honor, I believe the witness

21  testified he reviewed the FBI's report; and that's what he

22  testified to.  He didn't say he forgot.  That's my objection,

23  that it's an improper refreshment of his recollection.

24  BY MR. AUSTIN:

10:39:29  25  Q    There are four reports in front you, Officer Fernandez.

```
 1              THE COURT:  Objection overruled.
 2                   You can ask the question.
 3              MR. AUSTIN:  Okay.
 4  BY MR. AUSTIN:
```
10:39:35
```
 5  Q    Which report do you recall reviewing in preparation for
 6  your testimony today?
 7  A    It was a three-page report.  I believe it was this one.
 8  Q    What's the name?
 9  A    It was by Agents Austin and Thomas --
```
10:40:01
```
10  Q    Thank you.
11  A    -- I mean Dvornick and Oppedisano.
12              THE COURT REPORTER:  I'm sorry, what were the names?
13  BY MR. AUSTIN:
14  Q    Dvornick and Oppedisano?
```
10:40:03
```
15  A    Yes.
16  Q    And that report that you recall was of that person --
17  A    Yes.
18  Q    -- Arthur Fernandez?
19  A    Yes.
```
10:40:23
```
20  Q    That's you?
21  A    Yes.
22  Q    Okay.  So, you read the report that somebody else wrote in
23  preparation for your testimony today, right?
24  A    Yes.
```
10:40:31
```
25  Q    And because it's hard to remember all the events, I assume,
```

1  from 2022, right?

2  **A**    No.

3  **Q**    It's not hard to remember?

4  **A**    No.

10:40:45  5  **Q**    So, you remember everything clearly from 2022 on December

6  25th, that event, right?

7  **A**    I remember when I went into the meeting with the attorneys

8  to review and they offered for me to review the report.  I felt

9  I didn't need to, but I did because it was pretty clearcut what

10:41:04  10  happened, and I remember what happened.

11  **Q**    Right.  And so, in your report -- or your interview with

12  the agents, you said you didn't see Mr. Walker punch Deputy

13  Chavez, right?

14  **A**    I don't know what word I used, but I might have said I

10:41:23  15  didn't --

16  **Q**    Do you remember clearly or not what happened?

17  **A**    I remember clearly what happened.

18  **Q**    Okay.  Do you remember clearly or not what you told

19  Officers Oppedisano and Dvornick?  Do you remember clearly about

10:41:40  20  that?

21  **A**    Not exactly.

22  **Q**    Okay.  So, there is some limitations on how clear you

23  recall things, right?

24  **A**    I remember the event more than the interview.

10:41:47  25  **Q**    Okay.  And that's fair.

1  **A**    I can explain that if you want.

2  **Q**    And you lived through the event, right?

3  **A**    Right.

4  **Q**    And so, that would make more sense why you might remember

10:41:58  5  certain details rather than minute details, right?

6  **A**    Right.

7  **Q**    And I think you just testified that you did not see him

8  actually -- "him," meaning Officer Chavez -- be punched by

9  Mr. Walker.

10:42:10  10              Did I hear that correctly?

11  **A**    What I'm portraying now and in my testimony earlier and any

12  statement to the FBI was that I didn't see the fist make direct

13  contact with the mouth.

14  **Q**    Thank you.  Thank you.

10:42:26  15              And so, for the record, you did not see

16  Mr. Walker punch with his fist Deputy Chavez?

17  **A**    I saw everything that indicated that the punch occurred.

18  **Q**    So, you are going off of what I will call an inference,

19  correct?

10:42:49  20  **A**    In my training and experience, what I saw was a punch being

21  thrown and a punch being absorbed; but I didn't -- my eyes

22  didn't see --

23  **Q**    An absorbed punch?  Your eyes didn't see an absorbed

24  punch?

10:43:08  25  **A**    Because I was blocked by --

1  Q    Okay.

2  A    -- the bodies, you could say; and it was close quarters.

3  Q    I don't think the question is why didn't you see an

4  absorbed punch.  The question is you did not see an absorbed

10:43:19  5  punch.  There's a distinction.  You would agree with that,

6  right?

7  A    I saw what appeared to be the result of an absorbed

8  punch --

9  Q    Okay.

10:43:27  10  A    -- and the sound and everything leading up to it.  But I

11  didn't want to say I saw the fist hit the face because it

12  wouldn't be true.

13  Q    Thank you.

14  A    I saw what I saw.

10:43:38  15  Q    Thank you.

16        And you're here to testify truthfully?

17  A    Exactly.

18  Q    And you're doing the best you can.

19        Now, you had an opportunity to refresh, I guess,

10:43:57  20  to some extent, your recollection on the report you reviewed in

21  preparation for it today, right?

22  A    Yes.

23  Q    And how many times did you meet with the government to

24  prepare for your testimony today?

10:44:11  25  A    Once.

1 **Q**    In the recent past?  How long ago was that?

2 **A**    It was -- it was the other day before I left town.  And

3 there was a conflict with my arrival yesterday.  So, Friday.

4 **Q**    Okay.  So, you prepared for your testimony today prior to

10:44:48  5 the weekend?

6 **A**    Yes.

7 **Q**    And it's unclear to me, based on your testimony, if

8 Mr. Walker fell down flat on his stomach or on his side.

9              What do you recall?

10:45:09 10 **A**    I don't recall exactly how he fell.

11 **Q**    Okay.

12 **A**    They fell together in a fighting -- like, together like

13 still fighting, holding each other.

14 **Q**    Okay.  And before they fell, did you see them grappling?

10:45:27 15 **A**    No.

16 **Q**    Did you see, before they fell, if another officer came in

17 and tackled them?

18 **A**    There was no other officer that would have gotten

19 involved.

10:45:43 20 **Q**    So, you testified that there were GEO officers there.  Or

21 I guess they're not officers.

22 **A**    Guards.  They came with the van.

23 **Q**    Okay.  Were there not GEO escorts to the podded area?

24 **A**    No.  It was a female staff member that was, like, with

10:46:02 25 management.

1 **Q**    So, it was only -- it was only three of you that went to

2 the pod area, yourself, Deputy Chavez, and some unknown person?

3 **A**    No.  Two GEO guards came, but they stayed in the entrance

4 to the pod.  They hung back during the initial contact.

10:46:27  5 **Q**    Okay.  So, when you're saying it was just --

6          MR. AUSTIN:  Maybe we do need Government's -- in fact,

7 let me use Defense Exhibit 1.

8          THE COURT:  One second.  We're going to turn down --

9          MR. AUSTIN:  Sorry.  We probably don't need the

10:46:52  10 lights.

11 BY MR. AUSTIN:

12 **Q**    Okay.  I don't want to misrepresent what you're saying.

13 You walked into this area without the GEO folks.  Is that what

14 you're testifying to right now?

10:47:02  15 **A**    Yeah.  They stopped at this wall on the left.  They stopped

16 at the first bunks.

17          MR. AUSTIN:  Do we have a pointer or anything like

18 that?  Or I can just walk up.

19 BY MR. AUSTIN:

10:47:15  20 **Q**    The GEO people stopped in this (indicating) area?

21 **A**    From what I recall -- because I was walking in.  So, I

22 wasn't looking behind me.  But when -- I remember after I

23 turned, I knew there was another inmate to my -- sort of behind

24 me and then the guards were --

10:47:37  25 **Q**    Okay.  So, could you point out the area where Cedric was

1  with that pointer, hopefully.

2  **A**    (Complied.)

3         MR. AUSTIN:  See if everybody can see.

4  BY MR. AUSTIN:

10:48:02  5  **Q**    Okay.  So, that area is where the GEO guards stopped?

6  **A**    Here and here -- here and here (indicating throughout.)

7  **Q**    All right.

8  **A**    It's not in the picture.

9  **Q**    Okay.

10:48:11  10  **A**    I was over here.  Joe was right here.  When he stood up and

11  I turned and he turned towards me, that's where I knew where

12  sort of everybody was.

13  **Q**    Okay.

14  **A**    They were not involved.

10:48:24  15  **Q**    I understand.

16         So, my question is when you walked up into that

17  area, how many people walked over there with you?

18  **A**    Towards that area?

19  **Q**    Towards the pod area.

10:48:33  20  **A**    Yeah.  The staff member walked first.  That's the pod.

21  **Q**    Okay.  And who else was there?

22  **A**    Joe and I were the two marshals that went in; and then, the

23  two guards were sort of lagging behind us.

24  **Q**    So, that's at least five people in that podded area,

10:48:47  25  right --

```
          1  A    No.

          2  Q    -- that you --

          3  A    The staff member didn't go in.

          4  Q    Okay.

10:48:52  5  A    The staff member sort of passed it.  They were like

          6  non-existent.  They just pointed that's the pod and they stepped

          7  off.

          8  Q    But you said there was another guy in the pod area, right?

          9  A    There was another inmate, yes.

10:49:05  10 Q    Okay.  So, that's at least five people --

          11 A    Yes.

          12 Q    -- that you remember --

          13 A    Yes.

          14 Q    -- in that area?

10:49:10  15          Okay.  Did you tell the guy to leave the area?

          16 A    No.

          17 Q    And let me see if I can give you a better photo.

          18        MR. AUSTIN:  Excuse me.

          19        Defense Exhibit 3, please.

10:49:42  20 BY MR. AUSTIN:

          21 Q    All right.  Can you see that photo?

          22 A    Yes.

          23 Q    There are two people depicted in there -- in that photo.

          24 Would that be kind of where the guards are?

10:50:02  25 A    Exactly.
```

1   Q    All right, I understand.

2            And that is the full area of the pod?

3   A    From the back, right.  Yes.  Yes.  From what I recall.

4   There would be a wall sort of behind the screen.

10:50:21    5   Q    If you can point at it with your pointer so we can tell.

6   A    There must be a wall here (indicating) or a short wall.

7   Q    Okay.

8   A    I want to say this was the second pod section.  There's

9   another pod section in the photo.  There's a long hallway.  So,

10:50:40   10   there would be a short wall here.

11   Q    So, Defense Exhibit 4?  I'm trying to help you out --

12   A    Yes.

13   Q    -- so that you can be accurate.

14            Better?  That's the other wall you were referring

10:50:57   15   to?

16   A    Well, no.  There should be a wall right here (indicating).

17   Q    Okay.

18   A    The chair -- this is a red chair.

19   Q    Yeah.

10:51:07   20   A    Behind that is a short wall.

21   Q    Okay.  Perfect.

22   A    Just like this one here (indicating).

23   Q    But as far as anybody else is in there, it is you in that

24   area where you are pointing towards the middle, back end of

10:51:18   25   Defense Exhibit 4?

1    **A**    I believe there was another inmate here (indicating), and

2    he stayed away.

3    **Q**    Okay.  Now, you were asked a few questions.

4            MR. AUSTIN:  We can turn the lights on for now --

10:51:34   5    thank you -- unless everybody's okay with the darkness.

6            THE COURT:  No.  We'll turn the lights back on.

7            MR. AUSTIN:  Okay.

8    BY MR. AUSTIN:

9    **Q**    All right.  So, we have an idea of the podded area for

10:51:54  10    purposes of where the incident occurred.

11            And I think you said on direct there were two

12    escape notices, right?

13    **A**    Correct.

14    **Q**    And sometimes it's -- I think you articulated that people

10:52:12  15    leave without permission or they miss curfew or so on and so

16    forth, right?

17    **A**    Yes.  It's across the board.  They could disappear and

18    never come back.  Sometimes they leave and come back two days

19    later.  Sometimes they leave and are only a few hours late.

10:52:32  20    Sometimes they leave and get arrested --

21    **Q**    Right.

22    **A**    -- and we find out they were in another jail.

23    **Q**    But in this case, that didn't -- that wasn't the situation.

24    The situation, I guess from your testimony, is he left on the

10:52:44  25    24th and he left on the 25th?

1  A    He left here without permission on Christmas Eve.

2  Q    And that you said the 25th, also?

3  A    Yeah.

4  Q    You said there were two?

10:52:57  5  A    There were two -- two violations so --

6  Q    And are you aware that he actually had permission?

7  A    No, I'm not aware.

8  Q    Did you do any interviewing of any witnesses in preparation

9  or investigation of this case at all?

10:53:03  10  A    No.  It wasn't important.  If he had permission, then they

11  wouldn't have sent us the escape notice or there was a

12  miscommunication among their staff.  But we had our orders.  We

13  had an escape notice which we were told to use as a transfer.

14  Q    I think you've indicated mistakes happen, right?

10:53:22  15  A    At the facility?

16  Q    Yes.  At the facility, mistakes happen?

17  A    I assume.

18  Q    Well, did he tell you "I have permission"?

19  A    It was irrelevant at that point.

10:53:34  20  Q    So, if he didn't escape but you're treating him like an

21  escapee, you think that's irrelevant?

22  A    We had orders to conduct the transfer order.

23  Q    Right or wrong, you had orders?

24  A    Well, if an inmate wants to argue his case, he had an

10:53:55  25  opportunity with the staff there; and the staff were the ones

1  that told us when we got there to -- you know.

2  **Q**    And if the staff made a mistake, I guess you might imagine

3  somebody might not be so happy to hear they're going to

4  potentially prison, right, for something they didn't do?

10:54:17  5  **A**    He definitely wasn't happy.

6  **Q**    Okay.  That's what you were testifying to, his demeanor

7  seemed like he was agitated or whatever, right?

8  **A**    Yes.

9  **Q**    But he told you he had permission, didn't he?

10:54:29  10  **A**    No.

11  **Q**    You don't recall that?

12  **A**    No.

13  **Q**    Okay.  And you said that he was called to come to the front

14  which is kind of like strategic, right?

10:54:46  15  **A**    Yes.

16  **Q**    Were you there when that happened?

17  **A**    Yes.

18  **Q**    Okay.  And you were told he's not coming?

19  **A**    Correct.

10:54:53  20  **Q**    Okay.  And so, you guys kind of went around your way to the

21  back?

22  **A**    Yes.  So -- yes.

23  **Q**    Yes, right?

24           And now, you were shown Government's Exhibit 2.

10:55:12  25           MR. AUSTIN:  If you can pull that up.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          We may not need the lights.  Let's see.

2    BY MR. AUSTIN:

3    Q    All right.  We can kind of see?

4          Do you see a light in that photo at the top --

10:55:35  5    A    A light?

6    Q    -- the ceiling?

7    A    Yes.

8    Q    All right.  What's that white thing, looks like a button

9    next to it?

10:55:45  10   A    A camera.

11   Q    That's a camera?

12          So, when you were testifying on direct about you

13   saw an inmate with a gun, who was that person you saw with a

14   gun?  That wasn't Mr. Walker, was it?

10:56:00  15   A    No.  That was a few years ago.

16   Q    Oh.

17   A    And the magnetometer was over on the left side, and that's

18   where the entrance is for the inmates.

19   Q    All right.  So, you know they have video surveillance, so

10:56:13  20   to speak?

21   A    In the front at least.

22   Q    At least, right?  All right.

23          MR. AUSTIN:  And Government's Exhibit 3.

24   BY MR. AUSTIN:

10:56:36  25   Q    This one is a little tough.  But you see where the cursor

1  is?

2  **A**    Yes.

3  **Q**    Is there another camera in that far right corner?

4  **A**    Yeah, appears to be.

10:56:50  5  **Q**    And what area is that?

6  **A**    That's the office area.

7  **Q**    All right.  Did you review camera work for either of those

8  areas?

9  **A**    No.

10:56:58  10  **Q**    Why not?

11  **A**    Because they wouldn't depict the pod area where the

12  incident took place.

13  **Q**    Okay.  But you said you asked was there any video, right?

14  **A**    Of the pod.

10:57:13  15  **Q**    Oh, it was specifically of the pod?

16  **A**    Correct.

17  **Q**    All right.  So, you didn't want to know of video of him

18  actually maybe leaving or maybe not leaving, for example, as an

19  escapee?  You weren't interested in that, right?

10:57:27  20  **A**    No. I wasn't interested in charging him with escape because

21  he was in custody.

22  **Q**    You weren't interested in finding out if he walked out with

23  permission and a high five or a smiling face either, right?

24  **A**    Not necessarily.

10:57:41  25  **Q**    Okay.

1          MR. AUSTIN:  Government's Exhibit 4 --

2     BY MR. AUSTIN:

3     **Q**     I don't want to cheat you.

4          MR. AUSTIN:  -- blow that up.

10:57:54   5          We may have to use the lights on this one.

6     BY MR. AUSTIN:

7     **Q**     Now, that's the back hallway, right?

8     **A**     That's the -- what I would call the pod area.

9     **Q**     And that is the walkway you-all came down, right?

10:58:29  10     **A**     We came from the forefront of this photo or where the photo

11    starts at the bottom.  And we walked into the photo and turned

12    right at Number 6.

13    **Q**     All right.  Well, for clarification, I think the pod area

14    is Number 8.  Do you recall which number the pod area is?

10:58:48  15    **A**     No.  I felt like it was pretty early.  I've been in there

16    to get an inmate in the past where he was all the way in the

17    back.

18    **Q**     Okay.  So, if you can tell, if you can, there are lights on

19    the ceiling in this photo, Government's 4.  It goes one, two,

10:59:10  20    three, four, five in a row, right?

21    **A**     Yes.

22    **Q**     Do you see something blocking or in the middle of that

23    sixth light there?  Do you see that?

24          MR. AUSTIN:  Can you zoom in.

10:59:24  25    //

BY MR. AUSTIN:

Q    What does that look like?

A    It looks like a camera.

Q    Did you ask to see the surveillance on that camera?

10:59:38    A    Not specifically that one.

Q    Why not?

A    Well, I asked the staff member if they had video of this area here; and they said, "No, we don't."

Q    But you --

10:59:48    A    Oh, because I asked for the pod; and I don't think that --

Q    You don't think, right?  So, you don't know what, if anything, that camera captured, yes or no?

A    No, I don't.

Q    Okay.  And you didn't check?

11:00:06    A    I asked the staff and I was satisfied that they didn't have any video.

Q    They satisfied you enough that whatever happened, we would never know, right?

        MS. SWANSON:  Objection, your Honor.  Counsel is

11:00:29    testifying.  It's also argumentative.

        THE COURT:  I'm going to overrule the objection.

            The jury will remember that the evidence in this case comes from the witness on the stand, not arguments by counsel or not questions or statements by counsel.

11:00:42    //

1  BY MR. AUSTIN:

2  **Q**   All right.  So, as far as we're left with the incident that

3  occurred almost -- well, over a year and a half ago, we have to

4  rely on your recollection, right?

11:00:50  5  **A**   Yes.

6  **Q**   We don't have the ability, for example, to view what, if

7  anything, happened, right?

8  **A**   No.

9  **Q**   We don't.

11:01:00  10            And, in fact, I think you indicated on direct

11  that after Mr. Walker was arrested, you went and spoke --

12  visited, excuse me, Joe, you referred to him, right?

13  **A**   Yes.

14  **Q**   And that's Officer Chavez or Deputy Chavez.

11:01:16  15            Did you talk to him about what happened at the

16  hospital?

17  **A**   Yes.

18  **Q**   Is there a chance he might have infected your mind or your

19  recollection with his own misrememberings?

11:01:27  20  **A**   No.

21  **Q**   You don't think there's a chance of that?

22  **A**   No.

23  **Q**   Okay.

24  **A**   I mean, I saw what I saw.

11:01:35  25  **Q**   So, you don't think there's a chance?  That's the question.

1  A    No.

2  Q    So, when you said in the interview with Officers Oppedisano

3  and Dvornick and you said he struck him in the head, where would

4  that information come from if you didn't see it?

11:01:55   5  A    I saw -- just a summary of everything I did see.

6  Q    Okay.  And isn't it a fact you asked Officer Chavez, Joe,

7  what happened before he was ever even stitched up?  You said,

8  "What happened?"  Right?

9  A    I don't recall.

11:02:18   10  Q    You read -- well, let me see if I can refresh your

11  recollection.

12            You have the reports.  See if that refreshes your

13  recollection, if you asked what happened.

14  A    Yeah.

11:02:52   15  Q    It does?  It refreshes your recollection, right, that you

16  asked what happened?

17  A    Yes.

18  Q    And I think Joe indicated to you that the punch cut him in

19  the mouth, right?

11:03:09   20  A    Yes, he stated that.

21  Q    So, you were going off of the punch as the nexus of the

22  injury to his mouth from Joe?

23  A    Yes.  Like, I wanted to hear his take on what happened.

24  Q    And did you have anybody else's take on what happened?  Did

11:03:29   25  you interview any of the other people that were standing right

1  there?

2  **A**     No.

3  **Q**     So, you were only interested in one person's account of

4  what happened?

11:03:41    5  **A**     And -- yes.

6  **Q**     But you thought well enough to ask for video?

7  **A**     Yes.

8  **Q**     Okay.

9  **A**     The video could be useful for training or --

11:03:57   10  **Q**     Or trial?

11  **A**     -- or -- yes.

12  **Q**     Or to get the events accurate, right?

13  **A**     Exactly.

14         MS. SWANSON:  Your Honor, objection again.  Counsel

11:04:07   15  continues to testify, not asking questions.

16         MR. AUSTIN:  That was a question, to get accurate

17  testimony.

18         THE COURT:  I'm going to overrule the objection and

19  instruct the jury again the testimony in this case and the

11:04:20   20  evidence you are to consider comes from the witness on the stand

21  and the evidence that -- the documents that are introduced into

22  evidence.

23         Statements by counsel, questions by counsel,

24  objections by counsel are not evidence in this case and should

11:04:33   25  not be considered by you.

1  BY MR. AUSTIN:

2  **Q**   Now, based on your training, you mentioned on direct you

3  took like a bladed position?

4  **A**   Yes.

11:04:45   5  **Q**   Like a boxer, you said.  Like that (indicating)?

6  **A**   Yes.

7  **Q**   When was the last time you did a transfer like that?

8  **A**   Well, it's similar to arrests so --

9  **Q**   I want to know about a transfer.  When was the last time

11:05:03   10  you did a transfer like the one you did in 2022?

11  **A**   The transfer where we had to go to the pod?

12  **Q**   Yes.

13  **A**   A few years before.

14  **Q**   So, it was an unfamiliar setting for you, at least an

11:05:17   15  unfamiliar -- an unpracticed setting, right?  That's the first

16  time in a while?

17  **A**   No.  Because it's similar to the street arrest.

18  **Q**   Certainly similar, correct.

19          But in terms of you doing these procedures, it

11:05:33   20  had been some years, I think, is what you're indicating?

21  **A**   I had done one probably a few months before where they

22  brought the inmate to the front office.  So, occasionally, when

23  staff was low, supervisors would -- I would volunteer to do it

24  occasionally but not too often.

11:05:51   25  **Q**   Right.  And in this particular, you had to go to the pod?

1   **A**   Yes.

2   **Q**   So, I'm more concerned with your experiences of going to

3   the pod.  When was the last time you had to do that?  Would that

4   be a few years ago?

11:06:01   5   **A**   Yes.

6   **Q**   All right.  And so, when you said you felt a little uneasy,

7   it's because he's standing pretty much in your face, right?

8   **A**   Yes.

9   **Q**   You're unprotected, right, so to speak?

11:06:12   10   **A**   Well, that's part of our job.

11   **Q**   Okay.  But it's natural if somebody is in your space -- how

12   close was he to you?

13   **A**   Very close.

14   **Q**   Closer than I am to you?

11:06:23   15   **A**   Yes.

16   **Q**   A foot or two away?

17   **A**   A normal distance, communication.  It wasn't unusually

18   close, but it wasn't extended.

19   **Q**   An arm's reach --

11:06:32   20   **A**   Yes.

21   **Q**   -- at least, right?

22   **A**   Yes.

23   **Q**   And you're -- I don't know how tall you are.  You seem tall

24   from where you're seated.  What are you, about six-two,

11:06:45   25   six-three?

```
       1  A    Six-one -- six-one and a half.

       2  Q    Six-one?

       3  A    Six-one and a half.

       4  Q    I don't normally know guys that go lower.

11:06:54 5       So, he's within an arm's reach distance?

       6  A    Yes.

       7  Q    And it's like Christmas time, right?

       8  A    Yes.

       9  Q    And you were shown some images -- I forget which one.  But

11:07:05 10 you indicated it was your arm in the photo, right?

      11  A    Yes.

      12  Q    Who were the people taking those photos?

      13  A    I think Joe took that photo.

      14  Q    All right.  That was like the first time you saw those

11:07:18 15 photos was today?

      16  A    No.  I saw them Friday.

      17  Q    Oh, I'm sorry.  That's true.

      18       Preparation for trial was the first time you saw

      19 the photos?

11:07:30 20 A    Yes.

      21  Q    Okay.  Now, I think you indicated you didn't write a report

      22 on this, right?

      23  A    That I did not?

      24  Q    That you did not?

11:07:51 25 A    I believe the only report I wrote was the use-of-force
```

1  report.

2  **Q**   Which was when you described the TASing that you used.  You

3  TASed him twice.

4  **A**   We're obligated whenever we use force to write a report

11:08:05  5  about the use of force.

6  **Q**   Okay.  And I just want to be -- for purposes of

7  completeness, I'm going to show you Defense Exhibit 9 and 10.

8              We'll put up 9 first.

9              That's the door you came through to go to the

11:08:27  10  pod?

11  **A**   I can't recall.  I haven't looked at it at that angle.

12  **Q**   Okay.

13          MR. AUSTIN:  Let's try Defense Exhibit 10.

14  BY MR. AUSTIN:

11:08:46  15  **Q**   How about now?  Does that tell you which area you came in

16  to get to the pods?

17  **A**   I can't recall.

18  **Q**   Okay.  No problem.

19              And I think we saw a photo like this with Defense

11:09:16  20  Exhibit 11.  We are -- I think you've already indicated that

21  that was a camera up there as well, right?

22  **A**   Yes.

23  **Q**   Which is clearly a different area than what was depicted in

24  Defense Exhibits 9 and 10, you would agree?

11:09:39  25  **A**   Yes.

1 **Q**    Okay.  And so, before I let you go, I just want to be

2 clear:  When you met with Joe, you asked him how he was feeling,

3 that kind of thing?

4 **A**    Yes.

11:09:51  5 **Q**    Did you talk to him about the events even at that time?

6 **A**    Probably, yeah.

7 **Q**    And as far as I recall, you did not speak with anybody

8 else, what their take on what happened was, right?

9 **A**    Nothing significant that I recall or remember.

11:10:14  10 **Q**    Right.  So, you don't remember talking to either GEO

11 officer that was there, right?

12 **A**    I don't remember if we talked or what was said.

13 **Q**    Do you recall at all if that at least one other person that

14 was in the pod area had his phone out and was recording?

11:10:36  15 **A**    No.

16 **Q**    Okay.  Did you talk to him about what happened?

17 **A**    No.

18 **Q**    And, likewise, you spoke with nobody else about what

19 happened other than Deputy Chavez?

11:10:46  20 **A**    Talking about witnesses or --

21 **Q**    Or anything?

22 **A**    No.  Just other -- talked to people that came for support

23 or to help out.

24 **Q**    Okay.  But they weren't there, right?

11:10:58  25 **A**    No.

1    Q    They wouldn't be eyewitnesses, right?

2    A    No.

3    Q    Okay.  So, the only other eyewitnesses you spoke to was

4    Joe, Officer Chavez?

11:11:07    5    A    Yes.

6    Q    Thank you.

7         MR. AUSTIN:  I will pass the witness.

8         THE COURT:  Redirect?

9         MS. SWANSON:  Yes, your Honor.

11:11:24    10                    REDIRECT EXAMINATION

11    BY MS. SWANSON

12    Q    All right.  Retired Deputy Fernandez, are the US Marshals

13    the investigating agency for this case?

14    A    No.  No, we're not.

11:11:41    15    Q    Which agency investigated this case?

16    A    Well, the FBI did --

17    Q    Okay.

18    A    -- because we couldn't investigate as our own agency

19    because, I guess, it would be, like, a conflict of interest or

11:11:57    20    something; like a supervisor may say make sure you get, you

21    know, charges or -- it would have to be an outside agency, not

22    an involved party.  So --

23    Q    So --

24    A    -- we got a call from the FBI or we called the FBI and had

11:12:14    25    discussions.

1 **Q** Right. So, was it your role to do all these investigative

2 things that defense counsel was asking you about?

3 **A** No.

4 **Q** Whose role is that in this case?

11:12:25  5 **A** The FBI.

6 **Q** Okay. And are you actually a witness in this case?

7 **A** Yes.

8 **Q** Okay. Now, defense counsel had asked you about the report

9 that you did related to the TASER, or the use of force?

11:12:45 10 **A** Yes.

11 **Q** Within this report -- do you remember when you wrote it,

12 approximately?

13 **A** It's due within 24 hours. So, I did it that night, I

14 believe.

11:13:00 15 **Q** And within this report -- you actually authored this

16 report?

17 **A** Yes.

18 **Q** And I believe that counsel said it only talked about the

19 TASER. But is that actually true? Your report, what else did

11:13:18 20 you talk about in this report?

21 **A** I might have talked about the purpose, what we were doing,

22 who was there, then the incident and the use of the TASER and

23 why I felt I needed to use it maybe. And then, that was it.

24 It's not a report of the whole story necessarily as long as

11:13:41 25 those FBI reports were there.

Fernandez - Redirect/Swanson

1          But it was just to summarize, to cover our

2    policies that this is why I used the TASER and this was the

3    incident around the use of the TASER.  But that's the gist of

4    it.

11:13:57   5   **Q**    And would it help refresh your recollection of what you

6    wrote about the incident in this report if you were able to take

7    a look at your report?

8    **A**    Yes.

9    **Q**    Okay.

11:14:08  10         MS. SWANSON:  May I approach the witness, your Honor?

11         THE COURT:  You may approach.

12   BY MS. SWANSON:

13   **Q**    I know the writing is really small, but this is -- would

14   you take a look at that.

11:15:58  15   **A**    All right.  I read it.

16   **Q**    Are you the author of this use-of-force report?

17   **A**    Yes.

18   **Q**    And within the report, does it only talk about the TASER?

19   **A**    No.  I think the report pretty much tells the whole story.

11:16:11  20   **Q**    Yeah.

21   **A**    It says we got a transfer order, we went there, and who was

22   there.  It talks about the injury.  I think it's pretty

23   thorough.

24   **Q**    What's actually -- what's the title of this report?

11:16:28  25   **A**    Use-of-force report.

Fernandez - Redirect/Swanson

1    **Q**    Would it help your memory if I give you back the report?

2    **A**    Yes.

3    **Q**    Okay.  And what is the title of this report that you wrote?

4    **A**    Incident report -- or Incident 23-2668 --

11:16:42    5         THE COURT REPORTER:  Incident -- I'm sorry.  Incident

6    what?

7         THE WITNESS:  Incident, dash -- or INCIV-23-2668-

8    assault and battery.

9    BY MS. SWANSON:

11:17:05    10   **Q**    So, the day after the incident occurred, you had to do your

11   use-of-force report, which is this report.  But you did document

12   what happened within it?

13        MR. AUSTIN:  Objection.  Leading.  Excuse me.

14   Objection.  Leading.

11:17:15    15   BY MS. SWANSON:

16   **Q**    What's documented in there --

17        THE COURT:  Objection sustained.

18        MR. AUSTIN:  Move to strike.

19        THE COURT:  The question is stricken but you can reask

11:17:29    20   it.

21   BY MS. SWANSON

22   **Q**    What did you document about the incident in that report?

23   **A**    To me, it documents everything, about the whole -- the

24   whole incident, what the reason we went there, the incident

11:17:43    25   itself, and the aftermath.

Fernandez - Recross/Austin

```
 1  Q    And then, again, in terms of this case, that report, you're
 2  not the investigator of this case; is that correct?
 3  A    No.
 4  Q    And what agency investigates this case?
11:17:57  5  A    The FBI.
 6          MS. SWANSON:  I have no further questions for this
 7  witness, your Honor.
 8          THE COURT:  Recross?
 9          MR. AUSTIN:  Yes.
11:18:24 10                 RECROSS EXAMINATION
11  BY MR. AUSTIN:
12  Q    Okay.  You were just asked about the use-of-force report,
13  correct?
14  A    Yes.
11:18:31 15  Q    And if I understand correctly, you wrote this report after
16  speaking with Joe, right?
17  A    Yes.
18  Q    Okay.  And so, your training dictates you're not supposed
19  to be talking to other officers about what happened, you're
11:18:44 20  supposed to be writing from your memory, correct?
21  A    No.
22  Q    That's not your training?
23  A    No.
24  Q    Okay.  So, your training is "I can write a report and
11:18:53 25  incorporate other people's memories or opinions"?
```

1 **A**    No.  You're not necessarily going to incorporate opinions

2 in their perspective but you're still writing it from your point

3 of view, what you observed.

4 **Q**    So, my original question then -- maybe I'll ask it better:

11:19:08  5 In your training and experience on report writing, are you

6 supposed to incorporate other people's thoughts and opinions in

7 your report?

8 **A**    No.

9 **Q**    You're not, right?

11:19:17 10 **A**    No.

11 **Q**    You're supposed to go off of your memory, correct?

12 **A**    Yes.

13 **Q**    And so, you do the report before you start talking to other

14 people about what happened, right?

11:19:27 15 **A**    Not necessarily.

16 **Q**    According to you?

17 **A**    In my experience, it's not an issue.  You can talk to other

18 people and then write what you remember.

19 **Q**    What does that mean "it's not an issue"?  What do you mean

11:19:43 20 by that?

21 **A**    You still are not going to put other people's opinions or

22 statements -- well, you may put statements of other people if it

23 needs to be in there.  But I wrote the report as I remembered

24 it.

11:19:59 25 **Q**    Right.  And the main thing was to cover you for the usage

1  of the TASER?  That was the main reason you wrote the report?

2  **A**    It's a requirement when you use a TASER.

3  **Q**    Right.  And report writing generally that they train you,

4  you used this word "thorough."  That's a key word, right?

11:20:16  5  **A**    Yes.

6  **Q**    Accurate?

7  **A**    Yes.

8  **Q**    Complete?

9  **A**    (No response.)

11:20:22  10  **Q**    Yes, complete?

11  **A**    What?

12  **Q**    You're supposed to be complete in your report writing?

13  **A**    Yes.

14  **Q**    And contemporaneous, right?

11:20:32  15  **A**    Yes.

16  **Q**    Which means don't wait too long.  Contemporaneous is do it

17  as quickly or reasonably as soon as possible, right?

18  **A**    Yes.

19  **Q**    "Complete" means put all the details in, such as "There's

11:20:42  20  video surveillance, but I didn't get it yet," right?

21  **A**    I was told there wasn't.

22  **Q**    You should put that in the report, don't you think?

23  **A**    I wasn't charging him with --

24  **Q**    Okay.

11:20:54  25  **A**    -- assault.

1  Q    I understand.

2            Accurate.  If you put in the report you saw

3  somebody strike him in the head, that's not an accurate

4  statement, is it?

11:21:03  5  A    Did I?

6  Q    You tell me.  You wrote the report.  You remembered

7  everything clearly.

8  A    Yeah.

9  Q    Okay.  And, of course, thorough, right?

11:21:18  10  A    Yes.

11  Q    Which means you don't skip steps, you investigate or you

12  write down as best as you can recall, right?

13  A    Yes.

14  Q    And this report is none of those things.  It's just policy

11:21:34  15  followed, right?  You used the TASER, and you put that "I used

16  the TASER."

17  A    I think it summarizes -- I think it summarizes pretty

18  thoroughly.

19  Q    You can stand on business on that.

11:21:47  20            MR. AUSTIN:  Nothing else, your Honor.

21            THE COURT:  Anything further with this witness?

22            MR. AUSTIN:  Thank you.

23            MS. WIRSING:  Permission to approach, your Honor?

24            THE COURT:  You may approach.

11:22:07  25        (At side bar.)

Fernandez - Recross/Austin

1          MS. WIRSING:  Your Honor, defense has made an issue of

2     this report.  At this point, we are going to ask the witness to

3     read it, the content of it.

4          MR. AUSTIN:  It's hearsay.  You can't put a report in.

11:22:29   5     That's Rule --

6          MS. WIRSING:  You asked him extensively about the

7     contents of the report.

8          MR. AUSTIN:  No, I didn't.  I asked him about his

9     report writing.  You and I both know you can't put a report into

11:22:43  10     evidence.

11          MS. WIRSING:  You opened the door.

12          THE COURT:  Don't argue back and forth.

13              Are you moving to move the report in?

14          MS. WIRSING:  We're asking the witness for the -- if

11:22:52  15     the defense is attacking the completeness and thoroughness of

16     the report, then we think it's appropriate that the witness be

17     able to read the contents of the report that he prepared.

18          THE COURT:  Okay.  Here's what we're going to do:

19     We're going to take a recess right now for ten minutes.  I'll

11:23:11  20     come back; and then, I'll entertain your motion and then rule on

21     the motion -- your argument.

22          MS. WIRSING:  Okay.

23          MR. AUSTIN:  I don't know if it's a motion.

24          THE COURT:  You want a motion to introduce the -- are

11:23:23  25     you -- are you moving to introduce the document itself?

1      MS. WIRSING:  No.

2      MR. AUSTIN:  The contents.

3      MS. WIRSING:  Yes.  We are asking --

4      MR. AUSTIN:  That's what she's trying --

11:23:29  5      MS. WIRSING:  Yes.  Because the contents have been put

6  at issue by defense counsel.

7      THE COURT:  Okay.  But it's -- okay.  So, we're going

8  to take a break.  We'll come back; and then, I'll rule on your

9  request.

11:23:42  10      MS. WIRSING:  Thank you, your Honor.

11      THE COURT:  I want to take a look at the transcript as

12  well.

13      MR. AUSTIN:  Thank you.

14      MS. WIRSING:  Thank you.

11:23:56  15      (Side bar concluded.)

16      THE COURT:  Okay.  Ladies and gentlemen, we're going

17  to take our morning break.  I know that we've been going a long

18  time.  It's been at least two hours.  Thank you for your focus.

19  We're just going to take about a ten-minute break -- I need to

11:24:09  20  address something with the lawyers -- and then, we'll get

21  started again.

22      THE MARSHAL:  All rise for the jury.

23      (Court recessed at 11:14 a.m.)

24      (Court resumed at 11:41 a.m.; jury not present.)

11:41:50  25      THE MARSHAL:  All rise.

1        MS. WIRSING:  The government is abandoning their

2   request, your Honor.  We're just going to ask that this witness

3   be excused and move to --

4        THE COURT:  Okay.

11:42:03    5        MR. AUSTIN:  No objection.  We don't have to keep him

6   around.  We don't have to -- whatever the -- we can release him.

7   He doesn't have to be hanging out.

8        MS. WIRSING:  Oh.  Can he watch the rest of the trial?

9        MR. AUSTIN:  Yeah.  That's what I'm saying:  He can be

11:42:18   10   released.

11        MS. WIRSING:  Oh.

12             You're free to stay, apparently, after you're --

13   yeah.

14        THE MARSHAL:  All rise for the jury.

11:43:46   15      (The jury was brought into the courtroom at 11:43 a.m.)

16        THE COURT:  Welcome back, everyone.

17             Any further questions of this witness?

18        MS. WIRSING:  Nothing further from the government,

19   your Honor.

11:43:52   20        THE COURT:  Anything further from the defense?

21        MR. AUSTIN:  No.  The witness is excused, your Honor.

22        THE COURT:  Thank you, Deputy.  You're excused.

23        THE WITNESS:  Thank you, your Honor.

24        MS. WIRSING:  The government calls to the stand Joseph

11:44:06   25   Ruiz de Chavez.

1         Art, can you send him in?

2              THE COURT:  Ladies and gentlemen, for lunch purposes,

3    I thought we'd continue until about 12:30 to get this witness

4    started; and then, we'll take our lunch break.

11:44:32    5              Deputy Chavez, if you can please approach.

6         (The witness, **JOSEPH RUIZ DE CHAVEZ,** called on behalf of

7    the government, was sworn.)

8              THE COURT:  And you may proceed when ready.

9                        DIRECT EXAMINATION

11:45:00   10   BY MS. WIRSING:

11   **Q**    Good morning.

12   **A**    Good morning.

13   **Q**    Please state your name.

14   **A**    My name is Joseph Ruiz de Chavez.

11:45:06   15   **Q**    And do you go by other names?

16   **A**    I go by Joe.

17   **Q**    Do sometimes people call you Chavez, Ruiz de Chavez just in

18   the course of your job?

19   **A**    Sometimes they call me RDC, but I go by Joe.

11:45:20   20   **Q**    Okay.  How are you employed?

21   **A**    I'm employed as a Supervisory Deputy US Marshal.

22   **Q**    How long have you been employed with the United States

23   Marshal Service?

24   **A**    As a law enforcement official, about 15 years.

11:45:35   25   **Q**    And what about before that?

1  **A**     Prior to that, I was an analyst for the Marshal Service for
2  a fugitive task force in southern California.

3  **Q**     And currently, what are your -- what is your title?

4  **A**     I'm a Supervisory Deputy US Marshal.  I currently oversee
11:45:59  5  the Gulf Coast Violent Offenders and Fugitive Task Force.  It
6  consists of approximately 65 criminal investigators from 17
7  different state, local, and federal law enforcement agencies.

8              Although we are a federal task force, about 80
9  percent of our cases are state and local.  We go after the most
11:46:16  10  violent and dangerous fugitives here in the Houston area.  We
11  average about 1200 arrests a year.  About ten percent of those
12  are, typically, for homicide.

13              I'm also a member of the Marshal's Critical
14  Incident Response Team.  We -- the team works closely with our
11:46:37  15  agency clinicians to provide peer support to Marshal Service
16  personnel and also task force officers that have been involved
17  in a critical incident, such as a shooting or a line-of-duty
18  death.  I've been on that team for about six years.

19  **Q**     Are you also responsible at times for transporting and/or
11:46:58  20  transferring inmates?

21  **A**     That is something that I do.  I'm still a Deputy US Marshal
22  even though I'm a supervisor.  I wear the same badge.  So, I do
23  try to get out with my team, with my deputies, to effect arrests
24  or transports or whatever.

11:47:15  25  **Q**     Are you familiar with a Cedric Tyrone Walker?

1    A    Yes, I am.

2    Q    How did he come to your attention?

3    A    I received a notification from the Bureau of Prisons that

4    the individual, Mr. Walker, had violated his conditions of the

11:47:32    5    residential reentry center, or halfway house; and they submitted

6    a formal request to the Marshal Service to transport Mr. Walker

7    from the halfway house to the Bureau of Prisons -- the Federal

8    Detention Center in downtown.

9    Q    And on what date did you receive notice that he had

11:47:54    10    violated the conditions or the -- the terms at the residential

11    center?

12    A    The initial notification that we received was on Christmas

13    Eve, December 24, 2022; and that would have been through email.

14    Q    And was there more than one violation, to your

11:48:13    15    understanding?

16    A    So, I believe the initial violation was related to a

17    curfew; but he had left the facility that same day.  So, he was

18    no longer at the facility; and they didn't know where he was.

19    Q    And was there an update provided at some point?

11:48:32    20    A    He had returned on Christmas Day, on the 25th.  Again --

21    again, he left shortly after that.

22    Q    And was that without permission?

23    A    Yes.

24    Q    And as a result of that, what did you -- did you receive

11:48:47    25    any formal notice?

1  **A**     It would have been a follow-up email from the original

2  notification.

3  **Q**     Okay.  And in that email, were you advised that Mr. Walker

4  was, once again, at the facility, at the residential facility?

11:49:03  5  **A**     I received -- yes, on Christmas Day.  On the 25th, yes.

6  **Q**     Okay.  And who was it specifically that contacted you in

7  regards to these violations?

8  **A**     Well, the communication would have been through email.

9  It's typically the director of the halfway house.  Although it's

11:49:22  10  operated -- although it's ran by the Bureau of Prisons, it's

11  contracted out through GEO Group, a private company.

12  **Q**     And to be clear, residential reentry centers, also known as

13  halfway houses, are still a place of confinement; is that

14  correct?

11:49:42  15  **A**     Yes.

16  **Q**     And this is where inmates serve out the remainder of their

17  sentence; is that right?

18  **A**     Yes.  It gives them the opportunity to acclimate to being

19  back into community after they have completed a custodial term

11:49:56  20  at the Bureau of Prisons.

21  **Q**     So, there are relaxed restrictions.  However, there are

22  restrictions that must be complied with while an inmate served

23  out the remainder of their sentence; is that right?

24  **A**     Yes.

11:50:08  25          MR. AUSTIN:  Judge, I'm just going to object.  This

2-87

Ruiz de Chavez - Direct/Wirsing

1 line of questioning is really leading.

2        THE COURT:  It is leading, but I'm going to allow it

3 because we're establishing background facts.

4        MS. WIRSING:  Thank you, your Honor.  And I'm done

11:50:22 5 with that line of questioning.

6 BY MS. WIRSING:

7 **Q**   And as a result of receiving this notification that

8 Mr. Walker had violated the terms at the reentry center, what

9 did you do?

11:50:37 10 **A**   Is this on Christmas Day or --

11 **Q**   Thereafter.

12 **A**   Thereafter.

13        So, I received another notification on the 27th,

14 which was a Tuesday, that Mr. Walker had returned to the

11:50:49 15 facility; and they were requesting that he be picked up and

16 transported to the Bureau of Prisons.

17 **Q**   And did you respond to Leidel?

18 **A**   Yes.  So, typically, something like this, I'd assign the

19 task to a Deputy US Marshal; however, this was between Christmas

11:51:10 20 and New Year's.  I have a lot of employees that are on leave or

21 on vacation; and I was actually on my way into the office, into

22 downtown.

23        So, I decided to respond to the halfway house;

24 and I reached out to one of my colleagues, also a supervisor,

11:51:29 25 Art Fernandez, to meet me there.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  **Q**    What time of day was it that you both went to Leidel?

2  **A**    I believe it was probably around 10:00 o'clock in the

3  morning.

4  **Q**    Okay.  And what happened when you got there?

11:51:43  5  **A**    I got there first.  I looked over the paperwork that I had

6  received on Mr. Walker to look at what they had sent me.  Then,

7  I spoke to some of the halfway house employees.  One of the

8  employees cautioned me, said that he believed that Mr. Walker --

9                  MR. AUSTIN:  Objection.  Hearsay.

11:52:08  10                THE COURT:  Hearsay?

11                 MS. WIRSING:  Your Honor, it's not offered for the

12  truth of the matter asserted.

13                 MR. AUSTIN:  Move to strike.

14                 THE COURT:  It is stricken.

11:52:18  15                THE COURT REPORTER:  I'm sorry, Judge, I can't hear

16  you.

17                 THE COURT:  Oh, I'm sorry.  The objection at this time

18  is overruled.  The objection at this time is overruled.

19                      But explain why it's not being offered for the

11:52:32  20  truth of the matter asserted.

21                 MS. WIRSING:  Your Honor, this goes to the affect on

22  the listener and the reason why these Deputy US Marshals

23  proceeded the way that they did.

24                 THE COURT:  Response?

11:52:45  25                MR. AUSTIN:  The real issue is he's about to explain

1  or testify what someone else told him.  He can do that without

2  saying what was said.

3        THE COURT:  The problem is how -- what you're trying

4  to show is why he proceeded the way he proceeded.  And the

**11:52:59** 5  reason why he proceeded the way he proceeded was because of what

6  he was told.  Whether or not it's true or not, that's

7  irrelevant.

8         So, objection overruled.

9         This testimony, ladies and gentlemen, is being

**11:53:09** 10  offered not for the truth of the matter asserted but to show why

11  the witness proceeded the way he did.  So, you're not -- you

12  shouldn't infer whether or not what he was told is or is not

13  true.  But you will consider what he's about to testify to as to

14  his motive and procedure in moving forward.  Is that clear?

**11:54:02** 15  BY MS. WIRSING:

16  **Q**   Please continue with your response.

17  **A**   I was cautioned that Mr. Walker may be combative.

18  **Q**   Okay.  And normally -- or how many of these transports or

19  transfers are you typically involved with -- or have you done in

**11:54:20** 20  your career?

21  **A**   In my career, I would say dozens.

22  **Q**   Okay.  And have you reported to Leidel specifically in the

23  past?

24  **A**   Yes, I have.

**11:54:33** 25  **Q**   When you go there, typically, what is your procedure?

1 **A**    So, I would reach out to the courthouse to request a van or

2 caged vehicle to assist with transport.  Our vehicles don't have

3 any kind of cage to transport prisoners.  So, we'll have the GEO

4 Group, which is a contract company, to assist us with the

11:54:57 5 transport aspect.  So, in this particular case, I did request

6 GEO to meet us at the halfway house to provide that transport.

7            Also, at the halfway houses, typically, we'll

8 have GEO guards search and restrain the individual in shackles.

9 In this particular case, because he may be combative, I informed

11:55:25 10 the GEO guards that myself and Art would be doing the searching

11 and restraining.

12 **Q**    I'm sorry, search and what?

13 **A**    Searching and restraining.  Restraining in handcuffs.

14 **Q**    And normally, when you report to Leidel, is there an area

11:55:43 15 that you wait in?

16 **A**    You enter through the front doors.  There's a lobby.  And

17 then, off to the side, there's an office.  Typically, we'll be

18 in the office.  The staff will go and retrieve the individual

19 from the dormitory area or the rec area and then bring them to

11:56:02 20 us to that office.  And in the office area, we'll search them

21 and apply restraints.

22 **Q**    Did that happen on December 27th of 2022?

23 **A**    No.

24 **Q**    What happened?

11:56:15 25 **A**    The staff went to the back to retrieve Mr. Walker.  They

1   returned several minutes later and informed me that Mr. Walker
2   refused to come out.
3   **Q**    What did you do after that?
4   **A**    Well, at that point, the staff escorted myself and my
11:56:35  5  partner, along with our GEO transport guards, to the back
6   dormitory area.
7   **Q**    And did you have a plan going in with your partner?  And
8   your partner was who?
9   **A**    Art Fernandez.
11:56:49 10  **Q**    Okay.  Did you have a plan going in with your partner?
11  **A**    Yes.  I told Art and the GEO guards that I would be the
12  contact, and I asked Art to be my cover.  That's, typically --
13  we call it a cover contact where I'll be the one interacting
14  with individuals and then my partner would be providing cover.
11:57:07 15  We like to do that at about a 45 degree angle so that we have
16  better observation of the suspect.
17  **Q**    Okay.  So, you're referencing with the 45 degree angle how
18  you stand in relation to the subject?
19  **A**    Correct.
11:57:23 20  **Q**    Okay.  And when you -- did you make contact with -- with
21  Mr. Walker?
22  **A**    Yes.  So, the halfway house staff, they escorted us through
23  -- through a hallway, through a door; and they took us into the
24  dormitory; and they showed us where Mr. Walker was.  He was in a
11:57:46 25  pod area.  There were bunk beds, and he was seated on the bottom

1    bunk.

2    **Q**    We're pulling up what has previously been introduced as

3    Government's Exhibit Number 4.

4            Can you see that clearly?

11:58:17    5    **A**    Yes.

6    **Q**    And what is it that we're looking at here?

7    **A**    This would be, I guess, the -- like the dormitory area.

8    The pods where the bunk beds are located to -- on the right-hand

9    side of the -- of the photo.

11:58:36    10    **Q**    Okay.  So, there's -- and is there a hallway leading into

11    the pods?

12    **A**    Yes.

13    **Q**    Okay.  So, there are several pods within the entire

14    dormitory --

11:58:46    15    **A**    Correct.

16    **Q**    -- is that right?

17    **A**    Correct.

18    **Q**    And are they all connected by this hallway?

19    **A**    Yes.

11:58:53    20    **Q**    Okay.  I'm done with that exhibit.

21            And did you go to the pod in which Mr. Walker was

22    located?

23    **A**    Yes, I did.

24    **Q**    And what was his demeanor when you arrived?

11:59:11    25    **A**    When I first observed Mr. Walker, he was seated on the

1  bottom bunk.  I identified myself as a US Marshal, and I showed

2  him my belt badge.  I explained to him that he had violated the

3  terms of the halfway house and that we were taking him into

4  custody and transporting him to FDC, the Federal Detention

11:59:36  5  Center, where he will serve the remainder of his time.

6  **Q**   And what was his stature?  Did you notice anything about

7  him physically?

8  **A**   After I identified myself, he was upset.  He cursed at me,

9  said that he's not going.  He was clinching his fists.  In one

11:59:52  10  of his fists, he was clinching a blue bandana.  He was visibly

11  upset.

12  But my partner and I, we weren't in any kind of

13  rush.  So, I took the opportunity to try to deescalate the

14  situation.  I explained to him that he wasn't looking at any

12:00:11  15  additional time, that he'd be -- he was going to FDC to finish

16  the remainder of his time.  My partner, Art Fernandez, also

17  explained to him what was going on.

18  **Q**   And how would you describe him physically, his height, his

19  build, that type of thing?

12:00:32  20  **A**   I would say he's about five-ten, solid build; probably

21  around 190, 200 pounds.

22  **Q**   Okay.  And did he comply with your efforts to take him into

23  custody initially?

24  **A**   Initially, no.  But after several minutes, I felt that he

12:00:55  25  had calmed down.  And so, I gave him -- I started giving him

1    commands.  I told him to stand up, and he stood up.  I asked him

2    to turn around, place his hands behind his back, which he

3    complied.

4              He still had that blue bandana clinched in his

12:01:14  5    fist.  I asked him to place the bandana on the bed.  As he bent

6    over to do that, I moved in to grab his left wrist to apply a

7    handcuff.  As soon as I touched him, he spun around and struck

8    me with a closed fist.  He hit me right in the mouth.

9    **Q**    Can you, if you're comfortable, show the jurors how -- how

12:01:45  10   he -- how he punched you.  Only if you're comfortable.

11   **A**    Well, I have a torn meniscus right now.  So, I can't do the

12   spinning motion.

13   **Q**    Okay.

14   **A**    But as I was giving him commands, he was complying.  I told

12:02:04  15   him to stand up.  He stood up.  I told him to turn around, face

16   away from me; and he did.  And I told him to put his hands

17   behind his back.

18             When I asked him to put the bandana on the bed,

19   that's when I approached to grab his left wrist.  I had

12:02:21  20   handcuffs ready to apply the handcuffs.  But as soon as I

21   touched him, he spun around and did, I guess, a haymaker, a

22   haymaker and a hit perfect right on my upper lip.

23   **Q**    Okay.  So, just one punch?

24   **A**    It was just a single punch.

12:02:39  25   **Q**    All right.  You may take the witness stand once again.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1              And what did you feel when that punch made
2  contact?
3  **A**    Well, I fell back; and as I was falling, I grabbed onto
4  him, and we both went to the ground.  The way we landed, he
5  landed on his stomach.  I was kind of off to his left side, and
6  I had his left arm.  So, I was able to place his arm behind his
7  back.
8              One of the guards was -- had his arm on
9  Mr. Walker's back pushing him down to the ground because
10 Mr. Walker was trying to push himself up off the ground with his
11 right arm.  I was able to apply a handcuff to his left wrist.
12             That's when my partner, Art Fernandez, used his
13 TASER to apply what's called a dry stun.  That's when you remove
14 the cartridge from the TASER and you activate it on the skin.
15 **Q**    What's the purpose of doing that, removing the cartridge?
16 **A**    It's pain compliance.  It's very painful at the location of
17 the -- of where it's being applied.
18 **Q**    Without using the actual prongs --
19 **A**    Correct.
20 **Q**    -- the electrical prongs of a TASER?
21 **A**    Correct.
22 **Q**    Okay.
23 **A**    I believe he activated the TASER on multiple occasions.
24 And I finally -- Mr. Walker put his right arm behind his back;
25 and then, I was able to apply the handcuffs.

12:02:59 (line 5)
12:03:18 (line 10)
12:03:42 (line 15)
12:03:57 (line 20)
12:04:14 (line 25)

Ruiz de Chavez - Direct/Wirsing

1  Q    And at what point did you notice that you were injured?

2  A    While I was trying to apply the handcuffs, blood was

3  dripping onto the floor, onto Mr. Walker, and my hands.  I knew

4  -- I had a throbbing pain in my mouth.  I knew I had been hit

5  pretty hard.

6        Once Mr. Walker was in restraints and I stood up,

7  that's really when I had the opportunity to assess my injuries.

8  You know, I was bleeding --

9  Q    I'm going to pause for a moment.

10  A    Yes.

11  Q    I'm showing you what has been previously introduced as

12  Government's Exhibit 7A.

13        Do you -- do you recognize what's in this

14  picture?

15  A    Yes.  That's Mr. Walker right after he had been restrained.

16  Q    Do you see blood in this picture?

17  A    Yes.

18  Q    Whose blood is that?

19  A    That's mine.

20  Q    How did that blood get there?

21  A    Well, it got there after I was struck by Mr. Walker and

22  while I was trying to restrain him.

23  Q    So, while you were standing over him?

24  A    No.  It happened while I was on the ground with him trying

25  to apply the handcuffs.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  Q    And that's fine.  Thank you.

2           Where was that blood coming from?

3  A    It was coming from my upper lip.

4  Q    So, how would you characterize the bleeding?

12:05:53  5  A    At some point, it was a pouring out.  It wasn't just a

6  drop, drop, drop.  It was bleeding quite a bit.

7  Q    Okay.  And then, you said after he was restrained, you

8  stood and you had a moment to assess your injury.  What did you

9  notice?

12:06:10  10  A    The guards, they brought me some paper towels; and I could

11  feel that my lip had been lacerated on the front and the back.

12  When my mouth was closed, I could blow air out of my lip.  I

13  also knew that I had cracked teeth.  It felt like I had pieces

14  of eggshell in my mouth.  And I could feel cracks in two of my

12:06:39  15  teeth.

16  Q    Okay.  And so, this eggshell phenomenon that you're

17  describing, what was that from?

18  A    Pieces, shards of my tooth -- my teeth.

19  Q    Okay.  So, your lip was split and you felt some cracked

12:06:58  20  teeth.  Did any of them feel loose at all?

21  A    I had two front teeth, one more than the other felt loose.

22  It felt like when you were a child and you have a loose tooth

23  and you can pull it out.  That's how it felt.  At least one of

24  them felt very loose and the other one was loose.

12:07:17  25  Q    Okay.

1       MS. WIRSING:  Now, we'll display Government's Exhibit

2  Number 8, please.

3  BY MS. WIRSING:

4  **Q**     And what are we looking at here?

12:07:29  5  **A**     That was immediately after.  I'm still at the halfway

6  house.  You could see the front laceration of the upper lip.

7  **Q**     Could you feel it?

8  **A**     It was throbbing.  I mean, I could -- yeah.

9  **Q**     What happened after you cleaned up your lip and the

12:08:01  10  defendant was under control?

11  **A**     So, I made sure that Art and the guards had Mr. Walker; and

12  then, I exited the halfway house to notify my supervisor.  I

13  called him and informed him that I had been assaulted and that I

14  needed to go to the hospital.

12:08:22  15       The halfway house isn't far from the courthouse.

16  So, they were there within, I'd say, under ten minutes.

17  **Q**     And where did you go upon leaving Leidel?

18  **A**     The acting assistant chief, he drove me to Ben Taub's

19  emergency room.

12:08:42  20  **Q**     The emergency room?

21  **A**     Yes.

22  **Q**     What happened once you were in the emergency room?

23  **A**     After I got checked in, I definitely needed stitches.  They

24  had a facial plastic surgeon in the building.  So, I waited for

12:08:58  25  the surgeon to be available.  And they -- he saw me in an

1  operating room.  They injected, I guess, some pain killers.

2  **Q**    How did they do that?

3  **A**    They use a needle, and they inject it from behind my lip --

4  between my lip and my gums, and they inject up into -- felt like

12:09:29  5  underneath my eye.  It was -- it was as painful as getting hit.

6  And the worse part was they have to do both sides.

7              And then, after that, I had 12 stitches to close

8  the wound.  They also had to do stitches inside the lip to

9  connect the muscle.

12:09:52  10  **Q**    And was that done by an emergency room doctor?

11  **A**    That was done by the plastic surgeon.

12  **Q**    Who was there at Ben Taub?

13  **A**    Yes.

14              MS. WIRSING:  And I'd like to show what's previously

12:10:05  15  been introduced as Government's Exhibit Number 9.

16  BY MS. WIRSING:

17  **Q**    What are we looking at here?

18  **A**    That was in the operating room.  They're getting ready to

19  do the stitching.

12:10:29  20  **Q**    Who took this photo, do you know?

21  **A**    It was my chief.

22  **Q**    The one who accompanied you to the hospital?

23  **A**    No.  It was a different chief.  The assistant chief had

24  drove me to the hospital.  This is the chief.

12:10:40  25  **Q**    Okay.  So, lots of members of your team responded out of

1  concern; is that right?

2  **A**    Yes.

3         MS. WIRSING:  You can take that down.  Thank you.

4  BY MS. WIRSING:

12:10:50  5  **Q**    Did you receive any follow-up care?

6  **A**    That same day after I had the stitches, I did go to a

7  dentist to see if they could assess, you know, the damage to my

8  teeth.  I wasn't sure if, like, I needed to do anything.  I

9  didn't know if my tooth was going to fall out.  They did confirm

12:11:13  10  that I had two -- two cracks on the back of two teeth; and,

11  also, you know, I had two teeth that were loose.

12  **Q**    Was there a course of treatment that was recommended?

13  **A**    Yes.  However, they weren't -- they were unable to perform

14  that that day because of the trauma to my mouth and the amount

12:11:39  15  of swelling and discomfort that I was in.  So, they scheduled to

16  provide that treatment at a later date.

17  **Q**    And is there a concern about ongoing treatment for the

18  injuries that you sustained as a result of this blow?

19  **A**    So, they were able to fill the cracks; however, on the

12:12:03  20  x-rays, you could see on the root -- the root part of my tooth

21  is gray, indicative of trauma.  And overtime, the tooth will

22  continue to gray; and five, ten years from now, I may require a

23  root canal.

24  **Q**    Is there any doubt in your mind that these injuries were

12:12:24  25  caused as a result of this punch?

1 **A**    The single punch, yes.

2 **Q**    So, is there a doubt in your mind or --

3 **A**    No, there's no doubt.

4 **Q**    The person who punched you on December 27th of 2022, do you

12:12:38    5 see him present in the courtroom today?

6 **A**    Yes, I do.

7 **Q**    Can you please point that person out and describe what

8 they're wearing?

9 **A**    He's wearing a suit and I believe a blue tie.

12:12:48    10 **Q**    At counsel's table?

11 **A**    Yes.  And he's wearing glass.

12         MS. WIRSING:  Please let the record reflect that the

13 witness has identified the defendant.

14         THE COURT:  The record will so reflect.

12:12:59    15         MS. WIRSING:  May I have one moment, your Honor?

16         THE COURT:  Sure.

17         MS. WIRSING:  I'll pass the witness, your Honor.

18         THE COURT:  Cross-examination?  Will you be needing

19 also the lighting?

12:13:17    20         MR. AUSTIN:  I will wait.  So, you can -- yes, if I

21 need it.  All right.

22         THE COURT:  You may proceed when ready.

23         MR. AUSTIN:  Thank you, Judge.

24 //

12:14:05    25 //

1                        CROSS-EXAMINATION

2  BY MR. AUSTIN:

3  **Q**    Deputy -- is it de Chavez or Chavez?

4  **A**    Ruiz de Chavez.

12:14:15  5  **Q**    de Chavez, all right.

6              Deputy, you said you were -- testified that you

7  had been in the law enforcement end of US Marshals for 15 years?

8  **A**    Approximately, 15 years.

9  **Q**    But, essentially, you've been a US Marshal your entire

12:14:41  10  career -- or adult career?

11  **A**    A deputy, yes.

12  **Q**    And I think one of the things you testified was that you

13  received a notification on the 27th which, I guess, is why you

14  went to the halfway house?

12:15:00  15  **A**    Correct.

16  **Q**    And when you say "the notification," how did you receive

17  that?  Was it like a text, a phone call?

18  **A**    It would have been through email from the BOP and the

19  halfway house.

12:15:13  20  **Q**    All right.  And I assume that came as a result of some

21  action on the part of the halfway house, Leidel?

22  **A**    I mean, I can't speak for the halfway house; but,

23  typically, it's stemming from a violation.

24  **Q**    Okay.  And you mentioned the word "curfew."  I heard you

12:15:36  25  say it.  Why do you say "curfew"?  Is that like a thing you were

1    told or is that a typical violation?

2    **A**    So, on the escape notification, what they provide us as an

3    attachment in the email, it will include what the violation was.

4    **Q**    Understood.

12:15:56   5    Now, just as, I guess, a matter of safekeeping,

6    do you deal with the regional director at that time, Heriberto

7    Tellez?  Would that have been the person you got the

8    communication from?

9    **A**    From -- I don't recognize that name.

12:16:23  10   **Q**    All right.  Would it have come from the regional

11   administrative office?

12   **A**    It would have come from the regional Bureau of Prisons,

13   correct.

14   **Q**    All right.  And if they indicated that Mr. Walker was,

12:16:40  15   indeed, entitled to leave on, for example, December 25th, would

16   that have -- would that notification have gone to BOP in error?

17   **A**    I'm not sure.

18   **Q**    All right.  And so, when you got to Mr. Walker, didn't he

19   tell you he had permission?

12:17:00  20   **A**    I don't recall.

21   **Q**    You said he was cursing?

22   **A**    Yes.

23   **Q**    Why was he cursing --

24   **A**    He was --

12:17:06  25   **Q**    -- in your purview?

1  **A**     He was upset that we were taking him into custody and

2  bringing him to the Federal Detention Center.

3  **Q**     Okay.  And as a -- and so, he's cursing but he didn't

4  protest that he didn't violate or he shouldn't be returning to

12:17:29  5  prison in any form?  He didn't verbalize that to you in any way?

6  **A**     He may have.  I don't exactly remember, like, what he was

7  saying; but I do recall that he was very upset.  And really, we

8  received the notification Bureau of Prisons wanted him returned

9  to FDC.

12:17:51  10  **Q**     Okay.

11  **A**     We're not -- the Marshal Service is not involved in what

12  type of violation he did, whether he drank alcohol, whether he

13  was caught with cigarettes, whether it was a curfew violation.

14  For whatever reason, Bureau of Prisons is requesting that we

12:18:07  15  move him, transport him from the halfway house to FDC.

16  **Q**     Do you think that as a measure of what you call to try to

17  deescalate the situation might have been to say, "Well, let's

18  check"?

19  **A**     It's just like being issued an arrest warrant.  That's not

12:18:26  20  really our role to know whether or not the person is really

21  guilty or innocent.  That's -- that's up to the courts and

22  litigated.  And so, at this point, we had an order from BOP

23  requesting that we transport Mr. Walker who is under their

24  custody, who is their prisoner, move him from BOP to FDC.

12:18:53  25  Whether --

1 **Q**    So, I gather the answer to the question is, "No, I would

2 not have tried to deescalate it in that way"?

3 **A**    We tried to escalate it by explaining to him --

4 **Q**    In that way.

12:19:02   5 **A**    In that particular way?

6 **Q**    Yes.  Showing him why you're here.  You mentioned a

7 warrant.  Did you show him the paperwork?

8 **A**    I don't recall if we showed him the paperwork.

9 **Q**    Would that have been a way to deescalate the situation,

12:19:16  10 according to you?

11 **A**    I don't think it would have been effective.

12 **Q**    Okay.  And that's fair.  That's what I'm asking.

13          And so, in your judgment, that would not have

14 helped the scenario?

12:19:26  15 **A**    Correct.

16 **Q**    Now, you mentioned this thing about a bandana.  It was on

17 his left hand?

18 **A**    I believe it was in his right hand.

19 **Q**    Oh, it was in his right hand.  And you grabbed his left

12:19:46  20 hand?

21 **A**    When I made my approach to try to apply the handcuffs, yes,

22 I grabbed his left wrist.

23 **Q**    All right.  And so, I think you indicated -- let me back

24 up.  At some point, you were interviewed as a result of this --

12:20:05  25 the incident, right?  I mean, you were injured.

```
        1  A    Yes.

        2  Q    So, you were interviewed as a result of being injured --

        3  A    Yes.

        4  Q    -- during that processing, right?

12:20:14 5  A    Yes.

        6  Q    And do you recall indicating that he put the bandana down?

        7  A    That's what I instructed him to do, to place the bandana on

        8  the bed.

        9  Q    All right.  And so, whether or not it was the left or right

12:20:30 10 hand -- I'm trying to pin you down; but if you don't recall,

        11 that's fine.  But you do remember telling him to put the bandana

        12 down, right?

        13 A    Yes, I did.

        14 Q    And you said he faced you?

12:20:44 15 A    When I was attempting to apply restraints, his back was

        16 towards me.

        17 Q    All right.  So, he was facing Deputy Fernandez at that

        18 point?

        19 A    He was more facing towards his bed.

12:20:57 20 Q    His face was towards the bunk bed?

        21 A    Yes.

        22 Q    And the bunk beds, by the way, are metal bunk beds?

        23 A    I believe so, a metal frame.

        24 Q    All right.  Well, wait.  Put a pin in it and come back.

12:21:13 25      You were probably -- well, what area do you
```

1  recall being in the pod with relation to the bunk bed?

2  **A**    When I was speaking with Mr. Walker, I was more towards

3  the, I guess, entrance to the pod.  So, there may have been

4  eight -- eight feet between us.

12:21:36  5  **Q**    And where was Deputy Fernandez while you're speaking to

6  him, speaking to Mr. Walker?

7  **A**    To my right.

8  **Q**    And that's when you first approached?

9  **A**    Correct.

12:21:46  10  **Q**    I'm using the word "approached."  That's when you first

11  entered the area?

12  **A**    When we first interacted with Mr. Walker, yes.

13  **Q**    And at some point, you come within close proximity, as

14  you've indicated, right?

12:21:58  15  **A**    Correct.

16  **Q**    All right.  And at that point, where are you within the pod

17  when you're in very close proximity, within a two-feet radius?

18  **A**    I would say two to three feet.

19  **Q**    Yeah.  At what point -- and where in the pod are you?

12:22:07  20  **A**    Closer to the beds.

21  **Q**    All right.  Let's use the defense exhibit.  Maybe that will

22  be helpful.

23        MR. AUSTIN:  You don't have to turn the light off I

24  think now.

12:22:28  25        Defense Exhibit 1, please.

1          1 or 3 will be fine.

2          Can you see that?

3          THE COURT:  Ladies and gentlemen, can you see okay?  I

4    mean, you've seen it before but -- okay, great.

12:22:46  5  BY MR. AUSTIN:

6  **Q**     This is probably your first time.  Can you see it on

7    your --

8  **A**     Yes, I can see it.

9  **Q**     I'm going to point out the red chair which is hard to see.

12:22:53 10   You can see it in the circled area up there.  Were you towards

11   that back end or closer to the front where these speakers are?

12  **A**     It was closer to the wall on the right.

13  **Q**     Over by the lockers?

14  **A**     Correct.

12:23:08 15  **Q**     Those lockers, you can see, are metal?

16  **A**     Yes.

17  **Q**     All right.  So, you were over in that area?

18  **A**     Well, I remember there being a top bunk.

19  **Q**     Yeah.

12:23:22 20  **A**     So, this picture may have been taken after some of the beds

21   have been moved.  But I recall Mr. Walker being closer to the

22   middle bunk.

23  **Q**     Okay.  So, those beds are still on that wall but maybe two

24   bunk beds, one single; single bed, two bunks.  Whatever it was,

12:23:50 25   those beds are fairly depicted on this side?

1  **A**    Yes.

2  **Q**    And do you recall seeing lockers in that area?  Do you

3  remember if there were or not?

4  **A**    I believe there were.  But as far as, like, their

12:24:03  5  positioning in that area, I don't recall.

6  **Q**    Fair enough.

7           Now -- and so, I gather the way this photo looks,

8  you are --

9           MR. AUSTIN:  Excuse my back to the jury.

12:24:13  10  BY MR. AUSTIN:

11  **Q**    -- facing towards the bunk beds, right?

12  **A**    Yes.

13  **Q**    And he is standing in front of the bunk bed.  So, if the

14  jury box is the bunk bed, you're facing the jury; is that fair?

12:24:26  15  **A**    It wasn't a perfect 45 degree angle.  It was at an angle.

16  **Q**    A bladed angle?

17  **A**    A bladed angle.

18  **Q**    I think that's the term of art you've used, bladed.

19  **A**    I used bladed.

12:24:43  20  **Q**    Okay.  Are you righty or lefty?

21  **A**    I'm left-handed.

22  **Q**    All right.  So, is your right foot forward a little bit?

23  **A**    I don't remember if it was --

24  **Q**    Well, if you're going to get in a bladed position as a

12:24:48  25  lefty, would you put your right foot forward, like southpaw, or

1   would you put your left foot forward?

2   **A**   When I was saying "bladed," I was meaning more of my

3   position to the bed --

4   **Q**   Okay.

12:25:02   5   **A**   -- the angle of my body.

6   **Q**   So, not a defensive-bladed position?

7   **A**   Correct.

8   **Q**   Okay.  But just kind of angled off?

9   **A**   Yes.

12:25:08   10   **Q**   So, you have open (indicating), so to speak?

11   **A**   Yes.

12   **Q**   All right.  And I'm being nit-picky a little bit.  Do you

13   remember if your body was a little to the left or a little to

14   the right?

12:25:20   15   **A**   I don't recall that.

16   **Q**   Fair enough.

17            So, you were -- I'm going to just keep on using

18   the jury box.  That's the bed -- the bunk bed.  You're, one way

19   or the other, a little staggered, right?  Where is Officer

12:25:35   20   Fernandez to Mr. Walker?

21   **A**   So, if the jury box is the bed, I would have been more at

22   an angle and Art Fernandez would have been more of where you're

23   standing.

24   **Q**   Okay.  So, Mr. Fernandez was probably closer to Mr. Walker

12:25:53   25   in the lead position, so to speak?

2-111

1 **A**    Yes.  He was providing me with cover, yes.

2 **Q**    Because you're the one doing the cuffing.  So, you're

3 coming from behind?

4 **A**    I'm coming from an angle, yes.

12:26:06  5 **Q**    An angle?

6 **A**    Yes.

7 **Q**    From Mr. Walker's right side?

8 **A**    Since he was turned around, it would have been -- I mean,

9 when he was standing and I was instructing him to stand up and

12:26:19  10 turn around, he was -- his back was angled towards the entrance

11 of the pod.

12 **Q**    Okay.  So, let's take a step back.  We don't want to go too

13 quickly.  He stands up.  And I mean "he," Mr. Walker, stands up

14 in front of the bed eventually, right?

12:26:36  15 **A**    Yes.

16 **Q**    Not immediately because there was some back and forth

17 between you guys?

18 **A**    Correct.

19 **Q**    So, at some point, he stands up.  He's in front of his bed.

12:26:49  20 And Mr. Fernandez is facing in front of him sort of like where I

21 am, right?

22 **A**    Yes.

23 **Q**    That's the bed.  Is Mr. Fernandez closer or all the way

24 back here somewhere?

12:27:01  25 **A**    I was closest to him.  He would have been farther back.

1  Q    All right.  So, he was back here.  And you instruct him to

2  turn around?

3  A    Correct.

4  Q    All right.  So, that's from his right side, right?  He

12:27:10  5  turns whichever direction.  If you recall, you don't -- you can

6  correct me.  But then, he's facing his bunk bed, right?

7  A    Yes.  But he's not at a 45 degree angle.  He's cantered

8  slightly.

9  Q    So, the way I'm positioned?  Is it more like that?

12:27:28  10  A    Yes.

11  Q    Okay.  And he's still in front of his bunk bed, right?

12  A    Correct.

13  Q    And so, for the record, I am positioned my right shoulder a

14  little behind, my left shoulder a little forward, right, towards

12:27:40  15  the jury box?

16  A    Yes.

17  Q    And you get behind where I am closer to the podium?

18  A    Yes, that's correct.

19  Q    And it is your testimony that when you applied pressure, he

12:27:51  20  swings around like that (indicating)?

21  A    I didn't really apply pressure.  Literally, as soon as I --

22  he felt my contact, he spun around.

23  Q    On his left hand?

24  A    As soon as he felt I touched his left wrist, he spun

12:28:07  25  around, correct, with his right fist.

1  Q    Like if discus throwing?  Have you ever seen discus in the
2  Olympics?
3  A    I'm familiar with it.
4  Q    So, like that, right?
12:28:20  5  A    Correct.
6  Q    Isn't it true that one of the GEO officers come in and kind
7  of pushes you guys forward?
8  A    I don't believe that.
9  Q    But you do remember falling forward, right?
12:28:37  10  A    No.  We fell back.
11  Q    So, he punched you and he fell on his back?
12  A    No.  When he struck me, I grabbed onto him and I fell back.
13  Q    Okay.
14  A    And brought him down with me; and then, he landed on his
12:28:55  15  side.
16  Q    Okay.  And where did he land if this is the bunk bed?
17  A    I would say closer to this location right here
18  (indicating).
19  Q    All right.  With his face facing what direction?
12:29:04  20  A    His head would have been more towards the entrance to the
21  pod.
22  Q    Still in front of the bunk beds?
23  A    It's a very tight area.  But, yes, he's still next to the
24  bunk beds.
12:29:21  25  Q    And where did you fall?

Ruiz de Chavez - Cross/Austin

1    **A**    On his left side.

2    **Q**    Uh-huh.  Facing towards the bunk bed?

3    **A**    No.  It would have been -- he -- his body would have been

4    in between myself and the bunk bed.

12:29:35   5   **Q**    And where was -- where would your head be in relation to

6    the bunk bed in that photo, Defense Exhibit 1?

7    **A**    I would say a good five -- five feet from the bunk bed.

8    **Q**    Towards the bunk bed or away from the bunk bed?  Where is

9    your head?

12:30:05  10   **A**    Adjacent but not close.  It was within five feet of the

11   bunk bed.

12   **Q**    Okay.  Are you aware, sir, that GEO Officer Kirrison

13   Wilmore said you hit your head on a pole?  Were you aware of

14   that?

12:30:23  15   **A**    No.

16   **Q**    Nobody informed you that an onlooker saw you hit your head

17   on a pole?

18   **A**    I know that GEO guards had been interviewed, but I haven't

19   -- I haven't seen, like, any reports or anything like that.

12:30:39  20   **Q**    But I'm asking did anybody inform you of it?

21   **A**    I mean, I don't recall.

22   **Q**    You don't recall ever hearing -- this is the first time you

23   ever heard that?

24   **A**    No.  I do recall that there was some -- maybe their

12:30:53  25   perception or what occurred differed from what I experienced.

Ruiz de Chavez - Cross/Austin

1 **Q**    Yeah.  Your reality might differ from what somebody else

2 saw, right?

3 **A**    Correct.  But I don't know the specifics as far as what was

4 said?

12:31:06  5 **Q**    But you were asked is there any doubt in your mind if that

6 punch caused the laceration to your lip, right?  Weren't you

7 asked that question on direct?

8 **A**    Yes.

9 **Q**    Even though you were told or you -- it was indicated to you

12:31:22  10 in some manner you hit your head on a metal object, right?

11 **A**    There's no chance.  I saw -- I saw his fist hit me in the

12 mouth.

13 **Q**    Right.  I'm talking about what caused the injury.  You said

14 you were breathing through a hole in your lip?

12:31:41  15 **A**    Correct.

16 **Q**    Wouldn't that be like a puncture mark or puncture wound?

17 **A**    Of, you know --

18 **Q**    Did you ever look at it that way?  Did you ever consider

19 that it could have come from a puncture wound from something

12:31:53  20 metal?

21 **A**    I don't believe so.  I think that it was a powerful punch.

22 It was explosive.  You know, after the fact, I -- I was

23 frustrated because I was alert and I felt like I was ready and

24 he still got me.

12:32:15  25 **Q**    Okay.  And we've heard you testify he punched you once,

1   right?

2   **A**    Yes.

3   **Q**    Have you ever --

4           MR. AUSTIN:  Can we -- all right.  Maybe we do need to

12:32:24  5  look at the photos with the lights off.

6           Can you zoom in on the front of the bunk bed.  It

7   looks like a -- zoom in on that ladder, for example, please.

8   BY MR. AUSTIN:

9   **Q**    Those are the bunk beds, how they looked, right?

12:33:05  10  **A**    I don't recall the exact setup but yes.

11  **Q**    But those metal bunk beds, right --

12  **A**    Yes.

13  **Q**    -- are the bunk beds?

14  **A**    Yes.

12:33:11  15  **Q**    So, for example, if you hit your head or your lip after

16  what you described as being punched on any of those jagged metal

17  edges, might that have punctured your lip?

18  **A**    If that's what happened, yes.  But I never lost

19  consciousness.  I knew that he struck me with a closed fist.  We

12:33:34  20  went down to the ground.  He was in close proximity to me.  And,

21  you know, there was a struggle on the ground.  I know the time I

22  was struck or sustained any other injury.

23  **Q**    And I think I heard you say if that happened, that might

24  have caused a puncture.  You don't know?

12:33:50  25  **A**    I never lost consciousness.

1 **Q**    You don't have to lose consciousness to not know if you hit

2 something on your way down, do you?

3 **A**    I believe -- I believe I would remember if that occurred.

4 **Q**    But you -- your belief and your answer are two different

12:34:07  5 things.  You said if that happened, that might have caused the

6 hole.  You agree with that, right?

7 **A**    If, yes.

8 **Q**    Okay.  And right now, you have some hesitancy whether that

9 happened or not, the puncturing of your lip.

12:34:28  10 **A**    Are you asking me a question?

11 **Q**    I'm asking you, yes.

12 **A**    What was the question?

13 **Q**    Sure, sure.  Let me rephrase it.  You had already heard or

14 somebody had indicated to you you might have hit something like

12:34:43  15 a pole.  You agree with that?  Is that a fair --

16 **A**    Yes.

17 **Q**    -- statement or question?  Yes?

18 **A**    If you're telling me that, yes.

19 **Q**    I'm asking you.  Had you already been -- had anybody in the

12:34:57  20 world of this case indicated to you you hit your head on a pole,

21 somebody indicated you hit your head on a pole before today?

22 Did you hear that?

23 **A**    I do remember there being a discussion whether or not there

24 was a pole in that general area.  But there is, like, a concrete

12:35:19  25 pillar.  And my assumption was, like, well, maybe -- maybe that

1  -- that's not a pole but, perhaps --

2  **Q**   So, the word you're using is "assumption," right?  And so,

3  my question to you is you don't really know if you're kind of

4  piecing it together?

12:35:42  5  **A**   I'm trying to make sense of the question that you're trying

6  to ask.

7  **Q**   Do you know what it means to assume?

8  **A**   Yes.

9  **Q**   And I don't mean euphemistically.  So, if you're assuming,

12:35:52  10  that means you don't know, right?

11  **A**   Well, you're using phrases like "if" so --

12  **Q**   No.  I'm asking you do you know what it means to assume?

13  **A**   Yes.

14  **Q**   And I'm following up on that question.  If you're assuming,

12:36:03  15  that means you don't actually know?

16  **A**   Or you're not entirely sure.

17  **Q**   Okay.  And so, when you use words like "my assumption,"

18  that indicates, does it not, you have some trepidation on what

19  actually occurred with the pole or not a pole?

12:36:20  20  **A**   Again, I didn't see a report.  I didn't see anything, and

21  that's why I don't know.

22  **Q**   Okay, thank you.  We got there.  You don't know.

23        You can -- well, I do see, while we're there,

24  next to the ladder there's a bed frame, right?  Do you see that,

12:36:45  25  where there's like a slipper and black shoes?

Ruiz de Chavez - Cross/Austin

1  A    Yes.

2  Q    Is that a 90-degree angle, 45?  What is that angle on that

3  edge of that rail?

4  A    It would be a 90-degree angle.

12:36:56    5  Q    90.

6              Could somebody mistake that as a pole, random

7  metal object as a pole?

8  A    I would refer to that as a bed frame.

9  Q    I would, too.  But I'm asking do you think somebody could

12:37:17    10  mistake that as a pole because it happened so quickly?

11  A    It could have.

12  Q    And if you, indeed, hit the corner of that, might that put

13  a hole in your lip that you could breath through?  Is it an

14  impossibility in your world -- or in your mind, excuse me?

12:37:32    15  A    I would say it's possible, but that's not what happened.

16  Q    Okay.  Now, we can move on.

17              There was another officer that was there.  His

18  name was David Rozales.  Did anybody indicate to you that

19  Mr. Rozales tackled you or pushed you -- excuse me -- pushed

12:38:05    20  Mr. Walker and you three fell on top of each other?  The three

21  of you fell down?

22  A    The pod, it's a very narrow corridor.  It's a tight area.

23  So, when I was struck and I was -- and I fell back, I grabbed

24  onto Mr. Walker; and we both fell to the ground.  And I know

12:38:26    25  that there were guards assisting me in trying to keep him on the

1  ground so that he wouldn't push himself up.

2  But as far as who that was, I don't know.  I was

3  focused on Mr. Walker, and I was trying to apply the handcuff.

4  **Q**  And so, I gather you didn't talk to anybody from GEO about

12:38:47  5  the events that occurred?

6  **A**  Correct, I hadn't.

7  **Q**  And I'm asking has anybody from the government, at that

8  table or anyone else, indicate to you that David Rozales claims

9  that you guys were grappling each other and he pushed you down?

12:39:05  10  Did anybody indicate that to you?

11  **A**  I don't -- no, I don't recall that.

12  **Q**  Okay.  And I think you've described it but --

13  MR. AUSTIN:  If we could put up Defense Exhibit 3.

14  BY MR. AUSTIN:

12:39:40  15  **Q**  All right.  Do you see on the far left side of the photo --

16  **A**  Yes.

17  **Q**  -- two people there?

18  **A**  Yes.

19  **Q**  Don't mind those two handsome gentlemen.

12:39:54  20  Where were you in relation to the photo when the

21  fall occurred?

22  **A**  I was closer to the bed without the top bunk.

23  **Q**  Okay.  So, somewhere in the middle?

24  **A**  Correct.

12:40:10  25  **Q**  All right.  And for proximity's sake, the GEO folks that

1  also escorted you, where were they, if you recall, in relation
2  to this photo?
3  **A**    Probably where the gentlemen are standing.
4  **Q**    Okay.  So, you said it's a tight area.  But let's give it
12:40:32  5  seven to eight feet away.
6  **A**    Okay, yeah.
7  **Q**    Okay.  And I'm asking at that point in the photo or where
8  you are in relation, is it your understanding that nobody from
9  GEO made contact with you that caused you to fall down?  Are you
12:40:58  10  ruling that out?  Maybe that's a better way to put it.  Are you
11  ruling out the idea that somebody kind of pushed you and
12  Mr. Walker while grappling and that's how you guys fell?
13  **A**    I was focused on Mr. Walker.  I knew that Art Fernandez was
14  to my right and he was providing me that cover.  The exact
12:41:20  15  positioning of the GEO guards behind me I wouldn't know.
16  **Q**    Are you aware Mr. Fernandez did not see you get punched?
17  **A**    No.
18  **Q**    No one indicated that to you?
19  **A**    That Mr. Fernandez did not see me get punched?
12:41:43  20  **Q**    Yeah.  This is the first you're hearing of that?
21  **A**    I mean, I haven't -- no.
22  **Q**    Did you speak to Mr. Fernandez after the incident.  After
23  you got cut in the lip, did you talk to him?
24  **A**    Yes.
12:41:52  25  **Q**    Did he ask you what happened?

1    A    Well, he was there.  So, I mean --

2    Q    Did he ask you what happened?

3    A    Did he ask me what happened?

4    Q    Yes.

12:42:00    5    A    I don't remember the exact conversation that we had.

6    Q    He didn't ask you what happened and you told him "I got

7    punched in the lip and he cut my lip"?  You didn't tell him

8    that?

9    A    I don't remember the conversation that we had immediately

12:42:14    10    after that.

11    Q    All right.  In preparation for your testimony today, did

12    you meet with the government --

13    A    Yes.

14    Q    -- to prepare for your testimony?

12:42:25    15    A    Yes.

16    Q    In prior preparation, you kind of go over the questions

17    they're going to ask you, right?

18    A    Yes.

19    Q    And you kind of give them your answers.  You talk about

12:42:35    20    pace and look at the jury when you speak the answers, right?

21    A    We didn't discuss -- go into that type of detail, but we

22    did go over certain questions.

23    Q    Okay.  Are you trained to, you know, make contact and be

24    pleasant and have a good demeanor when testifying?  Is that part

12:42:54    25    of your training?

1  **A**   Yes.

2  **Q**   All right.  Did they say, you know, "Recall your training.

3  Be calm.  Don't bait Mr. Austin"?  Did they do any of that with

4  you?

12:43:04  5  **A**   No.

6  **Q**   Okay.  Did they give you any materials to review?

7  **A**   I did review the statement from the FBI when they

8  interviewed me.

9  **Q**   Okay.

12:43:18  10  **A**   Yes.

11  **Q**   Perfect.  So, you didn't review anybody else's statement?

12  **A**   Correct.

13  **Q**   Ah.  And by the way, when they interviewed you, was that on

14  the phone, in person?

12:43:28  15  **A**   It was in person.

16  **Q**   And who all was present?

17  **A**   Two FBI agents.

18  **Q**   Oppedisano and Dvornick?

19  **A**   Yes.

12:43:37  20  **Q**   And just you, right?

21  **A**   Correct.

22  **Q**   Did you have a union rep or anybody else there?

23  **A**   No.

24  **Q**   And that's when you gave what you could best remember of

12:43:45  25  what happened, right?

1  A    That's correct.

2  Q    And that interview, by the way, happened, I believe, on

3  January 11th?

4  A    I don't remember the exact date, but that sounds about

12:43:55  5  right.

6  Q    The new year had already came and went, right?

7  A    Yes.

8  Q    Yes, for the record?

9  A    Yes.

12:44:00  10  Q    So, roughly, that's the second week in July or almost two

11  weeks into July -- I mean, excuse me, into January?

12  A    Yes.

13  Q    And before these officers interviewed you, had you given

14  any other statements or interviews with anybody else about what

12:44:22  15  happened other than Joe?

16  A    I mean, to other deputies or my supervisors, to my family.

17  Q    Okay.  How many people would you estimate you recounted

18  this story to between December 27th and January 11th?

19  A    It's hard to say.

12:44:47  20  Q    Ten?

21  A    Maybe around ten.

22  Q    15??

23  A    Perhaps.

24  Q    20?

12:44:50  25  A    I don't think that many times.

1  **Q**   So, between 15 and 20 you told this story before you were

2  interviewed by the FBI?

3  **A**   Yes.

4  **Q**   At least 15 to 20 different people you told that story?

12:45:05  5  **A**   Yes.

6  **Q**   So, there are at least 15 to 20 people, if we knew who they

7  were, that might say, well, he didn't say that or he did say

8  that?  They could either confirm or corroborate your rendition

9  throughout the time, right?

12:45:21  10  **A**   Well, a lot of the statements that I would have said was

11  that I got hurt on the job or I was struck in the face while

12  trying to make an arrest.  The way that I'm presenting to you or

13  how I would with the FBI is different from what I would tell,

14  you know, my parents.

12:45:39  15  **Q**   Understood.

16        Your parents don't want to know how dangerous

17  your job can be?

18  **A**   I'm not going to give them all the details.

19  **Q**   That's right.

12:45:48  20        And so, the detail -- I'm just picking this one

21  out:  The fact that you could blow air through your lip, when

22  did you first realize -- when did you first indicate that to

23  anyone?  Today the first day we hear that?

24  **A**   Well, the -- no.  The day of.  The laceration went all the

12:46:05  25  way through.  So, I needed stitches on the front of my lip and

1  also the back.

2  **Q**    No.  I don't dispute that you were injured.  That is very

3  clear, that you were hurt.  I'm asking the way you remembered

4  breathing air through your lip.  Was today the first time you

12:46:23  5  actually uttered those words?

6  **A**    I wasn't breathing through my lip; but when I closed my

7  mouth and pushed, it would bubble out.

8  **Q**    Okay.

9  **A**    So, I wasn't breathing through my lip.  That's how I knew

12:46:37  10  that the laceration was through and through.

11  **Q**    Yes.  And I'm asking -- and I don't mean to misstate.  You

12  pushed air through your lip.  So, you were not breathing through

13  your lip?

14  **A**    Right.

12:46:49  15  **Q**    Understood.

16          That statement about your lip being through and

17  through, passing air and bubbles, is today the first time you

18  said that?

19  **A**    No, it's not.

12:47:05  20  **Q**    Did you tell the agents that when you interviewed?

21  **A**    They knew that -- I did say that the laceration went

22  through; but I don't recall, specifically, saying that I was

23  able to blow, like, air through.

24  **Q**    Right.  So, that's more like dramatic effect for the jury,

12:47:24  25  for the listeners, right?

Ruiz de Chavez - Cross/Austin

1  **A**   Well, it's to kind of paint a picture of what I

2  experienced.

3  **Q**   Right.  And we have a photo of it.  You absolutely were

4  injured.  There's not a dispute on that, right?  Has anybody

12:47:40  5  said were you really hurt or not?

6  **A**   No.

7  **Q**   Anybody ask you were you really hurt or not?

8  **A**   No.

9  **Q**   In fact, the government showed you a photo -- I think it

12:47:56  10  was -- was it 7?  8? -- of your lip at the pod, right?  It was

11  8.  At the pod?

12  **A**   Yes.

13  **Q**   You took that photo?

14  **A**   No.  I think that was my partner, Art Fernandez.

12:48:21  15  **Q**   This was not a selfie?

16  **A**   No.

17  **Q**   Okay.  So, you think Fernandez got up in there and took it?

18  **A**   I believe so.

19  **Q**   Okay.  And so, back to my original question on this:  No

12:48:35  20  one that I think you've indicated has actually questioned were

21  you injured or not, right?

22  **A**   Correct.

23  **Q**   I guess you might gather there is some question on whether

24  your recollection mirrors what other people perceive happened?

12:48:52  25  **A**   Yes.

                1  **Q**    I think you would agree with that?

                2  **A**    Yes, I do agree.

                3  **Q**    And so, with that topic, I think you've also indicated you

                4  don't know if you hit a metal pole or bed or something else or

    12:49:05    5  not?

                6  **A**    No, I do know that did not occur.

                7  **Q**    Oh, this is new.  You're now going in the affirmative that

                8  you did not hit a pole or anything else that would have -- that

                9  could have punctured your lip?

    12:49:21   10  **A**    Well, earlier, you asked if I had hit a pole, could it

               11  puncture my lip.

               12  **Q**    Yes.

               13  **A**    Yes, I agree with you there that if that had happened, that

               14  could have occurred --

    12:49:30   15  **Q**    Right.

               16  **A**    -- but that's not what occurred.

               17  **Q**    And what you're now -- I used the word "affirmative."  You

               18  are now taking the affirmative approach you, in fact, did not

               19  hit a metal pole or anything metal despite what somebody else

    12:49:45   20  has said?

               21  **A**    I've known this whole time that it was Mr. Walker striking

               22  me with his fist.

               23  **Q**    Are you not taking the affirmative approach that that did

               24  not happen?  Somebody must have been lying on you to say that?

    12:50:04   25  **A**    Again, if somebody else had a different perspective, maybe

1 their view of what occurred was obstructed; but I was right in

2 front of Mr. Walker.  I would have had the best view.  And I saw

3 him spin around and strike me with a closed fist.

4 **Q**    Right.  And then, you fell?

12:50:27   5 **A**    I fell back, grabbed onto him, and we both went to the

6 ground.

7 **Q**    And while you're falling, you do not have a view of your

8 lip, right?

9 **A**    I pulled him into me --

12:50:39   10 **Q**    While you're falling --

11 **A**    Correct.

12 **Q**    -- you do not have a view of your lip, correct?

13 **A**    While I'm falling, I -- correct.

14 **Q**    And if somebody had a view of your head hitting a pole or

12:50:59   15 something else that could puncture it, if that did, indeed,

16 happen, you can't say they didn't see that.  How can you -- how

17 can you say that?

18 **A**    I could only speak for myself or what I observed.

19 **Q**    But you didn't observe your lip while you were falling?

12:51:19   20 **A**    I feel that I would -- I would have known if --

21 **Q**    You feel.  That's a belief.

22 **A**    Yes.

23 **Q**    I'm asking you --

24 **A**    If --

12:51:27   25 **Q**    I'm asking you did you see?

1  **A**    Did I see it?

2  **Q**    Did you see yourself falling as an eyewitness to your face,

3  what happened to it?

4  **A**    I couldn't see myself falling.

12:51:42  5  **Q**    All right.  So, you are deducing, well, it must have been

6  the punch at the time you were saying that, right?  Because you

7  -- correct?  At the time it happened, you were saying it must

8  have been the punch, right?

9  **A**    Yes, I felt it when it happened.

12:52:02  10  **Q**    Then, at some point later, someone else -- I don't know who

11  -- indicated to you actually someone saw you hit a pole, right?

12  **A**    Is that a question?

13  **Q**    Yeah, that was the question.

14  **A**    Yes.

12:52:19  15  **Q**    And so, now, what you are remembering differs from what

16  someone else saw; you would agree?

17  **A**    Yes.

18  **Q**    Thank you.

19            And so, when I asked you are you taking the

12:52:36  20  affirmative, you can't do that.  That's the point, right?  You

21  can't affirmatively say, "No one saw me hit a pole.  No one saw

22  me hit a bunk bed.  No one saw me hit anything on the way down."

23  You can't do that.

24  **A**    I can say that that didn't happen.

12:52:55  25  **Q**    So, then, they would be lying on you?

```
        1  A    Again --
        2         MS. WIRSING:  Your Honor, that calls for speculation
        3  about what somebody else is --
        4  BY MR. AUSTIN:
12:53:04  5  Q    If they can't say that, wouldn't that not be the truth?
        6         THE COURT:  Objection sustained.  Argumentative.
        7         MR. AUSTIN:  Sure.
        8         THE COURT:  I made the objection for you.
        9         MS. WIRSING:  Thank you, your Honor.
12:53:18 10  BY MR. AUSTIN:
       11  Q    If I'm a driver on a car -- in a car and I'm going what I
       12  perceive is the speed limit and an officer says, "I see you
       13  going two times above the speed limit," there's a conflict in
       14  that scenario, right?
12:53:37 15  A    Yes.
       16  Q    You would look to a third party or somebody else or
       17  something other than my perception, the officer's perception --
       18         MS. WIRSING:  Objection.  Relevance.
       19  BY MR. AUSTIN:
12:53:51 20  Q    -- to help get clarity on the conflicting accounts, right?
       21         MS. WIRSING:  Objection.  Relevance.
       22         THE COURT:  And response?  Why is it relevant?
       23         MR. AUSTIN:  Why is it -- I'm asking for his -- this
       24  witness if he would look to another person for conflicting
12:54:04 25  accounts.
```

1          THE COURT:  And response?

2          MS. WIRSING:  Then, it calls for speculation.  Well, I

3    renew my objection that this is not relevant.

4          MR. AUSTIN:  It's relevant to his perception and

12:54:21  5    another person's account that he was made aware of.

6          MS. WIRSING:  Your Honor, this witness has testified

7    over and over and over again about what his perception is.

8          THE COURT:  And I think the jury understands that.

9          I'm going to respectfully overrule the objection.

12:54:35  10   Mr. Austin can continue questioning, but I think the jury

11   understands the witness's answer.

12   BY MR. AUSTIN:

13   **Q**    You would look to a third party or something else neutral,

14   right, to satisfy the dispute between the two, wouldn't you?

12:54:50  15   **A**    Yes.

16   **Q**    Okay.  For example, a video.  You would look to see if

17   there's a video of the traffic stop, right?

18   **A**    Yes.

19   **Q**    And in this case, there was an assault.  You would look to

12:55:04  20   see if there was a video, right?  That's what you called it, an

21   assault.

22   **A**    Yes.

23   **Q**    So, you would look for something neutral to, indeed, say

24   there was an assault or there was that punch, right?

12:55:17  25   **A**    Correct.

1  Q    You would look to another witness, wouldn't you?

2  A    Yes.

3  Q    So far, we don't have any other witness that said they saw

4  you get punched, right?

12:55:31  5         MS. WIRSING:  Objection.  Argumentative.  And this is

6  an ultimate issue for the jury to decide what happened.

7         THE COURT:  Response?

8         MS. WIRSING:  And there is another witness who was

9  present who testified to what he saw and only to what he saw.

12:55:42  10         MR. AUSTIN:  My response -- because I asked him was he

11  aware that Deputy Fernandez did not see him get punched.

12         MS. WIRSING:  He asked that a long time ago in his

13  cross, and this witness has already answered that.

14         MR. AUSTIN:  Right.  And I'm following up.

12:55:54  15         THE COURT:  I'm going to overrule the objection.  The

16  witness can answer the question again.  I think the jury heard

17  it, but I'll let you ask the question again.

18         MR. AUSTIN:  Okay.

19  BY MR. AUSTIN:

12:56:04  20  Q    So, you look for -- the point is you would look for another

21  witness if you don't have a video, for example, right?

22  A    Correct.

23  Q    To help corroborate what happened?  Yes?

24  A    Yes.

12:56:17  25  Q    And so, you would hope that witness that saw it would be

1  truthful, right?

2  **A**    Yes.

3  **Q**    And if they're truthful and it helps your side, you would

4  credit that, wouldn't you, as an officer?  You would credit that

12:56:38  5  -- that testimony or that rendition of what they observed?

6              MS. WIRSING:  Again, objection.  Relevance.

7              THE COURT:  Okay.

8              Response?

9              MR. AUSTIN:  It's the same -- it's getting to his

12:56:51  10  state of mind and his perception of what he would look for to do

11  the tiebreaker of neutrality.

12              MS. WIRSING:  That's not his role here.

13              MR. AUSTIN:  He's a witness.

14              MS. WIRSING:  His role is to testify about what he

12:57:08  15  knows, not what he would look to under different circumstances.

16              MR. AUSTIN:  The problem is, Judge --

17              THE COURT:  Objection sustained.

18              Here's the problem:  This witness is an

19  eyewitness.  He's not an investigating officer.  He's not

12:57:20  20  testifying as to how someone would go about determining what

21  happened or didn't happen.  That's the job of you guys as

22  attorneys and the FBI who investigated the claim.

23              This is an eyewitness to this event, nothing

24  more.  So, respectfully, this is -- this line of questioning is

12:57:36  25  done.

1          MR. AUSTIN:  Your Honor, may I approach?

2          THE COURT:  Yes.

3       (At side bar.)

4          MR. AUSTIN:  The government asked this witness is

12:57:53    5   there any doubt in your mind what happened.  They brought this

6   up on direct.  And I'm cross-examining him on his ability to

7   accurately depict if there was any doubt in his mind.  The doubt

8   in his mind doesn't matter.  That's up to the jury.  They

9   brought it up on direct.

12:58:13   10          THE COURT:  And he has said repeatedly that he knows

11   -- he testified as to what happened.

12          MR. AUSTIN:  Right.

13          THE COURT:  To figure out -- as to figure out what

14   happened in the investigation, there's other witnesses that do

12:58:22   15   that.

16          MR. AUSTIN:  Sure.  I'm not asking him -- at this

17   point, I'm asking as part of his purview as a US Marshal would

18   he look to other instances to make or break the tie here.

19          THE COURT:  That's not his role here.  He's not doing

12:58:35   20   that.  He's an eyewitness.

21          MR. AUSTIN:  And I understand, your Honor; and I'm not

22   -- excuse me if I'm cutting you off.  I'll let you --

23          THE COURT:  No, no.  I'm sorry.

24          MR. AUSTIN:  I just got to make sure.

12:58:47   25              I'm only -- because at first he said he didn't

1  know; but then, he doubled down and said that didn't happen.

2  And I don't know how he can say such in an affirmative way that

3  didn't happen.

4          MS. WIRSING:  That misrepresents his testimony.  He

12:59:02  5  said if that had happened.

6          MR. AUSTIN:  Right.  He's waffling on it.

7          MS. WIRSING:  No, he's not waffling.

8          MR. AUSTIN:  If he's saying "if," that means he

9  doesn't know.  And I tried to pin him down; but then, he came

12:59:13  10  back and waffled.

11          MS. WIRSING:  Then, this is argument for closing.

12          MR. AUSTIN:  It's going to veracity.  It's going to

13  the science.  It's cross-examination.  He doesn't know what

14  happened.  And now, I'm trying to say because you don't know

12:59:23  15  what happened, wouldn't there be other things that you could

16  look to to try to get you to what happened.

17          MS. WIRSING:  It's, obviously, his face.  He knows

18  what happened.

19          THE COURT:  Respectfully, the objection is sustained.

12:59:34  20  It's all on the record.

21          MR. AUSTIN:  Okay.  Thank you.

22      (Side bar concluded.)

23          THE COURT:  Ladies and gentlemen, I know I've kept you

24  a long time.  Would you like your lunch break now?

01:00:07  25          MR. AUSTIN:  I want to keep him maybe five minutes.

1 Or is that too much?  I'm just about done.

2           THE COURT:  Ladies and gentlemen, can you go another

3 five minutes?

4                Well, it's been a long time.

01:00:17  5           MR. AUSTIN:  Yeah.  I'm sorry, Judge.  I didn't

6 realize.

7           THE COURT:  We usually break every hour and a half.

8           MR. AUSTIN:  I did not realize.  I'm almost --

9           THE COURT:  It's 1:00 o'clock.

01:00:23  10           MR. AUSTIN:  Sorry.

11           THE COURT:  Nobody is doing anything wrong, ladies and

12 gentlemen.  The lawyers are doing their jobs.  It's just that I

13 promised to give you guys breaks, and you've been sitting a long

14 time.

01:00:32  15           MR. AUSTIN:  I'm going to be quick with this last

16 little bit, your Honor.

17           THE COURT:  If you can hold on just a little bit

18 longer, everyone, we'll have a full hour lunch break.  I

19 promise.

01:00:46  20 BY MR. AUSTIN:

21 **Q**    All right.  Moving quickly, in terms of your testimony, I

22 think you've already indicated you only reviewed in preparation

23 the report of one of the officers after you were interviewed on

24 January 11th, correct?

01:01:00  25 **A**    Yes.  My interview.

1   Q    You didn't review any video surveillance, for example?

2   A    I did not.

3   Q    You didn't interview or talk to any other witnesses that

4   were there?

01:01:11   5   A    I have not.

6   Q    You didn't look at any cell phone videos that may or may

7   not have happened, right?

8   A    Correct.

9   Q    And I do believe you indicated there were at least two

01:01:31   10   other GEO officers with you walking to the pod area?

11   A    Yes.

12   Q    Two other GEO, Rozales and -- what was her name? --

13   Wilmore?  Rozales and Wilmore?

14   A    To be honest, I don't know their names.  I reached out to

01:01:52   15   the courthouse for a request for a GEO transport team.  I

16   wouldn't know them by name.

17   Q    Okay.  Just in terms of when you got to the pod, it just --

18   it wasn't just yourself and Deputy Fernandez, there was at least

19   two other GEO officers --

01:02:09   20   A    Yes.

21   Q    -- whether or not you know their name?

22   A    Correct.  And there was also the halfway house GEO staff.

23   Q    Okay.  Walking you through the hallway?

24   A    That escorted us through to the pod, yes.

01:02:23   25   Q    All right.  And when you got to the pod -- I'm almost done

1    -- did you see anybody else other than Mr. Walker there?

2 **A**    There were other -- there were other inmates.

3 **Q**    Yeah.  How many do you recall seeing?

4 **A**    There was no other inmates in the pod; however, there were

01:02:44    5 inmates like standing on bunks.

6 **Q**    Looking over?

7 **A**    Like in the distance.  But I was focused on Mr. Walker.

8 So, I couldn't tell you exactly where they were or how many.

9 **Q**    All right.  You were focused on the guy you were there to

01:03:00   10 arrest.  And you don't recall if anybody else was in that podded

11 area?  Or are you saying there wasn't anybody else?

12 **A**    During the interaction, when I started giving him commands

13 and we were discussing, there was -- he was the only person

14 there.

01:03:15   15 **Q**    Okay, thank you.

16              MR. AUSTIN:  Pass the witness.

17              THE COURT:  Redirect?

18              MS. WIRSING:  No, your Honor.  May this witness be

19 excused?

01:03:26   20              THE COURT:  Anything further from this witness?

21              MR. AUSTIN:  No.  The witness may be excused.  Thank

22 you, Judge.

23              THE COURT:  Deputy, you may be excused.  Thank you,

24 sir.

01:03:38   25              THE WITNESS:  Thank you.

1          THE COURT:  Okay.  Ladies and gentlemen, we're going

2    to take our lunch break now.  I know it's been a long morning.

3    Thank you so much for hanging in there with us.  If we can all

4    be back at 2:00 o'clock, we'll continue at that time.

01:03:58   5          THE MARSHAL:  All rise for the jury.

6          (The jury recessed at 1:04 p.m.)

7          THE COURT:  Please be seated, counsel.

8               So, I have the jury charge ready without the --

9    right now without the lesser-included offense.  I need to get

01:04:34  10    your instructions on that so I can include it, just to see what

11    it looks like; and then, we'll talk about whether or not it

12    should or should not go in.

13          MR. AUSTIN:  Okay.

14          THE COURT:  But I got it ready.  It's in -- if I can

01:04:47  15    get your proposed addition.

16          MR. AUSTIN:  Okay.  No.  It's in the charge itself.

17          THE COURT:  It's not what I have.

18          MR. AUSTIN:  Oh.  It's in the pattern.  I'm sorry.

19          MS. WIRSING:  The pattern jury instructions, your

01:05:10  20    Honor --

21          THE COURT:  Okay.

22          MS. WIRSING:  -- instruct when it is appropriate; and

23    the government disagrees that it's inappropriate.

24          THE COURT:  Well, I guess my first step is I need a

01:05:21  25    copy of what you want me to put in --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1        MR. AUSTIN:  Okay.

2        THE COURT:  -- if you can do that.

3        MR. AUSTIN:  Let me do that.  Can I email it to --

4        THE COURT:  Yes, email it.  Then, after lunch, we'll

01:05:28   5  talk about whether or not -- or I'll hear argument about whether

6  or not it should be or should not be included.  But I just

7  wanted to let you know I've got it all ready.

8        The only part I guess I need to figure out is the

9  lesser-included charge or not; and then, with respect to the

01:05:46  10  elements of forcibly assault, resist, oppose, impede, I need to

11  figure out which ones, if any, are going in there.

12        MS. WIRSING:  "Assault" is absolutely fine, your

13  Honor.  That is the theory of the case, although the indictment

14  does use all of the language; but for the fourth prong to apply,

01:06:07  15  it would have to be assault resulting in bodily injury.

16        So, to avoid confusion to the jurors, let's just

17  include the word "assault" and omit the others.

18        THE COURT:  Okay.  And then, your position?  Is that

19  fine?

01:06:20  20        MR. AUSTIN:  Yeah.  I think the reason why the lesser

21  included would come up is because our theory is that he didn't

22  do it, right?  He didn't assault him, and he didn't cause any

23  injuries.  So, that's why the lesser included I thought could --

24  could, depending on how the testimony --

01:06:38  25        THE COURT:  Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. AUSTIN:  And I don't know if the government is

2   done, right?  So, we still probably have maybe a witness or two.

3          THE COURT:  Well, first things first.  If you can just

4   submit to me a copy of what you want --

01:06:51  5          MR. AUSTIN:  Yeah.

6          THE COURT:  -- so I can have it.  And then, after

7   lunch, we'll -- after we hear the witnesses, then we'll talk

8   about what should or should not be included.

9                And, Ms. Wirsing, you'll be able to go.

01:07:04  10                Mr. Austin, you be ready to go.

11                We need to take a break because I need to handle

12   a couple of things over lunchtime.

13          MR. AUSTIN:  Okay.

14          THE COURT:  We'll stand in recess until -- actually

01:07:13  15   2:00 o'clock.

16          MS. WIRSING:  Thank you, your Honor.

17          THE MARSHAL:  All rise.

18      (Court recessed at 1:07 p.m.)

19      (Court resumed at 2:28 p.m.; jury not present.)

02:28:51  20          THE MARSHAL:  All rise.

21          THE COURT:  We're back on the record in this case.

22   The jury is ready to go.  I understand the parties wanted to

23   talk to me.

24          MS. SWANSON:  Yes, Judge.  We're talking about the

02:29:04  25   jury instructions.  And Ms. Wirsing -- may I get her?

             1          THE COURT:  Sure.  I mean, we're not at the charge
             2   conference stage yet.
             3          MS. SWANSON:  Oh, okay.  I thought we were going back
             4   and forth on whether or not --
02:29:31     5          MR. AUSTIN:  Oh, no, no, no.  I'm sorry.  Let me go
             6   ahead.
             7          I did submit it to the government.  So, I know
             8   you said we would discuss it after.  And I don't think we have
             9   anything at the moment.
02:29:42    10          THE COURT:  I just wanted to have it here so if I
            11   include it, I can put it in.  I haven't decided to put it in
            12   yet.  I just need a copy so I can have it to put in if I need
            13   to.
            14          MS. SWANSON:  Okay.  Yes, Judge.  And as long as we
02:29:58    15   get an opportunity to oppose it based on case law.
            16          THE COURT:  We're going to have a full charge
            17   conference.
            18          MS. SWANSON:  Thank you, your Honor.
            19          THE MARSHAL:  All rise for the jury.
02:32:18    20     (The jury was brought into the courtroom at 2:32 p.m.)
            21          THE COURT:  Please be seated, everyone.
            22          Welcome back, everyone.
            23          We are moving forward.
            24          Ms. Wirsing, you may call your next witness.
02:32:52    25          MS. WIRSING:  Your Honor, at this time, the government

1   rests.

2            THE COURT:  Ladies and gentlemen, the government has

3   rested its case.

4                 Mr. Austin.

02:32:59  5         MR. AUSTIN:  At the close of the government's case,

6   we'd make a brief motion on the record.  Do you want me to wait

7   or side bar?

8            THE COURT:  Yes, come up.

9      (At side bar.)

02:33:24  10        MR. AUSTIN:  Now at the close of the government's

11  case, the defense moves the judge for a Rule 29 motion of

12  acquittal.  Without waiving any of the appellate rights of

13  Mr. Walker, we would submit that your Honor -- to your Honor

14  that the government has failed to meet all the -- all the

02:33:47  15  elements of the crime and that no rationale juror could find

16  beyond a reasonable doubt that Mr. Walker did, indeed, connect

17  each element for the forceable assault of Officer Chavez.

18           THE COURT:  Respectfully, the motion is denied.

19                 Anything further?

02:34:08  20        MS. WIRSING:  No, your Honor.

21     (Side bar concluded.)

22           MR. AUSTIN:  Defense rests.

23           THE COURT:  Ladies and gentlemen, you've now heard all

24  of the evidence in this case from the witnesses.  At this time,

02:34:32  25  I'm going to allow the parties an opportunity to have closing

1  argument; and then, we're going to take just a brief recess.

2          I've been working on the jury charge.  I'll need

3  just a few minutes to talk to the attorneys about that charge.

4  And then, we'll bring you back in; and you'll start

02:34:50  5  deliberating.

6          MS. WIRSING:  Your Honor, before we close, may we

7  approach the bench again?

8          THE COURT:  Yes.

9     (At side bar.)

02:35:08  10          MS. WIRSING:  Your Honor, we'd like to note that there

11  are some things that we're going to be referencing, and I don't

12  want to misstate what the judge is going to say.

13          THE COURT:  We'll take our break now; and then, we'll

14  do the charge conference.

02:35:27  15          MS. WIRSING:  Is it your Honor's practice to have the

16  attorneys close before the instructions are read?

17          THE COURT:  No.  What I do is I read the instructions

18  and then let you close.

19          MS. WIRSING:  Oh, okay.

02:35:40  20          THE COURT:  What we're going to do is give them a

21  break.  We will have argument on the instructions; and then,

22  I'll let you close with a copy of the instructions I'm going to

23  give.

24          MS. WIRSING:  Okay.  Thank you, your Honor.

02:35:55  25     (Side bar concluded.)

1          THE COURT:  Ladies and gentlemen, I'm going to -- I

2    know that you just got back in the courtroom.  What I'm going to

3    do is we're going to take just a brief recess.  I need to go

4    over some issues in the jury charge with the attorneys.

02:36:18    5          After that, I'll bring you back.  I will give you

6    the charge in this case and then let the lawyers have closing

7    argument.  So, this won't take very, very long; but I appreciate

8    your patience.

9          THE MARSHAL:  All rise for the jury.

02:36:41   10    (The jury recessed at 2:36 p.m.)

11          THE COURT:  This is the charge conference in this

12    matter.  I received the charge from the government, and I also

13    included a request for a lesser-included offense.  Before I

14    address that issue, does anyone have any objections to the

02:37:33   15    charge that was submitted to me by the government except for the

16    lesser-included offense?  And we'll talk about that later.

17          Any changes that you want in the charge?

18          MS. WIRSING:  No, your Honor.  Prior to breaking for

19    lunch, the government did represent that we were not -- that we

02:37:50   20    were not opposed to having some of the language removed that

21    follows the assault, the "impeding," "resisting," "opposing."

22    We would, in fact, like that to be included.

23          THE COURT:  Okay.  You want all of it?

24          MS. WIRSING:  All of it, your Honor.

02:38:08   25          THE COURT:  And response, Mr. Austin?

1          MR. AUSTIN:  I think they alleged it in the

2     indictment.  So, it's certainly their call.

3          THE COURT:  Okay.

4          MR. AUSTIN:  Are you referring to resist, oppose,

02:38:26  5     impede, intimidate?

6          MS. WIRSING:  That's correct.  As alleged in the

7     indictment.

8          THE COURT:  I'll keep that in.

9               Now, let's look at the lesser-included offense.

02:38:34  10    Mr. Austin submitted to me Pattern Jury Instruction 1.35 with

11    the lesser-included offense of -- I guess it's simple assault.

12    Is that correct?

13         MR. AUSTIN:  Yes.  The pattern -- well, there's really

14    like three types of crimes here in Section 111.  So, there's

02:39:00  15    like the simple assault, there's the physical contact, and then

16    there's the physical contact creating injury.

17         THE COURT:  Let me hear argument.

18         MS. SWANSON:  Yes, your Honor.  And I do have the case

19    law, both from the Fifth Circuit and the Ninth Circuit that I

02:39:18  20    can present to the Court.  But I do want to start with the

21    Pattern Jury Instructions for forceable assault, 2.07, of the

22    Fifth Circuit Pattern Jury Instructions.

23              On page 130, it states that a simple assault does

24    not involve physical contact.  And there has been uncontroverted

02:39:39  25    evidence in this case that there was physical contact.  And the

1  standard that the Fifth Circuit looks at -- and let me give your

2  Honor a copy of these.  I'm actually going to give you a copy,

3  your Honor, of the Fifth Circuit and the Ninth Circuit case that

4  I'm going to be referencing and then a copy for the defense, as

02:40:00  5  well.

6        Your Honor, the Fifth Circuit in *US versus*

7  *Pierre-Louis* -- that's 251 Federal -- F.App'x 307 at page 1.

8  The standard -- the Fifth Circuit says that a Court has held

9  that a District Court may give a lesser-included offense

02:40:55  10  instruction if, but only if, one, the elements of the offense

11  are a subset of the elements of the charged offense.  We don't

12  dispute that.

13        What we are disputing is Number 2, that the

14  Court, and the evidence at trial, permits a jury to rationally

02:41:09  15  find the defendant guilty of the lesser offense and acquit him

16  of the greater offense.  And a rationale jury could not find

17  that there was no physical contact.

18        That is uncontroverted that there's physical

19  contact.  And in order for a jury to find someone guilty of

02:41:26  20  simple assault, there's no physical contact.  So, the second

21  element is not met.

22        And I referenced your Honor to the Ninth Circuit

23  case.  This is *United States versus Rivera-Alonzo* because it's

24  on point to the issue.  That's 584 F.3d 829, and it's page 835.

02:41:49  25  And I'm quoting:  "To convict Rivera of simple assault while

1    acquitting him of the eight-year felony, the jury would have to
2    be required to find that there was no physical contact with the
3    victim.

4              "Because there was uncontroverted evidence of
02:42:03   5    physical contact, the jury could not have discounted that
6    contact unless the jury believed Rivera acted only in
7    self-defense."

8              And, your Honor, this was when the trial court
9    did not include the lesser-included offense of simple assault;
02:42:14  10    and the Ninth Circuit upheld the trial court's decision in that
11    case.

12         THE COURT:  So, your position is the undisputed
13    evidence -- that no jury could -- no jury could find that there
14    was no physical contact?

02:42:29  15         MS. SWANSON:  Correct, your Honor.  That's correct.
16    So, a rationale jury could not find that there was a simple
17    assault; and so, that -- the second prong does not apply.

18              And, in fact, your Honor, not in an assault case
19    but in another type of case, your Honor in March of 2024 -- it
02:42:45  20    was United States versus Cleary -- looked at the issue of
21    whether or not a simple -- or a lesser included should be
22    included; and your Honor found that it should not.

23              And that was your decision just in March of 2024
24    in United States versus Cleary.

02:43:01  25         THE COURT:  Any response, Mr. Austin?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

2-150

1    MR. AUSTIN:  Yes.  So, the first, I guess, question or

2 point I would make is if they are arguing all the other options

3 under the statute, resist, oppose, impede, intimidate, and

4 interfere with, those could be accomplished, I think, without

02:43:25  5 physical contact.

6    And so, if a jury hears the argument from the

7 government that he in some way resisted, opposed, impeded,

8 intimidated, interfered with a lawful police function by the

9 marshals that didn't result in Mr. Walker assaulting him, that

02:43:47 10 is why I think the simple assault would be -- that is exactly

11 why a simple assault is a lesser-included offense.

12    It's not -- it would not be improper if there's

13 evidence that suggests that that happened.  The idea that it is

14 uncontroverted that he attacked or assaulted Mr. Chavez is not

02:44:09 15 entirely the way I view it.

16    One officer did say that he punched him; the

17 other officer said, "I didn't see it."  So, a jury could infer

18 maybe he didn't get punched, right?  And the issue is also --

19 well, let me just stick with the simple assault.  Sorry.

02:44:27 20    THE COURT:  So, he just fell onto the ground.  I

21 don't --

22    MR. AUSTIN:  I'm not going to argue my case in terms

23 of where the holes are, so to speak; but there is evidence that

24 actually was brought about how they ended up on the ground.  And

02:44:45 25 not by Mr. Walker.

1          THE COURT:  Okay.

2          MR. AUSTIN:  And so, at any rate, then there's the

3    other part of the charge which is the physical assault; and

4    then, there's the third part of the physical assault caused the

02:45:07   5    injury.

6               And so, in terms of that, the jury should either

7    be told -- or asked what the physical injury -- was the physical

8    assault the thing that caused the injury to Deputy Chavez or not

9    or was there just a physical assault or was there no physical

02:45:29  10    assault, right?

11              And that's why the lesser included says if you

12   cannot agree on whether there was a physical assault, let's say,

13   or you cannot agree that the physical assault resulted in Agent

14   Chavez's injury, they could still, really to the government's

02:45:48  15   benefit, find a third option.  And so, that's why I thought it

16   would be really prudent.  But if not, I mean --

17          THE COURT:  I want to hear a response.  I mean,

18   Mr. Austin is arguing that you can resist, oppose, impede, or

19   intimidate without physical contact.

02:46:09  20          MS. SWANSON:  However, in our case, we have shown --

21   and it's been uncontroverted -- that there was physical contact.

22   That's the point.  The case law supports and the Fifth Circuit

23   flat out says that a simply assault does not involve physical

24   contact.

02:46:27  25              So, you can impede and resist with physical

1  contact, which we have shown.  They were wrapped up.  They were
2  wrestling.  Physical contact has been uncontroverted.  The
3  defense has not -- now, how bodily injury happened may be
4  controverted by the defense.  But physical contact itself, that
02:46:44  5  has to be absent for a rationale jury to find a simple assault
6  occurred.
7          So, they do not meet the second prong of the
8  standard for when a lesser-included offense should be included,
9  your Honor.
02:46:54  10          THE COURT:  And where's the Fifth Circuit case that
11  holds that simple assault does not require physical contact?
12  I've got *Rivera-Alonzo*.  That's a Ninth Circuit case.
13          MS. SWANSON:  Right.  I presented your Honor with
14  *United States versus Pierre-Louis*.  That case I presented to
02:47:14  15  you, Judge, to show the standard.  The Fifth Circuit jury
16  instructions on page 130 say that a simple assault does not
17  involve physical contact.
18          The Ninth Circuit I gave to your Honor is because
19  it's an on-point case involving the issue of -- that we're
02:47:30  20  discussing today.  There is not a Fifth Circuit case that I
21  found discussing that issue that the Ninth Circuit stated
22  plainly.  However, as I said, the physical contact -- simple
23  assault does not involve physical contact is in the pattern jury
24  instructions, page 130; and that's the Fifth Circuit.
02:47:53  25          MR. AUSTIN:  The issue that I'm having honestly, your

1  Honor, is that the statute is just -- it's not -- not poorly

2  written but it allows three different alternatives.  And right

3  now, the jury is not being told to unanimously agree on any one

4  alternative.

02:48:17  5  MS. SWANSON:  Your Honor, the jury is being asked to

6  unanimously agree that serious -- that bodily injury occurred

7  through the physical force, Elements 1 through 4.  That is --

8  there are three different -- there's simple assault.  There's

9  forceable assault, which is what we alleged.  And then, there's

02:48:32  10  the deadly weapon option.  That is what *United States versus*

11  *Pierre-Louis* parsed out, could you get a simple assault jury

12  instruction with the deadly force option.

13  We are not alleging that he used a deadly weapon

14  or deadly force.  We are the second one, which is a forceable

02:48:50  15  assault with physical contact.  That is what has been indicted.

16  This is not a simple assault.  We are not arguing and there is

17  no evidence that shows that there was not physical contact.

18  That's what has to be found for there to be a simple assault.

19  And it just simply doesn't exist.

02:49:10  20  MR. AUSTIN:  Well, the issue then still becomes a

21  problem.  Let's assume in the abstract the government meets

22  their burden.  What is the penalty range at that point?  Is it

23  up to 8 years or is it up to 20?

24  MS. SWANSON:  According to --

02:49:30  25  MR. AUSTIN:  Ms. Swanson's interpretation of the case

1  law would be zero to eight.

2         MS. SWANSON:  According to the statute -- I'm just

3  reading directly from the statute -- it says, "Whoever in the

4  commission --" this is the enhanced penalty, 18 USC 111(b) I'm

02:49:48  5  reading.  "Enhanced penalty.  Whoever in the commission of any

6  act described in Subsection A uses a deadly weapon or dangerous

7  weapon or inflicts bodily injury shall be fined under this title

8  or imprisoned not more than 20 years or both."

9         So, we are, to get the 20 years, proving bodily

02:50:14  10  injury.  That's what we've been arguing in this case.  So, it's

11  our position that this is a 20-year max, your Honor.

12         MR. AUSTIN:  And so, I think that's where the jury

13  would have to decide.

14         MS. SWANSON:  That's Element 4, Judge, bodily injury.

02:50:33  15  So, if the jury finds there's bodily injury, that applies.  It's

16  an "or."  Deadly weapon, deadly force, or bodily injury.

17         THE COURT:  Okay.  I'd like to go look at this.  Give

18  me about ten minutes.  I want to sit there and take a look at

19  the cases and think this through.  And then, I'll come back with

02:50:54  20  a decision.  Give me about ten minutes.

21         MS. WIRSING:  Your Honor, my response to defense

22  counsel's email sent to your case manager this morning also

23  further sets out the government's position as it relates to the

24  maximum penalty.

02:51:07  25         THE COURT:  Okay.  I did not see the response email

1  yet.

2          MS. WIRSING:  It was sent about 7:30 this morning

3  maybe or 8:00 a.m.

4          THE COURT:  I don't have it yet, but I will -- it's

02:51:30  5  being forwarded to me now.

6          MS. WIRSING:  Thank you, your Honor.

7          THE COURT:  Thank you.

8          THE MARSHAL:  All rise.

9      (Court recessed at 2:51 p.m.)

03:08:21  10      (Court resumed at 2:08 p.m. jury not present.)

11          THE MARSHAL:  All rise.

12          THE COURT:  We're back on the record in this case.

13          And I did get a chance, Ms. Wirsing, to look at

14  your email.  I looked at Mr. Austin's email.  I have read

03:08:47  15  through both of the cases that were submitted to me as well as

16  the proposed lesser-included offense.  And after careful

17  consideration, respectfully, I'm not going to include the

18  instruction as requested by the defendant.

19          In this case, the -- there is no evidence that a

03:09:08  20  rationale jury could find that Officer Ruiz either fell on his

21  own or that this didn't happen at all.  And given that fact, the

22  lesser-included offense instruction should not be given in this

23  matter.  So, respectfully, I understand the argument; but it's

24  denied.  And I'm going to submit the jury instruction as -- the

03:09:35  25  jury charge as was submitted by the government in this matter.

1    I'm going to give you-all copies of that charge.
2  It's going to take a little while.  I'm making the edits that
3  you requested, and that should take about maybe five minutes.
4  And then, I will give it to you.

03:09:54
5    And then, how long do you need for closing, each
6  side?

7    MS. WIRSING:  Maximum 15, your Honor.  15 minutes.
8    THE COURT:  Okay.
9    Mr. Austin?

03:10:06
10    MR. AUSTIN:  I don't know.  Maybe 20.  I probably
11  won't use it all.  But I'd rather be safe than sorry.  Time goes
12  quickly.

13    THE COURT:  Sure.  I'll give both sides 20 minutes.
14    MS. WIRSING:  Thank you, your Honor.  We would like to

03:10:18
15  reserve five minutes for rebuttal.

16    THE COURT:  Five minutes reserved for rebuttal.
17    MR. AUSTIN:  And maybe if the Court could indulge me
18  with a five-minute or so heads up --
19    THE COURT:  Okay.

03:10:32
20    MR. AUSTIN:  -- nearing the end.  Thank you.
21    THE COURT:  It's going to take me about five minutes
22  to get this printed up.  So, if you'll just hold on, we'll get
23  started in just a little bit.

24    MS. WIRSING:  Thank you, your Honor.

03:10:52
25    THE MARSHAL:  All rise.

1    (Court recessed at 3:10 p.m.)

2    (Court resumed at 3:31 p.m.; jury not present.)

3         THE COURT:  Okay, everyone.  We're back on the record

4  in this case.

03:31:35  5         I have given the parties the jury charge that I

6  intend to give the jury in this case.  What I want to do at this

7  time is have the formal charge conference, and what I'm going to

8  do is go page by page and see if you have any objections to each

9  page.

03:31:52  10         And then, when we get to the end, Mr. Austin, you

11  make your request for the lesser-included instruction; and I'll

12  rule on it at that time.

13         MR. AUSTIN:  Okay.  For the record, you want me to

14  redo it?

03:32:07  15         THE COURT:  Oh, yes.  Yes.

16         MR. AUSTIN:  Okay.  No problem.  You've already ruled.

17  So, I thought --

18         THE COURT:  I have.  But I just want you to just make

19  the motion --

03:32:13  20         MR. AUSTIN:  Okay.

21         THE COURT:  -- for the reasons stated earlier on the

22  record.

23         MR. AUSTIN:  I got it.

24         THE COURT:  So, we got the jury charge, the parties

03:32:21  25  have.  Any objections to page 1 of the charge from defendants?

1      MR. AUSTIN:  I thought we were about to read through

2 it.

3      THE COURT:  Oh, no.  I'm just going to go a page at a

4 time.  I'm sorry.

03:32:36   5      MR. AUSTIN:  Okay.  I'm sorry.  On page 1, there are

6 no objections.

7      THE COURT:  Okay.

8         Prosecution?

9      MS. WIRSING:  None from the government, your Honor.

03:32:42  10      THE COURT:  On page 2, any objections from the

11 prosecution?

12      MS. WIRSING:  No, your Honor.

13      THE COURT:  And from the defense?

14      MR. AUSTIN:  No, your Honor.

03:32:55  15      THE COURT:  Page 3, any objections from the defense?

16      MR. AUSTIN:  No, your Honor.

17      THE COURT:  And from the prosecution?

18      MS. WIRSING:  No, your Honor.

19      THE COURT:  Page 4, any objections from the

03:33:08  20 prosecution?

21      MS. WIRSING:  No, your Honor.

22      THE COURT:  And then, from the defense?

23      MR. AUSTIN:  No, your Honor.

24      THE COURT:  On page 5, any objections from the

03:33:23  25 defense?

1          MR. AUSTIN:  One second.

2                No, your Honor.

3          THE COURT:  Any objection from the prosecution?

4          MS. WIRSING:  No, your Honor.

03:33:58  5          THE COURT:  And page 6?

6                At this time, Mr. Austin, you can make your

7     request for the lesser-included offense for the reasons stated

8     earlier on the record.

9          MR. AUSTIN:  Yes.  We would request that the judge

03:34:11  10    include a lesser-included charge to the jury for the reasons

11    stated on the record earlier.

12          THE COURT:  Respectfully, that motion -- that request

13    is denied.

14                Any objections on page 6?

03:34:24  15          MS. WIRSING:  No, your Honor.

16          THE COURT:  And then, any objections on page 7 by

17    either the prosecution or the defense?

18          MS. WIRSING:  No, your Honor.

19          MR. AUSTIN:  No, your Honor.

03:34:35  20          THE COURT:  And then, any objections on page 8?

21          MS. WIRSING:  None from the government.

22          MR. AUSTIN:  No, your Honor, based on previous stated

23    objection.  Maybe that's better.  I renew but understood.

24          THE COURT:  Respectfully, the objections are carried

03:34:56  25    forward and they're overruled.

         1          MR. AUSTIN:  Thank you, Judge.

         2          THE COURT:  So, I'm going to print up copies.  When

         3   would you-all like me to release the -- Jurors Number 13 and 14?

         4   Do you want to wait until after I read the charge and after the

03:35:13 5   closing statement?

         6          MS. WIRSING:  Your Honor, I feel like they've sat

         7   through the trial up to this point; and it would probably be

         8   nice for them to see it to conclusion without, of course,

         9   deliberating.

03:35:25 10         THE COURT:  Not a problem.

         11         MS. WIRSING:  Or maybe they'd like to go home early.

         12         MR. AUSTIN:  I don't have a preference.

         13         THE COURT:  Well, just in case, I'll keep them until

         14   the end of closing.

03:35:36 15         MS. WIRSING:  Thank you, your Honor.

         16         THE COURT:  Okay.  Do you-all have a copy to look at?

         17         MR. AUSTIN:  Yes.

         18         THE COURT:  Do you have a copy?

         19      (No response.)

03:35:59 20         THE COURT:  Is everyone ready?  I'm going to read the

         21   charge and let you argue for 20 minutes.

         22         MS. WIRSING:  Thank you, your Honor.  The government

         23   is prepared to proceed.

         24      (Court recessed at 3:35 p.m.)

03:36:17 25      (Court resumed at 3:37 p.m.; jury not present.)



                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Do you-all have all the exhibits ready to

2  go?

3          MS. WIRSING:  Yes, your Honor.  And because we are on

4  the record, there is a typographical error in the government's

03:37:25    5  exhibit list.  Just that very --

6          THE COURT:  Let's take that up in a little bit since

7  the jury is ready.

8          MS. WIRSING:  Okay.  But it is ready to go back with

9  one change, the numbers.

03:37:41   10          THE COURT:  Great.  Just keep them all together and

11  keep them there; and then, we'll talk about it as soon as we

12  finish the closing statements -- argument.

13          THE MARSHAL:  All rise for the jury.

14     (The jury was brought into the courtroom at 3:38 p.m.)

03:38:27   15          THE COURT:  Please be seated, everyone.

16          Welcome back, ladies and gentlemen.  This took a

17  little bit longer than I anticipated, but we are now ready to

18  get the case to you.  What I'm going to do now is read to you

19  the jury charge.  These are the instructions that you-all need

03:38:41   20  to follow in deliberating in this case.

21          Once I finish reading the jury charge -- it's not

22  very long -- the prosecution will have an opportunity to make

23  closing argument to you, about maybe 15 to 20 minutes; and then,

24  the defense counsel will also make closing arguments to you,

03:38:57   25  about 15 to 20 minutes.  And then, after that, the case is going

1  to be yours.

2         I'll recess you back into the jury room.  I'll

3  give you each your own individual copy of the jury charge to

4  read, and I will also give you the exhibits that have been

03:39:14  5  admitted in this case as evidence.  And then, we're on your

6  schedule.  You can deliberate as long as you need to.  If you'd

7  like to come back tomorrow, it's no problem.  If you want to

8  stay late tonight, it's no problem.  We are now -- or we will be

9  on your schedule at that point in time.  Okay.

03:39:35  10         One second.

11                    **CHARGE OF THE COURT**

12         THE COURT:  Members of the jury, in any jury trial,

13  there are, in effect, two judges.  I am one of the judges; the

14  other is the jury.  It is my duty to preside over the trial and

03:39:57  15  to decide what evidence is proper for your consideration.  It is

16  also my duty at the end of the trial to explain to you the rules

17  of law that you must follow and apply in arriving at your

18  verdict.

19         First, I will give you some general instructions

03:40:13  20  which apply in every case; for example, instructions about the

21  burden of proof and how to judge the believability of the

22  witnesses.  Then, I will give you some specific rules of law

23  about this particular case; and, finally, I will explain to you

24  the procedures you should follow in your deliberations.

03:40:36  25         You, as jurors, are the judges of the facts.  But

1    in determining what actually happened, that is, in reaching your

2    decision as to the facts, it is your sworn duty to follow all of

3    the rules of law as I explain them to you.

4            You have no right to disregard or give special

03:40:56    5    attention to any one instruction or to question the wisdom or

6    correctness of any rule that I might state to you.  You must not

7    substitute or follow your own notion or opinion as to what the

8    law is or ought to be.  It is your duty to apply the law as I

9    explain it to you regardless of the consequences.

03:41:20    10           It is also your duty to base your verdict solely

11   upon the evidence without prejudice or sympathy.  That was the

12   promise you made and the oath you took before being accepted by

13   the parties as jurors, and they have a right to expect nothing

14   less.

03:41:33    15          The indictment or formal charge against a

16   defendant is not evidence of guilt.  Indeed, the defendant is

17   presumed by the law to be innocent.  The law does not require a

18   defendant to prove his innocence or produce any evidence at all,

19   and no inference whatsoever may be made -- may be drawn from the

03:41:57    20   election of a defendant not to testify.

21          The government has the burden of proving the

22   defendant guilty beyond a reasonable doubt; and if it fails to

23   do so, you must acquit the defendant.  While the government's

24   burden of proof is a strict or heavy burden, it is not necessary

03:42:23    25   that the defendant's guilt be proved beyond all possible doubt.

1   It is only required that the government's proof exclude any

2   reasonable doubt concerning the defendant's guilt.

3                   A reasonable doubt is a doubt based upon reason

4   and common sense after careful and impartial consideration of

03:42:42   5   all the evidence in the case.  Proof beyond a reasonable doubt,

6   therefore, is proof of such a convincing character that you

7   would be willing to rely and act upon it without hesitation in

8   the most important of your affairs.

9                   As I told you earlier, it is your duty to

03:43:02   10   determine the facts.  To do so, you must consider only the

11   evidence presented during the trial.  Evidence is the sworn

12   testimony of the witnesses, including stipulations and exhibits.

13   The questions, statements, objections, and arguments made by the

14   lawyers are not evidence.

03:43:21   15                   The function of the lawyers is to point out those

16   things that are most significant or most helpful to their side

17   of the case and, in doing so, to call your attention to certain

18   facts or inferences that might otherwise escape your notice.  In

19   the final analysis, however, it is your own recollection and

03:43:40   20   interpretation of the evidence that controls in this case.  What

21   the lawyers say is not binding upon you.

22                   During the trial, I sustained objections to

23   certain questions and exhibits.  You must disregard those

24   questions entirely.  Do not speculate as to what the witness

03:44:01   25   would have said if permitted to answer the question or as to the

1 contents of an exhibit.

2          Also, certain testimony or other evidence has
3 been ordered removed from the record; and you have been
4 instructed to disregard that evidence.  Do not consider any
03:44:17   5 testimony or other evidence which has been removed from your
6 consideration in reaching your decision.  Your verdict must be
7 based solely on the legally admissible evidence and testimony in
8 this case.

9          Also, do not assume from anything I may have done
03:44:35 10 or said during the trial that I have any opinion concerning any
11 of the issues in this case.  Except for the instructions to you
12 on the law, you should disregard anything I may have said during
13 the trial in arriving at your own verdict.

14          In considering the evidence, you are permitted to
03:44:53 15 draw such reasonable inferences from testimony and exhibits as
16 you feel are justified in light of common experience.  In other
17 words, you may make deductions and reach conclusions that reason
18 and common sense lead you to draw from the facts established by
19 the evidence.

03:45:10 20          Do not be concerned about whether evidence is
21 direct evidence or circumstantial evidence.  You should consider
22 and weigh all of the evidence that was presented to you.  Direct
23 evidence is the testimony of one who asserts actual knowledge of
24 a fact, such as an eyewitness.  Circumstantial evidence is proof
03:45:30 25 of a chain of events and circumstances indicating that something

1 is or is not a fact.

2          The law makes no distinction between the weight

3 you may give to either direct or circumstantial evidence.  But

4 the law requires that you, after weighing all of the evidence,

03:45:50   5 whether direct or circumstantial, be convinced of the guilt of

6 the defendant beyond a reasonable doubt before you can find him

7 guilty.

8          I remind you that it is your job to decide

9 whether the government has proved the guilt of the defendant

03:46:05  10 beyond a reasonable doubt.  In doing so, you must consider all

11 of the evidence.  This does not mean, however, that you must

12 accept all of the evidence as true or all of the evidence as

13 accurate.

14          You are the sole judges of the credibility or

03:46:26  15 believability of each witness and the weight to be given the

16 witness's testimony.  An important part of your job will be

17 making judgments about the testimony of witnesses who testified

18 in this case.  You should decide whether you believe all, some,

19 part, or none of what each person had to say and how important

03:46:48  20 that testimony was.

21          In making that decision, I suggest that you ask

22 yourself a few questions:  Did the witness impress you as

23 honest?  Did the witness have any particular reason not to tell

24 the truth?  Did the witness have a personal interest in the

03:47:05  25 outcome of the case?  Did the witness have any relationship with

1  either the government or the defense?  Did the witness have a

2  good memory?  Did the witness clearly see or hear things about

3  which he testified?  Did the witness have the opportunity and

4  ability to understand the questions clearly and answer them

03:47:24  5  directly?  Did the witness's testimony differ from the testimony

6  of other witnesses?

7  These are just a few of the considerations that

8  will help you determine the accuracy of what each witness said.

9  Your job is to think about the testimony of each witness you

03:47:41  10  heard and decide how much you believe of what that witness had

11  to say.

12  In making up your mind in reaching a verdict, do

13  not make any decisions simply because there were more witnesses

14  on one side than on the other side.  Do not reach a conclusion

03:47:57  15  on a particular point just because there were more witnesses

16  testifying for one side on that point.  You will always bear in

17  mind that the law never imposes upon a defendant in a criminal

18  case the burden or duty of calling any witnesses or producing

19  any evidence.

03:48:15  20  You will note that the indictment charges that

21  the offense was committed on or about a specific date.  The

22  government does not have to prove that the crime was committed

23  on that exact date so long as the government proves beyond a

24  reasonable doubt that the defendant committed the crime on a

03:48:33  25  date reasonably near the date stated in the indictment.

1          You are here to decide whether the government has

2  proved beyond a reasonable doubt that the defendant is guilty of

3  the crimes charged.  The defendant is not on trial for any act,

4  conduct, or offense not alleged in the indictment.  Neither are

03:48:52  5  you called upon to return a verdict as to the guilt of any other

6  person or persons not on trial as a defendant in this case

7  except as you are otherwise instructed.

8          If a defendant is found guilty, it will be my

9  duty to decide what punishment that defendant should receive.

03:49:12  10  You should not be concerned with punishment in any way.  It

11  should not enter into your consideration or your discussions.

12          The word "knowingly," as that word has been used

13  from time to time in these instructions, means that the act was

14  done voluntarily and intentionally, not because of mistake or

03:49:31  15  accident.

16          Count 1:  Forcibly assaulting a federal officer,

17  18 USC Section 111(a)(1)(B).  Title 18 United States Code

18  Section 111(a)(1) makes it a crime for anyone to forcibly

19  assault, resist, oppose, impede, intimidate, or interfere with

03:49:57  20  any person designated as a federal officer or employee of the

21  United States or of any agency in any branch of the United

22  States Government, including any member of the uniformed

23  services while the officer is engaged in the performance of his

24  official duties.

03:50:16  25          For you to find that the defendant is guilty of

1   this crime, you must be convinced that the government has proved

2   each of the following beyond a reasonable doubt:

3               first, that the defendant forcibly assaulted,

4   resisted, opposed, impeded, intimidated, or interfered with a

03:50:33   5   federal officer as described below;

6               second, that the federal officer was forcibly

7   assaulted, resisted, opposed, impeded, intimidated, or

8   interfered with while engaging in the performance of his

9   official duty or on account of the performance of those official

03:50:50   10   duties;

11               third, that the defendant did such acts

12   intentionally;

13               and, fourth, that in doing such acts, the

14   defendant inflicted bodily injury.

03:51:05   15               The term "forceable assault" means any

16   intentional attempt or threat to inflict injury upon someone

17   else when the defendant has the apparent present ability to do

18   so.  This includes any intentional display of force that would

19   cause a reasonable person to expect immediately -- immediate

03:51:24   20   bodily harm, regardless of whether the victim was injured or the

21   threat or attempt was actually carried out.

22               The term "bodily injury" means an injury that is

23   painful and obvious or an injury for which medical attention

24   would ordinarily be sought.

03:51:42   25               You are instructed that Jose Ruiz de Chavez,

1  Supervisory Deputy United States Marshal, is a federal officer

2  and that it is part of his official duty as such officer to

3  transport and secure prisoners.  It is not necessary to prove

4  that the defendant knew the person forcibly assaulted was at the

03:52:12  5  time a federal officer carrying out an official duty so long as

6  it is established beyond a reasonable doubt that the victim

7  assaulted was, in fact, a federal officer acting in the course

8  of his or her duty and that the defendant intentionally

9  committed a forceable assault upon that officer.

03:52:30  10          To reach a verdict, whether it is guilty or not

11  guilty, all of you must agree.  In other words, the verdict must

12  be unanimous.  Your verdict must be unanimous on each count of

13  the indictment.  Your deliberations will be secret.  You will

14  never have to explain your verdict to anyone if you don't want

03:52:53  15  to.

16          It is your duty to consult with one another and

17  to deliberate in an effort to reach agreement, if you can do so.

18  Each of you must decide the case for yourself but only after an

19  impartial consideration of the evidence with your fellow jurors.

03:53:10  20          During your deliberations, do not hesitate to

21  reexamine your own opinions and change your mind if you're

22  convinced that you're wrong.  But do not give up on your honest

23  beliefs as to the weight or effect of the evidence solely

24  because of the opinion of your fellow jurors or for the mere

03:53:28  25  purpose of returning a verdict.

1          Remember at all times you are judges.  You are

2    the judges of the facts.  Your duty is to decide whether the

3    government has proved the defendant guilty beyond a reasonable

4    doubt.

03:53:43    5          When you go to the jury room, the first thing you

6    should do is select one of your number as your foreperson who

7    will help guide your deliberations and will speak for you here

8    in the courtroom.

9          A verdict form has been prepared for your

03:53:57   10    convenience.  The foreperson will write the unanimous answer of

11    the jury in the space provided for each count of the indictment,

12    either guilty or not guilty.  At the conclusion of your

13    deliberations, the foreperson should sign and date the verdict.

14          If you need to communicate with me during

03:54:17   15    deliberations, the foreperson should write the message and give

16    it to the marshal.  I will either reply in writing or bring you

17    back in the courtroom to answer your message.

18          Bear in mind that you are never to reveal to any

19    person, not even the Court, how the jury stands, numerically or

03:54:37   20    otherwise, on any count of the indictment until after you have

21    all reached a unanimous verdict.

22          And then, the verdict form reads as follows:  On

23    Count 1 we, the jury, find the defendant, Cedric Walker either

24    guilty or not guilty.  There's a space for the foreperson to

03:54:55   25    sign and date the verdict form.

1           Are the parties ready to proceed with closing

2   argument?

3           MS. WIRSING:  Yes, your Honor.

4           THE COURT:  Ms. Wirsing, you may proceed.

03:55:07   5           MS. WIRSING:  May it please the Court.

6               Ladies and gentlemen.

7               The defendant was not going back to the Federal

8   Detention Center without a fight.  Cedric Walker was not going

9   without a fight.  At the beginning of trial this morning, my

03:55:34  10  co-counsel, Attorney Anna Swanson, had an opportunity to address

11  you; and she set out what we expected to present to you

12  throughout the course of this trial.

13              And I submit to you we have proven beyond a

14  reasonable doubt everything that we said that we would.  You

03:55:57  15  heard from two Supervisory Deputy United States Marshals, one of

16  whom is present in the back of the courtroom today that I'm --

17  you heard their testimony.

18          MR. AUSTIN:  Objection, Judge.  Objection, Judge.

19  That's an improper reference.

03:56:14  20          THE COURT:  I'm sorry?

21          MR. AUSTIN:  That's an improper reference during

22  closing argument.

23          THE COURT:  So, what's the objection?

24          MR. AUSTIN:  Calling the jury to look into the crowd

03:56:27  25  about a marshal, and it's improper.

1          THE COURT:  Response?

2          MS. WIRSING:  I don't have any objection to it being

3  struck, your Honor.

4          THE COURT:  The reference will be struck, and the jury

03:56:40   5  will disregard that reference.

6          MS. WIRSING:  So, you heard testimony from two

7  Supervisory Deputy United States Marshals; and you heard

8  testimony that on December 27th of 2022, just two days after

9  Christmas, that they went to the Leidel Reentry Residential

03:57:05  10  Center, also known as a halfway house, that they went themselves

11  because it was towards the end of the year and many of the other

12  deputies were at home with their families taking their leave.

13  And so, they went there because Mr. Walker violated the rules of

14  the halfway house and he needed to be transferred back to the

03:57:31  15  Federal Detention Center.

16          Now, make no mistake, Mr. Walker was an inmate.

17  He was a federal inmate, and he was serving out the remainder of

18  his federal prison sentence at the halfway house.  It is a

19  privilege to be at the halfway house towards the end of your

03:58:00  20  sentence.  However, there are rules, including curfew

21  restrictions; and Mr. Walker violated those restrictions; and

22  so, he had to be transferred back.

23          But despite their training, despite their

24  preparedness, despite their extensive time in the field, there's

03:58:36  25  still a danger inherent to the job.  And on this day, that

danger came in the form of one powerful explosive punch that
came from Mr. Walker.  Those are the words of Deputy US Marshal
Ruiz de Chavez.  He testified, "I was ready, and he still got
me."

03:59:18   Now, during jury selection, you were asked could
you convict someone on the basis of the testimony of one
witness; and you-all agreed that you could.  However, in this
case, you have the testimony of not only Ruiz de Chavez, you
also have the testimony of his partner, Arthur, or Art,
03:59:44   Fernandez.

And through the course of their testimony, you
had the opportunity to assess their credibility.  Now, the judge
just gave you some instructions on the factors that you may
consider when you are assessing the credibility of witnesses.
04:00:01   Those include did the witness impress you as honest?  Did the
witness have any particular reason not to tell the truth.  Did
the witness have a personal interest in the outcome of this
case?  Did the witness have a good memory?  Did the witness
clearly see or hear things about which they testified?  Did the
04:00:28   witness have the opportunity and ability to understand the
questions clearly and answer them directly?  So, that's your
job, ladies and gentlemen, to assess the credibility of the
witnesses that you heard in this case.

Now, we have direct testimony from Deputy Ruiz de
04:00:55   Chavez.  He was the one -- he was the victim.  He was the one

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  who was punched.  He has direct knowledge of receiving that

2  punch to his lip.

3          You also have the corroborating testimony of

4  Deputy Fernandez.  And his testimony may be what you consider at

04:01:20  5  times to be circumstantial evidence, and the judge gave you an

6  instruction about the difference between those two types of

7  evidence.  And you can take these jury instructions back with

8  you and refer to them during your deliberation.

9          Now, circumstantial evidence in this case would

04:01:41  10  be things like Deputy Fernandez seeing the defendant turn his

11  body and the demeanor of the defendant; and when the defendant

12  made contact with the victim in this case, he heard an "oof"

13  sound and he saw the victim's head snapping back.

14          Even though he didn't see the actual punch, he

04:02:12  15  saw things that led him to believe that there was, in fact, a

16  punch; and I would liken this to circumstantial evidence to,

17  let's say, it's raining outside, right?  Even if you're inside,

18  when you go outside, you can tell that it had just rained.

19          Perhaps, maybe while you were typing you heard

04:02:34  20  the rain on your rooftop.  When you go outside, you see people

21  with their umbrellas and you see the ground wet.  Even if you

22  didn't personally witness it raining outside, you can still

23  deduce it rained outside.  That's a reasonable inference, and

24  that's something you're allowed to do in this case.

04:02:55  25          I also submit to you that Arthur Fernandez, he

1  did not embellish his testimony.  He told you what he saw and
2  only what he saw.  He said, "I didn't see the fist making
3  contact."  He didn't embellish the testimony.  He just told you
4  what he saw.  And you can give the same weight -- you can give
04:03:25  5  circumstantial evidence the same weight as direct testimony.
6  But, again, that's up to you to decide what the evidence is in
7  this case.

8           Now, we did not present the testimony of the GEO
9  guards who were standing outside the pod.  They did not see what
04:03:42  10  happened -- or they were not in a position to see what happened.
11  And so, the government presented to you only the testimony of
12  the two deputies who are present inside the pod for the assault.

13           There's also been discussion about whether or not
14  there was a video camera.  And you heard testimony that there
04:04:01  15  were cameras outside the facility and in the reception area.
16  Also, that there was a camera in the area where the employees
17  were.  That all makes sense.

18           There was also a camera in the hallway area back
19  in the dorm but no cameras focused directly into the individual
04:04:26  20  pods where the inmate resides for privacy reasons.  The facility
21  is not recording these men getting dressed.  The facility is not
22  recording them sleeping and doing whatever other personal
23  business they attend to.  There is no recording of what happened
24  inside the pod.  But we have two witnesses that were there to
04:04:55  25  witness, to see what happened, and to experience directly what

1  happened.

2              Now, I want to go over the elements of the

3  offense.  The judge just instructed you about the four elements

4  that the government has to prove beyond a reasonable doubt in

04:05:12  5  this case.  The first is that the defendant forcibly assaulted,

6  resisted, opposed, impeded, intimidated, or interfered with a

7  federal officer; second, that the federal officer was forcibly

8  assaulted, resisted, opposed, impeded, intimidated, or

9  interfered with while engaged in the performance of his official

04:05:42  10  duties or on account of performing his official duties; third,

11  that the defendant did such act intentionally; and, fourth, that

12  in doing such act, the defendant inflicted bodily injury.

13              So, when we look at those elements, particular --

14  so, let's look at whether or not there was a federal officer

04:06:08  15  present here while they were performing their official duty.

16  The judge has instructed you on that element.  Specifically, he

17  said you are instructed that Deputy Ruiz de Chavez is a federal

18  officer and that it is a part of the official duty of him to

19  transport and secure prisoners.  So, that's already been taken

04:06:35  20  care of.  That element is not an issue.

21              Also, a factor that you must consider is whether

22  or not there was a forceable assault.  And in this case --

23  sorry.  I got lost in my -- I got lost in my thoughts here.

24              Okay.  Whether or not the defendant forcibly

04:07:21  25  assaulted, resisted, opposed, impeded, intimidated, or

2-178

interfered with a federal officer.  Now, in this case, you have

testimony that the defendant refused to come into the waiting

area to meet the Deputy US Marshals.

You also have testimony about his demeanor when

they went back into the pod, that he was angry, that he was

agitated, that he was reluctant to comply with their orders,

that he wouldn't get up off the bed.  They had to instruct him

several times to stand up.  "You need to stand up.  You're going

back to the Federal Detention Center because you violated the

rules."

There was testimony that he was not compliant

with the command to put his arms out to be cuffed; and then,

reluctantly, he turned around to put the bandana that he had

been instructed to drop on the bed and that -- and that he

turned around and clocked the deputy in the mouth, one hard

explosive punch.

You also heard that he had to be TASed two times

in order to bring him into compliance and to get him restrained.

You also heard that during the course -- during the entire

course of conduct that this began from -- from inside the pod

when the deputies were waiting outside, he was saying, "I'm not

going to go back.  I'm not going to go outside."  They will have

to go in there and get him.  And even after he was being

transported outside of the facility, he was still resisting and

still agitating.  He was still kicking.  He was cursing.  He was

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   not going to go back to the Federal Detention Center without a
2   fight.
3          Now, there's another element of bodily injury.
4   There's no dispute in this case that there's bodily injury.
04:09:29   5          Can we put up Exhibit Number 8.
6          You've seen this image a handful of times now.
7   These are the injuries that Deputy Ruiz de Chavez testified to.
8   I don't think we need to dim the lights for purposes of this.
9   You can take the picture back and look at it.  That is a split
04:09:49  10  lip, ladies and gentlemen.  I submit to you that's not a hole in
11  his lip.  That is a split lip that was done at the hands of
12  Mr. Walker.
13         Now, you heard testimony that Deputy Ruiz de
14  Chavez was transported to Ben Taub Hospital where he was seen by
04:10:10  15  a plastic surgeon who stitched him up with 12 stitches
16  externally and internally on muscle and also that Deputy Ruiz de
17  Chavez suffered from two cracked teeth.
18         You also heard from him that there's going to be
19  lasting -- potentially lasting health consequences, physical
04:10:36  20  consequences as the result of this punch at the hands of
21  Mr. Walker.
22         THE COURT:  Ms. Wirsing, you've used 15 minutes.
23         MS. WIRSING:  Thank you, your Honor.
24         You heard that he sought dental -- a dental
04:10:50  25  consultation and that even well into the future he may have

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    issues with the root of his tooth being damaged as the result of

2    the trauma that he suffered.

3         So, really, what it comes down to here is did the

4    defendant inflict bodily injury?  You heard testimony very

04:11:09  5    clearly without a doubt from Deputy Ruiz de Chavez that that

6    injury came from the hands of Mr. Walker.

7         Now, even if -- even if Deputy Ruiz de Chavez

8    fell into a pole or a wall after he was struck, that was still

9    the result of the action of the defendant, still a result of the

04:11:43  10   punch.  It was still by account of the defendant's act of

11   resisting, opposing, impeding, intimidating, and interfering.

12   Any one of those acts resulted in a bodily injury.

13         And those are acts the defendant did because he

14   was not going back to the Federal Detention Center without a

04:12:10  15   fight.

16         THE COURT:  Thank you, Ms. Wirsing.

17         Mr. Austin, you may proceed when ready.

18         MR. AUSTIN:  May it please the Court, your Honor.

19         THE COURT:  You may proceed.

04:12:49  20         MR. AUSTIN:  Good afternoon.  We are at the end

21   finally.  The case has been alleged to began in 2022 and here we

22   are in 2024.  I submit to you, jury, the government has not

23   proven their case.

24         The government has done a decent job of shielding

04:13:15  25   some facts from you; but as I said at the beginning of this

1   case, my job is to help usher you through.  My job is to

2   represent Mr. Walker.  Your job is to determine what's the

3   truth.

4              And unfortunately, you are in a position where

04:13:33   5   you can't do that when the government just admitted we had

6   witnesses and we determined those witnesses couldn't help you.

7   That's problematic.  Witness after witness, two, said there were

8   at least four to five other people that were there.

9              We saw on the defense exhibit how small the pod

04:13:55  10   is, where at the front of the pod two people were standing right

11   there in one of the photos; and both witnesses acknowledged

12   there was at least three GEO officers there.  They were in

13   perfect position to see if somebody was punched.  And they are

14   in perfect position to see that somebody was not punched.

04:14:14  15              You have to think about the converse.  Their

16   argument is he was punched.  That's an argument.  I submit we

17   haven't seen any punch.  The only person that actually said that

18   he was punched was Officer -- excuse me -- Deputy Chavez.

19              We heard an argument right now that Deputy

04:14:37  20   Fernandez said he saw Officer -- Deputy Chavez's head jerk back.

21   I never heard that testimony.  I pressed him on it:  Did you see

22   him get punched?  Eventually, he said, "No, I didn't see it."

23   And I'm being witty, perhaps, but paraphrasing.  He didn't see

24   it.

04:14:55  25              It took time to get there, and it took time to

1   get there because it's a fellow officer.  He was standing right
2   in front of Mr. Walker when this incident took place.  But yet,
3   he asked Chavez, "What happened?  What's the reading in between
4   the lines?  Let's get our stories together.  I got to back you
5   up."  He spoke to him right after and wrote whatever report, use
6   of force, a day later.
7                   Officer Chavez admitted he spoke to, like, 15 to
8   20 different people over the course of three weeks before he was
9   interviewed by the FBI, by two different agents, he testified.
10  And I asked him:  Did anybody indicate to you that you hit a
11  pole?  He had heard that.  That injury happened not from a
12  punch.  That injury happened because he fell and hit something
13  metal, something hard, something pointy.  Or we don't know.
14  Because we haven't seen any video.
15                  I've heard excuses why there are no videos.  No
16  reasons.  I heard excuses.  That's why they didn't bring in at
17  least five witnesses.  No real reasons.  How can they submit to
18  you they've proven their case when they have witnesses out there
19  with conflicting testimony?  They can't.  So, we have to
20  streamline the testimony to their most credible people by their
21  positions, the US Marshals.
22                  That office, comes with it integrity.  They're
23  leaning on the office's integrity to get you to the point where
24  they haven't been able to prove their case, but they're hoping
25  that that integrity just takes it over the line.  That's a tough

1 call for me to say to you they're relying on you guys to make a
2 mistake, but they are.

3         The elements are very clear.  The charge is very
4 clear, forcibly assaulting a federal officer.  If I am reluctant
5 to go in the front, that's not forcibly reluctant.  I'm not
6 forcibly impeding.  Forcibly impeding is the operative word.
7 It's not, "Oh, you just didn't come" or "You were protesting why
8 you are here."

9         It has to be forcibly because it's not enough to
10 say he didn't come to the front.  That's why they just told you
11 the federal officer, Count 2, was forcibly assaulted or forcibly
12 resisted or forcibly opposed or forcibly impeded, forcibly
13 intimidated, or forcibly interfered.  You just plug in which
14 word, but the first one is "forcibly."  That's how the statute
15 works.

16         And they misspoke, frankly, I would be arguing.
17 I think honestly they haven't proven anything.  There are four
18 elements that they have to go through.  The first one, the
19 defendant forcibly assaulted, forcibly resisted, forcibly dot,
20 dot, dot with a federal officer.  Well, he didn't do that.
21 That's my submission to you.

22         But the second element is a little bit
23 interesting, that in the course of official duty or on account
24 of the performance of his official -- performance of his duties.
25 They're referring to Officer Chavez.  And the interesting thing

1  about that is they claim there was this warrant.  I didn't see

2  any warrant.  There is no warrant anywhere in the government's

3  exhibits.

4  The official duty that they're claiming they were

04:19:07  5  here on, we didn't see it.  We have to take their word that he

6  was supposed to be arrested that day.  We have to take their

7  word for that because the government failed to arm you with the

8  tools to show you Element 2 is satisfied.  It is not satisfied.

9  There's testimony that gets them just to the

04:19:37  10  finish line in front of you.  But they didn't show you.  They

11  didn't show you this was like a lawful arrest, a lawful

12  detention, a lawful police action.  They didn't show it to you.

13  The judge instructed you as US Marshals they do -- perform these

14  duties, and we agree because we agree with the judge's

04:19:56  15  instructions.

16  But the second -- the first element we do not

17  agree; and the second one, they failed.  They messed up.  Excuse

18  me, they messed up.  Third, that the defendant did such acts

19  intentionally.  Now, what we heard about the testimony was they

04:20:16  20  kind of strategically don't let the inmate or prisoner, or

21  whatever words they want to use -- he's a man at a halfway

22  house.  He's almost done.  He wasn't going without a fight.

23  That's for you-all.  That's drama.

24  They said, "We strategically don't let him know

04:20:41  25  that we're here."  So, if they're calling him up, he doesn't

2-185

know why they're calling him up.  You can infer that, right, if they called him up?  Or if they went back or whatever it is.  We didn't hear any testimony.

So, he must have been caught off guard in that entire scenario.  He had to have been wondering why are you here to arrest me for a curfew violation that we haven't seen happen.  When I asked them didn't he tell you he had permission and all that, they were shaky on that.

I asked them:  Did they speak to the regional director who would have the information if he was given permission or not?  "I didn't ask."

I said, "Well, wouldn't it have been nice to show him the warrant to deescalate the situation?"

He said that wouldn't have mattered.  He made a determination, just like the government made a determination, "You're not going to get that information.  You just take my word for it because I'm a marshal."

We don't even know if they got the right Cedric Walker.  No one thought of that.  Are we sure we got the right guy?  Are we sure this is the right Cedric Walker that may have been -- I don't even know where the curfew thing came from because we haven't seen any notice.  We haven't seen any warrant.  We haven't seen anything that says arrest this man.

And so, we have this act described by Officer Chavez and Officer Fernandez.  The only thing that mirrors the

1  two of their testimony is this wind-up from the bowels, the

2  depths.  If you're standing in front of a man that is bending

3  down clocking his whole body, wouldn't you react?  Wouldn't you

4  move?  That's the only thing that is the same in their whole

04:22:51  5  testimony.

6          And we know why.  Because they prepped.  We know

7  why.  Because they spoke.  They got their stories together as

8  long as they could.  But Fernandez eventually kind of backed

9  off.  I'm not trying to make anybody look bad, but he's also not

04:23:15  10  going to violate himself.  He said, "I didn't see a hit."

11  Because we've taken an oath to be honest.  And he honestly said,

12  "I didn't see it."  I said something -- that's as far as he was

13  going to go.

14          But the fourth element, which is the real

04:23:32  15  sticking point, that in doing such acts, the defendant inflicted

16  bodily injury.  It's not but for him impeding this guy would

17  have been hurt.  No.  No, no, no.  It's the punch must have

18  caused the injury.  You don't get to charge somebody with

19  forcibly assaulting by saying, "Well, if he would have just

04:23:56  20  left, none of this would have happened."  That's not what the

21  law requires.

22          The judge just read it.  They misstated it.  They

23  may have misunderstood it.  But it's clear.  And we saw

24  something interesting on Government's Exhibit 8.  And you'll get

04:24:11  25  to see this.  That's a blowup of Officer Chavez's face.  That's

2-187

the cut.  We do not know what this (indicating) is.  But it
looks metallic to me.

And you can check for yourself.  Don't know what
it is.  You didn't hear from a doctor saying I removed or didn't
remove anything.  We didn't hear from a doctor saying his
injuries are going to be permanent.  We didn't hear from a
dentist saying he didn't have cracked teeth or cavities or
whatever it was the last time I saw him and I stitched him up or
I filled those cavities after and he's going to have these
permanent injuries.  We didn't hear.

How does he know what's permanent or not?  He
doesn't.  Or he's asking you to rely on this statement from a
doctor.  We can't question a guy that we didn't meet.  You can't
rule out that he hit his head on something metal because we
didn't talk to the doctor.  You can't rule it out.  That's the
problem.

Reasonable doubt is not just -- I like the
government's theory.  That's not reasonable doubt.  Reasonable
doubt is I've heard other reasonable or well-reasoned
explanations; and then, they ruled it out.  They didn't do that.
They didn't rule out that he hit his head on something metal.

What else didn't they do?  They didn't show you
any video.  They admitted that.  They offered an excuse as to
why there's no video.  But they did testify -- and I'm saying
"they."  But one of the officers did testify there is video

1  surveillance at the front.

2          So, why wouldn't you have gotten video

3  surveillance of Mr. Walker violating the curfew.  Why didn't the

4  FBI or whoever does the investigation get that?  Right?

04:26:25  5  Wouldn't that have been like corroboration?  We heard the word

6  "corroborate," but nothing is corroborated if your two

7  testimonies don't link up.  That's not corroboration.

8          One guy says, "I got hit."  The other guy says,

9  "I didn't see it."  That's not corroboration.  You know somebody

04:26:46  10  said, "I saw the man fall into a pole."  They didn't bring that

11  person in.  Okay?  That should score in our benefit.  Because

12  that is a witness they determined you should not hear from or

13  they don't want Mr. Austin to get a crack at them.

14          Think about it.  Every time they came up, what

04:27:06  15  did I do?  I had to go in there and extrapolate other facts,

16  extrapolate other instances, other occurrences.  I had to do

17  that for you-all to be able to do your job.

18          Now, the judge talked about reasonable doubt.

19  And one of the examples I've heard given by other judges -- and

04:27:35  20  I've even used this -- it's like, you know, when you have to

21  make a life-changing decision.  Maybe I should -- should we buy

22  a house?  If you're starting a family or newlywed couple.  Can

23  we have a child?  Should we have multiple child -- multiple

24  children?

04:27:54  25          And you take a reason-measured approach.  Can we

1 afford the mortgage?  Can we afford daycare?  Are we stretching
2 ourselves too thinly.  So, you ponder over it.  Then, you
3 conclude whatever way you want.  After you pondered everything
4 you've heard, can you conclude that he didn't hit his head on a
04:28:21  5 metal pole beyond a well-reasoned analysis of everything that
6 you heard?  I don't think you can.

7          Now, he was -- and I mean "he," Mr. Walker -- was
8 complying.  He was reluctant, but he was complying.  He stood
9 up.  He did everything they asked.  And then, something
04:28:54 10 happened.  Was he startled?  Did he move?  Did he jerk?  Don't
11 know.

12          I think it would have been easier to hit Officer
13 Fernandez who was standing directly in front of him than to hit
14 the guy either to his left or to his right behind him, if he was
04:29:13 15 really looking to go without a fight.  No kicking there.  He
16 didn't do anything to Officer Fernandez.

17          So, he wasn't looking for a fight.  He was
18 looking for answers.  And no answers were given to him.  No
19 explanations.  "I'm a marshal.  I don't get into all that.  You
04:29:33 20 come and get me."  That's what that was.  That's what the
21 testimony was.

22          THE COURT:  You have used 15 minutes.
23          MR. AUSTIN:  Thank you.
24          And so, I've talked to you about the elements.
04:29:50 25 This last point I want to make is about impartial witnesses.

1  Were any of the witnesses impartial?  I mean, we have impartial

2  witnesses that could have testified; but none of them were

3  brought by the government where it is their burden to show to

4  you.

04:30:12  5          So, what do we have at the end of the day?  We

6  have the government protecting the marshal's office, the

7  government bringing these charges because they're not in a

8  position to say to Officer Chavez we think you -- we think it's

9  -- there's a bit of a mistake in your recollection.  They're not

04:30:32 10 in that position to do that.  I think we all can understand why.

11         Before I sit down, the government is going to get

12 another opportunity.  They get one more crack at it.  They can't

13 leave me with the last word.  Or they could.  If they really

14 chose -- or they really proved this case beyond a reasonable

04:30:57 15 doubt -- the judge gives them one minute, just one minute

16 rebuttal -- would they take it or not?  I'd say probably not.

17         So, when you go back there and deliberate and you

18 think about everything that they've presented and everything

19 that I tried to present, remember these four letters, WWDD, what

04:31:16 20 would Darryl do?  If you are in a spirited debate on some of the

21 elements or some of the facts, just recall me trying to usher in

22 the truth to you-all because that's what's possible with the

23 very limited information that was presented in this case.

24         And so, I asked you-all at the beginning -- or I

04:31:39 25 told you-all at the beginning the government would not be able

1   to meet its burden.  I ask you-all at the end, after you've

2   picked your foreperson, take a look at this:  We, the jury, find

3   the defendant, Cedric Walker, not guilty.

4            Thank you.

04:31:59  5         THE COURT:  Thank you, Mr. Austin.

6          Ms. Wirsing.

7         MS. WIRSING:  At the beginning of this trial, Attorney

8   Swanson told you --

9         THE COURT REPORTER:  I'm sorry.  I can't hear you.

10        MS. WIRSING:  My apologies.

11          I did advise the court reporter to let me know at

12   any point.

13          Okay.  At the beginning of this trial, Attorney

14   Swanson told you that this was a simple case, this was a clear

04:32:42  15  case.  We have made it as simple for you and as clear for you as

16   we possibly could.  Don't let the defense convolute the facts

17   and the evidence and the testimony in this case.

18          The judge has instructed you and I ask you to

19   keep in mind what the attorneys say and what they argue is not

04:33:09  20  evidence in this case.  The evidence came from that witness

21   stand and the exhibits that you viewed, and it is your

22   recollection that prevails.

23          So, when you go back to -- I want you to keep in

24   mind that there was testimony that this incident occurred in

04:33:34  25  three seconds.  There was no big wind-up.  This was an

1 explosive, sudden punch.

2              Now, this was a short trial; but it is an

3 important one.  It's important for the government; it's

4 important for the victim; it's important for the defendant.  So,

04:33:58 5 we do ask that you go back and do -- carefully deliberate.  And

6 as you deliberate and go through the factors of the offense, I

7 ask that you keep in mind that is not -- that is not doubt.

8 That's not reasonable doubt.  That's you doing your job.  That's

9 you deliberating.

04:34:20 10             And I would also ask you to look at the

11 instructions that the federal -- it seems to be that, really,

12 the main element that's at issue here is the second element:

13 that the federal officer was forcibly assaulted, that the

14 federal officer was forcibly resisted, or forcibly opposed,

04:34:43 15 forcibly impeded.

16             You've heard plenty of testimony that could

17 justify a finding of guilt on any of those bases.  But I submit

18 to you there was a clear, simple -- a clear assault in this case

19 that resulted in bodily injury to the victim.

04:35:08 20             When you go back and you look at the verdict

21 form, the government is asking you to check to find him guilty

22 and to check that on the verdict form.

23             We appreciate your time.  We appreciate your

24 attention.  Thank you.

04:35:30 25             THE COURT:  Thank you, Ms. Wirsing.

1        Ladies and gentlemen, the case is now yours.  I'm

2  going to excuse you back into the jury room.  And then, shortly,

3  you're going to receive each a copy of the jury charge; and the

4  form that needs to be filled out by the foreperson is going to

04:35:47  5  have my signature on it.  So, that's going to be the original.

6        So, whoever your foreperson is, have them sign

7  that form; and, again, with that form will be the exhibits

8  coming to you.  And then, we'll await your decision.

9        THE MARSHAL:  All rise for the jury.

04:36:05  10  (The jury recessed to commence deliberations at 4:35 p.m.)

11        MR. AUSTIN:  Your Honor, we didn't dismiss the two

12  alternates.

13        THE COURT:  All right.  That's what I was going to do

14  next.  Now at this time, I believe the parties are ready to

04:36:52  15  dismiss ███████████ and ███████████.

16        MS. WIRSING:  Yes, your Honor.

17        THE COURT:  Okay.

18        You can bring them back in.

19        And we're all going to rise when they come back

04:37:02  20  in, as well.

21    (The two alternates were brought into the courtroom at 4:36

22  p.m.)

23        THE COURT:  Please be seated, everyone.

24        ███████████ and ███████████, you were selected

04:38:04  25  as the alternate jurors in this case.  So, since the case has

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  now made it to the deliberation stage with all 12 jurors, it's

2  my unfortunate duty to discharge you from your responsibilities

3  as jurors in this case.

4           I know it's been a tough couple of days.  You've

04:38:24  5  paid attention.  You've focused.  But the nature of the process

6  is that we always have two jurors, just in case we lose a juror

7  or two, to be able to continue on with the case.  You leave with

8  our thanks.

9           Without your participation, again, we would not

04:38:42  10  have been able to get this case to trial.  If you'd like to know

11  how -- what happens in this case, my case manager will

12  definitely give you a call and let you know how the jury

13  decides.  But as I said, unfortunately, your service is at an

14  end.

04:39:02  15           It's truly been an honor and a privilege to work

16  with both of you.  I know that it's been difficult going back

17  and forth and waiting on the Court and waiting on the parties.

18  But thank you.  And, hopefully, you'll look forward to your next

19  time to serve on a jury.

04:39:19  20           I'm going to excuse you and let you go back and

21  say goodbye to everyone, obviously, and collect your things.

22  But if you need anything from us, please, please let us know;

23  and thank you again.

24           THE MARSHAL:  All rise for the jury.

04:39:36  25       (The two alternates were dismissed at 4:39 p.m.)

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Please be seated, everyone.

2              This is the copy that the jury is going to fill

3  out.

4              I think you, Ms. Wirsing, had something to say

04:39:54   5  about the exhibit list.

6          MS. WIRSING:  Yes, your Honor.  The exhibit list that

7  was previously filed, the very last entry says Exhibit Number

8  10, the photo of Chavez on stretcher.  It's actually Exhibit 9,

9  and that's how it was referred to throughout the trial.  So,

04:40:15  10  there shouldn't be any confusion with the record, but we did

11  want to make that amendment.  And we've made that correction to

12  the exhibit list that will be going back with the exhibits to

13  the jury.

14          THE COURT:  Okay.

04:40:27  15          MS. WIRSING:  But we would ask -- we would make an

16  oral motion to amend the exhibit list that was previously filed

17  electronically to reflect Exhibit Number 9, rather than 10.

18          THE COURT:  Any objection?

19          MR. AUSTIN:  Just the same language?

04:40:40  20          MS. WIRSING:  Yes.  We shared it with --

21          MR. AUSTIN:  Oh, yeah, yeah.  No objection.  I know

22  what you're saying.

23          MS. WIRSING:  That said 10 instead of 9.

24          MR. AUSTIN:  This is fine.  Do you need me to sign off

04:40:56  25  on it?

1          THE COURT:  Oh, no.  If there is no objection on the

2  record, that change is okay.

3          MR. AUSTIN:  That is fine, your Honor.

4          THE COURT:  Okay.  Then, I've given my case manager

04:41:05  5  the jury charge and 12 copies; and then, we're going to give the

6  jury your binders.  And then, we'll stand in recess until we

7  receive a verdict.

8              Okay.  We'll stand in recess.

9      (Court recessed at 4:42 p.m.)

04:42:23  10     (Court resumed at 6:16 p.m.; jury not present.)

11         THE COURT:  The jury is not present; all counsel are

12  present.  And we have a note from the jury.  And the Jury Note

13  Number 1 reads:  "Explanation of," colon, quote, "that the

14  defendant forcibly assaulted, resisted, opposed, impeded,

06:16:22  15  intimidated, or interfered with a federal officer as described

16  below," quote, "does it have to be a punch," slash, "strike or

17  can it be a push," comma, "wrestle," comma, "struggle, et

18  cetera?"

19              And I think the answer -- I plan to answer:

06:16:43  20  Please follow the instructions you have previously been given in

21  the charge.  Does anyone --

22         MR. AUSTIN:  No.

23         MS. WIRSING:  That sounds appropriate, your Honor.

24         THE COURT:  Okay.  So, my response is please follow

06:17:33  25  the instructions you were previously given in the jury charge.

1          MR. AUSTIN:  I did have one question, and this is just

2     a Darryl clarification.  Did they say forcibly to which element

3     or just forcibly?

4          THE COURT:  It says, "Explanation of," quote, "that

06:17:50  5     the defendant forcibly assaulted," comma, "resisted," comma,

6     "opposed," comma, "impeded," comma, "intimidated," comma, "or

7     interfered with a federal officer," comma, "as described below,"

8     quote -- I mean end quote.  "Does it have to be a punch," slash,

9     "strike or --" and they underlined "or" "-- can it be a push,"

06:18:14 10     comma, "wrestle," comma, "struggle," dot, dot, dot, "et cetera."

11          MR. AUSTIN:  Okay.  I don't have any objection.  I was

12     just wondering what the full question was.

13          THE COURT:  Okay.  Let me just -- okay.  Does anyone

14     -- do you want to see it?

06:18:38 15          MR. AUSTIN:  No.

16          THE COURT:  Okay.  Okay.  Just wanted to make sure.

17          MS. WIRSING:  (Indicated no.)

18          MR. AUSTIN:  Are you going to -- are you going to

19     bring them in to read?

06:18:47 20          THE COURT:  Oh, no, no.  I'm just going to send this

21     back to them.

22          MR. AUSTIN:  Perfect.  Thank you.

23          THE COURT:  Okay.  So, we'll stand in adjournment

24     until we either get a question or a verdict back.  Thanks for

06:18:57 25     hanging in there with me, everyone.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1        (Court recessed at 6:19 p.m.)

 2        (Court resumed at 6:34 p.m.; jury not present.)

 3             THE MARSHAL:  All rise.

 4             THE COURT:  The jury is on its way in.

 5             THE MARSHAL:  All rise for the jury.

 6        (The jury was brought into the courtroom at 6:36 p.m.)

 7             THE COURT:  Be seated, everyone.

 8             Let the record reflect the jury is present, all

 9    counsel are present.

10             The foreperson of the jury, I understand that

11    you've reached a verdict.

12             THE FOREPERSON:  We have.

13             THE COURT:  Could I see the verdict form.

14             I guess the marshals --

15             Thank you, sir.

16             The verdict form in this case has been signed by

17    the jury foreperson indicating that it is unanimous and it's

18    dated.  It reads:  "On Count 1, we, the jury, find the

19    defendant, Cedric Walker, guilty."

20             Do I have a motion at this time to enter the

21    verdict?

22             MR. AUSTIN:  I would ask that the jury be polled, your

23    Honor.

24             THE COURT:  Okay.

25             Ladies and gentlemen, the defense has asked that
```

1    the jury be polled.  So, I just need to ask each one of you

2    individually whether or not this is your verdict in this case.

3                    Juror Number 1, is this your verdict?

4                    A JUROR:  Yes.

06:37:29    5         THE COURT:  Juror Number 2?

6                    A JUROR:  Yes.

7                    THE COURT:  Juror Number 3?

8                    A JUROR:  Yes.

9                    THE COURT:  Juror Number 4?

06:37:33   10         A JUROR:  Yes.

11                   THE COURT:  Juror Number 5?

12                   A JUROR:  Yes.

13                   THE COURT:  Juror Number 6?

14                   A JUROR:  Yes.

06:37:39   15         THE COURT:  Juror Number 7?

16                   A JUROR:  Yes.

17                   THE COURT:  Juror Number 8?

18                   A JUROR:  Yes.

19                   THE COURT:  Juror Number 9?

06:37:44   20         A JUROR:  Yes.

21                   THE COURT:  Juror Number 10?

22                   A JUROR:  Yes.

23                   THE COURT:  Juror Number 11?

24                   A JUROR:  Yes.

06:37:48   25         THE COURT:  And Juror Number 12?

1          A JUROR:  Yes.

2          THE COURT:  Let the record reflect the jury's been

3  polled, and they indicate that it was a unanimous verdict.

4          So, do I need a motion from the government to

06:37:58  5  enter the verdict in this matter?

6          MS. WIRSING:  The government so moves, your Honor.

7          THE COURT:  Okay.  The verdict of guilty is entered

8  into the Court's record in this matter.

9          Ladies and gentlemen, your service as jurors has

06:38:10  10  now been completed.  I know it took a little bit longer than we

11  anticipated, and I know that you've been through a lot the last

12  couple of days.  Again, on behalf of my colleagues here and the

13  parties, thank you so much again for your time and your patience

14  and your service as members of the jury.

06:38:32  15          I'm now releasing you from all instructions I've

16  given you.  So, you can talk to anyone you want about your jury

17  experience.  You can write a book, blog about it, whatever you'd

18  like to do.  But you are now free from my instructions.

19          The lawyers sometimes like to speak with the

06:38:51  20  jurors afterwards just to find out how they did.  But you're

21  under no obligation to stick around.  It's 6:40 in the evening.

22  If you want to go home, you have, basically, a ten-minute head

23  start on the lawyers because I'm going to keep them in the

24  courtroom.

06:39:08  25          And if you want to speak with them, you can come

1  back into the courtroom; but if you don't, you're free to go.

2  But before you go, I just wanted to talk to you just for, like,

3  two or three minutes and thank you personally; and then, your

4  lives are your own again.

06:39:25  5  Thank you-all so much for your service, and good

6  luck to all of you.

7  All rise for the jury.

8  (The jury was excused at 6:39 p.m.)

9  THE COURT:  Thank you-all, counsel, for the excellent

06:40:01  10  job that you did.  It's been a pleasure having you here.  I'll

11  see you again at our post-trial matters in this case.

12  My practice is to let the jurors, if they want to

13  talk to you, come back into the courtroom and talk to you.  It's

14  late in the day.  They're probably going to want to go home, but

06:40:21  15  I'll let you know if they want to come back.  But I just want to

16  thank them personally and then let them all go.

17  MS. WIRSING:  Shall we remain in the courtroom?  Do we

18  have a sentencing date, your Honor?

19  THE COURT:  I will give you a sentencing date

06:40:37  20  tomorrow.

21  MS. WIRSING:  I will be back tomorrow afternoon for a

22  revocation hearing; and I just want to say, likewise, your

23  Honor, it's always a pleasure practicing in this courtroom.

24  THE COURT:  It was a pleasure having you-all.

06:40:50  25  And good luck to you, Mr. Walker.  We're going to

1  -- we will see each other again in later hearings in this

2  matter, when it comes time for sentencing or post-trial matters,

3  okay?

4           And the defendant is remanded back into the

5  custody of the Marshal Service.

06:41:04

6           I'll be right back and let you know whether they

7  want to speak with you-all.  But have a good night.  We'll talk

8  soon.

9           MS. WIRSING:  Thank you, your Honor.

10      (Proceedings concluded at 6:41 p.m.)

11

12

13                C E R T I F I C A T E

14

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter, to

17  the best of my ability.

18

19  By: /s/*Gayle L. Dye*                    *04-08-2025*

20        Gayle L. Dye, CSR, RDR, CRR        Date

21

22

23

24

25

| / | 2 | |
|---|---|---|

**4:42** [1] - 196:9

| | **5** |
|---|---|

**/s/Gayle** [1] - 202:19

**2** [9] - 1:12, 23:6, 23:7, 59:24, 148:13, 158:10, 183:11, 184:8, 199:5
**2.07** [1] - 147:21
**20** [17] - 1:6, 4:2, 19:2, 25:4, 124:24, 125:1, 125:4, 125:6, 153:23, 154:8, 154:9, 156:10, 156:13, 160:21, 161:23, 161:25, 182:8
**20-year** [1] - 154:11
**200** [1] - 93:21
**2001** [1] - 18:21
**2022** [13] - 9:6, 9:22, 10:14, 19:17, 21:3, 49:1, 49:5, 67:10, 85:13, 90:22, 101:4, 173:8, 180:21
**2024** [6] - 1:6, 4:2, 44:21, 149:19, 149:23, 180:22
**22** [2] - 18:24, 18:25
**23** [2] - 18:24, 18:25
**23-2668** [1] - 75:4
**2300** [1] - 1:18
**24** [2] - 73:13, 85:13
**24th** [3] - 9:8, 22:15, 57:25
**251** [1] - 148:7
**25th** [7] - 9:9, 49:6, 57:25, 58:2, 85:20, 86:5, 103:15
**27** [3] - 17:25, 18:21, 18:22
**27th** [9] - 9:22, 10:14, 21:3, 87:13, 90:22, 101:4, 102:13, 124:18, 173:8
**29** [2] - 3:20, 144:11
**2:00** [2] - 140:4, 142:15
**2:08** [1] - 155:10
**2:28** [1] - 142:19
**2:32** [1] - 143:20
**2:36** [1] - 146:10
**2:51** [1] - 155:9

**5** [4] - 25:17, 26:8, 158:24, 199:11
**515** [1] - 2:20
**584** [1] - 148:24

| | **6** |
|---|---|

**6** [5] - 25:25, 62:12, 159:5, 159:14, 199:13
**65** [1] - 84:6
**6:16** [1] - 196:10
**6:19** [1] - 198:1
**6:34** [1] - 198:2
**6:36** [1] - 198:6
**6:39** [1] - 201:8
**6:40** [1] - 200:21
**6:41** [1] - 202:10

| **0** | | |
|---|---|---|

**04-08-2025** [1] - 202:19

| **1** | | |
|---|---|---|

**1** [15] - 3:23, 22:24, 53:7, 107:25, 108:1, 114:6, 148:7, 153:7, 157:25, 158:5, 168:16, 171:23, 196:13, 198:18, 199:3
**1.35** [1] - 147:10
**10** [7] - 70:7, 70:13, 70:24, 195:8, 195:17, 195:23, 199:21
**1000** [1] - 1:18
**102** [1] - 3:15
**10:00** [1] - 88:2
**11** [2] - 70:20, 199:23
**111** [1] - 147:14
**111(a)(1** [1] - 168:18
**111(a)(1)(B)** [1] - 168:17
**111(b** [1] - 154:4
**11:00** [1] - 8:12
**11:14** [1] - 81:23
**11:41** [1] - 81:24
**11:43** [1] - 82:15
**11th** [3] - 124:3, 124:18, 137:24
**12** [5] - 99:7, 179:15, 194:1, 196:5, 199:25
**1200** [1] - 84:11
**12:30** [1] - 83:3
**13** [2] - 3:3, 160:3
**130** [3] - 147:23, 152:16, 152:24
**1350** [1] - 2:6
**14** [1] - 160:3
**143** [1] - 3:19
**144** [2] - 3:19, 3:20
**146** [1] - 3:20
**15** [15] - 7:1, 83:24, 102:7, 102:8, 124:22, 125:1, 125:4, 125:6, 156:7, 161:23, 161:25, 179:22, 182:7, 189:22
**15th** [1] - 6:3
**162** [1] - 3:21
**17** [2] - 3:11, 84:6
**171** [1] - 3:21
**18** [3] - 154:4, 168:17
**180** [1] - 3:22
**1819** [1] - 20:24
**190** [2] - 3:22, 93:21
**195** [1] - 3:23
**198** [1] - 3:23
**1997** [3] - 18:19, 44:21, 44:23
**1:00** [1] - 137:9
**1:04** [1] - 140:6
**1:07** [1] - 142:18

| | **3** |
|---|---|

**3** [7] - 23:23, 55:19, 60:23, 108:1, 120:13, 158:15, 199:7
**307** [1] - 148:7
**3:10** [1] - 157:1
**3:31** [1] - 157:2
**3:35** [1] - 160:24
**3:37** [1] - 160:25
**3:38** [1] - 161:14

| | **4** |
|---|---|

**4** [12] - 4:10, 4:13, 24:21, 56:11, 56:25, 62:1, 62:19, 92:3, 153:7, 154:14, 158:19, 199:9
**44** [1] - 3:12
**440** [1] - 2:6
**45** [5] - 91:15, 91:17, 109:15, 112:7, 119:2
**4:35** [1] - 193:10
**4:36** [1] - 193:21
**4:39** [1] - 194:25

| | **7** |
|---|---|

**7** [3] - 127:10, 159:16, 199:15
**713** [2] - 2:7, 2:8
**713.250.5582** [1] - 2:21
**713.567.9000** [1] - 1:19
**713.718.3300** [1] - 1:20
**718-4600** [1] - 2:7
**718-4610** [1] - 2:8
**72** [1] - 3:12
**76** [1] - 3:13
**77002** [2] - 1:19, 2:21
**77002-1056** [1] - 2:7
**7:30** [1] - 155:2
**7A** [2] - 36:8, 96:12
**7B** [1] - 36:19

| | **8** |
|---|---|

**8** [11] - 3:3, 37:21, 62:14, 98:2, 127:10, 127:11, 153:23, 159:20, 179:5, 186:24, 199:17
**80** [1] - 84:8
**8004** [1] - 2:20
**829** [1] - 148:24
**83** [1] - 3:15
**835** [1] - 148:24
**8:00** [1] - 155:3

| | **9** |
|---|---|

**9** [9] - 41:15, 70:7, 70:8, 70:24, 99:15, 195:8, 195:17, 195:23, 199:19
**90** [1] - 119:5
**90-degree** [2] - 119:2, 119:4
**94-15** [1] - 2:16
**9:01** [1] - 1:7
**9:06** [1] - 6:23
**9:10** [1] - 6:24

**9:11** [1] - 7:11
**9:36** [1] - 7:12
**9:37** [1] - 7:25

# A

**a.m** [10] - 1:7, 6:23, 6:24, 7:11, 7:12, 7:25, 81:23, 81:24, 82:15, 155:3
**abandoning** [1] - 82:1
**ability** [6] - 64:6, 135:6, 167:4, 169:17, 174:20, 202:17
**able** [23] - 12:2, 21:9, 29:19, 31:9, 31:24, 33:20, 36:25, 38:11, 38:20, 40:9, 74:6, 80:17, 95:6, 95:11, 95:25, 100:19, 126:23, 142:9, 182:24, 188:17, 190:25, 194:7, 194:10
**above-entitled** [1] - 202:16
**absent** [1] - 152:5
**absolutely** [2] - 127:3, 141:12
**absorbed** [6] - 50:21, 50:23, 51:4, 51:7
**abstract** [1] - 153:21
**academy** [2] - 45:4, 45:5
**accept** [1] - 166:12
**accepted** [1] - 163:12
**accident** [1] - 168:15
**accidents** [1] - 8:5
**acclimate** [1] - 86:18
**accompanied** [1] - 99:22
**accomplished** [1] - 150:4
**according** [4] - 77:16, 105:10, 153:24, 154:2
**account** [8] - 14:22, 66:3, 132:5, 169:9, 177:10, 180:10, 183:23
**accounts** [2] - 131:20, 131:25
**accuracy** [1] - 167:8
**accurate** [8] - 14:1, 56:13, 66:12, 66:16, 78:6, 79:2, 79:3, 166:13
**accurately** [1] - 135:7
**acknowledged** [1] - 181:11
**acquit** [2] - 148:15, 163:23
**ACQUITTAL** [1] - 3:20
**acquittal** [1] - 144:12
**acquitting** [1] - 149:1
**ACT** [1] - 2:13
**act** [8] - 154:6, 164:7, 168:3, 168:13, 177:11, 177:12, 180:10, 185:24
**acted** [1] - 149:6
**acting** [2] - 98:18, 170:7
**action** [3] - 102:21, 180:9, 184:12
**Action** [1] - 1:4
**activate** [1] - 95:14
**activated** [1] - 95:23
**acts** [7] - 4:16, 169:11, 169:13, 180:12, 180:13, 184:18, 186:15
**actual** [4] - 4:22, 95:18, 165:23, 175:14
**addition** [1] - 140:15
**additional** [1] - 93:15
**address** [4] - 20:23, 81:20, 146:14, 172:10

**addressed** [1] - 38:25
**adjacent** [1] - 114:10
**adjournment** [1] - 197:23
**administrative** [1] - 103:11
**admissible** [1] - 165:7
**admitted** [11] - 22:24, 23:7, 23:23, 24:21, 25:17, 36:8, 41:15, 162:5, 181:5, 182:7, 187:23
**adult** [1] - 102:10
**advise** [1] - 191:11
**advised** [1] - 86:3
**affairs** [1] - 164:8
**affect** [1] - 88:21
**affirmatively** [1] - 130:21
**afford** [2] - 189:1
**aftermath** [1] - 75:25
**afternoon** [2] - 180:20, 201:21
**afterwards** [1] - 200:20
**AGAINST** [1] - 2:14
**agencies** [1] - 84:7
**agency** [7] - 72:13, 72:15, 72:18, 72:21, 76:4, 84:15, 168:21
**Agent** [1] - 151:13
**agents** [5] - 48:9, 49:12, 123:17, 126:20, 182:9
**agitated** [9] - 9:15, 10:23, 11:2, 12:4, 12:6, 39:20, 40:8, 59:7, 178:6
**agitating** [1] - 178:25
**ago** [6] - 41:25, 52:1, 60:15, 64:3, 68:4, 133:12
**agree** [16] - 51:5, 70:24, 117:6, 117:15, 128:1, 128:2, 128:13, 130:16, 151:12, 151:13, 153:3, 153:6, 170:11, 184:14, 184:17
**agreed** [1] - 174:7
**agreement** [1] - 170:17
**ahead** [2] - 37:14, 143:6
**AIDED** [1] - 1:25
**air** [6] - 97:12, 125:21, 126:4, 126:12, 126:17, 126:23
**alcohol** [1] - 104:12
**alert** [1] - 115:23
**alleged** [8] - 4:25, 13:17, 14:19, 147:1, 147:6, 153:9, 168:4, 180:21
**allegedly** [1] - 13:16
**alleging** [1] - 153:13
**allow** [3] - 47:17, 87:2, 144:25
**allowed** [1] - 175:24
**allows** [1] - 153:2
**almost** [5] - 64:3, 124:10, 137:8, 138:25, 184:22
**Alonzo** [2] - 148:23, 152:12
**Aloyo** [1] - 41:6
**ALSO** [2] - 1:22, 2:10
**alternate** [1] - 193:25
**alternates** [3] - 193:12, 193:21, 194:25
**alternative** [1] - 153:4
**alternatives** [1] - 153:2
**amend** [1] - 195:16

**amendment** [1] - 195:11
**AMERICA** [3] - 1:4, 1:15, 3:9
**amount** [1] - 100:14
**AN** [2] - 2:14, 2:14
**analysis** [2] - 164:19, 189:5
**analyst** [1] - 84:1
**AND** [3] - 1:11, 2:13, 2:14
**angle** [16] - 33:18, 70:11, 91:15, 91:17, 109:15, 109:16, 109:17, 110:5, 110:22, 111:4, 111:5, 112:7, 119:2, 119:4
**angled** [2] - 31:4, 110:8, 111:10
**angry** [1] - 178:5
**Anna** [3] - 1:16, 8:23, 172:10
**anna.swanson@usdoj.gov** [1] - 1:21
**answer** [10] - 105:1, 117:4, 132:11, 133:16, 164:25, 167:4, 171:10, 171:17, 174:21, 196:19
**answered** [1] - 133:13
**answers** [4] - 122:19, 122:20, 189:18
**anticipate** [1] - 15:7
**anticipated** [4] - 14:19, 15:3, 15:15, 15:24, 161:17, 200:11
**apologies** [1] - 191:10
**apparent** [1] - 169:17
**APPEARANCES** [2] - 1:14, 2:1
**appeared** [2] - 38:6, 51:7
**appellate** [1] - 144:12
**applied** [2] - 95:17, 112:19
**applies** [1] - 154:15
**apply** [17] - 90:21, 94:6, 94:20, 95:11, 95:13, 95:25, 96:2, 96:25, 105:21, 106:15, 112:21, 120:3, 141:14, 149:17, 162:17, 162:20, 163:8
**appointments** [1] - 20:11
**appreciate** [2] - 146:7, 192:23
**approach** [17] - 8:18, 8:19, 17:15, 17:17, 46:23, 46:24, 74:10, 74:11, 79:23, 79:24, 83:5, 105:21, 128:18, 128:23, 135:1, 145:7, 188:25
**approached** [3] - 94:19, 107:8, 107:10
**approaching** [1] - 32:5
**appropriate** [3] - 80:16, 140:22, 196:23
**April** [1] - 18:3
**area** [77] - 10:3, 10:4, 10:12, 10:15, 19:19, 23:9, 23:18, 24:1, 24:14, 24:15, 24:23, 24:25, 25:1, 25:2, 25:19, 25:22, 26:10, 26:13, 26:16, 26:18, 26:25, 27:6, 34:2, 36:15, 38:17, 42:6, 43:21, 52:23, 53:2, 53:13, 53:20, 53:25, 54:5, 54:17, 54:18, 54:19, 54:24, 55:8, 55:14, 55:15, 56:2, 56:24, 57:9, 61:5, 61:6, 61:11, 62:8, 62:13, 62:14, 63:8, 70:15, 70:23, 71:14, 84:10, 90:14, 90:19, 90:20, 91:6, 91:25, 92:7, 106:25, 107:11, 108:10, 108:17, 109:2, 109:5, 113:23, 117:24, 119:22, 121:4, 138:10, 139:11, 176:15, 176:16, 176:18, 178:3
**areas** [3] - 43:8, 43:19, 61:8

**argue** [5] - 58:24, 80:12, 150:22, 160:21, 191:19
**arguing** [5] - 150:2, 151:18, 153:16, 154:10, 183:16
**ARGUMENT** [3] - 3:21, 3:22, 3:22
**argument** [17] - 16:5, 80:21, 136:11, 141:5, 145:1, 145:21, 146:7, 147:17, 150:6, 155:23, 161:12, 161:23, 172:2, 172:22, 181:16, 181:19
**argumentative** [4] - 15:14, 63:20, 131:6, 133:5
**arguments** [3] - 63:23, 161:24, 164:13
**arm** [15] - 33:3, 33:12, 33:25, 34:5, 34:11, 34:24, 35:20, 69:10, 95:6, 95:8, 95:11, 95:24, 184:7
**arm's** [2] - 68:19, 69:5
**arms** [3] - 35:19, 35:21, 178:12
**arrest** [9] - 32:6, 32:7, 67:17, 104:19, 125:12, 139:10, 184:11, 185:6, 185:23
**arrested** [3] - 57:20, 64:11, 184:6
**arrests** [3] - 67:8, 84:11, 84:23
**arrival** [1] - 52:3
**arrive** [5] - 9:25, 10:15, 21:21, 23:11, 24:5
**arrived** [6] - 9:13, 24:16, 25:8, 25:9, 39:10, 92:24
**arriving** [2] - 162:17, 165:13
**Art** [9] - 87:25, 91:9, 91:12, 93:16, 95:12, 110:22, 121:13, 127:14, 174:9
**art** [5] - 83:1, 90:10, 91:11, 98:11, 109:18
**ARTHUR** [2] - 3:10, 17:12
**Arthur** [6] - 9:23, 11:19, 17:8, 17:22, 48:18, 175:25
**arthur** [1] - 174:9
**articulated** [1] - 57:14
**AS** [1] - 2:13
**aspect** [1] - 90:5
**assault** [49] - 9:5, 75:8, 78:25, 132:19, 132:21, 132:24, 141:10, 141:12, 141:15, 141:17, 141:22, 144:17, 146:21, 147:11, 147:15, 147:21, 147:23, 148:20, 148:25, 149:9, 149:17, 149:18, 150:10, 150:11, 150:19, 151:3, 151:4, 151:8, 151:9, 151:10, 151:12, 151:13, 151:23, 152:5, 152:11, 152:16, 152:23, 153:8, 153:9, 153:11, 153:15, 153:16, 153:18, 168:19, 169:15, 170:9, 176:12, 177:22, 192:18
**assaulted** [17] - 9:4, 12:22, 98:13, 150:14, 169:3, 169:7, 170:4, 170:7, 177:5, 177:8, 177:25, 183:11, 183:19, 192:13, 196:14, 197:5
**assaulting** [8] - 4:14, 13:7, 13:8, 13:16, 150:9, 168:16, 183:4, 186:19
**asserted** [3] - 88:12, 88:20, 89:10
**asserts** [1] - 165:23
**assess** [5] - 96:7, 97:8, 100:7, 174:12, 174:22

**assessing** [1] - 174:14
**ASSESSMENT** [1] - 2:14
**assign** [2] - 22:7, 87:18
**assigned** [4] - 22:8, 27:23, 28:8, 28:11
**assist** [2] - 90:2, 90:4
**Assistant** [3] - 1:17, 2:5, 8:24
**assistant** [3] - 8:23, 98:18, 99:23
**assisting** [1] - 119:25
**assume** [7] - 48:25, 58:17, 102:20, 118:7, 118:12, 153:21, 165:9
**assuming** [3] - 23:12, 118:9, 118:14
**assumption** [3] - 117:25, 118:2, 118:17
**AT** [2] - 2:13, 2:14
**athletic** [2] - 31:4, 31:8
**attachment** [1] - 103:3
**attacked** [1] - 150:14
**attacking** [1] - 80:15
**attempt** [2] - 169:16, 169:21
**attempting** [1] - 106:15
**attend** [1] - 176:23
**attention** [6] - 85:2, 163:5, 164:17, 169:23, 192:24, 194:5
**attitude** [1] - 30:13
**attorney** [3] - 8:23, 172:10, 191:13
**Attorney** [2] - 8:25, 191:7
**ATTORNEY'S** [2] - 1:17, 1:23
**attorneys** [8] - 16:5, 49:7, 134:22, 145:3, 145:16, 146:4, 191:19
**Attorneys** [1] - 1:17
**audio** [1] - 16:19
**August** [3] - 1:6, 4:2, 6:3
**AUSTIN** [192] - 3:3, 3:12, 3:13, 3:15, 3:22, 4:11, 4:21, 4:24, 5:3, 5:9, 5:12, 5:15, 5:18, 5:21, 5:23, 6:15, 7:21, 13:13, 15:3, 15:9, 15:11, 15:15, 15:17, 16:1, 16:10, 31:12, 31:15, 38:21, 42:12, 43:9, 43:11, 44:4, 44:7, 44:10, 44:12, 44:14, 46:23, 47:1, 47:14, 47:24, 48:3, 48:4, 48:13, 53:6, 53:9, 53:11, 53:17, 53:19, 54:3, 54:4, 55:18, 55:20, 57:4, 57:7, 57:8, 59:25, 60:2, 60:23, 60:24, 62:1, 62:4, 62:6, 62:24, 63:1, 64:1, 66:16, 67:1, 70:13, 70:14, 72:7, 75:13, 75:18, 76:9, 76:11, 79:20, 79:22, 80:4, 80:8, 80:23, 81:2, 81:4, 81:13, 82:5, 82:9, 82:21, 86:25, 88:9, 88:13, 88:25, 101:20, 101:23, 102:2, 107:23, 108:5, 109:9, 109:10, 116:4, 116:8, 120:13, 120:14, 131:4, 131:7, 131:10, 131:19, 131:23, 132:4, 132:12, 133:10, 133:14, 133:18, 133:19, 134:9, 134:13, 134:16, 135:1, 135:4, 135:12, 135:16, 135:21, 135:24, 136:6, 136:8, 136:12, 136:21, 136:25, 137:5, 137:8, 137:10, 137:15, 137:20, 139:16, 139:21, 140:13, 140:16, 140:18, 141:1, 141:3, 141:20, 142:1, 142:5, 142:13, 143:5, 144:5, 144:10, 144:22, 147:1, 147:4, 147:13, 150:1, 150:22, 151:2, 152:25, 153:20,

153:25, 154:12, 156:10, 156:17, 156:20, 157:13, 157:16, 157:20, 157:23, 158:1, 158:5, 158:14, 158:16, 158:23, 159:1, 159:9, 159:19, 159:22, 160:1, 160:12, 160:17, 172:18, 172:21, 172:24, 180:18, 180:20, 189:23, 193:11, 195:19, 195:21, 195:24, 196:3, 196:22, 197:1, 197:11, 197:15, 197:18, 197:22, 198:22
**Austin** [23] - 2:4, 4:7, 7:20, 13:11, 13:14, 16:9, 17:4, 44:5, 48:9, 123:3, 132:10, 142:10, 144:4, 146:25, 147:10, 149:25, 151:18, 156:9, 157:10, 159:6, 180:17, 188:13, 191:5
**aUSTIN** [1] - 62:2
**Austin's** [1] - 155:14
**author** [1] - 74:16
**authored** [1] - 73:15
**AUTHORIZED** [1] - 2:13
**available** [1] - 98:25
**average** [2] - 19:12, 84:11
**avoid** [1] - 141:16
**Awad** [1] - 2:4
**await** [1] - 193:8
**aware** [7] - 58:6, 58:7, 114:12, 114:13, 121:16, 132:5, 133:11

## B

**backed** [1] - 186:8
**background** [1] - 87:3
**bad** [2] - 30:19, 186:9
**badge** [10] - 23:20, 28:2, 28:18, 28:19, 28:20, 28:21, 84:22, 93:2
**badges** [1] - 10:25
**bait** [1] - 123:3
**bandaged** [1] - 41:9
**bandana** [9] - 93:10, 94:4, 94:5, 94:18, 105:16, 106:6, 106:7, 106:11, 178:13
**banging** [1] - 12:8
**bar** [9] - 79:25, 81:15, 135:3, 136:22, 144:7, 144:9, 144:21, 145:9, 145:25
**base** [1] - 163:10
**baseball** [1] - 20:16
**based** [7] - 5:24, 52:7, 67:2, 143:15, 159:22, 164:3, 165:7
**bases** [1] - 192:17
**basis** [1] - 174:6
**bathroom** [1] - 24:3
**battery** [1] - 75:8
**battles** [1] - 13:24
**BE** [1] - 2:13
**bear** [2] - 167:16, 171:18
**became** [1] - 19:14
**becomes** [1] - 153:20
**bed** [40] - 10:21, 10:23, 11:6, 26:13, 41:3, 41:24, 94:5, 94:18, 106:8, 106:19, 106:20, 107:1, 108:24, 109:13, 109:14, 110:3, 110:18, 110:21, 111:14, 111:19, 111:23,

112:6, 112:11, 113:16, 114:2, 114:4, 114:6, 114:7, 114:8, 114:11, 116:6, 118:24, 119:8, 120:22, 128:4, 130:22, 178:7, 178:14

**bedroom** [1] - 43:19

**beds** [16] - 27:11, 91:25, 92:8, 106:22, 107:20, 108:20, 108:23, 108:24, 108:25, 109:11, 113:22, 113:24, 116:9, 116:11, 116:13

**BEEN** [1] - 2:13

**BEFORE** [1] - 1:11

**began** [2] - 178:20, 180:21

**beginning** [7] - 33:11, 172:9, 180:25, 190:24, 190:25, 191:7, 191:13

**begrudgingly** [2] - 30:5, 30:8

**behalf** [3] - 17:12, 83:6, 200:12

**behind** [21] - 11:7, 11:10, 23:19, 32:14, 32:16, 38:2, 53:22, 53:23, 54:23, 56:4, 56:20, 94:2, 94:17, 95:6, 95:24, 99:3, 111:3, 112:14, 112:17, 121:15, 189:14

**belief** [2] - 117:4, 129:21

**beliefs** [1] - 170:23

**believability** [2] - 162:21, 166:15

**below** [3] - 169:5, 196:16, 197:7

**belt** [2] - 28:2, 93:2

**Ben** [3] - 98:18, 99:12, 179:14

**bench** [2] - 40:10, 145:7

**bending** [1] - 186:2

**benefit** [2] - 151:15, 188:11

**bent** [1] - 94:5

**best** [8] - 34:5, 34:12, 45:13, 51:18, 79:12, 123:24, 129:2, 202:17

**better** [8] - 31:9, 31:24, 55:17, 56:14, 77:4, 91:16, 121:10, 159:23

**between** [13] - 11:3, 26:20, 87:19, 99:4, 107:4, 111:17, 114:4, 124:18, 125:1, 132:14, 166:2, 175:6, 182:3

**beyond** [12] - 12:21, 12:25, 17:1, 144:16, 163:22, 163:25, 164:5, 166:6, 166:10, 167:23, 168:2, 169:2, 170:6, 171:3, 172:13, 177:4, 189:5, 190:14

**big** [1] - 191:25

**binders** [1] - 196:6

**binding** [1] - 164:21

**bit** [17] - 18:11, 23:1, 30:25, 31:3, 35:15, 41:3, 97:6, 109:22, 110:12, 137:16, 137:17, 156:23, 161:6, 161:17, 183:22, 190:9, 200:10

**biting** [1] - 34:9

**bits** [2] - 16:13

**black** [1] - 118:25

**blade** [1] - 31:21

**bladed** [10] - 30:25, 31:1, 67:3, 109:16, 109:17, 109:18, 109:19, 109:24, 110:2, 110:6

**Blake** [1] - 1:23

**bleeding** [4] - 38:18, 96:8, 97:4, 97:6

**blend** [1] - 28:15

**blocked** [2] - 33:8, 50:25

**blocking** [1] - 62:22

**blocks** [1] - 28:9

**blog** [1] - 200:17

**blood** [23] - 11:15, 11:16, 13:18, 35:24, 36:1, 36:3, 36:4, 36:12, 36:15, 36:16, 36:23, 37:9, 37:12, 37:15, 38:4, 38:8, 38:11, 38:20, 96:2, 96:16, 96:18, 96:20, 97:2

**blot** [1] - 38:17

**blow** [5] - 62:4, 97:12, 100:18, 125:21, 126:23

**blowup** [1] - 186:25

**blue** [5] - 21:11, 21:13, 93:10, 94:4, 101:9

**blur** [1] - 34:11

**board** [1] - 57:17

**bodies** [1] - 51:2

**bodily** [22] - 4:16, 5:2, 9:5, 13:1, 141:15, 152:3, 153:6, 154:7, 154:9, 154:14, 154:15, 154:16, 169:14, 169:20, 169:22, 177:12, 179:3, 179:4, 180:4, 180:12, 186:16, 192:19

**body** [10] - 31:3, 31:21, 33:3, 33:8, 37:1, 110:5, 110:13, 114:3, 175:11, 186:3

**bolt** [1] - 38:8

**book** [1] - 200:17

**booth** [2] - 23:16, 23:18

**BOP** [4] - 102:18, 103:16, 104:22, 104:24

**bordering** [1] - 15:14

**bottom** [4] - 27:7, 62:11, 91:25, 93:1

**bowels** [1] - 186:1

**box** [4] - 109:14, 110:18, 110:21, 112:15

**boxer** [2] - 31:19, 67:5

**boxing** [1] - 31:19

**branch** [1] - 168:21

**break** [14] - 8:12, 33:24, 81:8, 81:17, 81:19, 83:4, 135:18, 136:24, 137:7, 137:18, 140:2, 142:11, 145:13, 145:21

**breaking** [1] - 146:18

**breaks** [1] - 137:13

**breath** [1] - 119:13

**breathing** [5] - 115:14, 126:4, 126:6, 126:9, 126:12

**brief** [4] - 6:20, 144:6, 145:1, 146:3

**bring** [11] - 24:9, 25:10, 90:19, 145:4, 146:5, 171:16, 178:18, 182:16, 188:10, 193:18, 197:19

**bringing** [2] - 104:2, 190:7

**brought** [20] - 7:25, 10:2, 10:5, 10:11, 10:20, 24:7, 35:21, 38:16, 67:22, 82:15, 97:10, 113:14, 135:5, 135:9, 143:20, 150:24, 161:14, 190:3, 193:21, 198:6

**bubble** [1] - 126:7

**bubbles** [1] - 126:17

**build** [2] - 93:19, 93:20

**building** [2] - 19:25, 98:24

**bunch** [2] - 46:21, 47:16

**bunk** [36] - 26:13, 26:14, 27:7, 91:25, 92:1, 92:8, 93:1, 106:20, 106:22,

107:1, 108:18, 108:22, 108:24, 109:11, 109:13, 109:14, 110:18, 112:6, 112:11, 113:16, 113:22, 113:24, 114:2, 114:4, 114:6, 114:7, 114:8, 114:11, 116:6, 116:9, 116:11, 116:13, 120:22, 130:22

**bunks** [5] - 25:6, 26:12, 53:16, 108:24, 139:5

**burden** [8] - 153:22, 162:21, 163:21, 163:24, 167:18, 190:3, 191:1

**Bureau** [8] - 85:3, 85:7, 86:10, 86:20, 87:16, 103:12, 104:8, 104:14

**business** [2] - 79:19, 176:23

**busy** [1] - 7:5

**button** [1] - 60:8

**buy** [1] - 188:21

**BY** [74] - 1:24, 2:13, 3:3, 3:3, 3:11, 3:12, 3:12, 3:13, 3:15, 3:15, 3:21, 3:22, 3:22, 17:19, 18:14, 19:15, 21:18, 23:2, 23:8, 23:24, 24:22, 25:18, 26:1, 26:9, 31:13, 32:1, 36:9, 36:20, 37:22, 38:23, 41:19, 42:18, 43:15, 44:14, 47:1, 47:24, 48:4, 48:13, 53:11, 53:19, 54:4, 55:20, 57:8, 60:2, 60:24, 62:2, 62:6, 63:1, 64:1, 67:1, 70:14, 72:11, 74:12, 75:9, 75:15, 75:21, 76:11, 83:10, 87:6, 89:15, 98:3, 99:16, 100:4, 102:2, 108:5, 109:10, 116:8, 120:14, 131:4, 131:10, 131:19, 132:12, 133:19, 137:20

## C

**cables** [1] - 35:5

**cage** [1] - 90:3

**caged** [1] - 90:2

**California** [1] - 84:2

**calm** [1] - 123:3

**calmed** [1] - 93:25

**camera** [13] - 43:20, 43:24, 60:10, 60:11, 61:3, 61:7, 63:3, 63:4, 63:12, 70:21, 176:14, 176:16, 176:18

**cameras** [7] - 16:18, 42:7, 42:10, 42:23, 43:18, 176:15, 176:19

**canal** [1] - 100:23

**cannot** [2] - 151:12, 151:13

**cantered** [1] - 112:7

**capture** [1] - 45:13

**captured** [1] - 63:12

**car** [3] - 39:6, 131:11

**care** [3] - 22:10, 100:5, 177:20

**career** [4] - 89:20, 89:21, 102:10

**careers** [2] - 19:3, 19:5

**careful** [2] - 155:16, 164:4

**carefully** [1] - 192:5

**Carrie** [2] - 1:16, 8:25

**carrie.wirsing@usdoj.gov** [1] - 1:20

**carried** [2] - 159:24, 169:21

**carrying** [1] - 170:5

**cartridge** [3] - 35:6, 95:14, 95:15

**case** [114] - 8:10, 9:1, 13:6, 16:3, 16:6, 16:15, 16:24, 17:1, 21:6, 28:1, 31:5, 39:5, 45:16, 57:23, 58:9, 58:24, 63:23, 66:19, 66:24, 72:13, 72:15, 73:4, 73:6, 76:1, 76:2, 76:4, 90:5, 90:9, 117:20, 132:19, 141:13, 142:21, 143:15, 144:3, 144:5, 144:11, 144:24, 146:6, 147:18, 147:25, 148:3, 148:23, 149:11, 149:18, 149:19, 150:22, 151:20, 151:22, 152:10, 152:12, 152:14, 152:19, 152:20, 153:25, 154:10, 154:22, 155:12, 155:19, 157:4, 157:6, 160:13, 161:18, 161:20, 161:25, 162:5, 162:20, 162:23, 164:5, 164:17, 164:20, 165:8, 165:11, 166:18, 166:25, 167:18, 168:6, 170:18, 174:8, 174:18, 174:23, 175:9, 175:12, 175:24, 176:7, 177:5, 177:22, 178:1, 179:4, 180:21, 180:23, 181:1, 182:18, 182:24, 190:14, 190:23, 191:14, 191:15, 191:17, 191:20, 192:18, 193:1, 193:25, 194:3, 194:6, 194:7, 194:10, 194:11, 196:4, 198:16, 199:2, 201:11
**cases** [3] - 84:9, 154:19, 155:15
**caught** [2] - 104:13, 185:4
**caused** [10] - 13:18, 100:25, 115:6, 115:13, 116:24, 117:5, 121:9, 151:4, 151:8, 186:18
**cautioned** [2] - 88:8, 89:17
**cavities** [2] - 187:7, 187:9
**ceased** [1] - 35:17
**CEDRIC** [1] - 1:6
**Cedric** [12] - 9:3, 10:21, 21:6, 29:10, 53:25, 84:25, 171:23, 172:8, 185:18, 185:20, 191:3, 198:19
**ceiling** [2] - 60:6, 62:19
**cell** [2] - 28:9, 138:6
**Center** [13] - 9:14, 9:24, 12:13, 22:12, 29:18, 85:8, 93:5, 104:2, 172:8, 173:15, 178:9, 179:1, 180:14
**center** [13] - 9:8, 9:11, 11:1, 11:9, 12:17, 16:16, 40:19, 40:21, 40:22, 85:5, 85:11, 87:8, 173:10
**centers** [2] - 43:7, 86:12
**certain** [6] - 28:8, 50:5, 122:22, 164:17, 164:23, 165:2
**certainly** [2] - 67:18, 147:2
**certify** [1] - 202:15
**cetera** [2] - 196:18, 197:10
**chain** [1] - 165:25
**chair** [3] - 56:18, 108:9
**chance** [5] - 64:18, 64:21, 64:25, 115:11, 155:13
**change** [3] - 161:9, 170:21, 196:2
**changed** [1] - 5:21
**changes** [1] - 146:17
**changing** [1] - 188:21
**character** [1] - 164:6
**characterize** [1] - 97:4

**CHARGE** [3] - 3:20, 3:21, 162:11
**charge** [38] - 4:8, 4:20, 6:1, 6:11, 140:8, 140:16, 141:9, 143:1, 143:16, 145:2, 145:3, 145:14, 146:4, 146:6, 146:11, 146:12, 146:15, 146:17, 151:3, 155:25, 156:1, 157:5, 157:7, 157:24, 157:25, 159:10, 160:4, 160:21, 161:19, 161:21, 162:3, 163:15, 183:3, 186:18, 193:3, 196:5, 196:21, 196:25
**charged** [2] - 148:11, 168:3
**charges** [3] - 72:21, 167:20, 190:7
**charging** [2] - 61:20, 78:23
**CHAVEZ** [2] - 3:14, 83:6
**Chavez** [64] - 9:23, 11:13, 11:19, 12:12, 12:14, 12:22, 12:23, 13:17, 13:18, 14:8, 14:11, 14:19, 14:22, 14:25, 26:24, 28:24, 29:12, 32:14, 32:19, 32:22, 33:5, 35:20, 36:1, 37:11, 39:5, 39:8, 49:13, 50:8, 50:16, 53:2, 64:14, 65:6, 71:19, 72:4, 82:25, 83:5, 83:14, 83:17, 102:3, 102:4, 102:5, 144:17, 150:14, 151:8, 169:25, 174:3, 174:8, 174:25, 177:17, 179:7, 179:14, 179:17, 180:5, 180:7, 181:18, 182:3, 182:7, 183:25, 185:25, 190:8, 195:8
**Chavez's** [6] - 11:15, 11:20, 37:19, 151:14, 181:20, 186:25
**cheat** [1] - 62:3
**check** [7] - 6:21, 41:1, 63:14, 104:18, 187:3, 192:21, 192:22
**checked** [1] - 98:23
**chief** [5] - 98:18, 99:21, 99:23, 99:24
**child** [3] - 97:22, 188:23
**children** [1] - 188:24
**choosing** [1] - 14:3
**chose** [1] - 190:14
**Christmas** [9] - 22:16, 58:1, 69:7, 85:12, 85:20, 86:5, 87:10, 87:19, 173:9
**cigarettes** [1] - 104:13
**circled** [1] - 108:10
**Circuit** [14] - 147:19, 147:22, 148:1, 148:3, 148:6, 148:8, 149:10, 151:22, 152:10, 152:12, 152:15, 152:20, 152:24
**circuit** [4] - 148:3, 148:22, 152:18, 152:21
**circumstances** [2] - 134:15, 165:25
**circumstantial** [8] - 165:21, 165:24, 166:3, 166:5, 175:5, 175:9, 175:16, 176:5
**city** [1] - 20:22
**claim** [2] - 134:22, 184:1
**claiming** [1] - 184:4
**claims** [1] - 120:8
**clarification** [2] - 62:13, 197:2
**clarity** [1] - 131:20
**classified** [1] - 16:17
**cleaned** [1] - 98:9
**cleanup** [1] - 41:10
**clear** [13] - 13:5, 49:22, 71:2, 86:12,

89:14, 126:3, 183:3, 183:4, 186:23, 191:14, 191:15, 192:18
**clearcut** [1] - 49:9
**clearly** [14] - 33:8, 49:5, 49:16, 49:17, 49:18, 49:19, 70:23, 79:7, 92:4, 167:2, 167:4, 174:19, 174:21, 180:5
**Cleary** [1] - 149:20
**cleary** [1] - 149:24
**clerk** [1] - 6:5
**clinched** [1] - 94:4
**clinching** [2] - 93:9, 93:10
**clinicians** [1] - 84:15
**clocked** [1] - 178:15
**clocking** [1] - 186:3
**close** [17] - 33:6, 33:7, 51:2, 68:12, 68:13, 68:18, 99:7, 107:13, 107:17, 114:10, 116:20, 144:5, 144:10, 145:6, 145:16, 145:18, 145:22
**close-quarter** [1] - 33:6, 33:7
**closed** [6] - 40:11, 94:8, 97:12, 116:19, 126:6, 129:3
**closely** [1] - 84:14
**closer** [12] - 18:6, 34:25, 68:14, 107:20, 108:11, 108:12, 108:21, 110:24, 111:23, 112:17, 113:17, 120:22
**closest** [1] - 111:25
**closing** [11] - 136:11, 144:25, 146:6, 156:5, 160:5, 160:14, 161:12, 161:23, 161:24, 172:1, 172:22
**CLOSING** [2] - 3:21, 3:22
**clothes** [5] - 27:22, 27:23, 28:1, 28:3, 36:4
**co** [3] - 34:10, 44:1, 172:10
**co-counsel** [1] - 44:1, 172:10
**co-supervisor** [1] - 34:10
**Coast** [1] - 84:5
**Code** [1] - 168:17
**colleague** [1] - 8:24
**colleagues** [2] - 87:24, 200:12
**collect** [1] - 194:21
**college** [1] - 18:10
**colon** [1] - 196:13
**color** [1] - 21:12
**combat** [1] - 33:6
**combative** [2] - 89:17, 90:9
**comfortable** [2] - 94:9, 94:10
**coming** [10] - 11:16, 25:12, 36:12, 38:4, 59:18, 97:2, 97:3, 111:3, 111:4, 193:8
**comma** [3] - 196:17, 197:5, 197:6, 197:7, 197:10
**command** [2] - 32:16, 40:22, 178:12
**commander** [1] - 19:22
**commands** [4] - 30:10, 94:1, 94:14, 139:12
**commence** [1] - 193:10
**comments** [2] - 4:7, 41:12
**commerce** [1] - 40:1
**Commerce** [3] - 20:16, 20:18, 20:24
**commission** [2] - 154:4, 154:5

committed [4] - 167:21, 167:22, 167:24, 170:9
common [5] - 43:17, 164:4, 165:16, 165:18
communicate [3] - 23:19, 29:16, 171:14
communication [3] - 68:17, 86:8, 103:8
community [4] - 20:9, 20:12, 28:15, 86:19
company [3] - 28:14, 86:11, 90:4
complain [1] - 37:6
complete [4] - 78:8, 78:10, 78:12, 78:19
completed [2] - 86:19, 200:10
completeness [2] - 70:7, 80:15
compliance [2] - 95:16, 178:18
compliant [3] - 29:5, 30:6, 178:11
complied [3] - 54:2, 86:22, 94:3
comply [4] - 10:17, 39:19, 93:22, 178:6
complying [3] - 94:14, 189:8
COMPUTER [1] - 1:25
COMPUTER-AIDED [1] - 1:25
concern [4] - 34:10, 39:5, 100:1, 100:17
concerned [3] - 68:2, 165:20, 168:10
concerning [2] - 164:2, 165:10
concerns [1] - 43:21
conclude [2] - 189:3, 189:4
concluded [5] - 81:15, 136:22, 144:21, 145:25, 202:10
conclusion [3] - 160:8, 167:14, 171:12
conclusions [1] - 165:17
concrete [1] - 117:24
concussion [1] - 39:5
conditions [2] - 85:4, 85:10
conduct [4] - 27:25, 58:22, 168:4, 178:20
confer [1] - 43:25
conference [5] - 143:2, 143:17, 145:14, 146:11, 157:7
CONFERENCE [1] - 3:20
confinement [1] - 86:13
confirm [2] - 100:9, 125:8
conflict [2] - 52:3, 72:19, 131:13
conflicting [5] - 16:13, 131:20, 131:24, 182:19
confront [1] - 24:12
confusion [2] - 141:16, 195:10
congratulations [1] - 44:17
connect [2] - 99:9, 144:16
connected [1] - 92:18
consciousness [3] - 116:19, 116:25, 117:1
consequences [3] - 163:9, 179:19, 179:20
consider [11] - 5:10, 66:20, 89:13, 115:18, 164:10, 165:4, 165:21, 166:10, 174:14, 175:4, 177:21
consideration [6] - 155:17, 162:15, 164:4, 165:6, 168:11, 170:19
considerations [1] - 167:7
considered [1] - 66:25

considering [1] - 165:14
consists [1] - 84:6
consult [1] - 170:16
consultation [1] - 179:25
contact [36] - 35:13, 50:13, 53:4, 91:12, 91:13, 91:20, 95:2, 112:22, 121:9, 122:23, 147:15, 147:16, 147:24, 147:25, 148:17, 148:19, 148:20, 149:2, 149:5, 149:6, 149:14, 150:5, 151:19, 151:21, 151:24, 152:1, 152:2, 152:4, 152:11, 152:17, 152:22, 152:23, 153:15, 153:17, 175:12, 176:3
contacted [1] - 86:6
contemporaneous [2] - 78:14, 78:16
content [1] - 80:3
contents [5] - 80:7, 80:17, 81:2, 81:5, 165:1
continually [1] - 12:6
continue [9] - 8:13, 15:22, 16:9, 83:3, 89:16, 100:22, 132:10, 140:4, 194:7
continued [3] - 2:2, 11:24, 29:24
continues [1] - 66:15
contract [1] - 90:4
contracted [1] - 86:11
control [6] - 34:3, 34:12, 38:11, 38:20, 98:10
controls [1] - 164:20
controverted [1] - 152:4
convenience [1] - 171:10
conversation [3] - 41:13, 122:5, 122:9
converse [1] - 181:15
convict [2] - 148:25, 174:6
convinced [3] - 166:5, 169:1, 170:22
convincing [1] - 164:6
convolute [1] - 191:16
copies [3] - 156:1, 160:2, 196:5
COPY [1] - 2:14
copy [12] - 140:25, 142:4, 143:12, 145:22, 148:2, 148:4, 160:16, 160:18, 162:3, 193:3, 195:2
corner [3] - 24:3, 61:3, 119:12
correct [57] - 5:6, 44:15, 44:22, 45:2, 45:23, 45:25, 50:19, 57:13, 59:19, 61:16, 67:18, 76:2, 76:13, 76:20, 77:11, 86:14, 91:19, 92:15, 92:17, 95:19, 95:21, 102:15, 103:13, 105:15, 107:9, 107:15, 108:14, 110:7, 111:18, 112:3, 112:6, 112:12, 112:18, 112:25, 113:5, 115:3, 115:15, 120:6, 120:24, 123:12, 123:21, 124:1, 127:22, 129:11, 129:12, 129:13, 130:7, 132:25, 133:22, 137:24, 138:8, 138:22, 147:6, 147:12, 149:15, 202:15
correction [1] - 195:11
correctly [2] - 50:10, 76:15
correctness [1] - 163:6
corridor [1] - 119:22
corroborate [3] - 125:8, 133:23, 188:6
corroborated [1] - 188:6
corroborating [1] - 175:3

corroboration [3] - 188:5, 188:7, 188:9
COST [1] - 2:14
counsel [18] - 44:1, 63:19, 63:24, 66:14, 66:23, 66:24, 73:2, 73:8, 73:18, 81:6, 140:7, 161:24, 172:10, 196:11, 198:9, 201:9
COUNSEL [1] - 2:14
counsel's [2] - 101:10, 154:22
counseling [1] - 20:10
Count [4] - 168:16, 171:23, 183:11, 198:18
count [3] - 170:12, 171:11, 171:20
couple [6] - 40:14, 41:12, 142:12, 188:22, 194:4, 200:12
course [11] - 79:9, 83:18, 100:12, 160:8, 170:7, 172:12, 174:11, 178:19, 178:20, 182:8, 183:23
court [13] - 6:23, 7:11, 19:7, 81:23, 142:18, 148:9, 149:8, 155:9, 160:24, 171:19, 191:11, 196:9, 198:1
Court [20] - 5:9, 6:24, 7:12, 8:17, 17:15, 81:24, 142:19, 147:20, 144:8, 148:14, 155:10, 156:17, 157:1, 157:2, 160:25, 172:5, 180:18, 194:17, 196:10, 198:2
COURT [244] - 1:1, 2:13, 2:16, 2:19, 3:21, 4:5, 4:12, 4:23, 5:2, 5:4, 5:7, 5:11, 5:14, 5:17, 5:20, 5:22, 5:24, 6:4, 6:9, 6:17, 6:20, 7:1, 7:7, 7:13, 7:19, 7:22, 8:2, 8:16, 8:19, 13:10, 15:5, 15:10, 15:13, 15:16, 15:18, 16:2, 17:4, 17:9, 17:14, 17:17, 18:5, 19:4, 21:17, 22:25, 42:14, 43:10, 43:13, 44:3, 44:5, 44:9, 44:11, 46:24, 47:10, 47:17, 48:1, 48:12, 53:8, 57:6, 63:21, 66:18, 72:8, 74:11, 75:5, 75:17, 75:19, 76:8, 79:21, 79:24, 80:12, 80:18, 80:24, 81:7, 81:11, 81:16, 82:4, 82:16, 82:20, 82:22, 83:2, 83:8, 87:2, 88:10, 88:14, 88:15, 88:17, 88:24, 89:3, 101:14, 101:16, 101:18, 102:12, 108:3, 131:6, 131:8, 131:22, 132:1, 132:8, 133:7, 133:15, 134:7, 134:17, 135:2, 135:10, 135:13, 135:19, 135:23, 136:19, 136:23, 137:2, 137:7, 137:9, 137:11, 137:17, 139:17, 139:20, 139:23, 140:1, 140:7, 140:14, 140:17, 140:21, 140:24, 141:2, 141:4, 141:18, 141:25, 142:3, 142:6, 142:14, 142:21, 143:1, 143:10, 143:16, 143:21, 144:2, 144:8, 144:18, 144:23, 145:8, 145:13, 145:17, 145:20, 146:1, 146:11, 146:23, 146:25, 147:3, 147:8, 147:17, 149:12, 149:25, 150:20, 151:1, 151:17, 152:10, 154:17, 154:25, 155:4, 155:7, 155:12, 156:8, 156:13, 156:16, 156:19, 156:21, 157:3, 157:15, 157:18, 157:21, 157:24, 158:3, 158:7, 158:10, 158:13, 158:15, 158:17, 158:19, 158:22, 158:24, 159:3, 159:5, 159:12, 159:16, 159:20,

159:24, 160:2, 160:10, 160:13, 160:16, 160:18, 160:20, 161:1, 161:6, 161:10, 161:15, 162:11, 162:12, 172:4, 172:20, 172:23, 173:1, 173:4, 179:22, 180:16, 180:19, 189:22, 191:5, 191:9, 192:25, 193:13, 193:17, 193:23, 195:1, 195:14, 195:18, 196:1, 196:4, 196:11, 196:24, 197:4, 197:13, 197:16, 197:20, 197:23, 198:4, 198:7, 198:13, 198:24, 199:5, 199:7, 199:9, 199:11, 199:13, 199:15, 199:17, 199:19, 199:21, 199:23, 199:25, 200:2, 200:7, 201:9, 201:19, 201:24
**court's** [1] - 149:10
**Court's** [1] - 200:8
**courthouse** [3] - 90:1, 98:15, 138:15
**courtroom** [16] - 7:25, 82:15, 101:5, 143:20, 146:2, 161:14, 171:8, 171:17, 172:16, 193:21, 198:6, 200:24, 201:1, 201:13, 201:17, 201:23
**courts** [1] - 104:21
**cover** [7] - 74:1, 77:25, 91:12, 91:13, 91:14, 111:1, 121:14
**crack** [2] - 188:13, 190:12
**cracked** [4] - 97:13, 97:19, 179:17, 187:7
**cracks** [3] - 97:14, 100:10, 100:19
**created** [1] - 30:15
**creating** [1] - 147:16
**credibility** [4] - 166:14, 174:12, 174:14, 174:22
**credible** [1] - 182:20
**credit** [2] - 134:4
**crime** [5] - 144:15, 167:22, 167:24, 168:18, 169:1
**crimes** [2] - 147:14, 168:3
**CRIMINAL** [1] - 2:13
**criminal** [3] - 1:4, 84:6, 167:17
**critical** [2] - 84:13, 84:17
**cropped** [2] - 41:3, 41:24
**CROSS** [4] - 3:12, 3:15, 44:13, 102:1
**cross** [5] - 44:3, 101:18, 133:13, 135:6, 136:13
**CROSS-EXAMINATION** [4] - 3:12, 3:15, 44:13, 102:1
**cross-examination** [3] - 44:3, 101:18, 136:13
**cross-examining** [1] - 135:6
**crowd** [1] - 172:24
**CRR** [2] - 2:20, 202:20
**CSR** [2] - 2:20, 202:20
**cuff** [1] - 35:21
**cuffed** [4] - 35:22, 35:23, 35:24, 178:12
**cuffing** [1] - 111:2
**cuffs** [2] - 35:21, 40:7
**curfew** [11] - 22:2, 22:20, 57:15, 85:17, 102:24, 102:25, 104:13, 173:20, 185:6, 185:21, 188:3
**cursed** [1] - 93:8
**cursing** [4] - 103:21, 103:23, 104:3,

178:25
**cursor** [1] - 60:25
**custodial** [4] - 19:6, 32:8, 86:19
**custody** [6] - 61:21, 93:4, 93:23, 104:1, 104:24, 202:5
**customs'** [1] - 19:25
**cut** [4] - 65:18, 121:23, 122:7, 187:1
**cuts** [1] - 38:9
**cutting** [1] - 135:22

## D

**daily** [1] - 28:11
**damage** [1] - 100:7
**damaged** [2] - 11:15, 180:1
**danger** [2] - 173:25, 174:1
**dangerous** [3] - 84:10, 125:16, 154:6
**dark** [1] - 21:10
**darkness** [1] - 57:5
**Darryl** [4] - 2:4, 13:14, 190:20, 197:2
**darryl_austin@fd.org** [1] - 2:8
**dash** [1] - 75:7
**Date** [1] - 202:20
**date** [11] - 85:9, 100:16, 124:4, 167:21, 167:23, 167:25, 171:13, 171:25, 201:18, 201:19
**dated** [1] - 198:18
**David** [4] - 14:17, 119:18, 120:8
**DAY** [1] - 1:12
**daycare** [1] - 189:1
**days** [6] - 13:23, 28:13, 57:18, 173:8, 194:4, 200:12
**DC** [1] - 18:19
**de** [24] - 29:12, 32:14, 32:19, 32:22, 33:5, 35:20, 36:1, 39:4, 82:25, 83:14, 83:17, 102:3, 102:4, 102:5, 169:25, 174:3, 174:8, 174:24, 177:17, 179:7, 179:13, 179:16, 180:5, 180:7
**DE** [2] - 3:14, 83:6
**deadly** [7] - 153:10, 153:12, 153:13, 153:14, 154:6, 154:16
**deal** [2] - 39:6, 103:6
**death** [2] - 13:25, 84:18
**debate** [1] - 190:20
**December** [14] - 9:6, 9:8, 9:9, 9:22, 10:13, 19:17, 21:3, 49:5, 85:13, 90:22, 101:4, 103:15, 124:18, 173:8
**decent** [1] - 180:24
**decide** [11] - 133:6, 154:13, 162:15, 166:8, 166:18, 167:10, 168:1, 168:9, 170:18, 171:2, 176:6
**decided** [3] - 40:6, 87:23, 143:11
**decides** [1] - 194:13
**decision** [9] - 6:12, 149:10, 149:23, 154:20, 163:2, 165:6, 166:21, 188:21, 193:8
**decisions** [1] - 167:13
**deduce** [1] - 175:23
**deducing** [1] - 130:5
**deductions** [1] - 165:17

**deep** [2] - 24:25, 38:7
**deescalate** [5] - 93:13, 104:17, 105:2, 105:9, 185:13
**Defendant** [1] - 1:7
**defendant** [89] - 4:16, 9:3, 9:6, 9:9, 9:14, 9:24, 10:14, 11:4, 11:6, 11:13, 11:18, 11:23, 12:1, 12:4, 12:12, 12:21, 12:24, 13:7, 21:5, 21:8, 21:16, 22:13, 22:18, 24:15, 25:7, 25:11, 26:11, 27:6, 27:7, 28:25, 29:4, 32:12, 36:22, 37:4, 37:6, 37:9, 38:19, 38:24, 39:25, 98:10, 101:13, 148:15, 155:18, 163:16, 163:18, 163:20, 163:22, 163:23, 166:6, 166:9, 167:17, 167:24, 168:2, 168:3, 168:6, 168:8, 168:9, 168:25, 169:3, 169:11, 169:14, 169:17, 170:4, 170:8, 171:3, 171:23, 172:7, 175:10, 175:11, 177:5, 177:11, 177:12, 177:24, 178:2, 180:4, 180:9, 180:13, 183:19, 184:18, 186:15, 191:3, 192:4, 196:14, 197:5, 198:19, 202:4
**DEFENDANT** [1] - 2:3
**DEFENDANT'S** [2] - 3:3, 3:22
**defendant's** [7] - 33:8, 34:7, 36:25, 39:9, 163:25, 164:2, 180:10
**defendants** [1] - 157:25
**DEFENDER** [2] - 2:5, 2:11
**Defenders** [1] - 2:5
**defense** [38] - 8:9, 15:8, 21:10, 53:7, 55:19, 56:11, 56:25, 70:7, 70:13, 70:19, 70:24, 73:2, 73:8, 80:1, 80:15, 81:6, 82:20, 107:21, 107:25, 114:6, 120:13, 144:11, 144:22, 148:4, 149:7, 152:3, 152:4, 154:21, 158:13, 158:15, 158:22, 158:25, 159:17, 161:24, 167:1, 181:9, 191:16, 198:25
**DEFENSE** [1] - 3:19
**defensive** [1] - 110:6
**defensive-bladed** [1] - 110:6
**definitely** [3] - 59:5, 98:23, 194:12
**degree** [4] - 91:15, 91:17, 109:15, 112:7
**deliberate** [5] - 162:6, 170:17, 190:17, 192:5, 192:6
**deliberating** [4] - 145:5, 160:9, 161:20, 192:9
**deliberation** [2] - 175:8, 194:1
**deliberations** [7] - 162:24, 170:13, 170:20, 171:7, 171:13, 171:15, 193:10
**demeanor** [6] - 10:22, 27:11, 29:4, 59:6, 92:24, 122:24, 175:11, 178:4
**denied** [3] - 144:18, 155:24, 159:13
**dental** [1] - 179:24
**dentist** [2] - 100:7, 187:7
**depart** [1] - 10:6
**depict** [2] - 61:11, 135:7
**depicted** [3] - 55:23, 70:23, 108:25
**depths** [1] - 186:2
**deputies** [9] - 9:25, 11:23, 12:8, 22:7, 84:23, 124:16, 173:12, 176:12, 178:21
**deputies'** [2] - 19:3, 19:5

**Deputy** [35] - 9:22, 9:23, 11:13, 11:14, 11:19, 11:20, 11:25, 12:11, 12:13, 12:16, 12:22, 13:17, 14:22, 23:3, 26:24, 28:24, 37:19, 44:15, 64:14, 71:19, 72:12, 82:22, 83:5, 106:17, 107:5, 133:11, 138:18, 151:8, 175:4, 175:10, 181:18, 181:19, 181:20

**deputy** [37] - 12:20, 17:24, 19:21, 19:22, 22:8, 22:10, 23:3, 37:11, 39:3, 39:8, 39:10, 49:12, 50:16, 53:2, 83:21, 84:4, 84:21, 87:19, 88:22, 102:3, 102:6, 102:11, 139:23, 170:1, 172:15, 173:7, 174:2, 174:24, 177:17, 178:3, 178:15, 179:7, 179:13, 179:16, 180:5, 180:7

**describe** [9] - 27:6, 30:7, 30:8, 30:12, 30:20, 31:1, 45:20, 93:18, 101:7

**described** [10] - 34:14, 41:22, 70:2, 116:16, 120:12, 154:6, 169:5, 185:24, 196:15, 197:7

**describing** [2] - 26:3, 97:17

**designated** [1] - 168:20

**despite** [4] - 128:19, 173:23, 173:24

**detail** [2] - 122:21, 125:20

**details** [4] - 50:5, 78:19, 125:18

**detain** [1] - 24:12

**detained** [4] - 34:22, 38:20, 38:24, 39:9

**detective** [1] - 28:3

**detention** [14] - 9:11, 9:14, 11:1, 11:9, 12:17, 12:24, 12:25, 32:6, 40:19, 40:21, 43:7, 43:16, 178:9, 184:12

**Detention** [11] - 9:24, 12:13, 22:12, 29:18, 85:8, 93:4, 104:2, 172:8, 173:15, 179:1, 180:14

**determination** [2] - 185:15

**determine** [3] - 164:10, 167:8, 181:2

**determined** [2] - 181:6, 188:12

**determining** [2] - 134:20, 163:1

**developed** [1] - 24:8

**dictates** [1] - 76:18

**differ** [2] - 115:1, 167:5

**differed** [1] - 114:25

**difference** [1] - 175:6

**different** [15] - 4:18, 19:8, 43:23, 70:23, 84:7, 99:23, 117:4, 125:4, 125:13, 128:25, 134:15, 153:2, 153:8, 182:8, 182:9

**differs** [1] - 130:15

**difficult** [3] - 8:4, 27:19, 194:16

**dim** [1] - 179:8

**DIRECT** [4] - 3:11, 3:15, 17:18, 83:9

**direct** [16] - 38:18, 50:12, 57:11, 60:12, 64:10, 67:2, 115:7, 135:6, 135:9, 165:21, 165:22, 166:3, 166:5, 174:24, 175:1, 176:5

**directed** [1] - 35:1

**direction** [2] - 112:5, 113:19

**directly** [6] - 154:3, 167:5, 174:21, 176:19, 176:25, 189:13

**director** [3] - 86:9, 103:6, 185:10

**disagrees** [1] - 140:23

**disappear** [1] - 57:17

**discharge** [1] - 194:2

**discomfort** [1] - 100:15

**discounted** [1] - 149:5

**discus** [2] - 113:1

**discuss** [2] - 122:21, 143:8

**discussing** [3] - 139:13, 152:20, 152:21

**discussion** [2] - 117:23, 176:13

**discussions** [2] - 72:25, 168:11

**dismiss** [2] - 193:11, 193:15

**dismissed** [1] - 194:25

**display** [2] - 98:1, 169:18

**dispute** [5] - 126:2, 127:4, 132:14, 148:12, 179:4

**disputing** [1] - 148:13

**disregard** [5] - 163:4, 164:23, 165:4, 165:12, 173:5

**distance** [3] - 68:17, 69:5, 139:7

**distinction** [2] - 51:5, 166:2

**District** [1] - 20:25

**district** [2] - 19:7, 148:9

**DISTRICT** [4] - 1:1, 1:2, 2:16, 2:16

**DIVISION** [1] - 1:3

**doctor** [5] - 99:10, 187:4, 187:5, 187:13, 187:15

**doctors** [2] - 41:12, 41:16

**document** [2] - 75:11, 75:22, 80:25

**documented** [1] - 75:16

**documents** [3] - 16:7, 66:21, 75:23

**done** [15] - 67:21, 87:4, 89:19, 92:20, 99:10, 99:11, 134:25, 137:1, 138:25, 142:2, 165:9, 168:14, 179:11, 180:24, 184:22

**door** [14] - 12:9, 23:12, 23:20, 23:25, 24:2, 25:1, 40:9, 40:11, 40:12, 70:9, 80:11, 91:23

**doors** [3] - 40:23, 90:16

**dorm** [1] - 176:19

**dormitory** [5] - 90:19, 91:6, 91:24, 92:7, 92:14

**dot** [6] - 183:19, 183:20, 197:10

**doubled** [1] - 136:1

**doubt** [34] - 12:21, 12:25, 17:2, 100:24, 101:2, 101:3, 115:5, 135:5, 135:7, 144:16, 163:22, 163:25, 164:2, 164:3, 164:5, 166:6, 166:10, 167:24, 168:2, 169:2, 170:6, 171:4, 172:14, 177:4, 180:5, 187:17, 187:18, 187:19, 188:18, 190:15, 192:7, 192:8

**down** [33] - 7:8, 22:25, 27:9, 31:5, 32:21, 32:23, 33:20, 38:16, 38:18, 40:10, 41:23, 52:8, 53:8, 62:9, 79:12, 93:25, 95:9, 100:3, 106:6, 106:10, 106:12, 113:14, 116:20, 117:2, 119:21, 120:9, 121:9, 130:22, 136:1, 136:9, 180:3, 186:3, 190:11

**downtown** [10] - 7:2, 19:24, 20:1, 20:2, 20:19, 20:23, 22:12, 85:8, 87:22

**dozens** [1] - 89:21

**drama** [1] - 184:23

**dramatic** [1] - 126:24

**drank** [1] - 104:12

**draw** [2] - 165:15, 165:18

**drawn** [1] - 163:19

**dress** [1] - 28:19

**dressed** [1] - 176:21

**dripping** [3] - 36:2, 36:15, 96:3

**drive** [1] - 39:5

**driver** [2] - 40:17, 131:11

**drop** [2] - 97:6, 178:14

**droplets** [1] - 35:24

**drove** [2] - 98:18, 99:24

**dry** [1] - 95:13

**due** [1] - 73:13

**during** [15] - 19:20, 53:4, 106:4, 139:12, 164:11, 164:22, 165:10, 165:12, 170:20, 171:14, 172:21, 174:5, 175:8, 178:19

**duties** [6] - 9:5, 9:20, 12:23, 42:20, 168:24, 169:10, 177:10, 183:24, 184:14

**duty** [20] - 84:17, 162:14, 162:16, 163:2, 163:8, 163:10, 164:9, 167:18, 168:9, 169:9, 170:2, 170:5, 170:8, 170:16, 171:2, 177:15, 177:18, 183:23, 184:4, 194:2

**Dvornick** [5] - 48:11, 48:14, 49:19, 65:3, 123:18

**Dye** [2] - 202:19, 202:20

**DYE** [1] - 2:20

## E

**early** [4] - 19:3, 19:5, 62:15, 160:11

**easier** [1] - 189:12

**east** [1] - 20:19

**edge** [1] - 119:3

**edges** [1] - 116:17

**edits** [1] - 156:2

**effect** [8] - 27:17, 29:14, 33:5, 35:16, 84:23, 126:24, 162:13, 170:23

**effective** [1] - 105:11

**effort** [1] - 170:17

**efforts** [1] - 93:22

**eggshell** [2] - 97:14, 97:16

**eight** [5] - 107:4, 121:5, 149:1, 154:1

**eight-year** [1] - 149:1

**either** [17] - 15:7, 16:23, 34:25, 61:7, 61:23, 71:10, 125:8, 151:6, 155:20, 159:17, 166:3, 167:1, 171:12, 171:16, 171:23, 189:14, 197:24

**election** [1] - 163:20

**electrical** [1] - 95:20

**electronic** [1] - 5:25

**electronically** [1] - 195:17

**element** [16] - 4:10, 4:13, 4:18, 4:20, 144:17, 148:21, 154:14, 177:16, 177:20, 179:3, 183:22, 184:16, 186:14, 192:12, 197:2

**Element** [1] - 184:8

**elements** [12] - 141:10, 144:15, 148:10, 148:11, 153:7, 177:2, 177:3, 177:13, 183:3, 183:18, 189:24, 190:21
**email** [13] - 4:19, 85:13, 86:1, 86:3, 86:8, 102:18, 103:3, 141:3, 141:4, 154:22, 154:25, 155:14
**emails** [1] - 18:13
**embellish** [2] - 176:1, 176:3
**embellishment** [1] - 14:23
**emergency** [4] - 98:19, 98:20, 98:22, 99:10
**Emmanuel** [1] - 2:4
**employed** [3] - 83:20, 83:21, 83:22
**employee** [1] - 168:20
**employees** [4] - 87:20, 88:7, 88:8, 176:16
**end** [20] - 16:24, 18:3, 20:8, 25:1, 28:15, 56:24, 102:7, 108:11, 156:20, 157:10, 160:14, 162:16, 173:11, 173:19, 180:20, 190:5, 191:1, 194:14, 197:8
**ended** [6] - 25:13, 30:17, 39:1, 39:19, 40:9, 150:24
**enforcement** [4] - 44:25, 83:24, 84:7, 102:7
**engaged** [2] - 168:23, 177:9
**engaging** [1] - 169:8
**enhanced** [2] - 154:4, 154:5
**enter** [6] - 24:4, 42:5, 90:16, 168:11, 198:20, 200:5
**entered** [5] - 26:16, 28:18, 28:23, 107:11, 200:7
**entertain** [1] - 80:20
**entire** [4] - 92:13, 102:9, 178:19, 185:5
**entirely** [3] - 118:16, 150:15, 164:24
**entitled** [3] - 15:17, 103:15, 202:16
**entrance** [8] - 23:4, 23:13, 53:3, 60:18, 107:3, 111:10, 113:20
**entry** [1] - 195:7
**error** [2] - 103:16, 161:4
**escalate** [1] - 105:3
**escape** [12] - 21:25, 22:1, 22:4, 22:15, 22:21, 57:12, 58:11, 58:13, 58:20, 61:20, 103:2, 164:18
**escapee** [2] - 58:21, 61:19
**escorted** [5] - 12:16, 91:4, 91:22, 121:1, 138:24
**escorts** [1] - 52:23
**essentially** [1] - 102:9
**established** [2] - 165:18, 170:6
**establishing** [1] - 87:3
**estimate** [1] - 124:17
**et** [2] - 196:17, 197:10
**euphemistically** [1] - 118:9
**Europe** [1] - 18:9
**eve** [2] - 58:1, 85:13
**evening** [1] - 200:21
**event** [4] - 49:6, 49:24, 50:2, 134:23
**events** [7] - 16:14, 45:13, 48:25, 66:12, 71:5, 120:5, 165:25

**eventually** [3] - 111:14, 181:22, 186:8
**everywhere** [1] - 16:18
**evidence** [72] - 5:17, 6:11, 8:6, 9:2, 9:12, 10:19, 11:12, 12:3, 12:20, 13:4, 13:6, 14:5, 15:19, 16:6, 16:8, 16:13, 43:6, 63:22, 66:20, 66:21, 66:22, 66:24, 80:10, 144:24, 147:25, 148:14, 149:4, 149:13, 150:13, 150:23, 153:17, 155:19, 162:5, 162:15, 163:11, 163:16, 163:18, 164:5, 164:11, 164:14, 164:20, 165:2, 165:4, 165:5, 165:7, 165:14, 165:19, 165:20, 165:21, 165:22, 165:23, 165:24, 166:3, 166:4, 166:11, 166:12, 167:19, 170:19, 170:23, 175:5, 175:7, 175:9, 175:16, 176:5, 176:6, 191:17, 191:20
**exact** [5] - 116:10, 121:14, 122:5, 124:4, 167:23
**exactly** [9] - 33:19, 49:21, 51:17, 52:10, 55:25, 66:13, 104:6, 139:8, 150:10
**EXAMINATION** [12] - 3:11, 3:12, 3:12, 3:13, 3:15, 3:15, 17:18, 44:13, 72:10, 76:10, 83:9, 102:1
**examination** [3] - 44:3, 101:18, 136:13
**examine** [1] - 41:17
**examining** [1] - 135:6
**example** [10] - 31:18, 61:18, 64:6, 103:15, 116:7, 116:15, 132:16, 133:21, 138:1, 162:20
**examples** [1] - 188:19
**excellent** [1] - 201:9
**except** [4] - 18:12, 146:15, 165:11, 168:7
**exchanged** [1] - 40:3
**exclude** [1] - 164:1
**excuse** [15] - 14:9, 15:3, 55:18, 64:12, 75:13, 109:9, 119:14, 119:19, 124:11, 135:22, 181:18, 184:17, 187:23, 193:2, 194:20
**excused** [7] - 82:3, 82:21, 82:22, 139:19, 139:21, 139:23, 201:8
**excuses** [2] - 182:15, 182:16
**exhibit** [11] - 92:20, 107:21, 107:25, 161:5, 165:1, 181:9, 195:5, 195:6, 195:12, 195:16, 195:17
**Exhibit** [32] - 22:24, 23:6, 23:7, 23:23, 24:21, 25:17, 25:25, 26:8, 36:8, 36:19, 37:21, 41:15, 53:7, 55:19, 56:11, 56:25, 59:24, 60:23, 62:1, 70:7, 70:13, 70:20, 92:3, 96:12, 98:1, 99:15, 114:6, 120:13, 179:5, 186:24, 195:7, 195:8
**exhibits** [10] - 70:24, 161:1, 162:4, 164:12, 164:23, 165:15, 184:3, 191:21, 193:7, 195:12
**exist** [1] - 153:19
**existent** [1] - 55:6
**exited** [1] - 98:12
**expect** [4] - 8:11, 14:15, 163:13, 169:19
**expected** [1] - 172:11
**EXPENSE** [1] - 2:13

**experience** [8] - 43:7, 43:16, 50:20, 77:5, 77:17, 165:16, 176:25, 200:17
**experienced** [2] - 114:25, 127:2
**experiences** [1] - 68:2
**explain** [10] - 31:11, 31:17, 50:1, 88:19, 88:25, 162:16, 162:23, 163:3, 163:9, 170:14
**explained** [4] - 30:11, 93:2, 93:14, 93:17
**explaining** [1] - 105:3
**explanation** [2] - 196:13, 197:4
**explanations** [2] - 187:20, 189:19
**explosive** [4] - 115:22, 174:1, 178:16, 192:1
**extended** [1] - 68:18
**extensive** [1] - 173:24
**extensively** [1] - 80:6
**extent** [1] - 51:20
**externally** [1] - 179:16
**extra** [1] - 28:19
**extrapolate** [2] - 188:15, 188:16
**eye** [1] - 99:5
**eyes** [2] - 50:21, 50:23
**eyewitness** [5] - 130:2, 134:19, 134:23, 135:20, 165:24
**eyewitnesses** [2] - 72:1, 72:3

### F

**F.3d** [1] - 148:24
**f.App'x** [1] - 148:7
**face** [22] - 15:1, 16:11, 33:20, 34:7, 36:3, 36:25, 37:9, 37:12, 37:15, 37:19, 37:23, 51:11, 61:23, 68:7, 94:15, 106:20, 113:19, 125:11, 130:2, 136:17, 186:25
**faced** [1] - 106:14
**facial** [1] - 98:24
**facilities** [3] - 42:20, 43:11, 43:16
**facility** [30] - 9:7, 9:10, 9:13, 10:1, 10:2, 10:8, 12:6, 12:24, 12:25, 20:5, 20:6, 20:7, 20:15, 21:21, 24:6, 40:1, 42:8, 42:19, 42:24, 58:15, 58:16, 85:17, 85:18, 86:4, 87:15, 176:15, 176:20, 176:21, 178:24
**facing** [8] - 106:17, 106:19, 109:11, 109:14, 111:20, 112:6, 113:19, 114:2
**fact** [14] - 53:6, 64:10, 65:6, 115:22, 125:21, 127:9, 128:18, 146:22, 149:18, 155:21, 165:24, 166:1, 170:7, 175:15
**factor** [1] - 177:21
**factors** [2] - 174:13, 192:6
**facts** [11] - 87:3, 162:25, 163:2, 164:10, 164:18, 165:18, 171:2, 180:25, 188:15, 190:21, 191:16
**failed** [4] - 17:1, 144:14, 184:7, 184:17
**fails** [1] - 163:22
**fair** [6] - 49:25, 105:12, 109:6, 109:14, 110:16, 117:15
**fairly** [1] - 108:25

fall [6] - 33:12, 100:9, 113:25, 120:21, 121:9, 188:10
falling [10] - 11:21, 43:2, 95:3, 113:9, 129:7, 129:10, 129:13, 129:19, 130:2, 130:4
familiar [5] - 42:20, 42:23, 45:10, 84:25, 113:3
familiarize [1] - 46:8
families [1] - 173:12
family [3] - 18:8, 124:16, 188:22
fan [2] - 26:20, 26:21
far [12] - 20:16, 56:23, 61:3, 64:2, 71:7, 98:15, 109:4, 115:3, 120:2, 120:15, 133:3, 186:12
fast [1] - 32:21
FAX [2] - 1:20, 2:8
FBI [16] - 46:7, 46:10, 50:12, 72:16, 72:24, 73:5, 73:25, 76:5, 123:7, 123:17, 125:12, 125:13, 134:22, 182:9, 188:4
FBI's [1] - 47:21
FDC [6] - 29:18, 93:4, 93:15, 104:9, 104:15, 104:24
February [1] - 18:3
federal [48] - 4:14, 9:4, 9:7, 9:11, 9:14, 9:20, 9:21, 9:24, 11:1, 11:8, 12:16, 12:24, 13:8, 19:1, 20:7, 20:8, 29:18, 42:19, 43:16, 43:22, 43:23, 84:7, 84:8, 104:2, 168:16, 168:20, 169:5, 169:6, 170:1, 170:5, 170:7, 173:17, 173:18, 177:7, 177:14, 177:17, 178:1, 178:9, 183:4, 183:11, 183:20, 192:11, 192:13, 192:14, 196:15, 197:7
Federal [10] - 2:5, 12:13, 22:12, 85:7, 93:4, 148:7, 172:7, 173:15, 179:1, 180:14
FEDERAL [2] - 2:5, 2:11
feet [8] - 31:22, 33:18, 107:4, 107:17, 107:18, 114:7, 114:10, 121:5
fell [26] - 33:13, 33:15, 33:17, 33:18, 33:21, 43:2, 52:8, 52:10, 52:12, 52:14, 52:16, 95:3, 113:10, 113:11, 113:12, 119:20, 119:21, 119:23, 119:24, 121:12, 129:4, 129:5, 150:20, 155:20, 180:8, 182:12
fellow [3] - 170:19, 170:24, 182:1
felony [1] - 149:1
felt [17] - 30:25, 49:8, 62:15, 68:6, 73:23, 93:24, 97:13, 97:19, 97:21, 97:22, 97:23, 97:24, 99:4, 112:22, 112:24, 115:23, 130:9
female [1] - 52:24
FERNANDEZ [2] - 3:10, 17:12
Fernandez [43] - 9:23, 11:19, 11:25, 12:16, 14:9, 17:8, 17:10, 17:22, 17:23, 23:3, 44:15, 47:25, 48:18, 72:12, 87:25, 91:9, 93:16, 95:12, 106:17, 107:5, 110:20, 110:22, 110:24, 111:20, 111:23, 121:13, 121:16, 121:19, 121:22, 127:14, 127:17,

133:11, 138:18, 174:10, 175:4, 175:10, 175:25, 181:20, 185:25, 186:8, 189:13, 189:16
few [11] - 18:8, 18:11, 57:3, 57:19, 60:15, 67:13, 67:21, 68:4, 145:3, 166:22, 167:7
FI [2] - 31:8, 31:10, 31:16
field [2] - 20:17, 173:24
Fifth [11] - 147:19, 147:22, 148:1, 148:3, 148:6, 148:8, 151:22, 152:10, 152:15, 152:20, 152:24
fight [9] - 9:16, 11:24, 172:8, 172:9, 179:2, 180:15, 184:22, 189:15, 189:17
fighting [14] - 10:18, 12:1, 12:5, 12:10, 33:23, 34:1, 34:5, 34:15, 34:23, 35:10, 52:12, 52:13
figure [5] - 5:7, 135:13, 141:8, 141:11
filed [3] - 6:2, 195:7, 195:16
fill [2] - 100:19, 195:2
filled [2] - 187:9, 193:4
final [1] - 164:19
finally [7] - 11:5, 12:1, 12:7, 30:21, 95:24, 162:23, 180:21
fine [8] - 39:15, 97:1, 106:11, 108:1, 141:12, 141:19, 195:24, 196:3
fined [1] - 154:7
finish [7] - 20:8, 20:12, 39:14, 93:15, 161:12, 161:21, 184:10
first [41] - 4:15, 8:7, 17:6, 18:8, 19:13, 25:22, 26:12, 29:8, 29:12, 44:25, 53:16, 54:20, 67:15, 69:14, 69:18, 70:8, 88:5, 92:25, 107:8, 107:10, 107:12, 108:6, 114:22, 121:20, 125:22, 125:23, 126:4, 126:17, 135:25, 140:24, 142:3, 150:1, 162:19, 169:3, 171:5, 177:5, 183:14, 183:18, 184:16
fist [11] - 50:12, 50:16, 51:11, 94:5, 94:8, 112:25, 115:11, 116:19, 128:22, 129:3, 176:2
fists [2] - 93:9, 93:10
five [25] - 7:17, 7:21, 8:12, 20:8, 35:8, 35:11, 54:24, 55:10, 61:23, 62:20, 93:20, 100:22, 114:7, 114:10, 136:25, 137:3, 156:3, 156:15, 156:16, 156:18, 156:21, 181:8, 182:17
five-minute [2] - 8:12, 156:18
five-ten [1] - 93:20
flash [1] - 33:8
flat [3] - 31:19, 52:8, 151:23
flat-footed [1] - 31:19
flatfooted [1] - 31:4
floor [3] - 11:16, 26:22, 96:3
flowing [2] - 11:16, 38:5
focus [1] - 81:18
focused [6] - 120:3, 121:13, 139:7, 139:9, 176:19, 194:5
folks [2] - 53:13, 120:25
follow [10] - 40:18, 86:1, 100:5, 161:20, 162:17, 162:24, 163:2, 163:7, 196:20,

196:24
follow-up [2] - 86:1, 100:5
followed [2] - 40:19, 79:15
following [3] - 118:14, 133:14, 169:2
follows [2] - 146:21, 171:22
foot [5] - 31:23, 68:16, 109:22, 109:25, 110:1
footed [1] - 31:19
FOR [4] - 1:15, 2:3, 2:14, 3:9
Force [1] - 84:5
force [23] - 4:25, 19:18, 27:23, 45:17, 45:24, 45:25, 69:25, 70:4, 70:5, 73:9, 74:16, 74:25, 75:11, 76:12, 84:2, 84:8, 84:16, 153:7, 153:12, 153:14, 154:16, 169:18, 182:6
forceable [7] - 144:17, 147:21, 153:9, 153:14, 169:15, 170:9, 177:22
forcefully [1] - 30:4
forcibly [36] - 4:14, 12:22, 13:7, 141:10, 168:16, 168:18, 169:3, 169:6, 170:4, 177:5, 177:7, 177:24, 183:4, 183:5, 183:6, 183:9, 183:11, 183:12, 183:13, 183:14, 183:19, 186:19, 192:13, 192:14, 192:15, 196:14, 197:2, 197:3, 197:5
forearms [1] - 27:8
forefront [1] - 62:10
foregoing [1] - 202:15
foreperson [10] - 171:6, 171:10, 171:13, 171:15, 171:24, 191:2, 193:4, 193:6, 198:10, 198:17
FOREPERSON [1] - 198:12
forget [1] - 69:9
forgot [2] - 47:8, 47:22
form [15] - 5:13, 5:21, 5:25, 104:5, 171:9, 171:22, 171:25, 174:1, 192:21, 192:22, 193:4, 193:7, 198:13, 198:16
formal [4] - 85:6, 85:25, 157:7, 163:15
forth [6] - 11:3, 57:16, 80:12, 111:16, 143:4, 194:17
forward [10] - 89:14, 109:22, 109:25, 110:1, 112:14, 113:7, 113:9, 143:23, 159:25, 194:18
forwarded [1] - 155:5
foundation [2] - 42:16, 43:14
four [13] - 14:24, 18:20, 34:17, 34:19, 45:5, 45:6, 47:2, 47:25, 62:20, 177:3, 181:8, 183:17, 190:19
fourth [7] - 4:15, 4:18, 4:20, 141:14, 169:13, 177:11, 186:14
frame [3] - 106:23, 118:24, 119:8
frankly [1] - 183:16
free [4] - 33:24, 82:12, 200:18, 201:1
Friday [2] - 52:3, 69:16
friendly [1] - 30:13
FROM [1] - 1:25
front [35] - 23:4, 24:10, 24:11, 27:3, 27:15, 29:11, 31:21, 40:1, 42:25, 47:25, 59:13, 60:21, 67:22, 90:16, 97:11, 97:21, 98:6, 108:11, 109:13,

111:14, 111:19, 111:20, 112:11,
113:22, 116:6, 125:25, 129:2, 181:10,
182:2, 183:5, 183:10, 184:10, 186:2,
188:1, 189:13
**frustrated** [1] - 115:23
**fugitive** [2] - 19:18, 84:2
**Fugitive** [1] - 84:5
**fugitives** [1] - 84:10
**full** [6] - 28:5, 32:8, 56:2, 137:18,
143:16, 197:12
**full-on** [1] - 28:5
**fully** [1] - 39:19
**function** [2] - 150:8, 164:15
**FURNISHED** [1] - 2:13
**future** [1] - 179:25

## G

**gash** [2] - 38:6, 38:7
**gather** [4] - 105:1, 109:7, 120:4, 127:23
**GAYLE** [1] - 2:20
**Gayle** [1] - 202:20
**GENERAL** [1] - 2:16
**general** [3] - 28:10, 117:24, 162:19
**generally** [2] - 28:14, 78:3
**gentleman** [1] - 25:21
**gentlemen** [26] - 8:21, 9:17, 12:18, 13:3,
13:13, 16:4, 81:16, 83:2, 89:9, 108:3,
120:19, 121:3, 136:23, 137:2, 137:12,
140:1, 144:2, 144:23, 146:1, 161:16,
172:6, 174:22, 179:10, 193:1, 198:25,
200:9
**GEO** [30] - 14:16, 38:13, 52:20, 52:23,
53:3, 53:13, 53:20, 54:5, 71:10, 86:11,
90:3, 90:6, 90:8, 90:10, 91:5, 91:11,
113:6, 114:12, 114:18, 120:4, 120:25,
121:9, 121:15, 138:10, 138:12,
138:15, 138:19, 138:22, 176:8, 181:12
**GEORGE** [1] - 1:11
**gist** [1] - 74:3
**given** [13] - 22:17, 124:13, 155:21,
155:22, 157:5, 166:15, 185:10,
188:19, 189:18, 196:4, 196:20,
196:25, 200:16
**glass** [2] - 23:18, 101:11
**glasses** [1] - 21:11
**goal** [2] - 20:12, 24:8
**goodbye** [1] - 194:21
**government** [56] - 13:19, 14:3, 15:6,
15:24, 16:17, 16:25, 17:13, 51:23,
82:1, 82:18, 82:24, 83:7, 120:7,
122:12, 127:9, 135:4, 140:23, 142:1,
143:7, 143:25, 144:2, 144:14, 146:12,
146:15, 146:19, 150:7, 153:21,
155:25, 158:9, 159:21, 160:22,
163:21, 166:9, 167:1, 167:22, 167:23,
168:1, 168:22, 169:1, 171:3, 176:11,
177:4, 180:22, 180:24, 181:5, 184:7,
185:15, 190:3, 190:6, 190:7, 190:11,
190:25, 192:3, 192:21, 200:4, 200:6

**GOVERNMENT** [1] - 3:19
**government's** [12] - 4:13, 53:6, 62:19,
144:5, 144:10, 151:14, 154:23, 161:4,
163:23, 164:1, 184:2, 187:18
**GOVERNMENT'S** [3] - 3:3, 3:21, 3:22
**Government's** [19] - 22:24, 23:7, 23:23,
24:21, 25:17, 25:25, 26:7, 36:8, 36:19,
37:21, 41:15, 59:24, 60:23, 62:1, 92:3,
96:12, 98:1, 99:15, 186:24
**grab** [4] - 34:4, 35:1, 94:6, 94:19
**grabbed** [8] - 32:18, 32:19, 95:3,
105:19, 105:22, 113:12, 119:23, 129:5
**grabbing** [1] - 34:24
**grappling** [4] - 34:1, 52:14, 120:9,
121:12
**gray** [2] - 100:21, 100:22
**great** [3] - 6:9, 108:4, 161:10
**greater** [1] - 148:16
**greatest** [1] - 18:23
**ground** [24] - 11:21, 11:24, 27:9, 34:1,
34:6, 34:15, 35:25, 36:5, 36:10, 37:1,
38:5, 43:3, 95:4, 95:9, 95:10, 96:24,
116:20, 116:21, 119:24, 120:1, 129:6,
150:20, 150:24, 175:21
**Group** [2] - 86:11, 90:4
**grunting** [1] - 33:4
**guard** [6] - 34:25, 40:16, 40:17, 40:22,
185:4
**guards** [18] - 38:13, 52:22, 53:3, 53:24,
54:5, 54:23, 55:24, 90:8, 90:10, 91:5,
91:11, 95:8, 97:10, 98:11, 114:18,
119:25, 121:15, 176:9
**guess** [23] - 5:17, 27:8, 30:15, 44:8,
44:21, 47:12, 51:19, 52:21, 57:24,
59:2, 72:19, 92:7, 94:21, 99:1, 102:13,
103:5, 107:3, 127:23, 140:24, 141:8,
147:11, 150:1, 198:14
**guide** [1] - 171:7
**guilt** [7] - 163:16, 163:25, 164:2, 166:5,
166:9, 168:5, 192:17
**guilty** [20] - 13:7, 104:21, 148:15,
148:19, 163:22, 166:7, 168:2, 168:8,
168:25, 170:10, 170:11, 171:3,
171:12, 171:24, 191:3, 192:21,
198:19, 200:7
**Gulf** [1] - 84:5
**gums** [1] - 99:4
**gun** [8] - 28:19, 28:22, 31:24, 43:1, 43:2,
60:13, 60:14
**guy** [9] - 55:8, 55:15, 139:9, 185:20,
186:16, 187:13, 188:8, 189:14
**guys** [12] - 7:7, 7:23, 24:15, 59:20, 69:4,
111:17, 113:7, 120:9, 121:12, 134:21,
137:13, 183:1

## H

**H-23-CR-42** [1] - 1:5
**half** [5] - 18:20, 64:3, 69:1, 69:3, 137:7
**halfway** [33] - 19:11, 20:7, 21:25, 22:9,

22:11, 23:4, 23:10, 32:6, 32:10, 85:5,
85:7, 86:9, 86:13, 87:23, 88:7, 90:6,
90:7, 91:22, 93:3, 98:5, 98:12, 98:15,
102:14, 102:19, 102:21, 102:22,
104:15, 138:22, 173:10, 173:14,
173:18, 173:19, 184:21
**hallway** [9] - 26:4, 41:4, 56:9, 62:7,
91:23, 92:10, 92:18, 138:23, 176:18
**hand** [11] - 11:9, 17:11, 36:21, 36:23,
92:8, 105:17, 105:18, 105:19, 105:20,
105:22, 110:3, 120:3
**handcuff** [7] - 11:7, 11:12, 12:2, 32:20,
94:7, 95:11, 120:3
**handcuffed** [2] - 33:2, 40:7
**handcuffing** [1] - 32:15
**handcuffs** [11] - 28:20, 40:3, 40:5,
90:13, 94:20, 95:25, 96:2, 96:25,
105:21
**handed** [1] - 109:21
**handful** [1] - 179:6
**handle** [1] - 142:11
**hands** [9] - 11:7, 30:24, 32:16, 94:2,
94:16, 96:3, 179:11, 179:20, 180:6
**handsome** [1] - 120:19
**hanging** [3] - 82:7, 140:3, 197:25
**HANKS** [1] - 1:11
**happy** [2] - 59:3, 59:5
**hard** [8] - 26:21, 48:25, 49:3, 96:5,
108:9, 124:19, 178:15, 182:13
**harder** [1] - 31:6
**harm** [1] - 169:20
**HAS** [1] - 2:13
**haymaker** [2] - 94:21, 94:22
**head** [19] - 36:15, 65:3, 79:3, 113:20,
114:5, 114:9, 114:13, 114:16, 115:10,
116:15, 117:20, 117:21, 129:14,
175:13, 181:20, 187:14, 187:21,
189:4, 200:22
**heads** [2] - 40:16, 156:18
**health** [1] - 179:19
**hear** [38] - 5:17, 6:11, 8:8, 9:18, 11:3,
11:14, 12:3, 12:8, 12:11, 12:15, 12:20,
14:5, 16:7, 16:21, 18:5, 31:12, 31:15,
33:1, 38:21, 50:10, 59:3, 65:23, 88:15,
117:22, 125:23, 141:5, 142:7, 147:17,
151:17, 167:2, 174:19, 185:3, 187:4,
187:5, 187:6, 187:10, 188:12, 191:9
**heard** [40] - 11:20, 13:6, 14:4, 33:3,
33:4, 102:24, 114:23, 115:25, 116:23,
117:13, 133:16, 144:23, 167:10,
172:15, 172:17, 173:6, 173:7, 174:23,
175:12, 175:19, 176:14, 178:17,
178:19, 179:13, 179:18, 179:24,
180:4, 181:19, 181:21, 182:11,
182:15, 182:16, 184:19, 187:19,
188:5, 188:19, 189:4, 189:6, 192:16
**hearing** [4] - 8:9, 114:22, 121:20,
201:22
**hearings** [1] - 202:1
**hears** [1] - 150:6

**hearsay** [3] - 80:4, 88:9, 88:10
**heavier** [1] - 27:25
**heavy** [1] - 163:24
**hectic** [1] - 18:11
**height** [1] - 93:18
**held** [1] - 148:8
**help** [15] - 13:22, 33:20, 35:1, 39:3, 46:20, 56:11, 71:23, 74:5, 75:1, 131:20, 133:23, 167:8, 171:7, 181:1, 181:6
**helped** [2] - 38:15, 105:14
**helpful** [2] - 107:22, 164:16
**helps** [3] - 20:9, 47:5, 134:3
**Heriberto** [1] - 103:6
**hesitancy** [1] - 117:8
**hesitate** [1] - 170:20
**hesitation** [1] - 164:7
**high** [2] - 18:10, 61:23
**himself** [4] - 29:12, 95:10, 120:1, 186:10
**hip** [1] - 34:2
**hit** [33] - 15:1, 51:11, 94:8, 94:22, 96:4, 99:5, 114:13, 114:16, 115:10, 115:11, 116:15, 117:1, 117:14, 117:20, 117:21, 119:12, 128:4, 128:8, 128:10, 128:19, 130:11, 130:21, 130:22, 182:10, 182:12, 186:10, 187:14, 187:21, 188:8, 189:4, 189:12, 189:13
**hitting** [1] - 129:14
**hold** [2] - 137:17, 156:22
**holding** [1] - 52:13
**holds** [2] - 16:16, 152:11
**hole** [4] - 115:14, 117:6, 119:13, 179:10
**holes** [1] - 150:23
**home** [4] - 160:11, 173:12, 200:22, 201:14
**homicide** [1] - 84:12
**honest** [5] - 138:14, 166:23, 170:22, 174:15, 186:11
**honestly** [3] - 152:25, 183:17, 186:11
**honor** [1] - 194:15
**Honor** [111] - 6:2, 6:8, 6:16, 6:19, 7:5, 7:17, 8:15, 8:20, 15:2, 15:4, 15:9, 15:12, 16:1, 17:7, 21:15, 42:13, 42:17, 43:25, 46:23, 47:7, 47:20, 63:19, 66:14, 72:9, 74:10, 76:7, 79:20, 79:23, 80:1, 81:10, 82:2, 82:19, 82:21, 82:23, 87:4, 88:11, 88:21, 101:15, 101:17, 131:2, 131:9, 132:6, 135:1, 135:21, 137:16, 139:18, 140:20, 141:13, 142:16, 143:18, 143:25, 144:13, 144:20, 145:6, 145:10, 145:24, 146:18, 146:24, 147:18, 148:2, 148:3, 148:6, 148:22, 149:8, 149:15, 149:18, 149:19, 149:22, 152:9, 152:13, 152:18, 153:1, 153:5, 154:11, 154:21, 155:6, 156:7, 156:14, 156:24, 158:9, 158:12, 158:14, 158:16, 158:18, 158:21, 158:23, 159:2, 159:4, 159:15, 159:18, 159:19, 159:22, 160:6, 160:15, 160:22, 161:3, 172:3, 173:3, 179:23, 180:18, 193:11, 193:16, 195:6, 196:3, 196:23, 198:23, 200:6, 201:18, 201:23, 202:9
**Honor's** [1] - 145:15
**HONORABLE** [1] - 1:11
**hope** [2] - 24:10, 133:25
**hopefully** [2] - 54:1, 194:18
**hoping** [1] - 182:24
**horizontally** [1] - 31:20
**hospital** [11] - 12:14, 39:2, 39:7, 39:8, 41:1, 41:2, 41:22, 64:16, 98:14, 99:22, 99:24
**Hospital** [1] - 179:14
**hour** [2] - 137:7, 137:18
**hours** [4] - 19:9, 57:19, 73:13, 81:18
**house** [33] - 18:4, 19:11, 20:7, 21:25, 22:9, 22:11, 23:4, 23:10, 32:6, 32:10, 85:5, 85:7, 86:9, 87:23, 88:7, 90:6, 91:22, 93:3, 98:6, 98:12, 98:15, 102:14, 102:19, 102:21, 102:22, 104:15, 138:22, 173:10, 173:14, 173:18, 173:19, 184:22, 188:22
**houses** [2] - 86:13, 90:7
**housing** [1] - 43:7
**HOUSTON** [1] - 1:3
**Houston** [15] - 1:6, 1:19, 2:7, 2:21, 18:21, 18:22, 18:23, 18:25, 19:13, 20:1, 20:2, 20:23, 20:25, 84:10
**hundred** [4] - 19:13, 29:9, 34:8, 42:25
**hung** [1] - 53:4
**hurt** [5] - 125:11, 126:3, 127:5, 127:7, 186:17

## I

**idea** [3] - 57:9, 121:11, 150:13
**identified** [7] - 21:16, 29:1, 29:3, 29:12, 93:1, 93:8, 101:13
**identify** [2] - 21:9, 28:24
**ignore** [1] - 29:24
**ignored** [3] - 29:15, 29:19, 32:16
**ignoring** [2] - 29:5, 30:10
**image** [1] - 179:6
**images** [1] - 69:9
**imagine** [1] - 59:2
**immediate** [1] - 169:19
**immediately** [5] - 35:24, 98:5, 111:16, 122:9, 169:19
**impact** [2] - 13:2, 35:16
**impartial** [5] - 164:4, 170:19, 189:25, 190:1
**impeachment** [1] - 47:10
**impede** [6] - 141:10, 147:5, 150:3, 151:18, 151:25, 168:19
**impeded** [10] - 150:7, 169:4, 169:7, 177:6, 177:8, 177:25, 183:12, 192:15, 196:14, 197:6
**impeding** [5] - 146:21, 180:11, 183:6, 186:16
**implore** [1] - 16:25

**important** [9] - 12:19, 58:10, 164:8, 166:16, 166:19, 192:3, 192:4
**imposes** [1] - 167:17
**impossibility** [1] - 119:14
**impress** [2] - 166:22, 174:15
**imprisoned** [1] - 154:8
**improper** [6] - 47:9, 47:23, 150:12, 172:19, 172:21, 172:25
**IN** [1] - 2:14
**inappropriate** [2] - 15:11, 140:23
**Incident** [5] - 75:4, 75:5, 75:7
**incident** [21] - 31:9, 38:3, 42:2, 42:5, 45:16, 57:10, 61:12, 64:2, 73:22, 74:3, 74:6, 75:10, 75:22, 75:24, 84:14, 84:17, 105:25, 121:22, 182:2, 191:24
**INCIV-23-2668** [1] - 75:7
**include** [8] - 103:3, 140:10, 141:17, 143:11, 149:9, 155:17, 159:10, 174:15
**included** [29] - 5:3, 5:5, 5:10, 6:11, 140:9, 141:6, 141:9, 141:21, 141:23, 142:8, 146:13, 146:16, 146:22, 147:9, 147:11, 148:9, 149:9, 149:21, 149:22, 150:11, 151:11, 152:8, 155:16, 155:22, 157:11, 159:7, 159:10
**includes** [1] - 169:18
**including** [3] - 164:12, 168:22, 173:20
**incorporate** [3] - 76:25, 77:1, 77:6
**increased** [1] - 35:10
**indeed** [6] - 103:15, 119:12, 129:15, 132:23, 144:16, 163:16
**INDEX** [3] - 3:1, 3:8, 3:18
**indicate** [8] - 15:6, 15:24, 119:18, 120:8, 120:10, 125:22, 182:10, 200:3
**indicated** [21] - 50:17, 58:14, 64:10, 65:18, 69:10, 69:21, 70:20, 103:14, 105:23, 107:14, 115:9, 117:14, 117:20, 117:21, 121:18, 127:20, 128:3, 130:11, 137:22, 138:9, 197:17
**indicates** [1] - 118:18
**indicating** [12] - 53:20, 54:6, 56:6, 57:1, 67:5, 67:20, 106:6, 110:10, 112:20, 165:25, 187:1, 198:17
**indicating)** [3] - 56:16, 56:22, 113:18
**indicative** [1] - 100:21
**indicted** [1] - 153:15
**indictment** [10] - 141:13, 147:2, 147:7, 163:15, 167:20, 167:25, 168:4, 170:13, 171:11, 171:20
**individual** [5] - 85:4, 90:8, 90:18, 162:3, 176:19
**individually** [1] - 199:2
**individuals** [1] - 91:14
**indulge** [1] - 156:17
**infected** [1] - 64:18
**infer** [3] - 89:12, 150:17, 185:1
**inference** [3] - 50:18, 163:19, 175:23
**inferences** [2] - 164:18, 165:15
**inflict** [2] - 169:16, 180:4
**inflicted** [5] - 4:16, 5:2, 169:14, 177:12, 186:15

**inflicts** [1] - 154:7
**inform** [1] - 114:20
**information** [5] - 14:12, 65:4, 185:10, 185:16, 190:23
**informed** [5] - 10:25, 90:9, 91:1, 98:13, 114:16
**inherent** [1] - 173:25
**initial** [4] - 35:5, 53:4, 85:12, 85:16
**initiated** [1] - 32:14
**inject** [2] - 99:3, 99:4
**injected** [1] - 99:1
**injured** [9] - 13:1, 14:8, 96:1, 105:25, 106:2, 126:2, 127:4, 127:21, 169:20
**injuries** [13] - 12:15, 13:1, 13:18, 37:3, 37:7, 37:17, 96:7, 100:18, 100:24, 141:23, 179:7, 187:6, 187:10
**injury** [38] - 4:16, 9:5, 11:17, 38:25, 65:22, 74:22, 97:8, 115:13, 116:22, 141:15, 147:16, 151:5, 151:7, 151:8, 151:14, 152:3, 153:6, 154:7, 154:10, 154:14, 154:15, 154:16, 169:14, 169:16, 169:22, 169:23, 177:12, 179:3, 179:4, 180:4, 180:6, 180:12, 182:11, 182:12, 186:16, 186:18, 192:19
**inmate** [24] - 10:2, 10:9, 21:19, 21:23, 24:6, 24:9, 25:21, 32:20, 36:5, 40:3, 43:1, 43:17, 53:23, 55:9, 57:1, 58:24, 60:13, 62:16, 67:22, 86:22, 173:16, 173:17, 176:20, 184:20
**inmates** [14] - 10:10, 16:17, 25:4, 32:9, 42:7, 43:8, 43:18, 43:21, 60:18, 84:20, 86:16, 139:2, 139:4, 139:5
**innocence** [1] - 163:18
**innocent** [2] - 104:21, 163:17
**inside** [6] - 26:11, 99:8, 175:17, 176:12, 176:24, 178:20
**instances** [2] - 135:18, 188:16
**instead** [1] - 195:23
**instruct** [4] - 66:19, 112:1, 140:22, 178:7
**instructed** [11] - 16:2, 106:7, 165:4, 168:7, 169:25, 177:3, 177:16, 177:17, 178:14, 184:13, 191:18
**instructing** [1] - 111:9
**instruction** [10] - 5:13, 147:10, 148:10, 153:12, 155:18, 155:22, 155:24, 157:11, 163:5, 175:6
**Instructions** [1] - 147:21
**instructions** [25] - 4:14, 16:4, 140:10, 140:19, 142:25, 145:16, 145:17, 145:21, 145:22, 147:22, 152:16, 152:24, 161:19, 162:19, 162:20, 165:11, 168:13, 174:13, 175:7, 184:15, 192:11, 196:20, 196:25, 200:15, 200:18
**integrates** [1] - 20:11
**integrity** [3] - 182:22, 182:23, 182:25
**intend** [1] - 157:6
**intends** [1] - 15:8

**intentional** [2] - 169:16, 169:18
**intentionally** [5] - 168:14, 169:12, 170:8, 177:11, 184:19
**interacted** [1] - 107:12
**interacting** [1] - 91:13
**interaction** [1] - 139:12
**interest** [3] - 72:19, 166:24, 174:17
**interested** [4] - 61:19, 61:20, 61:22, 66:3
**interesting** [4] - 14:23, 183:23, 183:25, 186:24
**interests** [1] - 14:2
**interfere** [2] - 150:4, 168:19
**interfered** [9] - 150:8, 169:4, 169:8, 177:6, 177:9, 178:1, 183:13, 196:15, 197:7
**interfering** [1] - 180:11
**internally** [1] - 179:16
**interpretation** [2] - 153:25, 164:20
**interview** [11] - 28:14, 46:10, 46:16, 46:17, 49:11, 49:24, 65:2, 65:25, 124:2, 137:25, 138:3
**interviewed** [11] - 16:20, 105:24, 106:2, 114:18, 123:8, 123:13, 124:13, 125:2, 126:20, 137:23, 182:9
**interviewing** [1] - 58:8
**interviews** [3] - 14:10, 14:24, 124:14
**intimidate** [4] - 147:5, 150:3, 151:19, 168:19
**intimidated** [9] - 150:8, 169:4, 169:7, 177:6, 177:8, 177:25, 183:13, 196:15, 197:6
**intimidating** [1] - 180:11
**introduce** [3] - 17:20, 80:24, 80:25
**introduced** [5] - 13:15, 66:21, 92:2, 96:11, 99:15
**investigate** [2] - 72:18, 79:11
**investigated** [2] - 72:15, 134:22
**investigates** [1] - 76:4
**investigating** [2] - 72:13, 134:19
**investigation** [3] - 58:9, 135:14, 188:4
**investigative** [1] - 73:1
**investigator** [1] - 76:2
**investigators** [2] - 19:19, 84:6
**involve** [4] - 147:24, 151:23, 152:17, 152:23
**involved** [8] - 21:5, 35:5, 52:19, 54:14, 72:22, 84:16, 89:19, 104:11
**involving** [1] - 152:19
**irrelevant** [3] - 58:19, 58:21, 89:7
**issue** [21] - 4:9, 5:8, 5:23, 6:10, 40:8, 77:17, 77:19, 80:1, 81:6, 88:25, 133:6, 146:14, 148:24, 149:20, 150:18, 152:19, 152:21, 152:25, 153:20, 177:20, 192:12
**issued** [1] - 104:19
**issues** [3] - 146:4, 165:11, 180:1
**itself** [4] - 75:25, 80:25, 140:16, 152:4

**J**

**Jacinto** [2] - 19:24, 20:1
**jacket** [2] - 36:23, 36:24
**jagged** [1] - 116:16
**jail** [5] - 32:8, 40:5, 43:22, 57:22
**jails** [2] - 19:8, 43:23
**January** [4] - 124:3, 124:11, 124:18, 137:24
**jerk** [2] - 181:20, 189:10
**Jessica** [1] - 2:11
**job** [22] - 13:21, 16:23, 20:10, 21:19, 44:25, 68:10, 83:18, 125:11, 125:17, 134:21, 166:8, 166:16, 167:9, 173:25, 174:22, 180:24, 181:1, 181:2, 188:17, 192:8, 201:10
**jobs** [1] - 137:12
**Joe** [22] - 30:18, 33:12, 35:19, 36:14, 37:24, 39:1, 41:1, 41:3, 41:9, 54:10, 54:22, 64:12, 65:6, 65:18, 65:22, 69:13, 71:2, 72:4, 76:16, 83:16, 83:19, 124:15
**Joe's** [3] - 36:16, 37:16, 37:18
**Jose** [1] - 169:25
**JOSEPH** [2] - 3:14, 83:6
**Joseph** [2] - 82:24, 83:14
**JR** [1] - 1:11
**Judge** [5] - 88:15, 137:5, 139:22, 142:24, 143:14
**judge** [26] - 7:24, 16:10, 38:21, 43:9, 44:12, 86:25, 101:23, 134:16, 144:11, 145:12, 152:15, 154:14, 159:9, 160:1, 162:21, 172:18, 174:12, 175:5, 177:3, 177:16, 184:13, 186:22, 188:18, 190:15, 191:18
**judge's** [1] - 184:14
**judges** [7] - 162:13, 162:25, 166:14, 171:1, 171:2, 188:19
**judgment** [1] - 105:13
**judgments** [1] - 166:17
**July** [2] - 124:10, 124:11
**jumped** [2] - 33:20, 34:1
**juror** [17] - 4:6, 6:18, 6:21, 7:9, 144:15, 194:6, 199:3, 199:5, 199:7, 199:9, 199:11, 199:13, 199:15, 199:17, 199:19, 199:21, 199:23
**JUROR** [12] - 199:4, 199:6, 199:8, 199:10, 199:12, 199:14, 199:16, 199:18, 199:20, 199:22, 199:24, 200:1
**Juror** [1] - 199:25
**jurors** [15] - 7:13, 94:9, 141:16, 160:3, 162:25, 163:13, 170:19, 170:24, 193:25, 194:1, 194:3, 194:6, 200:9, 200:20, 201:12
**Jury** [1] - 147:21
**jury** [148] - 4:3, 4:8, 4:13, 4:20, 5:2, 6:1, 6:24, 7:12, 7:25, 8:21, 8:22, 9:17, 13:3, 15:19, 16:2, 17:21, 18:18, 20:4, 22:24, 23:1, 23:7, 24:20, 25:16, 25:25, 26:3, 26:8, 26:24, 27:5, 28:4, 30:7,

31:2, 36:7, 36:18, 41:14, 63:22, 66:19, 81:22, 81:24, 82:14, 82:15, 109:9, 109:14, 110:18, 110:21, 112:15, 122:20, 126:24, 132:8, 132:10, 133:6, 133:16, 135:8, 140:5, 140:6, 140:8, 140:19, 142:19, 142:22, 142:25, 143:19, 143:20, 145:2, 146:4, 146:9, 146:10, 147:10, 147:22, 148:14, 148:16, 148:19, 149:1, 149:5, 149:6, 149:13, 149:16, 150:6, 150:17, 151:6, 152:5, 152:15, 152:23, 153:3, 153:5, 153:11, 154:12, 154:15, 155:10, 155:20, 155:24, 155:25, 157:2, 157:5, 157:6, 157:24, 159:10, 160:25, 161:7, 161:13, 161:14, 161:19, 161:21, 162:2, 162:3, 162:12, 162:14, 171:5, 171:11, 171:19, 171:23, 172:24, 173:4, 174:5, 175:7, 180:22, 191:2, 193:2, 193:3, 193:9, 193:10, 194:12, 194:19, 194:24, 195:2, 195:13, 196:5, 196:6, 196:10, 196:11, 196:12, 196:25, 198:2, 198:4, 198:5, 198:6, 198:8, 198:10, 198:17, 198:18, 198:22, 199:1, 200:14, 200:16, 201:7, 201:8
**JURY** [3] - 1:11, 3:20, 3:23
**jury's** [1] - 200:2
**JUSTICE** [1] - 2:13
**justified** [1] - 165:16
**justify** [1] - 192:17

## K

**keep** [12] - 82:5, 110:17, 119:25, 136:25, 147:8, 160:13, 161:10, 161:11, 191:19, 191:23, 192:7, 200:23
**kept** [2] - 35:9, 136:23
**key** [1] - 78:4
**kicked** [1] - 40:11
**kicking** [4] - 12:9, 40:12, 178:25, 189:15
**killers** [1] - 99:1
**kind** [29] - 13:24, 14:21, 14:22, 27:8, 29:5, 30:13, 30:16, 33:13, 34:1, 34:10, 35:3, 35:9, 55:24, 59:14, 59:20, 60:3, 71:3, 90:3, 93:12, 95:5, 110:8, 113:6, 118:3, 121:11, 122:16, 122:19, 127:1, 184:20, 186:8
**Kirrison** [3] - 14:16, 14:18, 114:12
**knee** [1] - 36:1
**kneeled** [1] - 36:15
**kneeling** [1] - 35:3
**knowingly** [1] - 168:12
**knowledge** [2] - 165:23, 175:1
**known** [4] - 86:12, 128:21, 129:20, 173:10
**knows** [4] - 20:21, 134:15, 135:10, 136:17

## L

**lacerated** [1] - 97:11
**laceration** [5] - 98:6, 115:6, 125:24, 126:10, 126:21
**lacking** [1] - 16:23
**ladder** [2] - 116:7, 118:24
**ladies** [24] - 8:21, 9:17, 12:18, 13:3, 13:13, 16:4, 81:16, 83:2, 89:9, 108:3, 136:23, 137:2, 137:11, 140:1, 144:2, 144:23, 146:1, 161:16, 172:6, 174:22, 179:10, 193:1, 198:25, 200:9
**lagging** [1] - 54:23
**land** [1] - 113:16
**landed** [3] - 95:4, 95:5, 113:14
**language** [6] - 4:17, 5:3, 5:4, 141:14, 146:20, 195:19
**laptop** [1] - 18:13
**Lasaunda** [1] - 1:23
**last** [12] - 6:7, 6:17, 18:11, 67:7, 67:9, 68:3, 137:15, 187:8, 189:25, 190:13, 195:7, 200:11
**lasting** [2] - 179:19
**late** [4] - 29:23, 57:19, 162:8, 201:14
**law** [21] - 6:4, 44:25, 83:24, 84:7, 102:7, 143:15, 147:19, 151:22, 154:1, 162:17, 162:22, 163:3, 163:8, 163:17, 165:12, 166:2, 166:4, 167:17, 186:21
**lawful** [4] - 150:8, 184:11, 184:12
**lawyer** [1] - 16:3
**lawyers** [8] - 81:20, 137:12, 146:6, 164:14, 164:15, 164:21, 200:19, 200:23
**lay** [1] - 42:15
**laying** [4] - 40:10, 41:5, 41:23, 43:14
**lead** [2] - 110:25, 165:18
**leading** [7] - 46:2, 51:10, 75:13, 75:14, 87:1, 87:2, 92:10
**leaning** [2] - 27:7, 182:23
**learn** [5] - 9:19, 9:25, 10:13, 10:16, 11:18
**least** [16] - 54:24, 55:10, 60:21, 60:22, 67:14, 68:21, 71:13, 81:18, 97:23, 125:4, 125:6, 138:9, 138:18, 181:8, 181:12, 182:17
**leave** [17] - 9:15, 10:16, 10:18, 12:9, 22:1, 24:25, 40:6, 55:15, 57:15, 57:18, 57:19, 57:20, 87:20, 103:15, 173:12, 190:13, 194:7
**leaving** [3] - 61:18, 98:17
**led** [1] - 175:15
**left** [39] - 16:23, 22:19, 22:20, 23:15, 29:22, 33:3, 35:2, 35:20, 40:24, 40:25, 43:4, 52:2, 53:15, 57:24, 57:25, 58:1, 60:17, 64:2, 85:17, 85:21, 94:6, 94:19, 95:5, 95:6, 95:11, 105:17, 105:19, 105:22, 106:9, 109:21, 110:1, 110:13, 112:14, 112:23, 112:24, 114:1, 120:15, 186:20, 189:14
**left-handed** [1] - 109:21

**lefty** [2] - 109:20, 109:25
**legal** [1] - 45:7
**legally** [1] - 165:7
**legs** [3] - 8:13, 34:21, 35:4
**Leidel** [25] - 9:8, 9:10, 9:13, 9:15, 9:24, 10:4, 10:14, 10:20, 20:4, 20:5, 20:6, 20:15, 21:20, 22:14, 42:19, 42:21, 43:12, 43:20, 87:17, 88:1, 89:22, 90:14, 98:17, 102:21, 173:9
**less** [3] - 20:13, 31:21, 163:14
**lesser** [22] - 5:10, 6:11, 140:9, 141:9, 141:20, 141:23, 146:13, 146:16, 147:9, 147:11, 148:9, 148:15, 149:9, 149:21, 150:11, 151:11, 152:8, 155:16, 155:22, 157:11, 159:7, 159:10
**lesser-included** [6] - 6:11, 140:9, 141:9, 146:13, 146:16, 147:9, 147:11, 148:9, 149:9, 150:11, 152:8, 155:16, 155:22, 157:11, 159:7, 159:10
**letters** [1] - 190:19
**level** [1] - 26:15
**levels** [1] - 43:23
**life** [1] - 188:21
**life-changing** [1] - 188:21
**light** [6] - 22:25, 60:4, 60:5, 62:23, 107:23, 165:16
**lighting** [1] - 101:19
**lightning** [1] - 38:8
**lights** [9] - 44:8, 53:10, 57:4, 57:6, 60:1, 62:5, 62:18, 116:5, 179:8
**likely** [1] - 12:19
**liken** [1] - 175:16
**likewise** [2] - 71:18, 201:22
**limit** [2] - 131:12, 131:13
**limitations** [1] - 49:22
**limited** [1] - 190:23
**limp** [1] - 35:19
**line** [6] - 84:17, 87:1, 87:5, 134:24, 182:25, 184:10
**line-of-duty** [1] - 84:17
**lines** [1] - 182:4
**link** [1] - 188:7
**lip** [40] - 11:15, 36:2, 38:7, 94:22, 97:3, 97:11, 97:12, 97:19, 98:6, 98:9, 99:3, 99:4, 99:8, 115:6, 115:14, 116:15, 116:17, 117:9, 119:13, 121:23, 122:7, 125:21, 125:25, 126:4, 126:6, 126:9, 126:12, 126:13, 126:16, 127:10, 128:9, 128:11, 129:8, 129:12, 129:19, 175:2, 179:10, 179:11
**list** [5] - 161:5, 195:5, 195:6, 195:12, 195:16
**listener** [1] - 88:22
**listeners** [1] - 126:25
**literally** [1] - 112:21
**litigated** [1] - 104:22
**live** [1] - 25:5
**lived** [1] - 50:2
**lives** [1] - 201:4
**living** [8] - 17:23, 24:19, 42:6, 42:7,

42:10, 43:17, 43:19, 43:20
**lobby** [1] - 90:16
**local** [2] - 84:7, 84:9
**located** [2] - 92:8, 92:22
**location** [2] - 95:16, 113:17
**lockers** [5] - 26:19, 26:20, 108:13, 108:15, 109:2
**look** [40] - 26:3, 26:5, 30:16, 47:3, 63:2, 74:7, 74:14, 81:11, 88:6, 115:18, 116:5, 122:20, 131:16, 131:24, 132:13, 132:16, 132:19, 132:23, 133:1, 133:20, 134:10, 134:15, 135:18, 136:16, 138:6, 147:9, 154:17, 154:18, 155:13, 160:16, 172:24, 177:13, 177:14, 179:9, 186:9, 191:2, 192:10, 192:20, 194:18
**looked** [13] - 4:7, 28:2, 29:10, 30:9, 40:16, 47:12, 47:14, 70:11, 88:5, 116:9, 149:20, 155:14
**looking** [21] - 4:12, 4:19, 4:21, 4:22, 6:13, 27:8, 30:17, 30:18, 30:23, 30:24, 41:16, 53:22, 92:6, 93:14, 98:4, 99:17, 139:6, 189:15, 189:17, 189:18
**looks** [7] - 60:8, 63:3, 109:7, 116:7, 140:11, 148:1, 187:2
**loose** [6] - 97:20, 97:21, 97:22, 97:24, 100:11
**lose** [2] - 117:1, 194:6
**lost** [4] - 116:18, 116:25, 177:23
**Louis** [3] - 148:7, 152:14, 153:11
**Louisiana** [2] - 1:18, 2:6
**love** [1] - 43:4
**low** [2] - 32:21, 67:23
**lower** [1] - 69:4
**luck** [2] - 201:6, 201:25
**lunch** [8] - 83:2, 83:4, 136:24, 137:18, 140:2, 141:4, 142:7, 146:19
**lunchtime** [1] - 142:12
**lying** [2] - 128:24, 130:25

## M

**mad** [1] - 30:20
**magazines** [1] - 28:20
**magnetometer** [1] - 60:17
**maid** [2] - 20:20, 20:22
**main** [5] - 23:10, 23:12, 77:25, 78:1, 192:12
**man** [6] - 13:16, 14:8, 184:21, 185:23, 186:2, 188:10
**management** [2] - 20:6, 52:25
**manager** [3] - 154:22, 194:11, 196:4
**manner** [1] - 115:10
**March** [3] - 18:3, 149:19, 149:23
**mark** [1] - 115:16
**marked** [3] - 25:25, 36:19, 37:21
**MARSHAL** [21] - 4:4, 6:22, 6:25, 7:10, 8:1, 81:22, 81:25, 82:14, 140:5, 142:17, 142:20, 143:19, 146:9, 155:8, 155:11, 156:25, 161:13, 193:9,

194:24, 198:3, 198:5
**marshal** [27] - 10:24, 17:24, 18:16, 19:6, 19:22, 28:17, 44:20, 45:3, 83:21, 83:23, 84:1, 84:4, 84:15, 84:21, 85:6, 87:19, 93:1, 102:9, 104:11, 135:17, 170:1, 171:16, 172:25, 174:2, 185:17, 189:19, 202:5
**marshal's** [2] - 84:13, 190:6
**Marshals** [3] - 9:13, 9:18, 9:19
**marshals** [27] - 10:5, 10:15, 10:20, 10:22, 11:3, 11:6, 11:11, 12:20, 14:8, 19:17, 19:18, 28:6, 28:10, 29:1, 29:13, 45:1, 54:22, 72:12, 88:22, 102:7, 150:9, 172:15, 173:7, 178:3, 182:21, 184:13, 198:14
**materials** [1] - 123:6
**math** [1] - 18:23
**matter** [12] - 88:12, 88:20, 89:10, 103:5, 135:8, 146:12, 155:23, 155:25, 200:5, 200:8, 202:2, 202:16
**mattered** [1] - 185:14
**matters** [2] - 201:11, 202:2
**max** [1] - 154:11
**maximum** [2] - 154:24, 156:7
**MAY** [1] - 2:13
**mean** [28] - 30:16, 31:2, 34:18, 43:19, 48:11, 64:24, 77:19, 98:8, 102:22, 105:25, 108:4, 111:8, 111:13, 114:21, 118:9, 121:21, 122:1, 124:11, 124:16, 126:11, 143:1, 151:16, 151:17, 166:11, 189:7, 190:1, 197:8
**meaning** [2] - 50:8, 110:2
**MEANS** [1] - 1:24
**means** [14] - 19:7, 31:11, 78:16, 78:19, 79:11, 118:7, 118:10, 118:12, 118:15, 136:8, 168:13, 169:15, 169:22
**measure** [1] - 104:16
**measured** [1] - 188:25
**medical** [3] - 12:14, 20:11, 169:23
**medieval** [1] - 13:23
**meet** [9] - 51:23, 87:25, 90:6, 122:12, 144:14, 152:7, 178:3, 187:13, 191:1
**meeting** [1] - 49:7
**meets** [1] - 153:21
**member** [8] - 38:16, 52:24, 54:20, 55:3, 55:5, 63:7, 84:13, 168:22
**members** [3] - 99:25, 162:12, 200:14
**memories** [1] - 76:25
**memory** [5] - 75:1, 76:20, 77:11, 167:2, 174:18
**men** [2] - 11:21, 176:21
**meniscus** [1] - 94:11
**mentioned** [16] - 8:7, 14:7, 18:15, 19:16, 20:3, 23:25, 24:23, 27:10, 28:17, 37:12, 38:10, 41:25, 67:2, 102:24, 105:6, 105:16
**mere** [1] - 170:24
**message** [2] - 171:15, 171:17
**messed** [2] - 184:17, 184:18
**met** [2] - 71:2, 148:21

**metal** [15] - 106:22, 106:23, 108:15, 115:10, 115:20, 116:11, 116:16, 119:7, 128:4, 128:19, 182:13, 187:14, 187:21, 189:5
**metallic** [1] - 187:2
**middle** [4] - 56:24, 62:22, 108:22, 120:23
**might** [21] - 5:21, 13:20, 25:4, 32:18, 49:14, 50:4, 59:2, 59:3, 64:18, 73:21, 104:17, 115:1, 116:17, 116:23, 117:5, 117:14, 119:12, 125:7, 127:23, 163:6, 164:18
**mike** [1] - 18:6
**military** [1] - 44:23
**million** [1] - 18:13
**mind** [17] - 64:18, 100:24, 101:2, 115:5, 119:14, 120:19, 134:10, 135:5, 135:7, 135:8, 167:12, 167:17, 170:21, 171:18, 191:19, 191:24, 192:7
**mine** [1] - 96:19
**minute** [9] - 8:12, 20:20, 20:22, 50:5, 81:19, 156:18, 190:15, 200:22
**minutes** [23] - 7:1, 7:18, 80:19, 91:1, 93:24, 98:16, 136:25, 137:3, 145:3, 154:18, 154:20, 156:3, 156:7, 156:13, 156:15, 156:16, 156:21, 160:21, 161:23, 161:25, 179:22, 189:22, 201:3
**Mireles** [1] - 2:11
**mirrors** [2] - 127:24, 185:25
**miscommunication** [1] - 58:12
**misrememberings** [1] - 64:19
**misrepresent** [1] - 53:12
**misrepresents** [1] - 136:4
**miss** [2] - 22:2, 57:15
**missed** [1] - 22:19
**missing** [1] - 7:4
**misspoke** [1] - 183:16
**misstate** [2] - 126:11, 145:12
**misstated** [1] - 186:22
**mistake** [7] - 59:2, 119:6, 119:10, 168:14, 173:16, 183:2, 190:9
**mistakes** [2] - 58:14, 58:16
**misunderstood** [1] - 186:23
**moment** [6] - 41:25, 43:25, 96:9, 97:8, 101:15, 143:9
**months** [3] - 18:8, 18:11, 45:5, 45:6, 67:21
**morning** [18] - 4:5, 7:5, 8:3, 8:4, 8:7, 8:13, 8:21, 13:13, 17:20, 30:19, 81:17, 83:11, 83:12, 88:3, 140:2, 154:22, 155:2, 172:9
**mortgage** [1] - 189:1
**most** [6] - 38:6, 84:9, 164:8, 164:16, 182:20
**motion** [13] - 80:20, 80:21, 80:23, 80:24, 94:12, 144:6, 144:11, 144:18, 157:19, 159:12, 195:16, 198:20, 200:4
**MOTION** [1] - 3:20
**motive** [1] - 89:14
**mouth** [15] - 11:13, 11:16, 38:9, 41:17,

50:13, 65:19, 65:22, 94:8, 96:4, 97:12, 97:14, 100:14, 115:12, 126:7, 178:15
**move** [12] - 11:2, 18:6, 22:7, 75:18, 80:13, 82:3, 88:13, 104:15, 104:24, 119:16, 186:4, 189:10
**moved** [4] - 26:14, 41:4, 94:6, 108:21
**movement** [1] - 33:16
**moves** [2] - 144:11, 200:6
**movies** [1] - 13:24
**moving** [8] - 19:8, 34:3, 80:13, 80:25, 89:14, 137:21, 143:23
**MR** [193] - 3:3, 3:12, 3:13, 3:15, 3:22, 4:11, 4:21, 4:24, 5:3, 5:9, 5:12, 5:15, 5:18, 5:21, 5:23, 6:15, 7:21, 13:13, 15:3, 15:9, 15:11, 15:15, 15:17, 16:1, 16:10, 31:12, 31:15, 38:21, 42:12, 43:9, 43:11, 44:4, 44:7, 44:10, 44:12, 44:14, 46:23, 47:1, 47:14, 47:24, 48:3, 48:4, 48:13, 53:6, 53:9, 53:11, 53:17, 53:19, 54:3, 54:4, 55:18, 55:20, 57:4, 57:7, 57:8, 59:25, 60:2, 60:23, 60:24, 62:1, 62:2, 62:4, 62:6, 62:24, 63:1, 64:1, 66:16, 67:1, 70:13, 70:14, 72:7, 75:13, 75:18, 76:9, 76:11, 79:20, 79:22, 80:4, 80:8, 80:23, 81:2, 81:4, 81:13, 82:5, 82:9, 82:21, 86:25, 88:9, 88:13, 88:25, 101:20, 101:23, 102:2, 107:23, 108:5, 109:9, 109:10, 116:4, 116:8, 120:13, 120:14, 131:4, 131:7, 131:10, 131:19, 131:23, 132:4, 132:12, 133:10, 133:14, 133:18, 133:19, 134:9, 134:13, 134:16, 135:1, 135:4, 135:12, 135:16, 135:21, 135:24, 136:6, 136:8, 136:12, 136:21, 136:25, 137:5, 137:8, 137:10, 137:15, 137:20, 139:16, 139:21, 140:13, 140:16, 140:18, 141:1, 141:3, 141:20, 142:1, 142:5, 142:13, 143:5, 144:5, 144:10, 144:22, 147:1, 147:4, 147:13, 150:1, 150:22, 151:2, 152:25, 153:20, 153:25, 154:12, 156:10, 156:17, 156:20, 157:13, 157:16, 157:20, 157:23, 158:1, 158:5, 158:14, 158:16, 158:23, 159:1, 159:9, 159:19, 159:22, 160:1, 160:12, 160:17, 172:18, 172:21, 172:24, 180:18, 180:20, 189:23, 193:11, 195:19, 195:21, 195:24, 196:3, 196:22, 197:1, 197:11, 197:15, 197:18, 197:22, 198:22
**MS** [182] - 3:3, 3:11, 3:12, 3:15, 3:21, 3:22, 5:6, 6:2, 6:8, 6:16, 6:19, 7:5, 7:17, 7:24, 8:15, 8:17, 8:20, 15:2, 15:6, 15:14, 15:23, 17:7, 17:15, 17:19, 18:14, 19:15, 21:15, 21:18, 22:23, 23:2, 23:6, 23:8, 23:22, 23:24, 24:20, 24:22, 25:16, 25:18, 25:24, 26:1, 26:7, 26:9, 31:13, 31:16, 32:1, 36:7, 36:9, 36:18, 36:20, 37:20, 37:22, 38:23, 41:14, 41:19, 42:17, 42:18, 43:15, 43:25, 47:7, 47:20, 63:19, 66:14, 72:9,

72:11, 74:10, 74:12, 75:9, 75:15, 75:21, 76:6, 79:23, 80:1, 80:6, 80:11, 80:14, 80:22, 81:1, 81:3, 81:5, 81:10, 81:14, 82:1, 82:8, 82:11, 82:18, 82:24, 83:10, 87:4, 87:6, 88:11, 88:21, 89:15, 98:1, 98:3, 99:14, 99:16, 100:3, 100:4, 101:12, 101:15, 101:17, 131:2, 131:9, 131:18, 131:21, 132:2, 132:6, 133:5, 133:8, 133:12, 134:6, 134:12, 134:14, 136:4, 136:7, 136:11, 136:17, 139:18, 140:19, 140:22, 141:12, 142:16, 142:24, 143:3, 143:14, 143:18, 143:25, 144:20, 145:6, 145:10, 145:15, 145:19, 145:24, 146:18, 146:24, 147:6, 147:18, 149:15, 151:20, 152:13, 153:5, 153:24, 154:2, 154:14, 154:21, 155:2, 155:6, 156:7, 156:14, 156:24, 158:9, 158:12, 158:18, 158:21, 159:4, 159:15, 159:18, 159:21, 160:6, 160:11, 160:15, 160:22, 161:3, 161:8, 172:3, 172:5, 173:2, 173:6, 179:23, 191:7, 191:10, 193:16, 195:6, 195:15, 195:20, 195:23, 196:23, 197:17, 200:6, 201:17, 201:21, 202:9
**multiple** [3] - 95:23, 188:23
**mumbled** [1] - 29:25
**muscle** [2] - 99:9, 179:16
**must** [21] - 56:6, 86:22, 128:24, 130:5, 130:7, 162:17, 163:6, 163:23, 164:10, 164:23, 165:6, 166:10, 166:11, 169:1, 170:11, 170:12, 170:18, 177:21, 185:4, 186:17

# N

**name** [11] - 8:23, 14:16, 17:22, 48:8, 83:13, 83:14, 103:9, 119:18, 138:12, 138:16, 138:21
**names** [3] - 48:12, 83:15, 138:14
**napkin** [1] - 38:11
**napkins** [2] - 36:4, 38:16
**narrow** [1] - 119:22
**Natalie** [1] - 2:4
**natalie_awad@fd.org** [1] - 2:9
**natural** [1] - 68:11
**nature** [1] - 194:5
**navy** [1] - 21:11
**near** [6] - 20:19, 26:20, 35:25, 36:15, 43:3, 167:25
**nearby** [1] - 34:25
**nearing** [1] - 156:20
**necessarily** [4] - 61:24, 73:24, 77:1, 77:15
**necessary** [2] - 163:24, 170:3
**neck** [2] - 11:20, 28:21
**need** [35] - 5:17, 6:13, 7:16, 27:15, 28:13, 29:17, 44:5, 49:9, 53:6, 53:9, 60:1, 81:19, 101:21, 116:4, 140:9, 140:24, 141:8, 141:10, 142:11,

143:12, 145:2, 146:3, 156:5, 161:19, 162:6, 171:14, 178:8, 179:8, 194:22, 195:24, 199:1, 200:4
**needed** [6] - 73:23, 98:14, 98:23, 100:8, 125:25, 173:14
**needing** [1] - 101:18
**needle** [1] - 99:3
**needs** [2] - 77:23, 193:4
**neutral** [2] - 132:13, 132:23
**neutrality** [1] - 134:11
**never** [8] - 57:18, 63:18, 116:18, 116:25, 167:17, 170:14, 171:18, 181:21
**New** [1] - 87:20
**new** [3] - 14:12, 124:6, 128:7
**newlywed** [1] - 188:22
**next** [13] - 27:1, 28:22, 30:22, 32:13, 34:23, 35:14, 41:6, 60:9, 113:23, 118:24, 143:24, 193:14, 194:18
**nexus** [1] - 65:21
**nice** [2] - 160:8, 185:12
**night** [4] - 6:7, 23:14, 73:13, 202:7
**Ninth** [2] - 147:19, 149:10
**ninth** [5] - 148:3, 148:22, 152:12, 152:18, 152:21
**nit** [1] - 110:12
**nit-picky** [1] - 110:12
**nobody** [4] - 71:18, 114:16, 121:8, 137:11
**non** [2] - 29:5, 55:6
**non-compliant** [1] - 29:5
**non-existent** [1] - 55:6
**none** [8] - 16:19, 16:20, 79:14, 158:9, 159:21, 166:19, 186:20, 190:2
**normal** [2] - 28:12, 68:17
**normally** [6] - 9:25, 24:5, 27:14, 69:4, 89:18, 90:14
**northeast** [1] - 20:19
**note** [4] - 145:10, 167:20, 196:12
**NOTE** [1] - 3:23
**noted** [1] - 15:23
**nothing** [6] - 71:9, 79:20, 82:18, 134:23, 163:13, 188:6
**notice** [14] - 21:23, 22:4, 22:13, 22:14, 22:15, 58:11, 58:13, 85:9, 85:25, 93:6, 96:1, 97:9, 164:18, 185:22
**notices** [3] - 22:17, 22:21, 57:12
**notification** [10] - 85:3, 85:12, 86:2, 87:7, 87:13, 102:13, 102:16, 103:2, 103:16, 104:8
**notify** [1] - 98:12
**notion** [1] - 163:7
**Number** [6] - 92:3, 98:2, 99:15, 179:5, 195:7, 195:17
**NUMBER** [1] - 3:23
**number** [19] - 62:12, 62:14, 148:13, 160:3, 171:6, 196:13, 199:3, 199:5, 199:7, 199:9, 199:11, 199:13, 199:15, 199:17, 199:19, 199:21, 199:23, 199:25
**numbers** [1] - 161:9

**numerically** [1] - 171:19
**numerous** [1] - 30:10

# O

**o'clock** [5] - 8:12, 88:2, 137:9, 140:4, 142:15
**oath** [2] - 163:12, 186:11
**object** [6] - 4:19, 16:1, 86:25, 115:10, 119:7
**objection** [47] - 15:2, 15:5, 15:9, 15:18, 15:21, 42:12, 42:14, 43:9, 43:10, 43:12, 43:13, 47:7, 47:22, 48:1, 63:19, 63:21, 66:14, 66:18, 75:13, 75:14, 75:17, 82:5, 88:9, 88:17, 88:18, 89:8, 131:6, 131:8, 131:18, 131:21, 132:3, 132:9, 133:5, 133:15, 134:6, 134:17, 136:19, 159:3, 159:23, 172:18, 172:23, 173:2, 195:18, 195:21, 196:1, 197:11
**objections** [15] - 66:24, 146:14, 157:8, 157:25, 158:6, 158:10, 158:15, 158:19, 158:24, 159:14, 159:16, 159:20, 159:24, 164:13, 164:22
**obligated** [1] - 70:4
**obligation** [1] - 200:21
**obligations** [1] - 14:6
**observation** [1] - 91:16
**observe** [6] - 27:11, 35:23, 36:25, 37:11, 39:24, 129:19
**observed** [7] - 36:13, 37:3, 37:25, 77:3, 92:25, 129:18, 134:5
**obstructed** [1] - 129:1
**obvious** [1] - 169:23
**obviously** [2] - 136:17, 194:21
**occasionally** [2] - 67:22, 67:24
**occasions** [1] - 95:23
**occur** [2] - 42:5, 128:6
**occurred** [15] - 50:17, 57:10, 64:3, 75:10, 114:25, 117:3, 118:19, 120:5, 120:21, 128:14, 128:16, 129:1, 152:6, 153:6, 191:24
**occurrences** [1] - 188:16
**OF** [13] - 1:2, 1:4, 1:10, 1:15, 2:5, 2:11, 2:14, 2:16, 3:8, 3:9, 3:20, 3:21, 162:11
**offenders** [1] - 84:5
**offense** [20] - 140:9, 146:13, 146:16, 147:9, 147:11, 148:9, 148:10, 148:11, 148:15, 148:16, 149:9, 150:11, 152:8, 155:16, 155:22, 159:7, 167:21, 168:4, 177:3, 192:6
**offered** [5] - 49:8, 88:11, 88:19, 89:10, 187:23
**office** [14] - 19:12, 19:24, 27:13, 27:15, 61:6, 67:22, 87:21, 90:17, 90:18, 90:20, 103:11, 182:22, 190:6
**OFFICE** [4] - 1:17, 1:23, 2:5, 2:11
**office's** [1] - 182:23
**Officer** [16] - 14:9, 14:11, 14:25, 47:25, 64:14, 65:6, 72:4, 110:19, 144:17,

181:20, 182:7, 185:24, 185:25, 186:25, 189:12, 189:16
**officer** [49] - 4:14, 9:4, 13:8, 14:8, 14:9, 14:16, 14:18, 28:3, 28:5, 44:23, 50:8, 52:16, 52:18, 71:11, 114:12, 119:17, 131:12, 134:4, 134:19, 150:16, 150:17, 155:20, 168:16, 168:20, 168:23, 169:5, 169:6, 170:1, 170:2, 170:5, 170:7, 170:9, 177:7, 177:14, 177:18, 178:1, 181:18, 182:1, 183:4, 183:11, 183:20, 183:25, 190:8, 192:13, 192:14, 196:15, 197:7
**officer's** [1] - 131:17
**officers** [17] - 9:20, 14:7, 14:25, 40:5, 49:19, 52:20, 52:21, 65:2, 76:19, 84:16, 113:6, 124:13, 137:23, 138:10, 138:19, 181:12, 187:25
**OFFICIAL** [1] - 2:15
**official** [16] - 9:5, 9:20, 12:23, 83:24, 168:24, 169:9, 170:2, 170:5, 177:9, 177:10, 177:15, 177:18, 183:23, 183:24, 184:4
**often** [2] - 22:5, 67:24
**old** [1] - 19:24
**olden** [1] - 13:23
**olympics** [1] - 113:2
**omit** [1] - 141:17
**on-point** [1] - 152:19
**once** [10] - 11:25, 35:23, 43:1, 51:25, 86:4, 94:25, 96:6, 98:22, 115:25, 161:21
**one** [98] - 4:6, 7:4, 7:13, 11:9, 12:24, 14:16, 14:17, 14:21, 14:25, 15:8, 19:8, 19:12, 22:17, 27:10, 36:1, 39:3, 41:16, 42:25, 43:25, 45:23, 46:13, 47:2, 48:7, 53:8, 56:22, 60:25, 62:5, 62:19, 63:5, 66:3, 67:10, 67:21, 69:1, 69:2, 69:3, 69:9, 71:13, 85:14, 87:24, 88:7, 91:13, 93:9, 94:23, 95:8, 97:21, 97:23, 97:24, 99:22, 101:15, 102:12, 108:24, 110:18, 111:2, 113:6, 121:18, 125:20, 127:20, 130:21, 130:22, 137:23, 148:10, 150:16, 153:3, 153:14, 159:1, 161:9, 162:10, 162:13, 163:5, 165:23, 167:14, 167:16, 170:16, 171:6, 172:15, 174:1, 174:6, 174:25, 178:15, 180:12, 181:11, 183:14, 183:18, 184:17, 185:19, 187:25, 188:8, 188:19, 190:12, 190:15, 192:3, 197:1, 199:1
**ONE** [1] - 2:14
**ones** [2] - 58:25, 141:11
**ongoing** [1] - 100:17
**onlooker** [1] - 114:16
**ONLY** [1] - 2:13
**oof** [1] - 175:12
**open** [4] - 25:1, 40:22, 40:23, 110:10
**opened** [3] - 40:8, 40:23, 80:11
**OPENING** [2] - 3:3, 3:3
**opening** [2] - 7:15, 8:8

**openings** [1] - 26:5
**operated** [1] - 86:10
**operating** [2] - 99:1, 99:18
**operation** [2] - 27:24, 27:25
**operative** [1] - 183:6
**opinion** [3] - 163:7, 165:10, 170:24
**opinions** [5] - 76:25, 77:1, 77:6, 77:21, 170:21
**Oppedisano** [5] - 48:11, 48:14, 49:19, 65:2, 123:18
**opportunity** [15] - 13:22, 35:2, 51:19, 58:25, 86:18, 93:13, 96:7, 143:15, 144:25, 161:22, 167:3, 172:10, 174:12, 174:20, 190:12
**oppose** [6] - 141:10, 143:15, 147:4, 150:3, 151:18, 168:19
**opposed** [12] - 146:20, 150:7, 169:4, 169:7, 177:6, 177:8, 177:25, 183:12, 192:14, 196:14, 197:6
**opposing** [2] - 146:21, 180:11
**option** [3] - 151:15, 153:10, 153:12
**options** [1] - 150:2
**oral** [1] - 195:16
**ORDER** [2] - 2:14, 2:16
**order** [5] - 58:22, 74:21, 104:22, 148:19, 178:18
**ordered** [1] - 165:3
**orders** [4] - 58:12, 58:22, 58:23, 178:6
**ordinarily** [1] - 169:24
**original** [4] - 77:4, 86:1, 127:19, 193:5
**ORIGINAL** [1] - 2:14
**originally** [1] - 26:16
**otherwise** [3] - 164:18, 168:7, 171:20
**ought** [1] - 163:8
**ourselves** [3] - 27:2, 29:1, 189:2
**outcome** [2] - 166:25, 174:17
**outside** [14] - 28:22, 40:1, 40:8, 72:21, 175:17, 175:18, 175:20, 175:22, 175:23, 176:9, 176:15, 178:21, 178:22, 178:24
**overrule** [4] - 63:21, 66:18, 132:9, 133:15
**overruled** [9] - 15:18, 15:21, 43:10, 43:13, 48:1, 88:18, 89:8, 159:25
**oversee** [1] - 84:4
**overtime** [1] - 100:21
**own** [9] - 64:19, 72:18, 155:21, 162:3, 163:7, 164:19, 165:13, 170:21, 201:4

# P

**p.m** [22] - 140:6, 142:18, 142:19, 143:20, 146:10, 155:9, 155:10, 157:1, 157:2, 160:24, 160:25, 161:14, 193:10, 193:22, 194:25, 196:9, 196:10, 198:1, 198:2, 198:6, 201:8, 202:10
**pace** [1] - 122:20
**page** [20] - 48:7, 147:23, 148:7, 148:24, 152:16, 152:24, 157:8, 157:9, 157:25,

158:3, 158:5, 158:10, 158:15, 158:19, 158:24, 159:5, 159:14, 159:16, 159:20
**Page** [1] - 3:2
**paid** [1] - 194:5
**pain** [3] - 95:16, 96:4, 99:1
**painful** [3] - 95:16, 99:5, 169:23
**paint** [1] - 127:1
**paper** [1] - 97:10
**paperwork** [5] - 22:6, 41:8, 88:5, 105:7, 105:8
**parallel** [1] - 31:20
**paraphrasing** [1] - 181:23
**parents** [2] - 125:14, 125:16
**park** [2] - 20:20, 20:22
**parsed** [1] - 153:11
**part** [22] - 5:9, 5:12, 9:20, 19:3, 19:5, 32:2, 33:25, 42:20, 45:21, 68:10, 99:6, 100:20, 102:21, 122:24, 135:17, 141:8, 151:3, 151:4, 166:16, 166:19, 170:2, 177:18
**participation** [1] - 194:9
**particular** [11] - 10:1, 10:6, 67:25, 90:5, 90:9, 105:5, 162:23, 166:23, 167:15, 174:16, 177:13
**parties** [9] - 142:22, 144:25, 157:5, 157:24, 163:13, 172:1, 193:14, 194:17, 200:13
**partner** [12] - 29:11, 30:4, 91:5, 91:7, 91:8, 91:10, 91:14, 93:12, 93:16, 95:12, 127:14, 174:9
**party** [4] - 15:20, 72:22, 131:16, 132:13
**pass** [4] - 44:2, 72:7, 101:17, 139:16
**passed** [1] - 55:5
**passenger** [1] - 40:18
**passing** [1] - 126:17
**past** [5] - 24:2, 26:19, 52:1, 62:16, 89:23
**patience** [3] - 8:5, 146:8, 200:13
**pattern** [7] - 4:22, 4:25, 140:18, 140:19, 147:10, 147:13, 152:23
**Pattern** [2] - 147:21, 147:22
**pause** [1] - 96:9
**peer** [1] - 84:15
**penalty** [4] - 153:22, 154:4, 154:5, 154:24
**people** [28] - 28:12, 32:5, 34:6, 38:13, 39:2, 53:20, 54:17, 54:24, 55:10, 55:23, 57:14, 65:25, 69:12, 71:22, 77:14, 77:18, 77:22, 83:17, 120:17, 124:17, 125:4, 125:6, 127:24, 175:20, 181:8, 181:10, 182:8, 182:20
**people's** [3] - 76:25, 77:6, 77:21
**perceive** [2] - 127:24, 131:12
**percent** [6] - 20:8, 29:9, 34:8, 42:25, 84:9, 84:11
**perception** [6] - 114:25, 131:17, 132:4, 132:7, 134:10
**perfect** [7] - 56:21, 94:22, 109:15, 123:11, 181:13, 181:14, 197:22
**perform** [2] - 100:13, 184:13
**performance** [6] - 168:23, 169:8, 169:9,

177:9, 183:24
**performing** [4] - 9:4, 12:23, 177:10, 177:15
**perhaps** [4] - 118:1, 124:23, 175:19, 181:23
**permanent** [3] - 187:6, 187:10, 187:11
**permission** [13] - 22:20, 57:15, 58:1, 58:6, 58:10, 58:18, 59:9, 61:23, 79:23, 85:22, 103:19, 185:7, 185:11
**permits** [1] - 148:14
**permitted** [2] - 164:25, 165:14
**person** [26] - 10:7, 16:11, 23:19, 29:9, 31:20, 48:16, 53:2, 60:13, 71:13, 101:4, 101:7, 103:7, 104:20, 123:14, 123:15, 131:24, 139:13, 166:19, 168:6, 168:20, 169:19, 170:4, 171:19, 181:17, 188:11
**person's** [2] - 66:3, 132:5
**personal** [4] - 40:5, 166:24, 174:17, 176:22
**personally** [4] - 19:12, 175:22, 201:3, 201:16
**personnel** [1] - 84:16
**persons** [1] - 168:6
**perspective** [2] - 77:2, 128:25
**phenomenon** [1] - 97:16
**phone** [4] - 71:14, 102:17, 123:14, 138:6
**photo** [26] - 24:25, 26:4, 55:17, 55:21, 55:23, 56:9, 60:4, 62:10, 62:11, 62:19, 69:10, 69:13, 70:19, 92:9, 99:20, 109:7, 114:6, 120:15, 120:20, 121:2, 121:7, 127:3, 127:9, 127:13, 195:8
**photograph** [4] - 25:23, 36:10, 36:21, 41:23
**photographs** [1] - 26:2
**photos** [5] - 69:12, 69:15, 69:19, 116:5, 181:11
**phrases** [1] - 118:11
**physical** [34] - 4:25, 147:15, 147:16, 147:24, 147:25, 148:17, 148:18, 148:20, 149:2, 149:5, 149:14, 150:5, 151:3, 151:4, 151:7, 151:9, 151:12, 151:13, 151:19, 151:21, 151:23, 151:25, 152:2, 152:4, 152:11, 152:17, 152:22, 152:23, 153:7, 153:15, 153:17, 179:19
**Physical** [1] - 5:1
**physically** [2] - 93:7, 93:18
**pick** [2] - 19:9, 22:11
**picked** [2] - 87:15, 191:2
**picking** [1] - 125:20
**pickups** [1] - 19:11
**picky** [1] - 110:12
**picture** [7] - 23:5, 54:8, 96:14, 96:16, 108:20, 127:1, 179:9
**pictures** [1] - 44:6
**pieces** [2] - 97:13, 97:18
**piecing** [1] - 118:4
**Pierre** [3] - 148:7, 152:14, 153:11

**Pierre-Louis** [3] - 148:7, 152:14, 153:11
**pillar** [1] - 117:25
**pin** [3] - 106:10, 106:24, 136:9
**pissed** [1] - 30:13
**pissed-off** [1] - 30:13
**place** [8] - 27:2, 61:12, 86:13, 94:2, 94:5, 95:6, 106:7, 182:2
**placement** [1] - 20:10
**places** [2] - 20:4, 43:18
**plain** [5] - 27:22, 27:23, 28:1, 28:3, 31:14
**plainly** [1] - 152:22
**plan** [3] - 91:7, 91:10, 196:19
**plastic** [3] - 98:24, 99:11, 179:15
**pleasant** [1] - 122:24
**pleasure** [3] - 201:10, 201:23, 201:24
**plenty** [1] - 192:16
**plug** [1] - 183:13
**pod** [64] - 10:16, 10:20, 24:14, 24:19, 24:23, 25:2, 25:14, 25:20, 26:10, 26:11, 26:16, 26:25, 27:6, 27:20, 28:18, 28:23, 29:8, 38:1, 38:17, 42:6, 53:2, 53:4, 54:19, 54:20, 55:6, 55:8, 56:2, 56:8, 56:9, 61:11, 61:14, 61:15, 62:8, 62:13, 62:14, 63:10, 67:11, 67:25, 68:3, 70:10, 71:14, 91:25, 92:21, 107:1, 107:3, 107:16, 107:19, 111:11, 113:21, 119:22, 127:10, 127:11, 138:10, 138:17, 138:24, 138:25, 139:4, 176:9, 176:12, 176:24, 178:5, 178:20, 181:9, 181:10
**podded** [4] - 52:23, 54:24, 57:9, 139:10
**podium** [3] - 8:18, 17:16, 112:17
**pods** [8] - 10:9, 26:2, 70:16, 92:8, 92:11, 92:13, 176:20
**point** [43] - 21:9, 27:3, 30:4, 35:19, 38:12, 40:2, 53:25, 56:5, 58:19, 77:2, 80:2, 85:19, 91:4, 96:1, 97:5, 101:7, 104:22, 105:24, 106:18, 107:13, 107:16, 107:19, 108:9, 111:19, 121:7, 130:10, 130:20, 133:20, 135:17, 148:24, 150:2, 151:22, 152:19, 153:22, 160:7, 162:9, 164:15, 167:15, 167:16, 182:23, 186:15, 189:25, 191:12
**pointed** [1] - 55:6
**pointer** [3] - 53:17, 54:1, 56:5
**pointing** [1] - 56:24
**pointy** [1] - 182:13
**pole** [24] - 16:12, 114:13, 114:17, 117:15, 117:20, 117:21, 117:24, 118:1, 118:19, 119:6, 119:7, 119:10, 128:4, 128:8, 128:10, 128:19, 129:14, 130:11, 130:21, 180:8, 182:11, 188:10, 189:5
**police** [6] - 19:19, 28:5, 28:6, 44:23, 150:8, 184:12
**policies** [1] - 74:2
**policy** [1] - 79:14
**polled** [3] - 198:22, 199:1, 200:3

**ponder** [1] - 189:2
**pondered** [1] - 189:3
**poorly** [1] - 153:1
**portion** [2] - 4:24, 10:8
**portraying** [1] - 50:11
**position** [18] - 28:9, 31:4, 32:22, 67:3, 109:24, 110:3, 110:6, 110:25, 141:18, 149:12, 154:11, 154:23, 176:10, 181:4, 181:13, 181:14, 190:8, 190:10
**positioned** [2] - 112:9, 112:13
**positioning** [2] - 109:5, 121:15
**positions** [3] - 28:8, 28:9, 182:21
**possible** [5] - 32:10, 78:17, 119:15, 163:25, 190:22
**possibly** [1] - 191:16
**post** [2] - 201:11, 202:2
**post-trial** [2] - 201:11, 202:2
**potentially** [2] - 59:4, 179:19
**pounds** [1] - 93:21
**pouring** [1] - 97:5
**powerful** [2] - 115:21, 174:1
**practice** [2] - 145:15, 201:12
**practicing** [1] - 201:23
**pre** [2] - 22:24, 23:7
**pre-admitted** [2] - 22:24, 23:7
**preference** [1] - 160:12
**prejudice** [1] - 163:11
**premature** [1] - 5:15
**preparation** [10] - 46:5, 47:4, 48:5, 48:23, 51:21, 58:8, 69:18, 122:11, 122:16, 137:22
**prepare** [2] - 51:24, 122:14
**prepared** [5] - 31:9, 52:4, 80:17, 160:23, 171:9
**preparedness** [1] - 173:24
**prepped** [1] - 186:6
**present** [26] - 4:3, 6:24, 7:12, 9:2, 81:24, 101:5, 123:16, 133:9, 142:19, 147:20, 155:10, 157:2, 160:25, 169:17, 172:11, 172:16, 176:8, 176:12, 177:15, 190:19, 196:10, 196:11, 196:12, 198:2, 198:8, 198:9
**PRESENT** [2] - 1:22, 2:10
**presented** [7] - 152:13, 152:14, 164:11, 165:22, 176:11, 190:18, 190:23
**presenting** [1] - 125:12
**preside** [1] - 162:14
**pressed** [1] - 181:21
**pressing** [1] - 34:2
**pressure** [3] - 38:18, 112:19, 112:21
**presumed** [1] - 163:17
**pretty** [13] - 26:22, 32:5, 34:18, 36:2, 38:7, 49:9, 62:15, 68:7, 74:19, 74:22, 79:17, 96:5
**prevails** [1] - 191:22
**previous** [2] - 26:4, 159:22
**previously** [15] - 23:23, 24:21, 25:17, 25:25, 36:8, 36:19, 37:21, 41:15, 92:2, 96:11, 99:14, 195:7, 195:16, 196:20,
196:25
**print** [1] - 160:2
**printed** [1] - 156:22
**prison** [5] - 9:7, 32:8, 59:4, 104:5, 173:18
**prisoner** [2] - 19:9, 22:11, 104:24, 184:20
**prisoners** [10] - 9:21, 19:1, 19:7, 19:8, 20:3, 20:7, 20:8, 90:3, 170:3, 177:19
**Prisons** [8] - 85:3, 85:7, 86:10, 86:20, 87:16, 103:12, 104:8, 104:14
**privacy** [3] - 43:21, 43:24, 176:20
**private** [1] - 86:11
**privilege** [2] - 173:19, 194:15
**problem** [11] - 4:10, 70:18, 89:3, 134:16, 134:18, 153:21, 157:16, 160:10, 162:7, 162:8, 187:16
**problematic** [1] - 181:7
**procedure** [2] - 89:14, 89:25
**procedures** [2] - 67:19, 162:24
**proceed** [6] - 8:14, 13:12, 17:14, 44:11, 83:8, 101:22, 160:23, 172:1, 172:4, 180:17, 180:19
**proceeded** [6] - 88:23, 89:4, 89:5, 89:11
**PROCEEDINGS** [3] - 1:10, 1:24, 4:1
**Proceedings** [1] - 202:10
**proceedings** [1] - 202:16
**process** [3] - 32:15, 33:2, 194:5
**processing** [1] - 106:4
**produce** [1] - 163:18
**PRODUCED** [1] - 1:25
**producing** [1] - 167:18
**program** [1] - 16:18
**promise** [2] - 137:19, 163:12
**promised** [1] - 137:13
**prong** [3] - 141:14, 149:17, 152:7
**prongs** [2] - 95:18, 95:20
**proof** [6] - 162:21, 163:24, 164:1, 164:5, 164:6, 165:24
**proper** [1] - 162:15
**proposed** [2] - 140:15, 155:16
**prosecute** [1] - 14:3
**prosecution** [8] - 8:8, 158:8, 158:11, 158:17, 158:20, 159:3, 159:17, 161:22
**protect** [1] - 31:5
**protected** [1] - 31:25
**protecting** [1] - 190:6
**protest** [1] - 104:4
**protesting** [1] - 183:7
**prove** [6] - 17:1, 163:18, 167:22, 170:3, 177:4, 182:24
**proved** [6] - 163:25, 166:9, 168:2, 169:1, 171:3, 190:14
**proven** [4] - 172:13, 180:23, 182:18, 183:17
**proves** [1] - 167:23
**provide** [4] - 84:15, 90:6, 100:16, 103:2
**provided** [2] - 85:19, 171:11
**providing** [3] - 91:14, 111:1, 121:14
**proving** [2] - 154:9, 163:21
**proximity** [3] - 107:13, 107:17, 116:20
**proximity's** [1] - 120:25
**prudent** [1] - 151:16
**Public** [1] - 2:5
**PUBLIC** [3] - 2:5, 2:11, 2:13
**publish** [11] - 22:23, 23:6, 23:22, 24:20, 25:16, 25:24, 26:7, 36:7, 36:18, 37:20, 41:14
**published** [1] - 44:6
**pull** [2] - 59:25, 97:23
**pulled** [6] - 35:4, 35:6, 35:7, 35:11, 40:21, 129:9
**pulling** [1] - 92:2
**punch** [38] - 14:12, 16:12, 33:11, 49:12, 50:16, 50:17, 50:20, 50:21, 50:23, 50:24, 51:4, 51:5, 51:8, 65:18, 65:21, 94:23, 94:24, 95:1, 100:25, 101:1, 115:6, 115:21, 130:6, 130:8, 132:24, 174:1, 175:2, 175:14, 175:16, 178:16, 179:20, 180:10, 181:17, 182:12, 186:17, 192:1, 196:16, 197:8
**punched** [23] - 11:13, 11:19, 13:17, 14:20, 50:8, 94:10, 101:4, 113:11, 115:25, 116:16, 121:16, 121:19, 122:7, 133:4, 133:11, 150:16, 150:18, 175:1, 181:13, 181:14, 181:16, 181:18, 181:22
**puncture** [6] - 115:16, 115:19, 116:24, 128:11, 129:15
**punctured** [2] - 116:17, 128:9
**puncturing** [1] - 117:9
**punishment** [2] - 168:9, 168:10
**purpose** [4] - 45:10, 73:21, 95:15, 170:25
**purposes** [4] - 57:10, 70:6, 83:2, 179:8
**purview** [2] - 103:25, 135:17
**push** [4] - 95:10, 120:1, 196:17, 197:9
**pushed** [6] - 119:19, 120:9, 121:11, 126:7, 126:12
**pushes** [1] - 113:7
**pushing** [1] - 95:9
**put** [38] - 5:18, 5:24, 11:7, 11:9, 12:12, 27:24, 32:15, 35:6, 43:24, 45:3, 70:8, 77:21, 77:22, 78:19, 78:22, 79:2, 79:15, 80:4, 80:9, 81:5, 94:16, 94:18, 95:24, 106:6, 106:11, 106:24, 109:25, 110:1, 119:12, 120:13, 121:10, 140:25, 143:11, 143:12, 178:12, 178:13, 179:5
**putting** [1] - 32:20

**Q**

**quarter** [2] - 33:6, 33:7
**quarters** [2] - 24:19, 51:2
**questioned** [1] - 127:20
**questioning** [4] - 87:1, 87:5, 132:10, 134:24
**questions** [14] - 57:3, 63:24, 66:15,

66:23, 76:6, 82:17, 122:16, 122:22,
164:13, 164:23, 164:24, 166:22,
167:4, 174:21
**quick** [4] - 8:12, 34:18, 137:15
**quickly** [8] - 29:10, 33:19, 38:16, 78:17,
111:13, 119:10, 137:21, 156:12
**quite** [1] - 97:6
**quote** [5] - 196:13, 196:16, 197:4, 197:8
**quoting** [1] - 148:25

# R

**radius** [1] - 107:17
**rail** [1] - 119:3
**rain** [1] - 175:20
**rained** [2] - 175:18, 175:23
**raining** [2] - 175:17, 175:22
**raise** [1] - 17:11
**ran** [1] - 86:10
**random** [1] - 119:6
**range** [1] - 153:22
**RATE** [1] - 2:15
**rate** [1] - 151:2
**rather** [4] - 24:14, 50:5, 156:11, 195:17
**rationale** [5] - 144:15, 148:16, 149:16,
152:5, 155:20
**rationally** [1] - 148:14
**rays** [1] - 100:20
**RDC** [1] - 83:19
**RDR** [2] - 2:20, 202:20
**reach** [7] - 68:19, 69:5, 90:1, 165:17,
167:14, 170:10, 170:17
**reached** [4] - 87:24, 138:14, 171:21,
198:11
**reaching** [3] - 163:1, 165:6, 167:12
**react** [3] - 31:9, 31:24, 186:3
**read** [20] - 46:6, 46:7, 46:12, 46:16,
46:21, 48:22, 65:10, 74:15, 80:3,
80:17, 145:16, 145:17, 155:14, 158:1,
160:4, 160:20, 161:18, 162:4, 186:22,
197:19
**reading** [4] - 154:3, 154:5, 161:21,
182:3
**readjust** [1] - 20:9
**reads** [3] - 171:22, 196:13, 198:18
**ready** [24] - 7:3, 7:14, 8:6, 13:12, 44:11,
83:8, 94:20, 99:18, 101:22, 115:23,
140:8, 140:14, 141:7, 142:10, 142:22,
160:20, 161:1, 161:7, 161:8, 161:17,
172:1, 174:3, 180:17, 193:14
**real** [4] - 5:23, 88:25, 182:17, 186:14
**reality** [1] - 115:1
**realize** [2] - 125:22, 137:6, 137:8
**realized** [3] - 4:22, 36:14, 36:16
**really** [21] - 18:4, 34:7, 35:9, 74:13,
87:1, 96:7, 104:7, 104:20, 112:21,
118:3, 127:5, 127:7, 147:13, 151:14,
151:16, 180:3, 189:15, 190:13,
190:14, 192:11
**rear** [1] - 27:3

**reask** [1] - 75:19
**reason** [14] - 24:11, 39:12, 43:24, 75:24,
78:1, 88:22, 89:5, 104:14, 141:20,
164:3, 165:17, 166:23, 174:16, 188:25
**reason-measured** [1] - 188:25
**reasonable** [27] - 12:21, 12:25, 17:2,
144:16, 163:22, 164:2, 164:3, 164:5,
165:15, 166:6, 166:10, 167:24, 168:2,
169:2, 169:19, 170:6, 171:3, 172:14,
175:23, 177:4, 187:17, 187:18,
187:19, 188:18, 190:14, 192:8
**reasonably** [2] - 78:17, 167:25
**reasoned** [2] - 187:19, 189:5
**reasons** [7] - 21:24, 157:21, 159:7,
159:10, 176:20, 182:16, 182:17
**REBUTTAL** [1] - 3:22
**rebuttal** [3] - 156:15, 156:16, 190:16
**rec** [1] - 90:19
**recalled** [1] - 47:15
**receive** [8] - 16:8, 85:9, 85:24, 100:5,
102:16, 168:9, 193:3, 196:7
**received** [9] - 22:13, 85:3, 85:12, 86:5,
87:13, 88:6, 102:13, 104:8, 146:12
**receiving** [2] - 87:7, 175:1
**recent** [1] - 52:1
**reception** [1] - 176:15
**recess** [8] - 6:20, 80:19, 142:14, 145:1,
146:3, 162:2, 196:6, 196:8
**recessed** [7] - 6:23, 7:11, 81:23, 140:6,
142:18, 146:10, 155:9, 157:1, 160:24,
193:10, 196:9, 198:1
**recognize** [6] - 21:8, 23:9, 24:24, 25:19,
96:13, 103:9
**recollection** [17] - 46:20, 47:5, 47:9,
47:11, 47:15, 47:23, 51:20, 64:4,
64:19, 65:11, 65:13, 65:15, 74:5,
127:24, 164:19, 190:9, 191:22
**recommended** [1] - 100:12
**record** [25] - 15:23, 21:15, 21:17, 50:15,
101:12, 101:14, 112:13, 124:8,
136:20, 142:21, 144:6, 155:12, 157:3,
157:13, 157:22, 159:8, 159:11, 161:4,
165:3, 195:10, 196:2, 198:8, 200:2,
200:8, 202:16
**recorded** [1] - 16:22
**RECORDED** [1] - 1:24
**recording** [4] - 71:14, 176:21, 176:22,
176:23
**recounted** [1] - 124:17
**recross** [1] - 76:8
**RECROSS** [2] - 3:13, 76:10
**RECROSS-EXAMINATION** [1] - 3:13
**red** [2] - 56:18, 108:9
**redirect** [1] - 72:8, 139:17
**REDIRECT** [2] - 3:12, 72:10
**redo** [1] - 157:14
**reentry** [7] - 9:8, 16:18, 20:6, 85:5,
86:12, 87:8, 173:9
**reexamine** [1] - 170:21
**refer** [2] - 119:8, 175:8

**reference** [4] - 172:19, 172:21, 173:4,
173:5
**referenced** [1] - 148:22
**referencing** [3] - 91:17, 145:11, 148:4
**referred** [2] - 64:12, 195:9
**referring** [3] - 56:14, 147:4, 183:25
**reflect** [7] - 21:15, 21:17, 101:12,
101:14, 195:17, 198:8, 200:2
**reflected** [1] - 5:12
**refresh** [7] - 46:20, 47:5, 47:11, 47:15,
51:19, 65:10, 74:5
**refreshes** [2] - 65:12, 65:15
**refreshment** [2] - 47:9, 47:23
**refused** [3] - 27:13, 91:2, 178:2
**regarding** [2] - 22:13, 22:17
**regardless** [2] - 163:9, 169:20
**regards** [1] - 86:7
**regional** [4] - 103:6, 103:10, 103:12,
185:9
**related** [2] - 73:9, 85:16
**relates** [1] - 154:23
**relation** [6] - 91:18, 107:1, 114:5,
120:20, 121:1, 121:8
**relationship** [1] - 166:25
**relaxed** [1] - 86:21
**release** [2] - 82:6, 160:3
**released** [1] - 82:10
**releasing** [1] - 200:15
**relevance** [3] - 131:18, 131:21, 134:6
**relevant** [3] - 131:22, 132:3, 132:4
**reluctant** [4] - 178:6, 183:4, 183:5,
189:8
**reluctantly** [3] - 30:5, 30:8, 178:13
**rely** [3] - 64:4, 164:7, 187:12
**relying** [1] - 183:1
**remain** [1] - 201:17
**remainder** [6] - 9:7, 86:16, 86:23, 93:5,
93:16, 173:17
**remanded** [1] - 202:4
**remember** [46] - 8:22, 15:19, 15:20,
16:3, 16:4, 23:14, 37:15, 45:22, 45:23,
45:24, 47:12, 47:18, 48:25, 49:3, 49:5,
49:7, 49:10, 49:16, 49:17, 49:18,
49:19, 49:24, 50:4, 53:22, 55:12,
63:22, 71:9, 71:10, 71:12, 73:11,
77:18, 104:6, 106:11, 108:18, 109:3,
109:23, 110:13, 113:9, 117:3, 117:23,
122:5, 122:9, 123:24, 124:4, 171:1,
190:19
**remembered** [3] - 77:23, 79:6, 126:3
**remembering** [1] - 130:15
**remind** [1] - 166:8
**remove** [2] - 95:13, 187:5
**removed** [4] - 146:20, 165:3, 165:5,
187:4
**removing** [1] - 95:15
**rendition** [2] - 125:8, 134:5
**renew** [1] - 132:3, 159:23
**rep** [1] - 123:22

**repeatedly** [2] - 14:20, 135:10
**rephrase** [1] - 117:13
**reply** [1] - 171:16
**report** [71] - 45:8, 45:11, 45:16, 45:17, 46:2, 46:6, 46:7, 46:21, 47:6, 47:14, 47:18, 47:19, 47:21, 48:5, 48:7, 48:16, 48:22, 49:8, 49:11, 51:20, 69:21, 69:25, 70:1, 70:4, 73:8, 73:11, 73:15, 73:16, 73:19, 73:20, 73:24, 74:6, 74:7, 74:16, 74:18, 74:19, 74:24, 74:25, 75:1, 75:3, 75:4, 75:11, 75:22, 76:1, 76:12, 76:15, 76:24, 77:5, 77:7, 77:13, 77:23, 78:1, 78:3, 78:12, 78:22, 79:2, 79:6, 79:14, 80:2, 80:4, 80:7, 80:9, 80:13, 80:16, 80:17, 90:14, 118:20, 137:23, 182:5
**reported** [1] - 89:22
**REPORTER** [7] - 2:19, 18:5, 19:4, 48:12, 75:5, 88:15, 191:9
**reporter** [1] - 191:11
**reports** [9] - 46:12, 46:21, 47:3, 47:4, 47:16, 47:25, 65:12, 73:25, 114:19
**represent** [7] - 8:25, 13:15, 13:21, 14:2, 146:19, 181:2
**REPRODUCTION** [1] - 2:14
**request** [11] - 81:9, 82:2, 85:6, 90:1, 90:5, 138:15, 146:13, 157:11, 159:7, 159:9, 159:12
**requested** [3] - 4:13, 155:18, 156:3
**requesting** [3] - 87:15, 104:14, 104:23
**require** [3] - 100:22, 152:11, 163:17
**required** [2] - 149:2, 164:1
**requirement** [1] - 78:2
**requires** [2] - 166:4, 186:21
**resembles** [1] - 23:4
**reserve** [1] - 156:15
**reserved** [1] - 156:16
**resets** [1] - 35:11
**resident** [1] - 10:10
**residential** [8] - 16:18, 20:6, 42:8, 85:5, 85:10, 86:4, 86:12, 173:9
**resides** [1] - 176:20
**resist** [6] - 141:10, 147:4, 150:3, 151:18, 151:25, 168:19
**resistant** [5] - 9:15, 10:17, 11:2, 12:7, 29:5
**resisted** [11] - 150:7, 169:4, 169:7, 177:6, 177:8, 177:25, 183:12, 183:19, 192:14, 196:14, 197:5
**resisting** [4] - 35:17, 146:21, 178:24, 180:11
**respect** [1] - 141:9
**respectfully** [9] - 15:18, 132:9, 134:24, 136:19, 144:18, 155:17, 155:23, 159:12, 159:24
**respond** [3] - 29:15, 87:17, 87:23
**responded** [1] - 99:25
**response** [17] - 78:9, 84:14, 88:24, 89:16, 131:22, 132:1, 133:7, 133:10, 134:8, 146:25, 149:25, 151:17,

154:21, 154:25, 160:19, 173:1, 196:24
**responsibilities** [1] - 194:2
**responsible** [1] - 84:19
**rest** [1] - 82:8
**rested** [1] - 144:3
**restrain** [2] - 90:8, 96:22
**restrained** [3] - 96:15, 97:7, 178:18
**restraining** [3] - 90:11, 90:13
**restraints** [3] - 90:21, 96:6, 106:15
**restrictions** [4] - 86:21, 86:22, 173:21
**RESTS** [2] - 3:19, 3:19
**rests** [2] - 144:1, 144:22
**result** [13] - 51:7, 85:24, 87:7, 100:18, 100:25, 102:20, 105:24, 106:2, 150:9, 179:20, 180:1, 180:9
**RESULT** [1] - 2:14
**resulted** [4] - 9:5, 151:13, 180:12, 192:19
**resulting** [1] - 141:15
**resumed** [9] - 6:24, 7:12, 81:24, 142:19, 155:10, 157:2, 160:25, 196:10, 198:2
**retired** [6] - 17:24, 18:1, 18:3, 23:3, 44:17, 72:12
**retirement** [3] - 18:2, 18:7, 18:12
**retrieve** [1] - 35:2, 90:18, 90:25
**return** [2] - 22:5, 168:5
**returned** [4] - 85:20, 87:14, 91:1, 104:8
**returning** [2] - 104:4, 170:25
**reveal** [1] - 171:18
**review** [7] - 49:8, 61:7, 123:6, 123:7, 123:11, 138:1
**reviewed** [5] - 47:4, 47:6, 47:21, 51:20, 137:22
**reviewing** [1] - 48:5
**revocation** [1] - 201:22
**ride** [1] - 39:7
**right-hand** [1] - 92:8
**rights** [1] - 144:12
**righty** [1] - 109:20
**rise** [23] - 4:4, 6:22, 6:25, 7:10, 8:1, 81:22, 81:25, 82:14, 140:5, 142:17, 142:20, 143:19, 146:9, 155:8, 155:11, 156:25, 161:13, 193:9, 193:19, 194:24, 198:3, 198:5, 201:7
**Rivera** [4] - 148:23, 148:25, 149:6, 152:12
**Rivera-Alonzo** [2] - 148:23, 152:12
**role** [7] - 19:17, 73:1, 73:4, 104:20, 134:12, 134:14, 135:19
**rooftop** [1] - 175:20
**room** [10] - 10:10, 98:19, 98:20, 98:22, 99:1, 99:10, 99:18, 162:2, 171:5, 193:2
**Room** [1] - 2:20
**rooms** [1] - 10:11
**root** [4] - 100:20, 100:23, 180:1
**roughly** [1] - 7:21, 44:20, 124:10
**row** [1] - 62:20
**Rozales** [7] - 14:17, 119:18, 119:19,

120:8, 138:12, 138:13
**Ruiz** [23] - 29:12, 32:14, 32:19, 32:22, 33:4, 35:20, 36:1, 39:4, 82:25, 83:14, 83:17, 102:4, 155:20, 169:25, 174:3, 174:8, 174:24, 177:17, 179:7, 179:13, 179:16, 180:5, 180:7
**RUIZ** [2] - 3:14, 83:6
**Rule** [2] - 80:5, 144:11
**RULE** [1] - 3:20
**rule** [7] - 80:20, 81:8, 157:12, 163:6, 187:14, 187:15, 187:21
**ruled** [2] - 157:16, 187:20
**rules** [7] - 21:24, 162:16, 162:22, 163:3, 173:13, 173:20, 178:10
**ruling** [2] - 121:10, 121:11
**rush** [1] - 93:13
**Rusk** [1] - 2:20

## S

**safe** [1] - 156:11
**safekeeping** [1] - 103:5
**sake** [1] - 120:25
**San** [2] - 19:24, 20:1
**sat** [1] - 160:6
**satisfied** [4] - 63:15, 63:17, 184:8
**satisfy** [1] - 132:14
**saw** [53] - 11:20, 14:12, 14:18, 33:11, 33:12, 34:15, 34:24, 35:19, 35:24, 36:1, 38:4, 41:22, 50:17, 50:20, 51:7, 51:11, 51:14, 60:13, 64:24, 65:5, 69:14, 69:16, 69:18, 70:19, 79:2, 98:25, 114:16, 115:2, 115:11, 129:2, 130:11, 130:16, 130:21, 130:22, 133:3, 133:9, 133:25, 175:13, 175:15, 176:1, 176:2, 176:4, 181:9, 181:20, 186:23, 187:8, 188:10
**scanned** [1] - 35:25
**scanning** [1] - 46:10
**scenario** [3] - 105:14, 131:14, 185:5
**schedule** [2] - 162:6, 162:9
**scheduled** [1] - 100:15
**school** [1] - 18:10
**science** [1] - 136:13
**score** [1] - 188:11
**screen** [1] - 56:4
**search** [4] - 32:9, 90:8, 90:12, 90:20
**searching** [2] - 90:10, 90:13
**seat** [3] - 40:10, 40:17, 40:18
**seated** [16] - 8:2, 10:21, 21:10, 26:12, 26:14, 27:7, 27:10, 68:24, 91:25, 92:25, 140:7, 143:21, 161:15, 193:23, 195:1, 198:7
**second** [21] - 4:15, 25:20, 26:13, 26:14, 26:15, 34:9, 53:8, 56:8, 124:10, 148:20, 149:17, 152:7, 153:14, 159:1, 162:10, 169:6, 177:7, 183:22, 184:16, 184:17, 192:12
**seconds** [6] - 34:17, 34:19, 35:8, 35:11, 191:25

**secret** [1] - 170:13
**section** [5] - 56:8, 56:9, 147:14, 168:17, 168:18
**secure** [4] - 9:21, 38:15, 170:3, 177:19
**see** [108] - 6:21, 14:10, 14:17, 16:15, 16:16, 16:19, 16:22, 21:12, 23:1, 26:21, 32:7, 33:1, 33:7, 33:10, 34:6, 37:19, 38:2, 41:2, 41:10, 43:4, 47:3, 49:12, 50:7, 50:12, 50:15, 50:22, 50:23, 51:3, 51:4, 52:14, 52:16, 54:3, 55:17, 55:21, 60:1, 60:3, 60:4, 60:25, 62:22, 62:23, 63:4, 65:4, 65:5, 65:10, 65:12, 92:4, 96:16, 98:6, 100:7, 100:20, 101:5, 108:2, 108:3, 108:6, 108:8, 108:9, 108:10, 108:15, 118:20, 118:23, 118:24, 120:15, 121:16, 121:19, 129:16, 129:25, 130:1, 130:2, 130:4, 131:12, 132:16, 132:20, 133:11, 139:1, 140:10, 150:17, 154:25, 157:8, 160:8, 167:2, 174:19, 175:14, 175:20, 175:21, 176:2, 176:9, 176:10, 176:25, 181:13, 181:14, 181:21, 181:22, 181:23, 184:1, 184:5, 186:10, 186:12, 186:25, 188:9, 197:14, 198:13, 201:11, 202:1
**seeing** [3] - 109:2, 139:3, 175:10
**seek** [1] - 12:14
**seem** [1] - 68:23
**select** [1] - 171:6
**selected** [1] - 193:24
**selection** [2] - 8:23, 174:5
**self** [1] - 149:7
**self-defense** [1] - 149:7
**selfie** [1] - 127:15
**send** [2] - 83:1, 197:20
**sending** [1] - 18:9
**sense** [7] - 14:2, 32:6, 50:4, 118:5, 164:4, 165:18, 176:17
**sent** [4] - 58:11, 88:6, 154:22, 155:2
**sentence** [7] - 9:7, 20:9, 20:13, 86:17, 86:23, 173:18, 173:20
**sentencing** [3] - 201:18, 201:19, 202:2
**serious** [1] - 153:6
**serve** [3] - 86:16, 93:5, 194:19
**served** [1] - 86:22
**service** [12] - 19:6, 44:19, 83:23, 84:1, 84:15, 85:6, 104:11, 194:13, 200:9, 200:14, 201:5, 202:5
**services** [1] - 168:23
**serving** [3] - 9:7, 21:19, 173:17
**set** [2] - 7:22, 172:11
**sets** [1] - 154:23
**setting** [3] - 32:8, 67:14, 67:15
**settling** [1] - 18:7
**setup** [1] - 116:10
**seven** [1] - 121:5
**several** [4] - 91:1, 92:13, 93:24, 178:8
**shackles** [1] - 90:8
**shaky** [1] - 185:8
**shall** [2] - 154:7, 201:17

**shape** [2] - 6:9, 38:8
**shards** [1] - 97:18
**shared** [1] - 195:20
**sheriffs** [1] - 19:19
**shielding** [1] - 180:24
**shirt** [1] - 35:12
**shoes** [1] - 118:25
**shook** [1] - 40:16
**shooting** [2] - 45:7, 84:17
**short** [6] - 14:6, 27:2, 56:6, 56:10, 56:20, 192:2
**shorter** [1] - 12:18
**shortly** [2] - 85:21, 193:2
**shoulder** [2] - 112:13, 112:14
**shoulders** [1] - 30:24
**show** [22] - 9:3, 9:12, 10:19, 11:12, 12:4, 12:21, 12:25, 23:19, 70:7, 89:4, 89:10, 94:9, 99:14, 105:7, 152:15, 184:8, 184:10, 184:11, 184:12, 185:12, 187:22, 190:3
**showed** [6] - 46:21, 47:16, 91:24, 93:1, 105:8, 127:9
**showing** [2] - 96:11, 105:6
**shown** [4] - 59:24, 69:9, 151:20, 152:1
**shows** [1] - 153:17
**shy** [1] - 18:21
**Side** [4] - 81:15, 136:22, 144:21, 145:25
**side** [28] - 7:15, 31:3, 31:6, 35:2, 36:21, 40:11, 52:8, 60:17, 79:25, 90:17, 92:9, 95:5, 108:25, 111:7, 112:4, 113:15, 114:1, 120:15, 134:3, 135:3, 144:7, 144:9, 145:9, 156:6, 164:16, 167:14, 167:16
**sides** [3] - 33:19, 99:6, 156:13
**sign** [4] - 171:13, 171:25, 193:6, 195:24
**signature** [1] - 193:5
**signed** [1] - 198:16
**significant** [3] - 38:7, 71:9, 164:16
**significantly** [1] - 36:2
**similar** [4] - 26:5, 67:8, 67:17, 67:18
**Simon** [1] - 39:10
**simple** [23] - 13:4, 147:11, 147:15, 147:23, 148:20, 148:25, 149:9, 149:16, 149:21, 150:10, 150:11, 150:19, 152:5, 152:11, 152:16, 152:22, 153:8, 153:11, 153:16, 153:18, 191:14, 191:15, 192:18
**simply** [3] - 151:23, 153:19, 167:13
**single** [4] - 94:24, 101:1, 108:24
**sit** [2] - 154:18, 190:11
**sitting** [1] - 41:5, 137:13
**situation** [7] - 33:7, 57:23, 57:24, 93:14, 104:17, 105:9, 185:13
**six** [7] - 68:24, 68:25, 69:1, 69:2, 69:3, 84:18
**six-one** [4] - 69:1, 69:2, 69:3
**six-three** [1] - 68:25
**six-two** [1] - 68:24
**sixth** [1] - 62:23

**skin** [2] - 35:12, 95:14
**skip** [1] - 79:11
**slash** [2] - 196:16, 197:8
**sleep** [1] - 43:22
**sleeping** [1] - 176:22
**slightly** [2] - 41:24, 112:8
**slipper** [1] - 118:25
**slow** [1] - 38:18
**slowly** [3] - 11:5, 30:6
**smacked** [1] - 16:11
**small** [3] - 38:9, 74:13, 181:9
**smeared** [1] - 36:3
**smiling** [1] - 61:23
**snap** [1] - 11:20
**snapping** [1] - 175:13
**sneak** [1] - 43:1
**sole** [1] - 166:14
**solely** [3] - 163:10, 165:7, 170:23
**solid** [1] - 93:20
**someone** [8] - 89:1, 130:10, 130:11, 130:16, 134:20, 148:19, 169:16, 174:6
**sometimes** [9] - 21:25, 22:5, 57:14, 57:18, 57:19, 57:20, 83:17, 83:19, 200:19
**somewhat** [1] - 42:22
**somewhere** [3] - 38:17, 111:24, 120:23
**son** [2] - 18:9, 18:10
**soon** [8] - 7:8, 78:17, 94:7, 94:20, 112:21, 112:24, 161:11, 202:8
**sorry** [26] - 5:1, 17:17, 18:5, 19:4, 27:20, 31:10, 47:5, 48:12, 53:9, 69:17, 75:5, 88:15, 88:17, 90:12, 135:23, 137:5, 137:10, 140:18, 143:5, 150:19, 156:11, 158:4, 158:5, 172:20, 177:23, 191:9
**sort** [22] - 20:11, 20:19, 21:22, 27:1, 28:6, 28:10, 30:12, 32:20, 33:15, 33:18, 34:3, 35:10, 35:19, 38:7, 40:9, 41:9, 53:23, 54:12, 54:23, 55:5, 56:4, 111:20
**sought** [2] - 169:24, 179:24
**sound** [3] - 33:4, 51:10, 175:13
**sounds** [2] - 124:4, 196:23
**southern** [1] - 84:2
**SOUTHERN** [2] - 1:2, 2:16
**Southern** [1] - 20:25
**southpaw** [1] - 109:25
**space** [7] - 42:6, 42:7, 42:11, 43:21, 68:11, 171:11, 171:24
**spaces** [1] - 43:17
**speakers** [1] - 108:11
**speaking** [4] - 76:16, 107:2, 107:5, 107:6
**special** [2] - 19:9, 163:4
**specific** [3] - 43:12, 162:22, 167:21
**specifically** [7] - 42:21, 61:15, 63:5, 86:6, 89:22, 126:22, 177:16
**specifics** [1] - 115:3
**speculate** [1] - 164:24

**speculation** [3] - 42:12, 131:2, 132:2
**speed** [2] - 131:12, 131:13
**spin** [1] - 129:3
**spinning** [2] - 34:15, 94:12
**spirited** [1] - 190:20
**split** [4] - 11:15, 97:19, 179:9, 179:11
**spun** [6] - 11:13, 32:23, 94:7, 94:21, 112:22, 112:24
**squatted** [2] - 32:21, 32:23
**staff** [28] - 10:1, 10:4, 10:14, 10:17, 10:20, 24:9, 25:9, 27:14, 38:16, 39:13, 42:1, 43:3, 52:24, 54:20, 55:3, 55:5, 58:12, 58:25, 59:2, 63:7, 63:15, 67:23, 90:18, 90:25, 91:4, 91:22, 138:22
**stage** [2] - 143:2, 194:1
**staggered** [2] - 31:22, 110:19
**stance** [3] - 31:8, 31:10, 31:17
**stand** [27] - 7:8, 16:7, 17:10, 29:18, 29:19, 29:25, 30:1, 30:5, 31:19, 39:16, 63:23, 66:20, 79:19, 82:24, 91:18, 94:1, 94:15, 94:25, 111:9, 142:14, 178:8, 191:21, 196:6, 196:8, 197:23
**standard** [6] - 28:19, 32:5, 148:1, 148:8, 152:8, 152:15
**standing** [19] - 26:17, 32:12, 34:25, 39:19, 41:5, 41:6, 65:25, 68:7, 96:23, 109:13, 110:23, 111:9, 121:3, 139:5, 176:9, 181:10, 182:1, 186:2, 189:13
**stands** [4] - 111:13, 111:19, 171:19
**start** [6] - 8:9, 32:20, 77:13, 145:4, 147:20, 200:23
**started** [13] - 4:6, 4:7, 4:9, 7:14, 8:6, 18:10, 18:19, 40:12, 81:21, 83:4, 93:25, 139:12, 156:23
**starting** [1] - 188:22
**startled** [1] - 189:10
**starts** [1] - 62:11
**state** [5] - 83:13, 84:7, 84:9, 134:10, 163:6
**statement** [8] - 50:12, 79:4, 117:17, 123:7, 123:11, 126:16, 160:5, 187:12
**STATEMENT** [2] - 3:3, 3:3
**statements** [11] - 7:15, 8:8, 16:5, 63:24, 66:23, 77:22, 124:14, 125:10, 161:12, 164:13
**STATES** [7] - 1:1, 1:4, 1:15, 1:17, 1:23, 2:16, 3:9
**states** [1] - 147:23
**States** [25] - 1:17, 8:23, 8:24, 8:25, 9:13, 9:18, 9:19, 12:20, 14:7, 17:7, 18:15, 19:17, 28:6, 83:22, 148:23, 149:20, 149:24, 152:14, 153:10, 168:17, 168:21, 168:22, 170:1, 172:15, 173:7
**stature** [1] - 93:6
**statute** [5] - 150:3, 153:1, 154:2, 154:3, 183:14
**stay** [3] - 10:10, 82:12, 162:8
**stayed** [3] - 39:10, 53:3, 57:2
**staying** [1] - 10:21
**stemming** [1] - 102:23

**STENOGRAPHIC** [1] - 1:24
**step** [2] - 111:12, 140:24
**stepped** [1] - 55:6
**steps** [1] - 79:11
**stick** [2] - 150:19, 200:21
**sticking** [1] - 186:15
**still** [30] - 32:9, 33:23, 34:23, 35:4, 36:5, 40:8, 52:13, 77:2, 77:21, 84:21, 86:13, 94:4, 98:5, 108:23, 112:11, 113:22, 113:23, 115:24, 142:2, 151:14, 153:20, 173:25, 174:3, 175:22, 178:24, 178:25, 180:8, 180:9, 180:10
**stipulations** [1] - 164:12
**stitched** [5] - 41:9, 41:10, 65:7, 179:15, 187:8
**stitches** [6] - 98:23, 99:7, 99:8, 100:6, 125:25, 179:15
**stitching** [1] - 99:19
**stomach** [2] - 52:8, 95:5
**stood** [12] - 11:6, 30:3, 30:5, 30:11, 30:17, 36:4, 54:10, 94:1, 94:15, 96:6, 97:8, 189:8
**stop** [7] - 12:1, 12:4, 12:5, 22:9, 38:18, 132:17
**stopped** [6] - 27:1, 53:15, 53:20, 54:5
**stories** [2] - 182:4, 186:7
**story** [5] - 73:24, 74:19, 124:18, 125:1, 125:4
**straight** [3] - 23:18, 30:17, 39:2
**straightforward** [1] - 13:4
**strategic** [1] - 59:14
**strategically** [4] - 24:9, 27:2, 184:20, 184:24
**streamline** [1] - 182:20
**Street** [1] - 20:24
**street** [6] - 19:24, 20:16, 20:18, 32:7, 40:2, 67:17
**stretch** [1] - 8:13
**stretcher** [1] - 195:8
**stretching** [1] - 189:1
**stricken** [2] - 75:19, 88:14
**strict** [1] - 163:24
**strike** [6] - 75:18, 79:3, 88:13, 129:3, 196:16, 197:9
**striking** [1] - 128:21
**struck** [13] - 11:21, 32:22, 65:3, 94:7, 96:21, 113:12, 116:19, 116:22, 119:23, 125:11, 173:3, 173:4, 180:8
**struggle** [3] - 116:21, 196:17, 197:10
**struggling** [1] - 33:24
**studies** [1] - 45:7
**stun** [1] - 95:13
**subject** [1] - 91:18
**submission** [1] - 183:21
**submit** [11] - 142:4, 143:7, 144:13, 155:24, 172:13, 175:25, 179:10, 180:22, 181:16, 182:17, 192:17
**submitted** [5] - 85:5, 146:15, 147:10, 155:15, 155:25

**subsection** [1] - 154:6
**subset** [1] - 148:11
**substantial** [1] - 22:3
**substitute** [1] - 163:7
**sudden** [2] - 33:16, 192:1
**suffered** [2] - 179:17, 180:2
**suggest** [1] - 166:21
**suggests** [1] - 150:13
**suit** [3] - 21:11, 28:13, 101:9
**Suite** [2] - 1:18, 2:6
**summarize** [1] - 74:1
**summarizes** [2] - 79:17
**summary** [2] - 46:18, 65:5
**supervisor** [21] - 17:25, 19:14, 19:16, 19:21, 22:6, 32:19, 32:22, 33:4, 33:25, 34:10, 35:20, 36:1, 37:24, 39:2, 39:3, 39:4, 72:20, 84:22, 87:24, 98:12
**Supervisor** [2] - 29:12, 41:6
**supervisor's** [1] - 34:7
**supervisors** [2] - 67:23, 124:16
**supervisory** [6] - 19:21, 83:21, 84:4, 170:1, 172:15, 173:7
**supply** [1] - 5:25
**support** [3] - 20:10, 71:22, 84:15
**supportive** [1] - 41:8
**supports** [1] - 151:22
**supposed** [4] - 4:18, 76:18, 76:20, 77:6, 77:11, 78:12, 184:6
**surgeon** [4] - 98:24, 98:25, 99:11, 179:15
**surveillance** [8] - 16:16, 16:19, 60:19, 63:4, 78:20, 138:1, 188:1, 188:3
**suspect** [1] - 91:16
**sustained** [8] - 42:14, 75:17, 100:18, 116:22, 131:6, 134:17, 136:19, 164:22
**Swanson** [8] - 1:16, 8:16, 8:24, 13:10, 17:5, 172:10, 191:8, 191:14
**SWANSON** [68] - 3:3, 3:11, 3:12, 7:17, 8:15, 8:17, 8:20, 17:7, 17:15, 17:19, 18:14, 19:15, 21:15, 21:18, 22:23, 23:2, 23:6, 23:8, 23:22, 23:24, 24:20, 24:22, 25:16, 25:18, 25:24, 26:1, 26:7, 26:9, 31:13, 31:16, 32:1, 36:7, 36:9, 36:18, 36:20, 37:20, 37:22, 38:23, 41:14, 41:19, 42:17, 42:18, 43:15, 43:25, 47:7, 47:20, 63:19, 66:14, 72:9, 72:11, 74:10, 74:12, 75:9, 75:15, 75:21, 76:6, 142:24, 143:3, 143:14, 143:18, 147:18, 149:15, 151:20, 152:13, 153:5, 153:24, 154:2, 154:14
**Swanson's** [1] - 153:25
**swelling** [1] - 100:15
**swings** [1] - 112:20
**sworn** [5] - 16:24, 17:13, 83:7, 163:2, 164:11
**swung** [3] - 11:18, 32:23, 33:3
**sympathy** [1] - 163:11

# T

**table** [3] - 21:10, 101:10, 120:8
**tackled** [3] - 14:25, 52:17, 119:19
**talks** [1] - 74:22
**tall** [2] - 68:23
**target** [1] - 31:22
**TASed** [2] - 70:3, 178:17
**TASER** [25] - 11:25, 28:2, 35:2, 35:4, 35:6, 35:8, 35:10, 45:18, 45:21, 45:25, 73:9, 73:19, 73:22, 74:2, 74:3, 74:18, 78:1, 78:2, 79:15, 79:16, 95:13, 95:14, 95:20, 95:23
**TASERing** [1] - 46:3
**TASing** [2] - 46:3, 70:2
**task** [6] - 19:18, 27:23, 84:2, 84:8, 84:16, 87:19
**Task** [1] - 84:5
**Taub** [2] - 99:12, 179:14
**Taub's** [1] - 98:18
**team** [7] - 28:12, 84:14, 84:18, 84:23, 99:25, 138:15
**technical** [1] - 21:25
**teeth** [11] - 11:15, 97:13, 97:15, 97:18, 97:20, 97:21, 100:8, 100:10, 100:11, 179:17, 187:7
**Tellez** [1] - 103:7
**ten** [14] - 7:17, 7:22, 7:23, 80:19, 81:19, 84:11, 93:20, 98:16, 100:22, 124:20, 124:21, 154:18, 154:20, 200:22
**ten-minute** [2] - 81:19, 200:22
**tension** [3] - 30:14, 30:15
**term** [4] - 86:19, 109:18, 169:15, 169:22
**terms** [11] - 9:10, 19:11, 67:19, 76:1, 85:10, 87:8, 93:3, 137:21, 138:17, 150:22, 151:6
**testified** [18] - 45:20, 47:8, 47:21, 47:22, 50:7, 52:20, 102:6, 102:12, 132:6, 133:9, 135:11, 166:17, 167:3, 174:3, 174:19, 179:7, 182:9, 190:2
**testify** [14] - 10:22, 11:19, 14:9, 14:10, 46:9, 51:16, 66:15, 89:1, 89:13, 115:25, 134:14, 163:20, 187:24, 187:25
**testifying** [7] - 53:14, 59:6, 60:12, 63:20, 122:24, 134:20, 167:16
**testimonies** [1] - 188:7
**testimony** [68] - 8:9, 11:14, 15:4, 15:15, 46:5, 47:4, 48:6, 48:23, 50:11, 51:24, 52:4, 52:7, 57:24, 66:17, 66:19, 89:9, 112:19, 122:11, 122:14, 134:5, 136:4, 137:21, 141:24, 164:12, 165:2, 165:5, 165:7, 165:15, 165:23, 166:16, 166:17, 166:20, 167:5, 167:9, 172:17, 173:6, 173:8, 174:6, 174:8, 174:9, 174:11, 174:24, 175:3, 175:4, 176:1, 176:3, 176:5, 176:8, 176:11, 176:14, 178:2, 178:4, 178:11, 179:13, 180:4, 181:21, 182:19, 182:20, 184:9, 184:19, 185:3, 186:1, 186:5, 189:21,

191:17, 191:24, 192:16
**TEXAS** [2] - 1:2, 2:16
**Texas** [5] - 1:6, 1:19, 2:7, 2:21, 21:1
**text** [1] - 102:17
**THE** [278] - 1:11, 1:15, 2:3, 2:5, 2:11, 2:13, 2:14, 3:9, 3:21, 4:4, 4:5, 4:12, 4:23, 5:2, 5:4, 5:7, 5:11, 5:14, 5:17, 5:20, 5:22, 5:24, 6:4, 6:9, 6:17, 6:20, 6:22, 6:25, 7:1, 7:7, 7:10, 7:13, 7:19, 7:22, 8:1, 8:2, 8:16, 8:19, 13:10, 15:5, 15:10, 15:13, 15:16, 15:18, 16:2, 17:4, 17:9, 17:14, 17:17, 18:5, 18:7, 19:4, 19:5, 21:17, 22:25, 31:18, 41:16, 42:14, 43:10, 43:13, 44:3, 44:5, 44:9, 44:11, 46:24, 47:10, 47:17, 48:1, 48:12, 53:8, 57:6, 63:21, 66:18, 72:8, 74:11, 75:5, 75:7, 75:17, 75:19, 76:8, 79:21, 79:24, 80:12, 80:18, 80:24, 81:7, 81:11, 81:16, 81:22, 81:25, 82:4, 82:14, 82:16, 82:20, 82:22, 82:23, 83:2, 83:8, 87:2, 88:10, 88:14, 88:15, 88:17, 88:24, 89:3, 101:14, 101:16, 101:18, 101:22, 108:3, 131:6, 131:8, 131:22, 132:1, 132:8, 133:7, 133:15, 134:7, 134:17, 135:2, 135:10, 135:13, 135:19, 135:23, 136:19, 136:23, 137:2, 137:7, 137:9, 137:11, 137:17, 139:17, 139:20, 139:23, 139:25, 140:1, 140:5, 140:7, 140:14, 140:17, 140:21, 140:24, 141:2, 141:4, 141:18, 141:25, 142:3, 142:6, 142:14, 142:17, 142:20, 142:21, 143:1, 143:10, 143:16, 143:19, 143:21, 144:2, 144:8, 144:18, 144:23, 145:8, 145:13, 145:17, 145:20, 146:1, 146:9, 146:11, 146:23, 146:25, 147:3, 147:8, 147:17, 149:12, 149:25, 150:20, 151:1, 151:17, 152:10, 154:17, 154:25, 155:4, 155:7, 155:8, 155:11, 155:12, 156:8, 156:13, 156:16, 156:19, 156:21, 156:25, 157:3, 157:15, 157:18, 157:21, 157:24, 158:3, 158:7, 158:10, 158:13, 158:15, 158:17, 158:19, 158:22, 158:24, 159:3, 159:5, 159:12, 159:16, 159:20, 159:24, 160:2, 160:10, 160:13, 160:16, 160:18, 160:20, 161:1, 161:6, 161:10, 161:13, 161:15, 162:11, 162:12, 172:4, 172:20, 172:23, 173:1, 173:4, 179:22, 180:16, 180:19, 189:22, 191:5, 191:9, 192:25, 193:9, 193:13, 193:17, 193:23, 194:24, 195:1, 195:14, 195:18, 196:1, 196:4, 196:11, 196:24, 197:4, 197:13, 197:16, 197:20, 197:23, 198:3, 198:4, 198:5, 198:7, 198:12, 198:13, 198:24, 199:5, 199:7, 199:9, 199:11, 199:13, 199:15, 199:17, 199:19, 199:21, 199:23, 199:25, 200:2, 200:7, 201:9, 201:19, 201:24

**themselves** [1] - 173:10
**theory** [3] - 141:13, 141:21, 187:18
**thereafter** [2] - 87:11, 87:12
**therefore** [1] - 164:6
**they've** [3] - 160:6, 182:18, 190:18
**thighs** [1] - 27:8
**thinly** [1] - 189:2
**third** [8] - 4:15, 131:16, 132:13, 151:4, 151:15, 169:11, 177:10, 184:18
**THIS** [1] - 2:13
**Thomas** [1] - 48:9
**thorough** [3] - 74:23, 78:4, 79:9
**thoroughly** [1] - 79:18
**thoroughness** [1] - 80:15
**thoughts** [2] - 77:6, 177:23
**threat** [2] - 169:16, 169:21
**three** [18] - 34:6, 34:17, 34:19, 47:2, 48:7, 53:1, 62:20, 68:25, 107:18, 119:20, 147:14, 153:2, 153:8, 181:12, 182:8, 191:25, 201:3
**three-page** [1] - 48:7
**throbbing** [2] - 96:4, 98:8
**throughout** [5] - 14:24, 54:6, 125:9, 172:12, 195:9
**throw** [1] - 33:11
**throwing** [2] - 33:11, 113:1
**thrown** [1] - 50:21
**tie** [4] - 21:11, 21:12, 101:9, 135:18
**tiebreaker** [1] - 134:11
**tight** [3] - 113:23, 119:22, 121:4
**title** [6] - 19:20, 74:24, 75:3, 84:3, 154:7, 168:17
**today** [20] - 9:2, 9:18, 45:20, 46:5, 46:9, 47:5, 48:6, 48:23, 51:21, 51:24, 52:4, 69:15, 101:5, 117:21, 122:11, 125:23, 126:4, 126:17, 152:20, 172:16
**toe** [2] - 31:19
**together** [10] - 5:24, 11:22, 33:18, 35:21, 52:12, 118:4, 161:10, 182:4, 186:7
**tomorrow** [3] - 162:7, 201:20, 201:21
**tonight** [1] - 162:8
**took** [15] - 18:8, 61:12, 67:3, 69:13, 91:23, 93:13, 99:20, 127:13, 127:17, 161:16, 163:12, 181:25, 182:2, 200:10
**tools** [1] - 184:8
**tooth** [6] - 97:18, 97:22, 100:9, 100:20, 100:21, 180:1
**top** [4] - 60:4, 108:18, 119:20, 120:22
**topic** [1] - 128:3
**torn** [1] - 94:11
**touched** [3] - 94:7, 94:21, 112:24
**tough** [3] - 60:25, 182:25, 194:4
**towards** [20] - 26:19, 29:11, 30:18, 54:11, 54:18, 54:19, 56:24, 106:16, 106:19, 106:20, 107:2, 108:10, 109:11, 111:10, 112:14, 113:20, 114:2, 114:8, 173:11, 173:19
**towels** [1] - 97:10

**town** [1] - 52:2
**tracks** [1] - 14:24
**traffic** [2] - 8:5, 132:17
**trailing** [1] - 38:22
**train** [1] - 78:3
**trained** [1] - 122:23
**training** [15] - 31:7, 32:2, 45:6, 45:7, 45:8, 50:20, 66:9, 67:2, 76:18, 76:22, 76:24, 77:5, 122:25, 123:2, 173:23
**transcript** [2] - 81:11, 202:15
**TRANSCRIPT** [3] - 1:10, 1:25, 2:13
**TRANSCRIPTION** [1] - 1:25
**transfer** [27] - 9:13, 9:21, 9:23, 10:6, 12:7, 12:13, 12:16, 21:5, 21:20, 21:22, 21:23, 22:6, 22:9, 24:7, 25:8, 25:9, 25:10, 29:2, 29:13, 39:15, 58:13, 58:22, 67:7, 67:9, 67:10, 67:11, 74:21
**transferred** [9] - 9:10, 10:3, 10:12, 11:1, 11:8, 18:20, 20:3, 173:14, 173:22
**transferring** [3] - 12:23, 21:19, 84:20
**transfers** [4] - 19:1, 32:10, 42:19, 89:19
**transport** [12] - 38:15, 85:6, 90:2, 90:3, 90:5, 90:6, 91:5, 104:15, 104:23, 138:15, 170:3, 177:19
**transported** [3] - 87:16, 178:24, 179:14
**transporting** [2] - 84:19, 93:4
**transports** [2] - 84:24, 89:18
**trauma** [3] - 100:14, 100:21, 180:2
**treated** [1] - 41:4
**treating** [1] - 58:20
**treatment** [4] - 12:14, 100:12, 100:16, 100:17
**trepidation** [1] - 118:18
**trial** [29] - 12:19, 13:16, 14:4, 66:10, 69:18, 82:8, 148:14, 149:8, 149:10, 160:7, 162:12, 162:14, 162:16, 164:11, 164:22, 165:10, 165:13, 168:3, 168:6, 172:9, 172:12, 191:7, 191:13, 192:2, 194:10, 195:9, 201:11, 202:2
**tried** [7] - 29:16, 38:17, 39:16, 105:2, 105:3, 136:9, 190:19
**trigger** [2] - 35:7, 35:11
**trouble** [1] - 34:3
**true** [7] - 51:12, 69:17, 73:19, 89:6, 89:13, 113:6, 166:12
**truly** [1] - 194:15
**trust** [1] - 18:22
**truth** [9] - 13:22, 88:12, 88:20, 89:10, 131:5, 166:24, 174:16, 181:3, 190:22
**truthful** [2] - 134:1, 134:3
**truthfully** [1] - 51:16
**try** [7] - 11:12, 70:13, 84:23, 93:13, 104:16, 105:21, 136:16
**trying** [22] - 5:7, 32:15, 33:24, 34:4, 34:22, 43:1, 56:11, 81:4, 89:3, 95:10, 96:2, 96:22, 96:24, 106:10, 118:5, 119:25, 120:3, 125:12, 136:14, 186:9, 190:21
**Tuesday** [1] - 87:14

**turn** [13] - 22:25, 34:3, 44:7, 44:9, 53:8, 57:4, 57:6, 94:2, 94:15, 107:23, 111:10, 112:2, 175:10
**turned** [13] - 11:9, 29:8, 29:10, 30:18, 31:3, 33:2, 53:23, 54:11, 62:11, 111:8, 178:13, 178:15
**turns** [1] - 112:5
**twice** [2] - 11:25, 70:3
**twist** [1] - 33:11
**twisted** [1] - 32:21
**two** [69] - 9:18, 11:21, 12:20, 14:7, 14:14, 19:9, 22:5, 22:21, 26:2, 26:12, 33:18, 38:13, 47:2, 53:3, 54:22, 54:23, 55:23, 57:11, 57:18, 58:4, 58:5, 62:19, 68:16, 68:24, 81:18, 97:14, 97:21, 100:10, 100:11, 107:17, 107:18, 108:23, 108:24, 117:4, 120:17, 120:19, 123:17, 124:10, 131:13, 132:14, 138:9, 138:12, 138:19, 142:2, 162:13, 172:15, 173:6, 173:8, 175:6, 176:12, 176:24, 178:17, 179:17, 181:7, 181:10, 182:9, 186:1, 188:6, 193:11, 193:21, 194:6, 194:7, 194:25, 201:3
**two-feet** [1] - 107:17
**type** [4] - 93:19, 104:12, 122:21, 149:19
**types** [2] - 147:14, 175:6
**typical** [1] - 103:1
**typically** [9] - 84:12, 86:9, 87:18, 89:19, 89:25, 90:7, 90:17, 91:12, 102:23
**typing** [1] - 175:19
**typographical** [1] - 161:4
**TYRONE** [1] - 1:6
**Tyrone** [3] - 9:3, 21:6, 84:25

## U

**ultimate** [1] - 133:6
**umbrellas** [1] - 175:21
**unable** [1] - 100:13
**unanimous** [4] - 170:12, 171:10, 171:21, 198:17, 200:3
**unanimously** [2] - 153:3, 153:6
**UNAUTHORIZED** [1] - 2:14
**unclear** [1] - 52:7
**uncontroverted** [6] - 147:24, 148:18, 149:4, 150:14, 151:21, 152:2
**uncooperative** [1] - 27:16
**UNDER** [1] - 2:13
**under** [9] - 4:14, 34:11, 98:10, 98:16, 104:23, 134:15, 150:3, 154:7, 200:21
**underlined** [1] - 197:9
**underneath** [1] - 99:5
**understood** [6] - 7:6, 46:19, 103:4, 125:15, 126:15, 159:23
**undisputed** [1] - 149:12
**uneasy** [2] - 30:25, 68:6
**unfamiliar** [2] - 67:14, 67:15
**unfortunate** [1] - 194:2
**unfortunately** [3] - 7:3, 181:4, 194:13

**uniform** [3] - 28:7, 28:10, 28:11
**uniformed** [1] - 168:22
**uniforms** [2] - 28:5, 28:9
**union** [1] - 123:22
**UNITED** [7] - 1:1, 1:4, 1:15, 1:17, 1:23, 2:16, 3:9
**United** [8] - 1:17, 8:23, 8:24, 8:25, 9:12, 9:18, 9:19, 12:20, 14:7, 17:7, 18:15, 19:17, 28:6, 83:22, 148:23, 149:20, 149:24, 152:14, 153:10, 168:17, 168:21, 170:1, 172:15, 173:7
**unknown** [2] - 24:10, 53:2
**unless** [2] - 57:5, 149:6
**unpracticed** [1] - 67:15
**unprotected** [1] - 68:9
**unusually** [1] - 68:17
**up** [105] - 10:23, 11:6, 19:10, 20:8, 20:13, 22:11, 25:1, 25:10, 25:13, 28:15, 29:18, 29:19, 29:25, 30:1, 30:5, 30:12, 30:17, 30:21, 32:12, 35:12, 36:4, 36:15, 38:10, 39:1, 39:16, 39:19, 40:9, 40:21, 41:3, 41:24, 44:21, 45:20, 46:2, 51:10, 53:18, 54:10, 54:16, 59:25, 62:4, 65:7, 70:8, 70:21, 86:1, 87:15, 92:2, 94:1, 94:15, 95:10, 96:6, 98:9, 99:4, 100:5, 104:21, 105:24, 108:10, 111:9, 111:13, 111:19, 118:14, 120:1, 120:13, 127:17, 133:14, 135:6, 135:8, 135:9, 141:21, 144:8, 150:24, 152:1, 153:23, 156:18, 156:22, 160:2, 160:7, 161:6, 167:12, 170:22, 176:6, 178:7, 178:8, 179:5, 179:15, 182:5, 184:17, 184:18, 184:25, 185:1, 185:2, 186:1, 187:8, 188:7, 188:14, 189:9, 191:25
**update** [1] - 85:19
**upheld** [1] - 149:10
**upper** [4] - 38:6, 94:22, 97:3, 98:6
**upset** [4] - 93:8, 93:11, 104:1, 104:7
**upwards** [1] - 36:1
**US** [29] - 10:15, 10:20, 10:22, 10:24, 11:6, 17:24, 19:22, 28:10, 28:17, 29:1, 29:13, 44:20, 45:1, 45:3, 72:12, 83:21, 84:4, 84:21, 87:19, 88:22, 93:1, 102:7, 102:9, 135:17, 148:6, 174:2, 178:3, 182:21, 184:13
**usage** [1] - 77:25
**USC** [2] - 154:4, 168:17
**use-of-force** [6] - 45:17, 69:25, 74:16, 74:25, 75:11, 76:12
**USED** [1] - 2:13
**useful** [1] - 66:9
**uses** [1] - 154:6
**usher** [3] - 13:22, 181:1, 190:21
**uttered** [1] - 126:5

## V

**vacation** [2] - 18:8, 87:21
**van** [12] - 12:13, 12:16, 38:15, 39:17,

39:23, 39:25, 40:2, 40:9, 40:10, 40:11,
52:22, 90:1
**vans** [1] - 19:8
**various** [1] - 21:24
**vehicle** [3] - 12:7, 19:9, 90:2
**vehicles** [1] - 90:2
**veracity** [1] - 136:12
**verbalize** [1] - 104:5
**verdict** [31] - 5:13, 5:21, 162:18, 163:10,
165:6, 165:13, 167:12, 168:5, 170:10,
170:11, 170:12, 170:14, 170:25,
171:9, 171:13, 171:21, 171:22,
171:25, 192:20, 192:22, 196:7,
197:24, 198:11, 198:13, 198:16,
198:21, 199:2, 199:3, 200:3, 200:5,
200:7
**VERDICT** [1] - 3:23
**version** [2] - 6:6
**versus** [6] - 148:6, 148:23, 149:20,
149:24, 152:14, 153:10
**VERSUS** [1] - 1:5
**vest** [2] - 27:24
**victim** [7] - 149:3, 169:20, 170:6,
174:25, 175:12, 192:4, 192:19
**victim's** [1] - 175:13
**video** [26] - 16:16, 16:19, 39:13, 43:1,
43:2, 43:4, 43:18, 60:19, 61:13, 61:17,
63:7, 63:16, 66:6, 66:9, 78:20, 132:16,
132:17, 132:20, 133:21, 138:1,
176:14, 182:14, 187:23, 187:24,
187:25, 188:2
**videos** [4] - 42:1, 42:3, 138:6, 182:15
**view** [9] - 33:9, 64:6, 77:3, 129:1, 129:2,
129:7, 129:12, 129:14, 150:15
**viewed** [1] - 191:21
**violate** [2] - 104:4, 186:10
**violated** [9] - 9:9, 29:22, 85:4, 85:10,
87:8, 93:2, 173:13, 173:21, 178:9
**violating** [1] - 188:3
**violation** [9] - 21:24, 85:14, 85:16,
102:23, 103:1, 103:3, 104:12, 104:13,
185:6
**violations** [2] - 58:5, 86:7
**Violent** [1] - 84:5
**violent** [1] - 84:10
**visible** [1] - 13:1
**visibly** [3] - 10:23, 12:6, 93:10
**visited** [1] - 64:12
**voluntarily** [1] - 168:14
**volunteer** [1] - 67:23

# W

**waffled** [1] - 136:10
**waffling** [2] - 136:6, 136:7
**wait** [9] - 6:11, 6:17, 7:2, 78:16, 90:15,
101:20, 106:24, 144:6, 160:4
**waited** [1] - 98:24
**waiting** [9] - 4:5, 10:3, 10:12, 10:15,
24:8, 178:2, 178:21, 194:17

**waiving** [1] - 144:12
**walk** [7] - 23:11, 23:12, 23:14, 23:15,
23:18, 24:25, 53:18
**walked** [16] - 10:24, 25:22, 26:10, 26:19,
26:23, 27:20, 39:22, 40:2, 53:13,
54:16, 54:17, 54:20, 61:22, 62:11
**walker** [2] - 96:3, 110:20
**Walker** [78] - 9:3, 10:21, 13:16, 13:21,
16:12, 17:1, 21:6, 27:14, 29:10, 36:11,
39:16, 49:12, 50:9, 50:16, 52:8, 60:14,
64:11, 84:25, 85:4, 85:6, 86:3, 87:8,
87:14, 88:6, 88:8, 89:17, 90:25, 91:1,
91:21, 91:24, 92:21, 92:25, 95:10,
95:24, 96:6, 96:15, 96:21, 98:11,
103:14, 103:18, 104:23, 107:2, 107:6,
107:12, 108:21, 110:24, 111:13,
119:20, 119:24, 120:3, 121:12,
121:13, 128:21, 129:2, 139:1, 139:7,
144:13, 144:16, 150:9, 150:25,
171:23, 172:8, 173:13, 173:16,
173:21, 174:2, 179:12, 179:21, 180:6,
181:2, 182:2, 185:19, 185:20, 188:3,
189:7, 191:3, 198:19, 201:25
**WALKER** [1] - 1:6
**Walker's** [2] - 95:9, 111:7
**walking** [4] - 12:5, 53:21, 138:10,
138:23
**walkway** [1] - 62:9
**wall** [11] - 53:15, 56:4, 56:6, 56:10,
56:14, 56:16, 56:20, 108:12, 108:23,
180:8
**wants** [1] - 58:24
**warden** [1] - 21:23
**warrant** [7] - 104:19, 105:7, 184:1,
184:2, 185:13, 185:23
**warrants** [1] - 28:11
**Washington** [1] - 18:19
**watch** [1] - 82:8
**weapon** [11] - 4:24, 27:25, 28:2, 31:5,
31:6, 32:11, 153:10, 153:13, 154:6,
154:7, 154:16
**weapons** [1] - 32:7
**wear** [8] - 27:23, 28:6, 28:9, 28:10,
28:12, 28:13, 84:22
**wearing** [6] - 27:21, 28:5, 28:17, 101:8,
101:9, 101:11
**weather** [1] - 18:4
**week** [2] - 19:12, 124:10
**weekend** [1] - 52:5
**weeks** [2] - 124:11, 182:8
**weigh** [1] - 165:22
**weighing** [1] - 166:4
**weight** [6] - 34:2, 166:2, 166:15, 170:23,
176:4, 176:5
**welcome** [4] - 8:3, 82:16, 143:22,
161:16
**well-reasoned** [2] - 187:19, 189:5
**wet** [1] - 175:21
**whatsoever** [1] - 163:19
**whichever** [1] - 112:5

**white** [1] - 60:8
**whole** [7] - 73:24, 74:19, 75:23, 75:24,
128:21, 186:3, 186:4
**wholly** [1] - 15:11
**WILL** [1] - 2:14
**willing** [1] - 164:7
**Wilmore** [4] - 14:16, 14:18, 114:13,
138:13
**wilmore** [1] - 138:13
**wind** [2] - 186:1, 191:25
**wind-up** [2] - 186:1, 191:25
**window** [2] - 38:2
**Wirsing** [14] - 1:16, 8:14, 8:25, 17:5,
142:9, 142:25, 143:24, 155:13, 172:4,
179:22, 180:16, 191:6, 192:25, 195:4
**WIRSING** [114] - 3:15, 3:21, 3:22, 5:6,
6:2, 6:8, 6:16, 6:19, 7:5, 7:24, 15:2,
15:6, 15:14, 15:23, 79:23, 80:1, 80:6,
80:11, 80:14, 80:22, 81:1, 81:3, 81:5,
81:10, 81:14, 82:1, 82:8, 82:11, 82:18,
82:24, 83:10, 87:4, 87:6, 88:11, 88:21,
89:15, 98:1, 98:3, 99:14, 99:16, 100:3,
100:4, 101:12, 101:15, 101:17, 131:2,
131:9, 131:18, 131:21, 132:2, 132:6,
133:5, 133:8, 133:12, 134:6, 134:12,
134:14, 136:4, 136:7, 136:11, 136:17,
139:18, 140:19, 140:22, 141:12,
142:16, 143:25, 144:20, 145:6,
145:10, 145:15, 145:19, 145:24,
146:18, 146:24, 147:6, 154:21, 155:2,
155:6, 156:7, 156:14, 156:24, 158:9,
158:12, 158:18, 158:21, 159:4,
159:15, 159:18, 159:21, 160:6,
160:11, 160:15, 160:22, 161:3, 161:8,
172:3, 172:5, 173:2, 173:6, 179:23,
191:7, 191:10, 193:16, 195:6, 195:15,
195:20, 195:23, 196:23, 197:17,
200:6, 201:17, 201:21, 202:9
**wisdom** [1] - 163:5
**witness** [72] - 17:6, 17:12, 21:16, 31:16,
42:15, 44:2, 47:7, 47:11, 47:17, 47:20,
63:23, 66:20, 72:7, 73:6, 74:10, 76:7,
79:21, 80:2, 80:14, 80:16, 82:2, 82:17,
82:21, 83:3, 83:6, 89:11, 94:25,
101:13, 101:17, 131:24, 132:6, 133:1,
133:3, 133:8, 133:13, 133:16, 133:21,
133:25, 134:13, 134:18, 135:4,
139:16, 139:18, 139:20, 139:21,
142:2, 143:24, 164:24, 166:15,
166:22, 166:23, 166:24, 166:25,
167:1, 167:2, 167:3, 167:8, 167:9,
167:10, 174:7, 174:15, 174:16,
174:17, 174:18, 174:20, 175:22,
176:25, 181:7, 188:12, 191:20
**WITNESS** [7] - 18:7, 19:5, 31:18, 41:16,
75:7, 82:23, 139:25
**witness's** [3] - 132:11, 166:16, 167:5
**witnesses** [30] - 8:9, 14:14, 15:7, 15:25,
16:7, 16:20, 58:8, 71:20, 135:14,
138:3, 142:7, 144:24, 162:22, 164:12,

166:17, 167:6, 167:13, 167:15,
167:18, 174:14, 174:23, 176:24,
181:6, 181:11, 182:17, 182:18,
189:25, 190:1, 190:2
**WITNESSES** [1] - 3:8
**witty** [1] - 181:23
**woman's** [1] - 24:3
**wonder** [1] - 13:20
**wondering** [2] - 185:5, 197:12
**word** [17] - 49:14, 78:4, 102:24, 107:10,
118:2, 128:17, 141:17, 168:12, 183:6,
183:14, 184:5, 184:7, 185:17, 188:5,
190:13
**words** [6] - 118:17, 126:5, 165:17,
170:11, 174:2, 184:21
**works** [2] - 84:14, 183:15
**world** [2] - 117:20, 119:14
**worse** [1] - 99:6
**wound** [3] - 99:8, 115:16, 115:19
**wrapped** [1] - 152:1
**wrestle** [2] - 196:17, 197:10
**wrestling** [1] - 152:2
**wrist** [8] - 32:19, 35:1, 94:6, 94:19,
95:11, 105:22, 112:24
**write** [10] - 45:16, 46:2, 69:21, 70:4,
76:24, 77:18, 79:12, 171:10, 171:15,
200:17
**writing** [12] - 45:8, 45:10, 45:23, 45:24,
74:13, 76:20, 77:2, 77:5, 78:3, 78:12,
80:9, 171:16
**written** [1] - 153:2
**wrote** [11] - 45:17, 48:22, 69:25, 73:11,
74:6, 75:3, 76:15, 77:23, 78:1, 79:6,
182:5
**WWDD** [1] - 190:19

# X

**x-rays** [1] - 100:20

# Y

**year** [7] - 20:13, 44:21, 64:3, 84:11,
124:6, 149:1, 173:11
**Year's** [1] - 87:20
**years** [19] - 17:25, 18:20, 18:21, 18:24,
18:25, 19:2, 24:8, 60:15, 67:13, 67:20,
68:4, 83:24, 84:18, 100:22, 102:7,
102:8, 153:23, 154:8, 154:9
**yesterday** [4] - 8:7, 8:22, 13:15, 52:3
**you-all** [23] - 8:5, 13:15, 16:24, 29:7,
33:17, 34:22, 62:9, 156:1, 160:3,
160:16, 161:1, 161:19, 174:7, 184:23,
188:17, 190:22, 190:24, 190:25,
191:1, 201:5, 201:9, 201:24, 202:7
**yourself** [9] - 17:20, 28:25, 46:8, 53:2,
130:2, 138:18, 166:22, 170:18, 187:3
**yourselves** [1] - 29:3

# Z

**zero** [1] - 154:1
**zoom** [3] - 62:24, 116:6, 116:7